Richard G. McCracken SBN 2748
Andrew J. Kahn, SBN 3751
Paul L. More, SBN 9628
McCRACKEN STEMERMAN & HOLSBERRY
1630 S. Commerce St.
Las Vegas, NV 89101
Telephone:   (702) 386-5132
Fax:         (415) 597-7201
Email:       rmccracken@dcbsf.com
             ajk@dcbsf.com
             pmore@dcbsf.com

*Attorneys for Plaintiffs*

DAVID ROGER
General Counsel
Las Vegas Police Protective Association
9330 W. Lake Mead Blvd. Ste. 200
Las Vegas, NV 89134
Tel:  (702) 384-8692 ext. 204
Email:  DRoger@LVPPA.com

*Attorneys for Plaintiff LVPPA*

JAY ROBERTS
General Counsel
Las Vegas Metro Police Managers &
    Supervisors Association
801 S. Rancho Drive, Suite A-1
Las Vegas, Nevada 89106
Tel:  702-309-7675
Office: 702-384-2924, x23
Fax: 702-384-3024
Email:  jayr@lvpmsa.org

*Attorneys for Plaintiff PMSA*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| LAS VEGAS POLICE PROTECTIVE ASSOCIATION METRO INC.;  LAS VEGAS METRO POLICE MANAGERS & SUPERVISORS ASSOCIATION,<br><br>          Plaintiffs,<br><br>     vs.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT;<br><br>          Defendant. | CASE NO. 2:15-cv-01928-LDG-CWH<br><br>**MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

1

**TO THE COURT AND DEFENDANT AND NEVADA ATTORNEY GENERAL:**

Plaintiffs hereby move for a preliminary injunction against Metro's enforcement of Section 1 of SB 241 against Plaintiffs. This motion is based on the memorandum below and the declarations filed herewith of Mark Chaparian, John Faulis, Melissa Johanning and Andrew Kahn.

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**I.      INTRODUCTION AND SUMMARY**

The Nevada Legislature in May 2015 through SB 241 enacted a ban on local governments providing paid leave to public employees engaging in the First Amendment-protected activities of advocating on behalf of employee organizations. The Legislature did not ban paid leaves to work <u>against</u> unions, nor ban paid leaves to advocate for various other organizations, nor ban local spending on other types of advocacy, nor ban paid leaves for state employees' representatives.  SB 241 represents impermissible viewpoint discrimination of the sort which has invalidated federal, state and local funding restrictions in *Rosenberger v. Regents, Univ. Va* , 515 U.S. 819 (1995)*, Legal Services Corp. Velasquez*, 531 U.S. 533 (2001) and other cases.  Defendant Metro is the agency responsible for carrying out SB 241 and actively doing so, but the Attorney General is being served with these moving papers as well.  Plaintiff Associations have heretofore been staffed primarily by Metro employees on paid leave.  SB 241 will severely cripple the speech and associational activities of Plaintiff Associations.  This Court should issue a preliminary injunction against enforcement of SB 241.

**II.     STATEMENT OF FACTS**

The American Legislative Exchange Council (ALEC) has advocated for a variety of model bills to reduce the effectiveness of unions, one of which bans public agencies from providing paid leaves for union representatives.  See www.alec.org/model-legislation/prohibition-on-paid-union-activity-release-time-by-public-employees-act/.  With the arrival in the Legislature of new majorities opposed by labor organizations, ALEC's bill was presented through AB 182 and SB 241.  The latter was enacted in May 2015 and provides as follows: "A local government employer may agree to provide leave to any of its employees for time spent by the employee in performing duties or providing services for an employee organization if the full

