| | |
|---|---|
| 1 | Richard G. McCracken SBN 2748 |
| 2 | Andrew J. Kahn, SBN 3751 |
|   | Paul L. More, SBN 9628 |
| 3 | McCRACKEN STEMERMAN & HOLSBERRY |
|   | 1630 S. Commerce St. |
| 4 | Las Vegas, NV 89101 |
|   | Telephone:   (702) 386-5132 |
| 5 | Fax:         (415) 597-7201 |
| 6 | Email:       rmccracken@dcbsf.com |
|   |              ajk@dcbsf.com |
| 7 |              pmore@dcbsf.com |
| 8 | *Attorneys for Plaintiffs* |

| | | |
|---|---|---|
| 9 | DAVID ROGER | JAY ROBERTS |
| 10 | General Counsel | General Counsel |
|    | Las Vegas Police Protective Association | Las Vegas Metro Police Managers & |
| 11 | 9330 W. Lake Mead Blvd. Ste. 200 |    Supervisors Association |
|    | Las Vegas, NV 89134 | 801 S. Rancho Drive, Suite A-1 |
| 12 | Tel: (702) 384-8692 ext. 204 | Las Vegas, Nevada 89106 |
| 13 | Email: DRoger@LVPPA.com | Tel: 702-309-7675 |
|    |                          | Office: 702-384-2924, x23 |
| 14 | *Attorneys for Plaintiff LVPPA* | Fax: 702-384-3024 |
| 15 |                           | Email: jayr@lvpmsa.org |
| 16 |                           | *Attorneys for Plaintiff PMSA* |

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS POLICE PROTECTIVE ASSOCIATION METRO INC.; LAS VEGAS METRO POLICE MANAGERS & SUPERVISORS ASSOCIATION, | |
| Plaintiffs, | **CASE NO. 2:15-cv-01928-LDG-CWH** |
| vs. | **DECLARATION OF ANDREW KAHN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT; | |
| Defendant. | |

1

I, Andrew Kahn, declare:

1. I am an attorney for Plaintiffs and member of the bar of this Court and competent to testify to the following: attached hereto as Exhibit A is a true and correct copy of relevant portions of a report by the State's Department of Taxation (found at its website, http://tax.nv.gov/uploadedFiles/taxnvgov/Content/Home/Features/2015_Session_Lobbying_Expense_Summary.pdf) of sums spent by local agencies on lobbying the State (based on reports from those agencies pursuant to their reporting requirement). I have experience with reviewing data published by this department and in my experience this department produces reliable information.

2. Attached hereto as Exhibit B is a true and correct copy of a Las Vegas Review Journal article quoting proponents in Carson City of legislation to ban paid leave for local labor organizations. I am informed and believe they were quoted correctly, as I searched for corrections and found none.

I declare under penalty of perjury of the laws of the United States and Nevada that the foregoing is true and correct. Executed this 9th day of October 2015.

/s/ Andrew J. Kahn
ANDREW J. KAHN

2

# Exhibit A



State of Nevada
# Department of Taxation

NV  Agencies  Jobs  About Nevada

**ADA** Americans with Disabilities Act

| ABOUT | TAX FORMS | ONLINE SERVICES | PUBLICATIONS | LOCAL GOVERNMENT | BOARDS/MEETINGS | CONTACT US | FAQ'S |



**Twitter**

Tweets    Follow

**NV Dept of Taxation** 5h
@NVTaxDept
Information about Commerce Tax here:
ow.ly/SWFCz

**NV Dept of Taxation** 7 Oct
@NVTaxDept
Nevada Educational Choice Scholarship Program Update, please follow this link:

Tweet to @NVTaxDept



## WELCOME TO THE NEVADA DEPARTMENT OF TAXATION

**Hot Topics**

- Commerce Tax Business Update
- Nevada Educational Choice Scholarship Program Update
- Commerce Tax (SB 483)
- Passenger Transportation Tax (SB 376)
- Live Entertainment Tax Proposed Regulation R062-15
- Summary of 2015 Major Legislation
- 2015-2016 REDBOOK- Property Tax Rates for Nevada Local Governments
- → 2015 Legislative Session Lobbying Expense Summary
- Updates to Short-Term Lessor Fees
- Tax Expenditure Report 2013-2014
- Streamlined Sales and Use Tax

    

Tax Forms | Online Services | Publications | Local Government Services | Calendar

Re-Sale Permit SEARCH — TAX EVASION ROBS YOU! They Steal. You Pay.

