Richard G. McCracken SBN 2748
Andrew J. Kahn, SBN 3751
Paul L. More, SBN 9628
McCRACKEN STEMERMAN & HOLSBERRY
1630 S. Commerce St.
Las Vegas, NV 89101
Telephone:   (702) 386-5132
Fax:         (415) 597-7201
Email:       rmccracken@dcbsf.com
             ajk@dcbsf.com
             pmore@dcbsf.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS POLICE PROTECTIVE ASSOCIATION METRO INC.; LAS VEGAS POLICE PROTECTIVE ASSOCIATION CIVILIAN EMPLOYEES, INC.; LAS VEGAS METRO POLICE MANAGERS & SUPERVISORS ASSOCIATION, <br><br> Plaintiffs, <br><br> vs. <br><br> LAS VEGAS METROPOLITAN POLICE DEPARTMENT; <br><br> Defendant. | CASE NO. <br><br> **DECLARATION OF JOHN FAULIS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, JOHN FAULIS, declare:

1. I am the Chairman of Plaintiff Las Vegas Police Managers & Supervisors Association Metro ("PMSA") and a Metro officer on full-time paid leave to work for the PMSA pursuant to our Association's collective bargaining agreement with Metro. The PMSA represents a bargaining unit of approximately 430 officers, of which approximately 405 are PMSA members. All the PMSA's field representation is provided by myself, another full release officer, and other Metro officers on part-time leave. A true and correct copy

1

of the applicable CBA leave provision is attached hereto as Exhibit A. Similar provisions have been in prior agreements for many years. Our agreement is set to expire July 1, 2016. Metro has made clear it will not continue those provisions in effect unless our Association grants concessions equal to the value of such funding or directly reimburses Metro, even though we believe we gave consideration for those provisions in prior agreements.

2. A significant part of our PMSA activities is to help direct the administration of human resources and health benefits for Metro officers and their families, as Metro does not have a single person performing benefit functions, unlike what most other employers do. Two of us on-leave PMSA representatives use some of our leave time to sit on the board of trustees governing the health plan; most of that work is nonadversarial in nature.

3. If I and my fellow PMSA representatives are deprived of this union leave, we do not have sufficient vacation time to cover more than a small percentage of the work we have been doing, and accordingly either the PMSA will have to begin paying us directly or we will have to curtail our representational activities. Neither I nor my fellow representatives would want to go onto the PMSA payroll because we would be taken out of the health benefit and PERS plans (which would cost us significantly but not in a way that could be readily calculated). PMSA cannot afford except on a very-short-term basis to pay for all of us representatives without drastically curtailing our other representational activities such as lobbying and provision of legal counsel to members. To reimburse Metro or pay for us to be on the PMSA payroll, our association would have to increase dues receipts substantially, but there would be significant opposition to a dues increase and such an increase would cause some members to drop out. Once members drop out, we will be less effective as an organization because we will speak for a smaller percentage of the department's officers, and not be in much communication with the non-union officers (who will not be on our mailing lists and will not have the right to attend meetings or vote). If dues increase, members would demand the PMSA seek

higher wages at the bargaining table to cover this increase, which will increase the difficulty and cost of negotiations for Metro and PMSA, and consume more time and resources for both the PMSA and management.

4. We on-leave representatives spend much of our time communicating with legislators and managers about Metro employees' needs and problems, and we also communicate with the employees about proposed legislation and proposed or past management decisions, including bargaining issues and grievances. Some of our work arises due to the provisions in NRS 289.080 that a peace officer under investigation for misconduct is entitled to have two representatives present during his or her interrogation or hearing. If SB 241 is implemented by Metro we will likely not be able to fully staff such interrogations and hearings.

5. Some of what we do with our paid leave is to encourage Metro employees to join the PMSA, and we will no longer be able to do that to the same extent if we have our leave hours cut, and hence the PMSA is likely to lose dues revenue from that reduction in organizing.

6. Metro has provided paid leaves within the past several years for employees to work for and with the following groups that engage in advocacy work: Nevada Chiefs and Sheriffs Associations; Police Athletic League; Black Police Officers Association, Latino Peace Officers Association; DARE (now disbanded); and crisis intervention groups. Metro also has sent managers on paid status to lobby in Carson City and before the County and various cities. We are aware of no legislative ban on such activities, but only on our paid leave.

