Richard G. McCracken SBN 2748
Andrew J. Kahn, SBN 3751
Paul L. More, SBN 9628
McCRACKEN STEMERMAN & HOLSBERRY
1630 S. Commerce St.
Las Vegas, NV 89101
Telephone:   (702) 386-5132
Fax:             (415) 597-7201
Email:          rmccracken@dcbsf.com
                     ajk@dcbsf.com
                     pmore@dcbsf.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

LAS VEGAS POLICE PROTECTIVE ASSOCIATION METRO INC.; LAS VEGAS METRO POLICE MANAGERS & SUPERVISORS ASSOCIATION,

Plaintiffs,

vs.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT;

Defendant.

CASE NO. 2:15-cv-01928-LDG-CWH

**DECLARATION OF MELISSA JOHANNING IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

I, Melissa Johanning, declare:

1. I am the President and top officer of Plaintiff Las Vegas Police Protective Association Civilian Employees ("PPACE") and a Metro employee who was granted paid leave pursuant to our Association's collective bargaining agreement with Metro. A true and correct copy of the last-applicable provision is attached hereto as Exhibit A. Some provision for paid leave for PPACE representatives has been in our agreements with Metro for over 20 years. The last addition to the leave amount we had was in July 1, 2007 (due to an increase in the number of employees in the unit), where we went from three representatives to four. We had to buy that

1

additional representative's leave because Metro offered PPACE a total dollar amount increase for the unit's wages and benefits, and said if we wanted more leave, we had to divert funds from the unit's wages and benefits, and that is what we did.

2. The last agreement with a paid leave provision expired July 1, 2015 and Metro refused to continue the prior provision in effect, citing SB 241, and demanded PPACE going forward reimburse the Department for the full pay and benefits for myself and the 3 other PPACE representatives (including the 4th whom we can readily prove through negotiations minutes that we paid for already). This is costing PPACE over $500,000 per year. We are headed into an arbitration on December 16th about how to handle this problem going forward. We are only able to afford this expense by consuming much of the reserves we built up over many decades. This is unsustainable as our total dues income per year is approximately $480,000. Once our reserves are gone, we will have to cut the number of representatives in half if we cannot get members to pay higher dues (in addition to the four representatives, our expenses include legal expenses to advocate for our members, travel expenses to Carson City to lobby, accountants, office rent, and life insurance for the members costing about $5 per member per pay period).

3. Based on my experience and constant discussions with our members, the members are unlikely to approve a dues increase sufficient to add $500,000 per year in dues: we have about 1050 members out of a bargaining unit of about 1300 employees. If dues are raised significantly, more employees will exercise their right under the state's right-to-work laws to not be members. Accordingly, SB 241 and the Department's actions will force us ultimately to spend less time advocating for our members. Myself and my three fellow association representatives do not have sufficient vacation time to cover more than a small percentage of the work we have been doing, and accordingly I will lobby less often in Carson City and with the elected officials whose agencies fund Metro. Also, we will file fewer grievances and meet less often with the members and Metro. Also, the quality of the health insurance being received by the members through our association will suffer: a significant part of our activities is to administer health benefits, performing functions that at many other employers are handled by their Human

1  Resources Department or by an outside benefit trust: for example, we handle all the paperwork
2  when employees want to add or drop a dependent from health insurance. We solicit employees to
3  come to health fairs via personal and mail solicitations. A true and correct list of these functions
4  is attached hereto as Exhibit B. If we have fewer staff, we will enroll people more slowly which
5  will adversely impact their healthcare.

6      4.    Some of what we do with our paid leave is to encourage Metro employees to join
7  the Association and we will no longer be able to do that to the same extent if returned to the
8  Metro workforce, and hence the Association is likely to lose dues revenue. With fewer members
9  as a result of SB 241 due to higher dues and less organizing, we will be less effective as an
10 organization because we will speak for a smaller percentage of the workforce, and we have much
11 less communication with non-members as they are not on our distribution lists and are not
12 allowed to attend meetings or cast ballots.

13     5.    To the extent we increase dues to compensate for SB 241, we will then face
14 increased pressure from members to bargain a better raise in the next negotiations with Metro to
15 compensate them for the dues increase, which pressure will adversely impact Metro and not just
16 us.

17     6.    Metro has provided paid leaves within the past several years for employees to
18 work for the following groups: Nevada Chiefs and Sheriffs Association; Police Athletic League;
19 Black Police Officers Association; Latino Police Officers Association; DARE; and crisis
20 intervention groups. It also has sent managers on paid status to lobby in Carson City. We are
21 aware of no legislative ban on such activities, but only on our paid leave.