1  cost of such leave is paid or reimbursed by the employee organization or is offset by the value of
2  concessions made by the employee organization in the negotiation of an agreement with the local
3  government employer pursuant to this chapter." While Section 6 made the bill effective upon
4  enrollment (which occurred June 1, 2015), Section 5 of SB 241 delays its onset where it is
5  contrary to current labor agreements until those expire.
6      All labor organizations at Metro have for decades had provisions in their labor
7  agreements providing paid leave for a certain amount of hours and positions, typically one
8  representative for each 400 employees. Nearly all these associations' non-clerical
9  representational staffing comes from Metro employees on leave.  See para. 1 of Declarations of
10 John Faulis, Mark Chaparian, and Melissa Johanning filed herewith.
11     The labor agreement between Metro and Las Vegas Police Protective Association
12 Civilian Employees Inc., (known as "PPACE") expired June 30, 2015 and Metro refused to
13 continue the prior provisions in effect, citing SB 241.  PPACE has been forced to spend half of
14 its reserves in just the first year alone paying for its four representatives, and now cannot afford
15 to join as a plaintiff here.  PPACE represents approximately 1300 clericals and other
16 noncommissioned personnel at Metro. Johanning Decl. paras. 1-2.
17     Plaintiff Las Vegas Police Protective Association Metro Inc. ("PPA") represents
18 approximately 2835 commissioned officers employed by Metro.  Its 7 top officers are Metro
19 officers who are on paid leave.  Chaparian Decl. para. 1. Plaintiff Las Vegas Police Managers
20 and Supervisors Association (PMSA) represents approximately 430 officers through two
21 representatives who are on paid leave from their Metro jobs.  Faulis Decl. para. 1.  Both of these
22 associations have agreements in place until July 1, 2016. Id.
23     A significant part of the Associations' work is the nonadversarial work of administering
24 health benefits for Metro's employees, a function normally done by employer benefit staff
25 elsewhere (Metro has none).  Johanning, Faulis, Chaparian Decls. para. 3.
26     Absent such paid leave, these representatives would not be able to continue serving as
27 such, as they do not have accrued vacation sufficient to fund the full-time nature of their union
28 advocacy, and would lose irreparable benefits by quitting their Metro jobs. Id.

Some of their work is meeting with Metro managers to review grievances or discuss potential changes to working conditions.  If they were forced to meet after regular hours, both the union representatives and the managers would be working long into the evenings and be exhausted and less effective.  Chaparian, Faulis, Johanning para. 7.  Some of their work is counseling employees who are running into problems at work, helping them obtain professional assistance and improve their performance. Id. para. 8.

To afford reimbursement of its current representatives' pay and benefits, PPACE would have to nearly double its rate of dues. Most associations' bylaws require a vote of the membership to amend the bylaws after advance notice and a substantial campaign.  The members would likely not approve an increase as high as would be required to sustain the current level of advocacy services.  Johanning Decl. para. 3.  Moreover, as Nevada is a "right to work" state, many members would react to a large dues increase by "voting with their feet" and leaving the union, making it less effective as a bargaining agent. Id.

The Plaintiffs' financial situation is slightly less dire than PPACE, but similar problems would result:  SB 241 would still force them to attempt to increase dues' revenues (with a likely loss of members and hence organizational clout) or to cut representational services with similar effects.  Chaparian, Faulis Decls. para. 3.  Having fewer representatives would mean reduced membership and reduced ability to communicate with the workforce and reduced clout as organizations.  Id. para. 4.

Metro employees have received and continue to receive paid leaves to work for the following advocacy organizations: Black Police Officers Association; Latino Peace Officers Association; Nevada Chiefs and Sheriffs Associations; Police Athletic League; DARE; and crisis intervention groups.  Faulis, Chaparian, Johanning Decls. para. 6.  Nothing in SB 241 bans this.  Moreover, every session localities spend several millions of dollars on lobbying in Carson City, which again the Legislature has not banned.  Ex. A to Kahn Decl.

Nevada state employees are entitled to paid leaves to represent state employees on state boards and commissions dealing with employment issues: see NAC 284.589(6) (c); NRS 284.068, 284.030; 285.030.  Again, SB 241 left this practice alone.