**ABOUT**

**TAX FORMS**
General Purpose Forms
Sales & Use Tax Forms
Modified Business Tax Forms

**ONLINE SERVICES**
SilverFlume - Register
Nevada Tax - File & Pay
Permit Search - Report Tax Evasion

**PUBLICATIONS**

**LOCAL GOVERNMENT**
Local Government Finance

Live Entertainment Tax Forms
Excise Tax Forms

Links to County Assessors and Treasurers
Appeals
Property Tax Reporting Forms
Net Proceeds Forms and Instructions Main

**BOARDS/MEETINGS**
Public Meetings
Nevada Tax Commission
State Board of Equalization
Mining Oversight and Accountability Commission
Committee on Local Government Finance
Appraiser Certification Board

**CONTACT US**

**FAQ'S**

The Official State of Nevada Website | Copyright ©2014 State of Nevada - All Rights Reserved   Privacy Policy

7/7/2015 1:48 PM

## SUMMARY OF LOBBYING EXPENDITURES - 2015 SESSION

Pursuant to NRS 354.59803

| COUNTY | COUNTY | CITIES | DISTRICTS | HOSPITALS | SCHOOLS | TOTAL | % of TOTAL |
|---|---|---|---|---|---|---|---|
| Carson City | 43,841.00 | - | - | - | - | $ 43,841.00 | 1.33% |
| Churchill | 24,000.00 | 47,500.00 | - | - | - | $ 71,500.00 | 2.17% |
| Clark | 427,026.92 | 930,170.21 (5) | 600,509.53 (7) | 11,013.66 | 275,051.00 | $ 2,243,771.32 | 67.95% |
| Douglas | 43,000.00 | - | - | - | - | $ 43,000.00 | 1.30% |
| Elko | - | 25,000.00 | - | - | - | $ 25,000.00 | 0.76% |
| Esmeralda | - | - | - | - | - | $ - | 0.00% |
| Eureka | 25,000.00 | - | - | - | - | $ 25,000.00 | 0.76% |
| Humboldt | - | - | - | - | - | $ - | 0.00% |
| Lander | - | - | - | - | - | $ - | 0.00% |
| Lincoln | - | - | - | - | - | $ - | 0.00% |
| Lyon | 9,475.00 | 10,787.50 | - | - | - | $ 20,262.50 | 0.61% |
| Mineral | - | - | - | - | - | $ - | 0.00% |
| Nye | - | - | - | - | - | $ - | 0.00% |
| Pershing | - | - | - | - | - | $ - | 0.00% |
| Storey | - | - | - | - | 31,054.70 | $ 31,054.70 | 0.94% |
| Washoe | 341,534.00 | 200,502.10 (2) | 187,853.67 (5) | - | 68,944.00 | $ 798,833.77 | 24.19% |
| White Pine | - | - | - | - | - | $ - | 0.00% |
| **Totals** | $ 913,876.92 | $ 1,213,959.81 | $ 788,363.20 | 11,013.66 | $ 375,049.70 | $3,302,263.29 | 100.00% |

### Historical Summary

| Session | COUNTY | CITIES | DISTRICTS | HOSPITALS | SCHOOLS | TOTALS | % to Prior Session |
|---|---|---|---|---|---|---|---|
| 2015 Session | $ 913,877 | $ 1,213,960 | $ 788,363 | $ 11,014 | $ 375,050 | $ 3,302,263 | 107% |
| 2013 Session | $ 856,565 | $ 1,158,966 | $ 791,779 | $ 6,236 | $ 283,198 | $ 3,096,744 | 102% |
| 2011 Session | $ 832,831 | $ 1,171,009 | $ 712,958 | $ - | $ 322,588 | $ 3,039,387 | 84% |
| 2009 Session | $ 882,286 | $ 1,526,058 | $ 665,259 | $ 35,353 | $ 509,338 | $ 3,618,293 | 91% |
| 2007 Session | $ 905,818 | $ 1,441,934 | $ 805,784 | $ - | $ 842,528 | $ 3,996,064 | 155% |
| 2005 Session | $ 646,162 | $ 906,371 | $ 575,602 | $ - | $ 457,308 | $ 2,585,443 | 104% |