7. Metro and the public all benefit from us having paid leave: (a) Metro might well have to pay more if it were to hire other individuals or entities to handle the health benefit functions that we perform; (b) we are more familiar with Metro's current conditions than someone hired from the outside to represent these employees would be, and we have access to areas which a civilian is ordinarily barred from such as jails and crime scenes where we do much of our work investigating use-of-force incidents; having

3

1  outside representatives take over for us would require Metro go through the process of
2  determining whether to grant them security clearances; (c) being on paid leave allows us
3  to conduct grievance meetings, investigative meetings, committee meetings and meet-
4  and-confer sessions during our managers' regular workdays rather than expecting them to
5  meet after hours or on their days off; both we and our management counterparts would
6  end up working excessive hours and becoming exhausted (and hence perhaps dangerous
7  to ourselves and others) if every meeting had to occur outside representatives' regular
8  work hours; (d) our being available immediately on the job allows meetings to occur
9  while or immediately after a problem occurs on the job (and at a time and place where we
10 representatives can directly observe conditions), rather than having to occur long after the
11 fact and away from the worksite because the representative was instead required at the
12 time of events to be on duty elsewhere at the agency. This makes for sounder
13 decisionmaking on the part of both management and our Association.

14  8.  We at the PMSA reduce Metro's problems in recruitment and retention of
15 public employees and morale problems by gathering information from current and
16 prospective employees and the community and providing it to government officials, and
17 by communicating information to Metro employees. Many times we have counseled
18 employees with performance issues to obtain outside help with their personal problems,
19 problems they never would have admitted to management representatives.

20  9.  I have read the Complaint in this action and it is true and correct of my
21 own personal knowledge.

22 I declare under penalty of perjury of the laws of the United States and Nevada that the foregoing
23 is true and correct. Executed this 8TH day of October 2015.



JOHN FAULIS

# Exhibit A

PMSA

# Police Managers' & Supervisors' Association

# &

# Las Vegas Metropolitan Police Department

## Collective Bargaining Agreement

July 1, 2014 – June 30, 2016

The Department will not be required to honor any bi-weekly deduction authorizations that are delivered to the Payroll Section after the beginning of the pay period during which the deductions should start.

*4.3 Errors.* The PMSA agrees to refund to the Department any monies paid to it in error on account of the payroll deduction provisions herein upon presentation of proper evidence thereof.

## ARTICLE 5 - ASSOCIATION RIGHTS

*5.1 Leave Hours.* The Department agrees to provide 400 hours each fiscal year, accumulative for the duration of this contract, for the use of PMSA members to conduct Association business associated with the administration of the collective bargaining agreement which is inclusive of representation of bargaining unit employees and including day to day operations, i.e., conventions, seminars, training, and lobbying during the legislative session. Once the maximum yearly hours are exceeded, annual leave will be used.

*5.2 Limits on Use.* The PMSA agrees not to exceed six (6) individuals request for PMSA leave at one time and under normal circumstances, no two of the six individuals can be from the same unit or section of the Department unless authorized by the Bureau Commander.

*5.3 Association Authorization.* The Chairman, or his designee, will determine the use of PMSA leave.

*5.4 Application for Leave.* Members who have been authorized to be relieved from duty for the purposes above will submit LVMPD 2 (Application for Leave) through the chain of command to Payroll. The application for leave will indicate the hours absent are for PMSA business.

*5.5 Association Positions.* The Association will also be entitled to adopt two (2) full-time positions with an additional 400 hours for the above describe use. One of the full-time positions will be from the sergeant rank. This limitation to the sergeant classification will be fixed and an assigned sergeant will not have the ability to promote in place. In the event an assigned sergeant promotes to lieutenant, the employee will be removed from the Association assignment upon date of promotion. In the event a full-time person is appointed to serve, he/she shall not suffer any loss of pay and will be entitled to return immediately to the assignment they left if the assignment still exists.

*Annotation: It is understood if a Captain serves as the Chairperson of the Association, the person may not fill a full-time association position as allowed above*

*5.6 Investigative Procedures* – Labor Relations and the Association will conduct mandatory training regarding the investigative procedures set out below. This training will be for all commissioned supervisors and OIA investigators upon implementation. Thereafter, every new supervisor and OIA investigator will receive this training as well.

A. The parties recognize the rights of all police officers under NRS 289 (Addendum A). The Association will receive a copy of all notices and summaries of any internal investigation of an employee at the time the notice and summary is sent to the employee via e-mail.

B. Employees called for a witness interview in an investigation will have the same rights as subject employees and will be entitled to Association representation during any interview.

C. The parties agree that on any investigation conducted pursuant to NRS 289, a summary of facts will be provided to the subject employee who is to be interviewed. For purposes of this section, "summary" means a description of the allegation, with the locations, time and date. If the location, time or date are unknown, the notice will so state. If there are multiple allegations, then the summary of facts must address all of the allegations and include a description of the misconduct or performance problem.