22     7.    Metro and the public benefit from us having paid leave: (a) Metro would likely
23 have to pay more if it were to hire other individuals or entities to handle the health benefit
24 functions that we perform; (b) we are more familiar with Metro's current conditions than
25 someone hired from the outside to represent these employees would be, but few of us want to
26 quit our Metro jobs to work exclusively for PPACE for many reasons, including a major loss of

1 PERS benefits; (c) being on paid leave allows us to conduct grievance meetings and meet-and-confer sessions during our managers' regular workdays rather than expecting them to meet after hours or on their days off: both we and our management counterpart would end up working excessive hours and becoming exhausted if every meeting had to occur outside the union representatives' regular work hours; (d) our being available immediately on the job allows meetings to occur while or immediately after a problem occurs on the job (and at a time and place where we representatives can directly observe the conditions), rather than having to occur long after the fact and away from the worksite because the representative was instead required at the time of the events to be on duty elsewhere at the agency. This makes for sounder decisionmaking on the part of both the Association and management.

8. We at the Association reduce Metro's problems in recruitment and retention of public employees and morale problems by gathering information from current and prospective employees and the community and providing it to government officials, and by communicating information to Metro employees. Many times we have counseled employees with performance issues to obtain outside help with their personal problems, problems they never would have admitted to management representatives. We have saved Metro large amounts of time and money by encouraging employees to waive formal investigations and accept proposed discipline.

9. I have read the complaint in this matter and it is true and correct as to our association and based on my experience working with the other plaintiff associations I believe it to be true as to them as well.

I declare under penalty of perjury of the laws of the United States and Nevada that the foregoing is true and correct. Executed this 1st day of October 2015.

*Melissa Johanning*

MELISSA JOHANNING

4

# Exhibit A

PPACE

# POLICE PROTECTIVE ASSOCIATION, CIVILIAN EMPLOYEES, INC.

&

# Las Vegas Metropolitan Police Department

# COLLECTIVE BARGAINING AGREEMENT

July 1, 2013 through June 30, 2015

case the discipline shall not be more severe than if the employee's violations had been discovered through regular means.

**4.3 Rights Generally.** Further, employees represented by this bargaining unit shall have, in addition to all rights guaranteed them by the United States Constitution, the State of Nevada Constitution, and the laws of those respective governments, the specific rights as listed in each article of the contract as a matter of entitlement under the terms of this agreement. These rights shall not limit the employee's general rights by law or practice in any fashion.

In accordance with NRS 288.270 (1) (a), no Department member shall prevent any employee covered by this agreement from having contact with the Association. This contact may occur during the work hours when approved by the supervisor based on operational needs or during breaks, lunch, or off-duty hours.

**4.4 Notice of Investigatory Interviews.** Whenever an employee covered by the collective bargaining agreement is a party to an internal investigation as a subject or witness and is so notified as per Department Procedure 5/101.26, such notice shall be faxed and e-mailed to the Association office. Notification to the Association shall be completed at or near the time the employee is notified of the required interview.

**4.5 Employee Files.** Employees' files and records, shall be maintained in a confidential manner. Access to employee files shall normally be limited to the employee's direct chain of command and other authorized members of the Department as needed. Typing or maintenance of these files shall not normally be assigned to part-time employees unless those employees are assigned to the Office of Labor Relations and sign a confidentiality agreement.

### ARTICLE 5 - ASSOCIATION RIGHTS

**5.1 President or Designee.** The Association President, Vice President, and full time representatives shall each be allowed 40 hours paid time per calendar week, individually or by job sharing, to accomplish general Association business. Upon completion of the term, the President, Vice President, and full time representatives shall return to the previously held classification, position and work assignment within the Department, or any successor position such members would have been reclassified had they not been serving in this capacity. Seniority will apply as if the member remained in that assignment. Members serving in a full time capacity, shall be assigned to the Office of the Deputy Chief, Professional Standards Division. The Deputy Chief will be informed of all annual, sick, and/or other leaves used by the members serving in a full-time capacity.

**5.2 Association Representatives.** The Association may designate Association representatives.
The Association shall notify the Department, in writing, of the names of the representatives and their respective jurisdictional areas prior to the effective date of any such designation.

**5.3 Time.** The Association will be allowed to maintain one full-time employee representative for every 400 employees of the bargaining unit. This authorized number will be inclusive of the position allowed in 5.1 President or Designee. The number of full time positions will be calculated at the start of each fiscal year and is based on the authorized strength that has been budgeted for that fiscal year. Employees so assigned are granted "Association Pay." In addition, the Association will be credited 800 hours of Association time to be utilized by other employee representatives and to work on management of the Medical Insurance programs available to Association members.