4

## III. ARGUMENT

### A. Plaintiff Associations and Their Members Face Irreparable Injuries Warranting Injunctive Relief

The Associations face a Hobson's choice: they can try to reimburse Metro for representatives' pay, but doing so would force them to substantially curtail the other advocacy functions they engage in, such as legal representation of officers. The Associations could lay off their representatives, but that means they will engage in less speech with (and on behalf of) their members. Much of such speech is mandated by state law's duty of fair representation (for such speech consists of negotiating a contract and filing grievances to enforce a contract as to which the association is the exclusive representative). See, e .g., *Nevada Service Employees Union v. Orr*, 121 Nev. 675, 119 P.3d 1259 (2005) (upholding union's liability for damages for breaching DFR for not pursuing grievance).[1] The Associations could try to get dues doubled to maintain their current level of representation, but doing so would require a lengthy difficult process to obtain a vote of the membership, which means rather than devoting time to advocating for their members and directly helping their members, representatives' time (and speech) must be devoted instead to campaigning for a dues increase. Even if a majority were to approve the increase, dissenters could and would just drop membership entirely as permitted by the state's right to work law – meaning their communications with the associations will be curtailed, as will be the associations' clout. Members will no doubt demand higher wage increases from Metro in the next negotiations in order to help soften the blow of higher dues, which in turn will dramatically cripple the bargaining process. Johanning, Faulis, Chaparian Decls.

In other words, any way one slices it, SB 241 cripples the speech and associational activities of Plaintiff Associations. This type of injury is widely-recognized as irreparable in nature and so serious that the likelihood of success need not be as high as would otherwise be

---

[1] Also, officers are entitled under NRS 289.080 to representation in any internal or external investigation or hearing challenging their conduct, and in such proceedings "[a] representative of a peace officer must assist the peace officer during the interview, interrogation or hearing." NRS 289.080(3).

required.  See, e.g., *Sammartano v. First Judicial Dist. Court, in & for Cnty. of Carson City*, 303 F.3d 959, 973-74 (9th Cir. 2002):

> The Supreme Court has made clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the issuance of a preliminary injunction.  *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); see also *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1148(9th Cir.1998) (holding that a civil liberties organization that had demonstrated probable success on the merits of its First Amendment overbreadth claim had thereby also demonstrated irreparable harm).  The district court refused to assume the existence of this injury because it found that Appellants had not "clearly established" that their First Amendment rights had been violated.  However, even if the merits of the constitutional claim were not "clearly established" at this early stage in the litigation, the fact that a case raises serious First Amendment questions compels a finding that there exists "the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [Appellants'] favor." Viacom Int'l, Inc. v. FCC, 828 F.Supp. 741, 744(N.D.Ca.1993).  "Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim."  Id. (citing *San Diego Committee v. Governing Board*, 790 F.2d 1471 (9th Cir.1986)).  Because the test for granting a preliminary injunction is "a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness," when the harm claimed is a serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing of meritoriousness.  See San Diego Committee, 790 F.2d at 1473 n. 1.

See also *ProtectMarriage.com v. Bowen*, 599 F. Supp. 2d 1197, 1225 (E.D. Cal. 2009) (following above language in *Sammartano*).

There are also more concrete irreparable harms here.  Metro employs none of its own personnel to handle health benefit administration. Metro instead uses the Associations' on-leave representatives for many such functions. Chaparian, Faulis, Johanning Decls. Para. 3. Cutting them will adversely impact health benefit administration to the detriment of Metro, the Associations, their members and their dependents.

The harm to Metro and the State from issuing a preliminary injunction are minimal or nonexistent.  If SB 241 is ultimately upheld, Plaintiffs will reimburse Metro for the paid leave continued during the pendency of these proceedings.

## B. Plaintiffs Are Likely To Prevail On The Merits

The First Amendment protects Plaintiffs from having paid leave curtailed on the basis of their views and associational status, namely their support for local labor organizations as opposed to supporting community organizations or expressing anti-union views or representing State employees. This First Amendment protection flows from a series of decision where government restrictions on funding for private organizations' speech have been struck down where based on identity of speaker or viewpoint.  For example, the Supreme Court struck down a law barring religious student groups from public university funding provided to other groups, even though the university showed scarcity of funds, in *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 835 (1995) (granting injunctive relief to Christian organizations refused funding due to public agency's refusal to fund any student organizations with religious orientation). The Court noted:

> The University urges that, from a constitutional standpoint, funding of speech differs from provision of access to facilities because money is scarce and physical facilities are not.  Beyond the fact that in any given case this proposition might not be true as an empirical matter, the underlying premise that the University could discriminate based on viewpoint if demand for space exceeded its availability is wrong as well.  The government cannot justify viewpoint discrimination among private speakers on the economic fact of scarcity.