# Exhibit B

# LAS VEGAS REVIEW-JOURNAL

Advertise  RJ Rewar



Tuesday, September 15, 2015   74°F Partly cloudy Las Vegas NV

| Home | News | Politics | Business | A&E | Sports | Life | Trending | Opinion | Travel | Obits | Auto |

Local | National | Government | Slash Politics | Legislature

Home » Politics » Government

37   20   Share 2   1   Share 0   136

Fatal shooting by BLM...                                    Obama to veto bill allowing...

Posted February 28, 2015 - 3:07pm | Updated February 28, 2015 - 5:49pm

# Lawmakers move to stop agencies from paying for union work

maintain adequate records as required by Section 1059. The burden thus shifted to Grimaldi to prove what work was covered and what was not covered.

3   Grimaldi Concrete claims that the invoices it produced for 20% of its work, and the uncontradicted testimony of Rocco Grimaldi that covered work took roughly the same amount of time to complete as work not covered by the agreement, were sufficient to show that 11% of its total work was covered under the collective bargaining agreement. The collective bargaining agreement, however, requires a calculation of benefits owed based on the precise number of hours worked by properly classified laborers on covered projects.[1] The information produced by Grimaldi Concrete clearly does not set forth the hours worked on covered projects, nor does it specify which laborers were working on those projects. In addition, it would be an exercise in pure speculation to attempt to ascertain from this information, and the limited inferences that can be drawn from it, the portion of the remaining 80% of work for which no records at all are available that constituted covered work. Grimaldi Concrete's information is thus insufficient to meet its burden of proof on the amount of covered work performed. *See Operating Engineers*, 911 F.2d at 1354 (employer does not meet burden of proof if it does not come forward with evidence of the number of hours spent performing covered work) (citing *Brick Masons*, 839 F.2d at 1338-39), *see also Combs*, 764 F.2d at 825 (same).

4   Nevertheless, Grimaldi Concrete argues, in light of the Funds' failure to request regular reports and contributions, and the elapsed time between the period covered by the agreement and the filing of this lawsuit, it should not be required to have kept detailed records. However, Section 1059 is couched in mandatory language, and does not require that plan administrators submit regular requests for reports and contributions. 29 U.S.C. §§ 1059, 1059(a)(1) (employer "shall ... maintain records"). Given the stipulation between the parties that Grimaldi Concrete is bound by the 1986-1989 agreement, the company's other contentions regarding Rocco Grimaldi's inability to understand written English, his resultant belief that he was not bound by the agreement after 1983, and the import of the 1988 default judgment are not relevant to the issues before us.

We have not addressed the issue of the appropriate penalty for an employer who fails to maintain records. In *Brick Masons*, on facts almost indistinguishable from those here, the Ninth Circuit held that

> because [the employer] violated its statutory duty under ERISA to keep accurate records and failed otherwise to come forward *697 with any evidence of the extent of covered work performed by the [employees], the Trust Funds are entitled as a matter of law to recover contributions for *all* hours worked by these [employees] during the quarter in which they were shown to have performed some covered work for [the employer].

*Brick Masons*, 839 F.2d at 1339 (emphasis added). In so holding, the Ninth Circuit relied on *Combs*, as well as the Supreme Court's statement in *Anderson* that an "employer cannot be heard to complain that the damages lack the precision of measurement that would be possible had he kept records in accordance" with the Act. *Anderson*, 328 U.S. at 688, 66 S.Ct. at 1192-93; *Brick Masons*, 839 F.2d at 1338-39. In *Anderson*, the Supreme Court also emphasized that the *fact* of damage was certain, as in the present case, and that an employer should not be allowed to benefit from the violation of a statutory duty. *Anderson*, 328 U.S. at 688, 66 S.Ct. at 1192-93. As the Ninth Circuit observed, "[a]n employer cannot escape liability for his failure to pay his employees the wages and benefits due to them under the law by hiding behind his failure to keep records as statutorily required." *Brick Masons*, 839 F.2d at 1338.