Representatives shall devote time provided by the Department to matters of collective bargaining or representation for Las Vegas Metropolitan Police Department's civilian employees.

Normally, no more than one employee from any bureau will be allowed off for Association leave at any one time. Any additional representatives off at the same time must be approved by the Bureau Commander.

*Annotation: This section was modified in 2007 to mirror language in the PPA agreement regarding the number of paid representatives and associated duties for representatives using Department time.*

*2012 – Added the Association Pay designation to memorialize how the pay is classified in the Payroll system.*

***5.4 Approval of Association Time.*** The representative shall have approval of the Association President or designee and immediate supervisor prior to conducting Association business. Association leave will be granted unless operational demands preclude the representative from leaving the work area. The "reason for leave" will be marked "Association Time" and must be signed by the Association President and the representative's chain-of-command when this time is utilized. This time will not be abused and will not be unreasonably denied by the supervisor(s).

The Payroll Section will submit a monthly report of Association time used via email to the PPACE office and the Office of Labor Relations.

*Annotation: 2012- Cleaned up language to reflect the actual practice for authorization of Association time.*

***5.5 Conduct of Business.*** Representatives of the Association may communicate with individual employees at the work site. The conduct of such business shall not unduly interfere with the individual employee's duties or work operations. Said representatives must check in with the employee's immediate supervisor upon entering the work area to make arrangements to conduct the appropriate business.

***5.6 Negotiations.*** The members of the Association negotiating team shall be granted leave from duty with full pay for all meetings held for the purpose of negotiating and ratifying the terms of the contract when such meetings take place at a time when such members are scheduled to be on duty. Members of each team will not exceed eight (8) unless agreed upon by the Association and Department. If negotiation session falls outside a members regularly scheduled work hours and/or RDO, their shift will be adjusted to accommodate negotiations. Shift adjustment does not apply to negotiation sessions that extend beyond a normal shift. The Association will make every effort to select members for the negotiation team from a cross section of the Department to minimize operational impact.

*Annotation: 2012 – Increased negotiation participants from seven (7) to eight (8).*

***5.7 Bulletin Boards.*** The Department will permit the use of bulletin boards in approved locations for the posting of official Association notices. Such notices will be posted by a designated member of the Association and will relate to Association business and activities.

It is understood that no material will be posted on the bulletin boards at any time which contains:

- Personal attacks upon any member or any other employee;
- Scandalous, scurrilous, or derogatory attacks upon the administration;
- Attacks on any other employee organization, regardless of whether the organization has local membership;
- Attacks on and/or favorable comments regarding a candidate for any public political office.

***5.8 Contract Training.*** Upon completion and ratification of this Agreement, the Department and Association will provide all personnel with training regarding the terms of this Agreement.

# Exhibit B

## **Medical Duties PPACE Performs:**

1. Initial enrollment of new hires onto the PPACE Medical Plan
2. Negotiations on the Annual Renewal of the Insurance Contracts (Medical, Vision, Dental & Life Insurance)
3. Handling of the Annual Open Enrollment of the plan (a 2-4 week period where employees on the plan can come to our office and make changes)
4. Yearly prior to the beginning of Open Enrollment, we have generally 3 days of meetings regarding any changes to the plans. This allows employees to come and ask questions to the carriers and the PPACE office staff.
5. Process changes during the plan year (ie. marriages, birth of babies, name changes, address changes, and any qualifying event changes)
6. Reconciling of the plan (ensuring the correct amount is being deducted from employees with dependent coverage and that the carriers are billing correctly)
7. Receiving bi-weekly contributions from both LVMPD and the employees with dependent coverage. Keeping separate medical insurance accounts for deposits and payments.
8. Making the monthly premium payments for the Medical, Vision, Dental and Life Insurance.
9. First point of contact for Insurance issues that an employee or retiree is having. We have them complete HIPPA forms and work with our Broker and Carriers to get issues resolved
10. Handling the termination of employees off the plan when they resign or retire and do not opt to keep the medical plan.
11. Process paperwork for employees retiring and keeping the medical insurance. To include paperwork for the carriers as well as deductions from their PERS retirement checks.
12. Handle questions regarding COBRA and the continuation of coverage once an employee leaves the agency.
13. Time spent mailing required insurance documents. ERISA documents and items required by HCR.
14. Maintaining individual files with the employees enrollment forms and billing/plan information(we do not keep medical history information)