This decision precludes Defendants from relying on the stated legislative motive here of saving taxpayer dollars.  Moreover, if the Legislature's primary concern was protecting taxpayers against funds being spent for advocacy, the Legislature would also have banned leaves for anti-union advocacy and other causes and for state employees' representatives, and indeed banned localities from spending money on lobbying regardless of whether carried out by public employees.

The *Rosenberger* doctrine is not limited to funding of student groups. It was applied to funding of legal services in *Legal Services Corp. v.  Velasquez*, 531 US 533 (2001):

> Neither the latitude for government speech nor its rationale applies to subsidies for private speech in every instance, however.  As we have pointed out, "[i]t does not follow . . . that viewpoint-based restrictions are proper when the [government] does not

> itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers. " *Rosenberger*, supra, at 834.
>
> Although the LSC program differs from the program at issue in *Rosenberger* in that its purpose is not to "encourage a diversity of views," the salient point is that, like the program in Rosenberger, the LSC program was designed to facilitate private speech, not to promote a governmental message.  Congress funded LSC grantees to provide attorneys to represent the interests of indigent clients. In the specific context of § 504(a)(16) suits for benefits, an LSC-funded attorney speaks on the behalf of the client in a claim against the government for welfare benefits.  The lawyer is not the government's speaker.  The attorney defending the decision to deny benefits will deliver the government's message in the litigation. The LSC lawyer, however, speaks on the behalf of his or her private, indigent client. * * *
>
> It is fundamental that the First Amendment "`was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"  New York Times Co. v. Sullivan, 376 U. S. 254, 269 (1964) (quoting Roth v. United States, 354 U. S. 476, 484 (1957)). * * * Congress was not required to fund an LSC attorney to represent indigent clients; and when it did so, it was not required to fund the whole range of legal representations or relationships. The LSC and the United States, however, in effect ask us to permit Congress to define the scope of the litigation it funds to exclude certain vital theories and ideas.  The attempted restriction is designed to insulate the Government's interpretation of the Constitution from judicial challenge.  The Constitution does not permit the Government to confine litigants and their attorneys in this manner.  We must be vigilant when Congress imposes rules and conditions which in effect insulate its own laws from legitimate judicial challenge.  Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest. *Regan v. Taxation With Representation of Wash.*, 461 U. S. 540, 548 (1983); *Speiser v. Randall*, 357 U. S. 513, 519 (1958). For the reasons we have set forth, the funding condition is invalid.

Similarly here, barring paid leave for union representatives cripples those with a legal duty to represent employees, while allowing anti-union employees to continue receiving paid leave.

The principles in these cases were applied to a context similar to that here in *United Food & Commercial Workers Local 99 v. Brewer*, 817 F. Supp. 2d 1118, 1124 (D. Ariz. 2011), where a legislature banned government agencies from allowing their payroll systems to be used for deducting dues for some unions who spent money on politics unless those unions met certain requirements:

> The statute specifically exempts from its regulatory structure payroll deductions for contributions to charitable organizations; payments to organizations that administer healthcare, retirement, or welfare benefits; payment of taxes; and donations to unions'

political action committees. A.R.S. § 23–361.02(E).  Five types of public safety employees, including police officers, firefighters, corrections officers, probation officers, and surveillance officers, are exempted from the law's definition of "employee." *Id.* § 23–361.02(H).  As a result, the burdens imposed by the law do not fall equally on similarly-situated groups.  The law therefore violates the First Amendment by discriminating against "those wishing to express less favored or more controversial views." *Police Dept. of City of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