5   As previously noted, the benefits calculations under the collective bargaining agreement depend on knowledge of the specific number of hours worked by each employee on projects covered under the collective bargaining agreement. Given these calculation constraints, and Grimaldi Concrete's violation of its statutory duty, it is impossible to determine with any precision the amount of contributions due to the Funds. We agree with the Ninth Circuit that, under these circumstances, an employer is liable for contributions on all hours worked during a period in which it has been demonstrated that some covered work was performed. Accordingly, the district court properly held Grimaldi Concrete liable to the Funds for $64,811.10, the full amount set forth in the stipulation.

6   Grimaldi Concrete's final argument, that this disposition is contrary to the expressed intent of one of the stipulations between the parties, is also without merit. The stipulation in question provides that "contributions need not be made to plaintiffs under the collective



Government pay for union-related work would end in Nevada under a bill sponsored by Assemblyman Randy Kirner, R-Reno. Photo taken Monday, Feb. 16, 2015. (Cathleen Allison/Las Vegas Review-Journal)



2015

**RELATED STORIES**

2015 could be year of the gun at Nevada Legislature

Tony Dane doesn't have many fans

Can Democrats compromise to get schools built?

Nevada construction defect reform bill sent to governor

By BEN BOTKIN
LAS VEGAS REVIEW-JOURNAL

Year in and year out, Clark County shells out six-figure pay to a small group of employees who step away from their regular work to handle matters for their unions.

The system of paid union leave offers flexibility: County employees can attend legislative sessions, participate in staff grievance hearings and catch up on labor issues at union conferences — all on the taxpayer's dime.

Clark County staffers were paid $825,376.14 for doing union-related work from 2011 through 2013, a Las Vegas Review-Journal analysis of salary data shows.

It's all perfectly legal, plainly spelled out in labor contracts just like everything else negotiated between a union and management.

But the practice raises eyebrows among critics, who say that tax dollars shouldn't fund union-related activities that sometimes run counter to the same government agencies that pay their salaries.

Government pay for union-related work would end in Nevada under a bill sponsored by Assemblyman Randy Kirner, R-Reno. Assembly Bill 182 would prohibit the practice as part of the bill's wide-ranging shake-up of collective bargaining. Other aspects of the legislation would exclude supervisors from collective bargaining, prevent local governments from deducting union dues from employee paychecks and require final contract offers from both sides to be made public.

judgment, which, in the opinion of the district court, should have put Grimaldi on notice for the remainder of the 1986-89 agreement period with respect to the statutory record-keeping requirements. Finally, the court stated that "the penalty must fall upon the person who had the legal responsibility to maintain those records," and concluded that, because it could not calculate the amount owed under the agreement on the basis of the incomplete invoice receipts, Grimaldi Concrete was liable for contributions for all hours worked, in the amount of $64,811.80, plus attorney's fees and costs. This appeal by Grimaldi Concrete timely followed.

II

Grimaldi Concrete asserts that the district court erred in ruling that the company failed to maintain adequate records as required by 29 U.S.C. § 1059. Section 1059 provides, in pertinent part, as follows:

(a)(1) Except as provided by paragraph (2) every employer shall, in accordance with regulations prescribed by the Secretary, maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees. The plan administrator shall make a report, in such manner and at such time as may be provided in regulations prescribed by the Secretary, to each employee who is a participant under the plan ...

. . . . .

(2) If more than one employer adopts a plan, each such employer shall, in accordance with regulations prescribed by the Secretary, furnish to the plan administrator the information necessary for the administrator to maintain the records and make the reports required by paragraph (1). Such administrator shall maintain the records and, to the extent provided under regulations prescribed by the Secretary, make the reports, required by paragraph (1).

(b) If any person who is required, under subsection (a) of this section, to furnish information or maintain records for any plan year fails to comply with such requirement, he shall pay to the Secretary a civil penalty of $10 for each employee with respect to whom such failure occurs, unless it is shown that such failure is due to reasonable cause.