      Viewpoint discrimination occurs when the government burdens "speech by particular *speakers*, thereby suppressing a particular view about a subject." *Moss v. U.S. Secret Service,* 572 F.3d 962, 970 (9th Cir.2009) (internal quotations omitted).  Statutes engage in viewpoint discrimination when they place "special prohibitions on those speakers who express views on disfavored subjects." *R.A.V. v. St. Paul,* 505 U.S. 377, 391, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).  "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). On the other hand, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner Broad. Sys. v. F.C.C.,* 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

      A regulation that burdens speech may discriminate by viewpoint through its underinclusiveness—that is, because it fails to burden all similarly situated parties equally. In *particular*, "an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.' " *City of Ladue v. Gilleo,* 512 U.S. 43, 51, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (quoting *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 785, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)).  "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entertainment Merchants Ass'n.,* ––– U.S. ––––, 131 S.Ct. 2729, 2740, 180 L.Ed.2d 708 (2011).

There Judge Snow enjoined agencies from following the new state statute.  The same result is required here.  There can no question as to the absence of the compelling state interest required to ban only local government union leave and not other advocacy spending.  Such leave serves vital public purposes and was not assented to by local agencies on a whim but rather equally benefits the agency: for example, it makes it likelier the union representatives will be rank-and-file employees familiar with current conditions in the workplace rather than "hired guns" from the outside with less familiarity; it allows public sector managers to conduct during regular business hours the frequent meetings with employee representatives required by their

duties to bargain and address grievances, rather than making them work absurdly-long hours. Johanning, Chaparian, Faulis para. 7.  Metro employs none of its own personnel to handle benefit administration (unlike most other employers, which either have an HR department or an outside contractor handle such functions), but instead Metro uses the Associations' on-leave representatives for many such functions.  Johanning para. 3; Chaparian, Faulis para. 2. Association representatives counsel employees with problems to get the help they need. Johanning, Chaparian, Faulis para. 8. These are all important public benefits.[2]

Nor is the speech of Plaintiffs' leaders of doubtful protection under the First Amendment. It is well-settled that government cannot punish public employees for their organizational activities and speech favoring unionization without violating the First Amendment. See, e.g., *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1438 (10th Cir. 1990)("The First Amendment protects the right of a public employee to join and participate in a labor union. [cite]"); *Thomas v. County of Riverside*, 763 F.3d 1167 (9th Cir. 2014); *McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir. 1983).

While Plaintiffs could prove an improper subjective motive on the part of the legislative majority, they do not need to, because the objective characteristics of its enactment is enough: singling out one set of advocates alone to ban from receiving funds. This is made clear by the

---

[2] See also *Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 100-01 (2d Cir. 2007)("The denial of funding in a viewpoint-discriminatory manner is as impermissible as the denial of access to a physical forum in a viewpoint-discriminatory manner. [citing *Rosenberger,* supra] *** A university's viewpoint-discriminatory decision respecting how much funding to allocate to an RSO raises the same concerns as a viewpoint-discriminatory decision respecting whether to fund an RSO at all. The level of funding a group receives may serve as an expression of approval or disapproval of the group's message. And the amount allocated to a group, whether a lot or a little, can skew debate on issues on which the group advocates a position. In this context, a comparatively low level of funding may not be much different than a complete denial of funding. A parallel lies in the realm of campaign contributions: 'A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.' *Buckley v. Valeo,* 424 U.S. 1, 19, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam)").

Supreme Court's recent decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228, 192 L. Ed. 2d 236 (2015):

> A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech. *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 429, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). We have thus made clear that "'[i]llicit legislative intent is not the sine qua non of a violation of the First Amendment,' " and a party opposing the government "need adduce 'no evidence of an improper censorial motive.' " *Simon & Schuster*, supra, at 117, 112 S.Ct. 501. Although "a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral.