29 U.S.C. § 1059. Grimaldi Concrete concedes that it is an employer within the meaning of this section.

According to both the plain language of the statute and the few court decisions that have interpreted it, Section 1059 imposes a clear duty on an employer to maintain adequate records. In our sole published opinion dealing with this section, we stated that Section 1059 imposes "a duty of responsibility and record keeping on employers with respect to all employees who are participants in an employee benefit plan." *Central States Pension Fund v. Central Transport, Inc.*, 698 F.2d 802, 805 (6th Cir. 1983), *rev'd on other grounds*, 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985). This was reiterated in the reversal on the merits, in which the Supreme Court stated that the section "requir[es] employers to maintain records on employees and to furnish to benefit plans the information needed for the plans' fulfillment of their reporting duties," *Central States Pension Fund v. Central Transport, Inc.*, 472 U.S. at 573, 105 S.Ct. at 2841-42. The Ninth and Eleventh Circuits have made similar declarations. *Operating Engineers Pension Trusts v. B & E Backhoe*, 911 F.2d 1347, 1354 (9th Cir.1990); *Brick Masons Pension Trust v. Industrial Fence and Supply*, 839 F.2d 1333, 1337-38 (9th Cir.1988); *Combs v. King*, 764 F.2d 818, 823 (11th Cir.1985).

1   In *Operating Engineers* and *Brick Masons*, the Ninth Circuit relied on the Eleventh Circuit's disposition in *Combs* in *696 holding that an employer's failure to maintain adequate records shifts the burden to the employer to prove that the work performed was covered or not covered. *Operating Engineers*, 911 F.2d at 1354; *Brick Masons*, 839 F.2d at 1337-39; *Combs*, 764 F.2d at 826 (an employer's failure to maintain records under ERISA shifts the burden "to the employer to come forward with evidence of the *precise* amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the [plaintiff's] evidence" in order to avoid a finding that the employer violated its statutory record-keeping duty) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88, 66 S.Ct. 1187, 1192-93, 90 L.Ed. 1515 (1946) (emphasis added) (applying this approach in a Fair Labor Standards Act context)). We agree with this sensible approach.

2   Here, Grimaldi Concrete provided no records at all with respect to 80% of the work performed under the collective bargaining agreement, and provided incomplete records with respect to the remaining 20%. We believe, accordingly, that Grimaldi Concrete failed to

- New assemblyman's campaign expenses reveal a lot
- Nevada lawmakers urged to OK aviation tax abatements
- Hambrick recall backers announce replacement candidate
- 6 legislative committees to watch in 2015
- Five (other) big issues for the 2015 Nevada Legislature
- 5 people to watch in the 2015 legislative session
- See all of our coverage: 2015 Nevada Legislature.

Kirner said the taxpaying public should be getting a teacher, police officer or other government employee when they're covering the person's salary — not union-related work.

"Government should not be in the business of subsidizing a union," he said.

The bill has yet to have a committee hearing.

BY THE NUMBERS

A Review-Journal analysis of Clark County pay records shows how much union leave costs the state's largest government agency: The annual cost ranged from $224,863.89 in 2011 to $346,200 in 2013, for an annual average of $275,125.

Less than 1 percent of the county's workforce of nearly 12,000 employees received paid union leave, or 115 employees.

Amounts paid vary widely. In 2013, for example, one staffer claimed the smallest amount, $12.93, while Ryan Beaman, president of the International Association of Firefighters Local 1908, was paid the most at $52,219.44. Union presidents typically are paid the most because they clock more time on union-related activities. County employees who spend part of their workday in grievance meetings representing a county worker typically are at the low end of the list.

The average annual pay for union leave in 2013 was $3,010 per employee who received it.

The bulk of the payouts go to employees affiliated with the firefighters union and the Service Employees International Union Local 1107, which are the county's largest labor organizations.

Those figures cover just Clark County government. In 2012, the Nevada Policy Research Institute determined the total annual union leave bill associated with 37 municipal labor contracts in Southern Nevada was at least $4.6 million. Those figures include unions that represent workers in cities, the Metropolitan Police Department and the Clark County School District.

"It's just a complete waste," said Victor Joecks, executive vice president of the right-leaning think tank. "There's no reason that taxpayers should be subsidizing organizations like that."

HOW IT WORKS

The agreement between Clark County and the Service Employees International Union has varied provisions for union leave.

A county worker who becomes president of SEIU's Local 1107 is paid for 40 hours a week at his regular county pay rate even though he works full-time for the union. The union's executive vice president, however, gets just four hours per week of paid leave for union activities.

Union leaders say they like the system just fine as it is.