Reed also consolidated the Court's doctrine of treating speaker-based regulation of speech as a type of content-based regulation. The Ninth Circuit had characterized the Town's sign ordinance as "turning on 'the content-neutral elements of who is speaking through the sign and whether and when an event is occurring.'" *Reed v. Town of Gilbert*, 707 F.3d 1057, 1069 (9th Cir. 2013). The Supreme Court rejected such reasoning: "because '[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content,' we have insisted that 'laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.'" *Reed*, 135 S.Ct. at 2230 (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340 (2010) and *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994)); *see Citizens United*, 558 U.S. at 340-41 ("Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. . . . The First Amendment protects speech and speakers, and the ideas that flow from each."). Thus the Legislature's targeting of labor organizations alone for stripping of leave rights requires strict scrutiny.

Here, the proffered justifications of saving taxpayer money and not paying for critics of government (see Ex. B to Kahn Decl.) both do not amount to the compelling state interest required by the strict scrutiny test applicable here. See *United Bhd. of Carpenters & Joiners of Am. Local 586 v. N.L.R.B.*, 540 F.3d 957, 965 (9th Cir.2008) ("Because free speech protections

1  were designed to protect critical speech, we cannot find the suppression of critical speech to be a
2  compelling interest."); *Citizens United, supra*, 558 U.S. at 348-56 (reducing the influence of self-
3  interested businesses in politics not a compelling state interest); *Shapiro v. Thompson*, 394 U.S.
4  618, 633 (1968)("The saving of welfare costs cannot justify an otherwise invidious
5  classification."); *Graham v. Richardson*, 403 U.S. 365, 374 (1971)("a concern for fiscal integrity
6  is no more compelling a justification for the questioned classification in these cases that it was in
7  *Shapiro*.").[3]

8  Strict scrutiny not only requires a compelling state interest, but also that the statute be
9  "narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340.  Here, SB 241 is
10  both underinclusive and overbroad in addressing the purported state interest: it is underinclusive
11  in not banning leaves for state employee representation nor leaves for non-labor advocacy nor
12  lobbying expenditures by local governments. It is overbroad in banning any paid leave for
13  employee organization work even when used for nonadversarial purposes such as administering
14  benefit plans and counseling workers on ways to improve job performance.
15  //       //
16
17  //       //
18
19  //       //
20
21  //       //
22

---

[3] See also *Chicago Acorn, SEIU Local No. 880 v. Metro. Pier & Exposition Auth.*, No. 96 C 4997, 1998 WL 164882, at *14 (N.D. Ill. Apr. 2, 1998),  vacated on other grounds, 150 F.3d 695 (7th Cir. 1998)("First Amendment precedent has refused to recognize risks far more serious than economic harm as compelling interests. *See Terminiello v. City of Chicago.* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (holding risk of rioting in response to speech is not compelling interest); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (holding need to maintain courthouse order is not sufficiently compelling to suppress speaker's profane message). As a matter of law, the desire to protect commercial and economic interests does not qualify as a compelling governmental interest sufficient to deny the plaintiffs access to traditional public or designated fora within the Pier.").

## IV. CONCLUSION

Given recent U.S. Supreme Court First Amendment caselaw, Plaintiffs have shown they have a reasonable likelihood of success in their constitutional challenge to SB 241. The balance of irreparable injuries substantially favors granting a preliminary injunction against Metro's use of SB 241.

Dated:  October  9, 2015                    **McCRACKEN STEMERMAN & HOLSBERRY**

By:     _/s/  Andrew J. Kahn_
                Richard G. McCracken
                Andrew J. Kahn
                Paul L. More

                *Attorneys for Plaintiffs*

DAVID ROGER
General Counsel
Las Vegas Police Protective Association
9330 W. Lake Mead Blvd. Ste. 200
Las Vegas, NV 89134
Tel:  (702) 384-8692 ext. 204
Email:  DRoger@LVPPA.com

*Attorneys for Plaintiff LVPPA*

JAY ROBERTS
General Counsel
Las Vegas Metro Police Managers &
   Supervisors Association
801 S. Rancho Drive, Suite A-1
Las Vegas, Nevada 89106
Tel:  702-309-7675
Office: 702-384-2924, x23
Fax: 702-384-3024
Email:  jayr@lvpmsa.org

*Attorneys for Plaintiff PMSA*