Martin Bassick, president of Local 1107, said it doesn't make sense for legislators to get involved in an issue that both sides have agreed upon.

"It's in a contract and it's not been in dispute," Bassick said. "It's never gone to arbitration."

Nor does the arrangement benefit only the union, he said.

By having employees serve as stewards, the union has people already at the workplace who can help deal with personnel and provide feedback about safety issues, Bassick said.

"The union has a person right there in the shop and they can address it right then and there," Bassick said.

As many as four chief stewards get 32 hours of paid time-off each week for union business. If the SEIU elects a president who isn't a county employee, the county is required to give another 32 hours total of paid leave to be shared by the stewards according to schedules provided to the county's human resources department.

I

Nearly all of the facts of the case are contained in three pre-trial stipulations between the parties, and the remaining facts not in dispute. The Michigan Laborers' Health Care Fund, Vacation Fund, and Training Fund, as well as the State of Michigan District Council Pension Fund ("Funds") *694 are multi-employer trust funds established to provide medical, hospital, pension, vacation, and other benefits to employees of the multi-employer group under Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), and the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. The Funds receive fringe benefit contributions from participating employers pursuant to collective bargaining agreements between the employers and local chapters of the Laborers' International Union.

On October 11, 1983, the president of Grimaldi Concrete signed an independent contractor's collective bargaining agreement with the Laborers' International Union of North America, Local 1191. This agreement bound Grimaldi Concrete to the terms and conditions of a second collective bargaining agreement, covering the period from 1983 to 1986, between the Michigan Road Builders' Association and the State of Michigan Laborers' District Council of the Laborers' International Union of North America. The agreement signed by Rocco Grimaldi contained an automatic renewal provision, which bound Grimaldi Concrete to the terms of a subsequent 1986-1989 collective bargaining agreement between the Union and the Road Builders' Association unless Grimaldi gave written notice to the Union at least sixty days prior to the termination date of the 1983-1986 agreement. Grimaldi Concrete failed to notify the Union, and the company subsequently changed its name to "Rocco's Concrete Company" in an unsuccessful attempt to avoid the consequences of the renewal provision, of which it allegedly had been previously unaware. The parties now agree that the 1986-1989 collective bargaining agreement covers the current dispute.

Under the 1986-1989 agreement, Grimaldi Concrete was required to make payments to each of the Funds for employees performing "covered" concrete-pouring work. The parties have stipulated that driveway and sidewalk work was covered by the agreement, and have also stipulated that contributions were not required for other concrete-pouring work. Grimaldi Concrete admits that it employed eleven laborers during the period covered by the 1986-1989 agreement, and that these laborers performed some work on driveways and sidewalks.

In 1988, the Funds obtained a $23,308.81 default judgment against Grimaldi Concrete for unpaid amounts involving similar covered work for the 1983-1986 period. With respect to the subsequent, 1986-1989 agreement, it is undisputed that Grimaldi Concrete failed to submit monthly fringe benefit reports to the Funds, and made no contributions to the Funds. As Grimaldi points out, however, from mid-1984 to September 20, 1992, the date the present action was filed, the Funds made no requests for reports or contributions other than in the 1988 action.

After the 1986-1989 agreement expired, the Funds audited Grimaldi Concrete's payroll records. The audit established that Grimaldi's eleven laborers worked a total of approximately 14,574 hours during this period. The parties have stipulated that if all of this time were spent performing work covered by the agreement, the deficit in contributions, including interest, would be $64,811.80. Grimaldi Concrete produced invoice receipts for 19.4 percent of the total work performed during this period, measured as a percentage of $2,350,181.40 in gross receipts. The receipts show a total of 346,626.32 square feet of concrete work, of which 39,034.32 feet, or 11.3 percent, was work covered under the agreement. Grimaldi Concrete has no records for the remaining 80.6 percent of total work performed in 1986-1989, nor does it have additional records for the 19.4 percent of work described showing which laborers performed covered work, or how many hours were spent performing covered work. Because of the lack of records, the Fund auditors were unable to determine the amount of work for which contributions were due. They concluded that Grimaldi Concrete owed contributions for all work performed during the agreement period. Grimaldi Concrete disputed this conclusion, and the Funds filed suit to recover the unpaid contributions provided for in the agreement.

The district court found that Grimaldi Concrete clearly violated ERISA by failing to maintain adequate records as required by *695 29 U.S.C. § 1059(a)(1), which provides that "[e]very employer shall ... maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." The court noted that the invoices supplied by Grimaldi did not specify the hours spent performing covered work, and that they were therefore inadequate to support a calculation of benefits owed under the collective bargaining agreement. The court also referred to the 1988 default

The SEIU's contract with Clark County also provides as much as 2,080 hours of paid leave each year for employees engaged in activities such as investigating grievances and attending legislative sessions, conferences and conventions.

Bassick said Kirner's bill is "just another attack on unions that are protecting the middle class. This is politics as usual."

Union leave provisions seldom are an issue in contract negotiations. For Clark County and the SEIU, for example, the key bargaining points are big-ticket items such as longevity pay and cost-of-living increases, which put millions of taxpayer dollars on the line.

But Kirner said the issue shouldn't be part of bargaining at all.

"At the end of the day, they're doing union business," Kirner said, noting that taxpayer dollars are involved.

The county's agreement with the firefighters union allows the union president to pick six officers and give them paid leave for activities that include educational conferences, seminars and training courses. They're required to give eight days' notice or more before taking the time away from their regular duties.

Firefighters can't claim overtime pay when participating in union functions, under terms of the contract.

Payroll records show the firefighters union president also works regular shifts in addition to receiving union leave pay.

Beaman was unavailable for an interview about the issue, but said in an email that the union has a "very productive working relationship with the county."

County Commission Chairman Steve Sisolak said he's brought up the issue in the past, and any changes would have to come through the bargaining process, which requires give-and-take from both sides.

SCRUTINY BEYOND NEVADA

While now on the Legislature's agenda, paid union leave has attracted more attention elsewhere.

In Arizona, the conservative think tank Goldwater Institute sued Phoenix and its police union to end the practice. That case hinged on a legal argument that the practice is tantamount to illegal gifts, forbidden by that state's constitution. The Goldwater Institute won the case when the court determined union leave is a "pure gift" because the Phoenix Police Department receives nothing of value in return.

If an appellate court upholds that determination, the practice would end statewide in Arizona, institute attorney Jon Riches said.

Utah lawmakers in 2011 passed legislation that prohibits paid union leave for public school teachers, according to the National Conference of State Legislatures.

Contact Ben Botkin at bbotkin@reviewjournal.com or 702-387-2904. Follow @BenBotkin1 on Twitter.

Fatal shooting by BLM...                                    Obama to veto bill allowing...

## From the Web

Sponsored Links by Taboola





bargaining agreement for [uncovered] work." In order for this provision to have its intended effect, of course, there must be sufficient evidence to show how much work is covered, and how much is not covered by the agreement. Grimaldi Concrete's failure to maintain adequate records, and its failure to provide sufficient evidence of the hours worked by its employees on covered projects, ensured that an accurate calculation of owed benefits could not be made. As we have already observed, under the Supreme Court's decision in *Anderson*, an employer should not be allowed to benefit from the violation of its statutory record-keeping duty. Thus, the general intent of the stipulation regarding contributions and non-covered work notwithstanding, Grimaldi Concrete is liable for fringe benefit contributions for all hours worked under the collective bargaining agreement, in addition to the civil penalty provided for in 29 U.S.C. § 1059(b).

III

For the foregoing reasons, the judgment of the district court is affirmed.

**All Citations**

30 F.3d 692, 1994 Fed.App. 0264P, Pens. Plan Guide (CCH) P 23898O

**Footnotes**

1   For example, Article V of the agreement sets forth classifications regarding worker eligibility for handling certain equipment and projects, and Article VI states as follows:

   **HEALTH CARE FUND**

   2. (a) The Contractors agree to pay into the Michigan Laborers' Health Care Fund one dollar and fifteen cents ($1.15) per hour paid each employee doing the work covered by this Agreement.

   Other provisions in Article VI similarly provide for payment into the remainder of the Funds.

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext. © 2015 Thomson Reuters | Privacy Statement | Accessibility | Supplier Terms | Contact Us | 1-800-REF-ATTY (1-800-733-2889) | Improve WestlawNext

THOMSON REUTERS