Exhibit C

**MINUTES OF THE MEETING
OF THE
ASSEMBLY COMMITTEE ON COMMERCE AND LABOR**

**Seventy-Eighth Session
May 4, 2015**

The Committee on Commerce and Labor was called to order by Chairman Randy Kirner at 1:34 p.m. on Monday, May 4, 2015, in Room 4100 of the Legislative Building, 401 South Carson Street, Carson City, Nevada. The meeting was videoconferenced to Room 4406 of the Grant Sawyer State Office Building, 555 East Washington Avenue, Las Vegas, Nevada. Copies of the minutes, including the Agenda (Exhibit A), the Attendance Roster (Exhibit B), and other substantive exhibits, are available and on file in the Research Library of the Legislative Counsel Bureau and on the Nevada Legislature's website at www.leg.state.nv.us/App/NELIS/REL/78th2015. In addition, copies of the audio or video of the meeting may be purchased, for personal use only, through the Legislative Counsel Bureau's Publications Office (email: publications@lcb.state.nv.us; telephone: 775-684-6835).

**COMMITTEE MEMBERS PRESENT:**

    Assemblyman Randy Kirner, Chairman
    Assemblywoman Victoria Seaman, Vice Chair
    Assemblyman Paul Anderson
    Assemblywoman Irene Bustamante Adams
    Assemblywoman Maggie Carlton
    Assemblywoman Olivia Diaz
    Assemblyman John Ellison
    Assemblywoman Michele Fiore
    Assemblyman Ira Hansen
    Assemblywoman Marilyn K. Kirkpatrick
    Assemblywoman Dina Neal
    Assemblyman James Ohrenschall
    Assemblyman P.K. O'Neill
    Assemblyman Stephen H. Silberkraus

**COMMITTEE MEMBERS ABSENT:**

    Assemblyman Erven T. Nelson (excused)

Minutes ID: 1074



Assembly Committee on Commerce and Labor
May 4, 2015
Page 2

## GUEST LEGISLATORS PRESENT:

Senator Michael Roberson, Senate District No. 20

## STAFF MEMBERS PRESENT:

Kelly Richard, Committee Policy Analyst
Matt Mundy, Committee Counsel
Leslie Danihel, Committee Manager
Connie Jo Smith, Committee Secretary
Olivia Lloyd, Committee Assistant

## OTHERS PRESENT:

Bruce H. Breslow, Director, Department of Business and Industry
Terry J. Reynolds, Deputy Director of Administration, Department of Business and Industry
Ernest Figueroa, Chief Deputy Attorney General, Bureau of Consumer Protection, Office of the Attorney General
Scott J. Kipper, Commissioner of Insurance, Division of Insurance, Department of Business and Industry
Jeanette K. Belz, representing Property Casualty Insurers Association of America; and U.S. Travel Insurance Association
Ruben Murillo, Jr., President, Nevada State Education Association
John Vellardita, Executive Director, Clark County Education Association
Rusty McAllister, President, Professional Fire Fighters of Nevada
Ronald P. Dreher, Government Affairs Director, Peace Officers Research Association of Nevada; and representing the Washoe County Public Attorney's Association; and Washoe School Principals' Association
Tray Abney, Director of Government Relations, The Chamber, Reno-Sparks-Northern Nevada
Paul J. Moradkhan, Vice President, Government Affairs, Las Vegas Metro Chamber of Commerce
Michael Ramirez, Director of Governmental Affairs, Las Vegas Police Protective Association Metro, Inc.; and representing Southern Nevada Conference of Police and Sheriffs
Lonnie Shields, Assistant Executive Director, Nevada Association of School Administrators; and representing Clark County Association of School Administrators and Professional-Technical Employees
Melissa Johanning, President, Las Vegas Police Protective Association Civilian Employees, Inc.
Richard P. McCann, Executive Director and Labor Representative, Nevada Association of Public Safety Officers

Assembly Committee on Commerce and Labor
May 4, 2015
Page 3

>    Venicia Considine, Attorney, Consumer Rights Project, Legal Aid Center
>        of Southern Nevada
>    Alfredo Alonso, representing Community Financial Services Association of
>        America; and Money Tree
>    Sara Cholhagian, representing EZCORP, INC.
>    Marlene Lockard, representing Nevada Women's Lobby
>    John Fielding, Attorney, U.S. Travel Insurance Association,
>        Washington, D.C.

**Chairman Kirner:**
[Roll was called, a quorum was present, and protocol was explained.]  We will
begin today's hearing with Assembly Bill 481.

**Assembly Bill 481:  Provides additional authority for the enforcement of the
laws prohibiting deceptive trade practices. (BDR 52-1168)**

**Bruce H. Breslow, Director, Department of Business and Industry:**
Four sessions ago, the Legislature put the Division of Consumer Affairs on ice
because of a fiscal crisis.  Each session since, there has been a bill, usually
toward the end of the session, to continue it on ice.  Last session, we created
a small hybrid consumer affairs unit within the Director's Office of the
Department of Business and Industry.  It was something that the Office of the
Attorney General asked us to do; in essence, it was almost a small claims court
for consumer affairs issues.

The Legislature last session asked us to come back with a plan to continue and
improve that if we could, but we were conscious of the cost, so we tried to
keep it very lean.  The Consumer Affairs Unit would consist of two investigators
in Las Vegas, two administrative staff in Las Vegas, and an administrative law
judge in Las Vegas.  In the north, the unit would have a compliance investigator
and a part-time administrative person, giving the unit approximately seven
positions in all.

Last session we hired an administrative law judge and were ready to go.
At that point, we realized that the law being on ice did not allow us to bring any
cases to the administrative law judge, and we moved him to another position in
the Department of Business and Industry.  That position has been vacant
awaiting the law so that we could bring cases to an administrative law judge.
That is what this bill does.  It takes the bill that was put on ice, reduces it, adds
the language allowing for our Consumer Affairs Unit, allows the Office of the
Attorney General to continue doing what that office does, and allows us to
bring cases for deceptive trade, and to do administrative fines.  We used the

Assembly Committee on Commerce and Labor
May 4, 2015
Page 4

power of persuasion for the last couple of years.   This would allow administrative fines, restitution, and things like that.

This bill was worked on initially by us and then by the Legislative Counsel Bureau (LCB).  It was a freestanding bill, and LCB preferred it to fix the bill so it did not have to get put on ice every session.  They combined the two, and then the Attorney General made the changes to what they thought affected them in a negative way.

Deputy Director Reynolds has one other thing to point out in an amendment that was submitted (Exhibit C).

**Terry J. Reynolds, Deputy Director of Administration, Department of Business and Industry:**
There was some question about one of the amendments we have.  We gave initial testimony before the Assembly Committee on Ways and Means as to where the administrative fines go.  We have proposed an amendment (Exhibit C) to have the administrative fines go into the State General Fund and not go back to the support of this unit.  The unit will be able to accept grants but not administrative fines.  I think that was the point of contention.

**Chairman Kirner:**
That is in section 4, subsections 2 and 3?

**Terry Reynolds:**
That is correct.

**Chairman Kirner:**
The new language would have the administrative fines related to the Division go into the General Fund, correct?

**Bruce Breslow:**
The administrative fines, yes.

**Assemblyman Ohrenschall:**
Section 2, subsection 3, says, "The Attorney General may institute criminal, civil or administrative proceedings to enforce the provisions ... in any district court."  I wonder about the language "in any district court."  We have some statutes that require certain actions to be brought in the First Judicial District Court, and folks from my part of the state always think that is tough.  I know it is convenient when you are up here, but why not have it be in the judicial district that the deceptive trade practice is allegedly occurring in?

Assembly Committee on Commerce and Labor
May 4, 2015
Page 5

**Bruce Breslow:**
That was not language that we put in the bill. I would assume it was for
convenience and ease, but that may make it consistent to other language.
The Attorney General's Office might properly answer that question, and they
are here today.

**Assemblywoman Kirkpatrick:**
In section 5, subsection 2, currently notice "must" be given by certified mail.
This will say "may" but also that someone can "personally serve"
a subpoena, correct?

**Bruce Breslow:**
Yes.

**Assemblywoman Kirkpatrick:**
When it says "may," what is the alternative if that does not happen? We have
seen problems in the past. What other form of notification will they get? Is this
to read that service has to either be done by mail or done in person?

**Bruce Breslow:**
Again, I think that would be a question for the Attorney General's Office.

**Assemblywoman Carlton:**
I have the original bill and two different proposed amendments that we had in
Ways and Means. I know the original bill is on the Nevada Electronic Legislative
Information System (NELIS), but what am I actually working from?

**Bruce Breslow:**
Our original bill was very simple. At that point, LCB thought it would be
a better idea to incorporate our bill into the bill the Legislature keeps putting on
ice, so that is the second amendment. The newest amendment changes the
administrative fine to go to the General Fund instead of to the agency.

**Assemblywoman Carlton:**
I have one that is dated April 12, 2015, and one that is not dated, but I do not
have one that has the proposed amendment that you have. I want to make sure
I have the right document.

**Bruce Breslow:**
The new amendment that incorporated all the changes is dated April 22, 2015,
and that is the printed version that was handed out today.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 6

**Terry Reynolds:**
Regarding the small copy you received that is in NELIS, the only amendment we submitted to that is dated April 22, 2015; we provided it to you. The only change in there is having the administrative fines go into the State General Fund, and it retains grant funds into the operation of the Department. That is the only change between those two. With the exception of that, this bill has only one minor change dealing with the administrative fines.

**Chairman Kirner:**
I believe the April 22 change is on NELIS. Are there other questions from the Committee? [There were none.] Are there those who are in support?

**Ernest Figueroa, Chief Deputy Attorney General, Bureau of Consumer Protection, Office of the Attorney General:**
I have worked closely with the Department of Business and Industry on the amendments to ensure that any of the language that was contained in the small pamphlet did not impact the current operations of the Nevada Attorney General's Office. That was the intent of the April 12 amendment. We are in support of the bill as amended.

**Assemblywoman Kirkpatrick:**
In regard to section 5, subsection 2, I would like to know what the process will be, considering we are going from "must" to "may" and adding an alternative piece.

**Ernest Figueroa:**
To answer that question, the purpose of this language was to ensure that the way to serve investigatory subpoenas under the deceptive trade practice statute would be in sync with the way the Attorney General's Office does it now. The language is consistent with the way the Attorney General's Office does it. Basically, in order for the Department of Business and Industry to issue a subpoena, it would have to be done by certified mail or by serving the individual personally.

**Assemblywoman Kirkpatrick:**
To follow up and make sure there is paperwork or a paper trail that follows—and I will sell myself out here—I do not pick up certified mail because the green card is not left until the day of expiration. Is there some documentation that follows? Is there a letter that goes out to say, "You will be getting a certified letter" or do they try to find you? What happens if it is only a certified letter and you do not pick it up? Are you in default?

Assembly Committee on Commerce and Labor
May 4, 2015
Page 7

**Ernest Figueroa:**
To the extent that such a situation happens now, in order to be legally consistent and served properly on the person if somebody fails to pick up their certified mail, then the Attorney General's Office, or in this case, the Department of Business and Industry, would have no choice but to serve that individual personally.

**Assemblywoman Kirkpatrick:**
That makes me feel comfortable that there is a second parameter for folks to be notified.

**Assemblywoman Neal:**
In section 13, subsection 4, the orange language reads, "Any offense which occurred within 10 years immediately preceding the date of the principal offense or after the principal offense constitutes a prior offense ... when evidenced by a conviction, without regard to the sequence of the offenses and convictions." Are these offenses where the cause of action is the same, and then you have this long chain-link fence and it is capped at 10 years?  What does that language mean?

**Ernest Figueroa:**
I believe that language you are referencing is set to be deleted.  It was in the amendment (Exhibit C).  It was present in the original printout.  To be consistent and to be within the spirit that we did not want to add additional language and duties in the way the deceptive trade practices actions are enforced by the Attorney General's Office, this language is to be removed completely by the amendments.

**Assemblywoman Neal:**
So the orange is now going to be purple one day, but not today?

**Ernest Figueroa:**
For clarity, the phrase that says, "Any offense which occurred within 10 years" and ends with "offenses and convictions" is to be removed by the amendment. It will not exist.

**Assemblywoman Neal:**
We are going to get a second amendment?

**Chairman Kirner:**
I will have our legal counsel explain.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 8

**Matt Mundy, Committee Counsel:**
I would like to make a point of clarification based on the previous testimony that the only substantive changes for the purposes of amendment were in section 4, regarding the fines going to the General Fund and grant funds received by the Consumer Affairs Division to be deposited in their account. Regarding the other blocks of orange text that appear as if they are being brought back in from the original bill, those are not part of the amendment.

**Ernest Figueroa:**
It is my understanding that is the version that the Attorney General's Office supports. Those sections in orange in the April 12 amendment should be contained in the April 22 amendment and are necessary to make sure that the current operations of the Attorney General's Office are not impacted by A.B. 481.

**Chairman Kirner:**
Are there any other questions? Seeing no other questions from the Committee, are there those who are in support of A.B. 481? Seeing no one, are there any opposed to this bill? Seeing no opposition, are there any who are neutral? Seeing no one, would the bill sponsor like to make closing comments? [He indicated no.] I will close the hearing on A.B. 481 and we will move to Senate Bill 67 (1st Reprint).

**Senate Bill 67 (1st Reprint):   Revises provisions governing the regulation of insurance. (BDR 57-371)**

**Scott J. Kipper, Commissioner of Insurance, Division of Insurance, Department of Business and Industry:**
The Division of Insurance has one policy bill this year. We apologize for the length and depth of the bill, but a variety of topics needed to be addressed relating to insurance regulation. [Referred to written testimony (Exhibit D).] Before I speak about the specific provisions of the bill, I will introduce you generally to Nevada's insurance industry and the Division of Insurance. Insurance is an $11.9 billion industry in Nevada, which breaks down to roughly $4,500 in insurance premiums per Nevadan per year. We oversee almost 135,000 licensees, 20,000 of whom are residents of the state; over 2,200 traditional insurers; and 159 captives. For the state of Nevada, the industry has generated over $254 million in premium tax revenues for the last reporting period and over $28 million in additional revenue for that period. The Division is a self-funded, fee-supported agency that takes no State General Fund money.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 9

As part of our charge to protect consumers and having an interest in insurance, the Division participates in the National Association of Insurance Commissioners (NAIC). The NAIC is the U.S. standard-setting and regulatory support organization created and governed by state insurance regulators across the country, including the District of Columbia and the five U.S. territories. Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory oversight. The NAIC is an integral part of state-based insurance regulation in the United States. The Division also uses NAIC systems to share information with and obtain information from other states for the purposes of licensure, enforcement, and uniform ethical standards. [Continued to read from written testimony (Exhibit D).]

Due to insurance company insolvencies in the 1980s and 1990s, insurance commissioners created an accreditation program and set accreditation standards to establish minimum requirements across the states. This program confirms that accredited states have adequate solvency laws to protect consumers, effective and efficient financial analysis and examinations, and appropriate organizational and personnel practices. Accreditation ensures that one state can give full faith and credit to the regulatory oversight of another accredited state because the states follow the same minimum standards, and regulatory staff has proper education and training.

I am very proud to say that the Division of Insurance in the state of Nevada is fully accredited. As a result, the Division can give full faith and credit to financial review and examinations of insurers domesticated in other states selling products to our citizens in Nevada. Additionally, other states can confidently accept the Division's exams of Nevada's domestic insurers. In short, accreditation gives Nevada consumers more options in insurance because they can trust carriers in other states, and accreditation makes operations easier and more efficient for Nevada insurance businesses.

I appreciate your indulgence in letting me share that with you because it provides a great deal of background for Senate Bill 67 (1st Reprint). As you will note, this is a first reprint, and the amendments reflect some technical corrections and include some input from the insurance industry. [Read from written testimony (Exhibit D).]

I will walk you through the sections. Sections 1 and 42 through 231 adopt the current version of the NAIC model law on investments. This model law helps protect insureds by promoting greater insurer solvency and financial strength through objective investment standards. The importance of this law is evident from the most recent financial crisis of 2008-2009. You will recall that most

Assembly Committee on Commerce and Labor
May 4, 2015
Page 10

insurance carriers fared far better than investment banks because of the conservative solvency requirements.  The investment model law also requires insurers to invest in ways that incorporate principles of prudent investment management so that obligations to insureds are met without jeopardizing solvency and financial strength.  The changes to Nevada's investment chapter required numerous changes throughout, making it more appropriate and efficient to replace most of the existing language with language from the model law.

Section 2 clarifies that fees apply to all the insurers as provided by the law. Let me be very clear: there are no new fees that will be charged to reinsurers. These fees were already in existence, and we are not changing one thing to that.

Sections 3 through 21 adopt revisions to NAIC's Credit for Reinsurance Model Law and amend related existing statutes.   When an insurance company reinsures part of its obligations, it transfers that risk to a reinsurer. The Credit for Reinsurance Model Law is an accreditation standard which insures that the reinsurance company is financially capable of assuming the risk. These sections also outline the circumstances under which an insurer would be allowed to reduce reserves to reflect the transfer of risk to the reinsurance company—in other words, to allow the company to free up much needed capital to use elsewhere.   These provisions strengthen the carrier's liquidity without harming its solvency.  [Read from written testimony (Exhibit D).]

Sections 22 through 39.5, 40.15 through 40.3, and 40.5 through 41.7 adopt the revisions to the NAIC's Standard Valuation Law model act.  This model act applies to life insurance companies to ensure that a life insurer maintains reserves that reflect the risks associated with a company's product offerings and business strategies, as well as the current economic environment, while preserving the historical practice of conservative statutory reserves.

The revisions to the Standard Valuation Law changes from a one-size-fits-all formulaic approach to principle-based reserving (PBR), which is based on principles rather than a set formula.  Currently, these life insurance reserves are calculated based on a formula that applies to all situations regardless of the level of risk.   This has resulted in overreserving for some products and underreserving for others.   The PBR approach leads to the "right-sizing" of reserves to reflect and adjust to different circumstances.  This provision will not be effective until 42 states, constituting greater than 75 percent of all direct premiums written, adopt the provision.  Currently, 26 states have passed or adopted this legislation, representing more than 40 percent of U.S. direct written premiums.  Having this provision in place in Nevada will contribute to reaching the threshold and allow Nevada to move forward with it as soon as it

Assembly Committee on Commerce and Labor
May 4, 2015
Page 11

takes effect.  Having this model act in place is also important for life insurers who wish to form or redomesticate to Nevada.

Section 40 and section 232 remove references to statutes that are sought to be repealed in this bill.

Section 233 changes annual report filing requirements for administrators to 90 days after the expiration of the administrator's fiscal year and clarifies what other financial reporting documents should be included with the filing.

Sections 234 through 237 allow the Division to conduct more of its licensing activities by electronic means.  The Division seeks to modernize and streamline its ability to communicate officially and effectively through electronic mediums.  Allowing official email communications also results in a cost savings to the Division, carriers, and consumers.  [Read from written testimony (Exhibit D).]

Section 238 gives the Division more latitude to consider criminal backgrounds of license and certificate applicants.   Although the law currently allows the Commissioner to consider a felony conviction, there are other acts, such as theft, fraud, dishonesty, and moral turpitude, that may not be felonies but cause concern, especially when it comes to protecting consumers from individuals whose past makes them unsuitable for the business of insurance.

Section 239 consolidates various statutes relating to the confidentiality of health rate filing information into one statute.

Sections 240 through 249 and 251 through 253 make changes to the Nevada Life and Health Insurance Guaranty Association Act.  These changes have been requested by the Nevada Life and Health Insurance Guaranty Association to allow Life and Health assumed claims to be covered under the Guaranty Association. If an insurer becomes insolvent and must be liquidated, it is not uncommon for another insurer to wish to acquire or "assume" the business.  Currently, these assumed claims are not covered by the Life and Health Insurance Guaranty Association, which can leave consumers without a safety net.  Sections 254 through 256 do the same thing for our property and casualty guaranty association, Nevada Insurance Guaranty Association.

Section 257 is a change to the notice requirement relating to the cancellation or renewal of health insurance policies and contracts.  This section broadens the notice requirement provision to avoid the need to change it in the future even if federal deadlines change.   Sections 258 and 259.5 are updates to the NAIC Standard Nonforfeiture Law relating to cash values of life insurance.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 12

Sections 260 through 262 remove references to statutes that are sought to be repealed in this bill.  [Read from written testimony (Exhibit D).]

Section 263 and sections 315 through 317 allow automobile insurers to issue electronic proof of insurance "cards" and permit the Department of Motor Vehicles (DMV) to accommodate such cards.  The DMV has been consulted on this measure.

Sections 264 through 289 adopt the NAIC's Risk Management and Own Risk Solvency Assessment Model Act.  In the wake of the last financial crisis, it became clear that state insurance regulators needed to be able to assess a holding company's financial condition as a whole, and its impact on an insurer within the holding company system.  The provisions of this model act require insurance companies to issue their own assessment of their current and future risk through an internal risk self-assessment process, and it will give regulators an enhanced view of an insurer's ability to withstand financial stress.

Sections 290 through 304 update Nevada's laws on insurer mergers and acquisitions to adopt recent NAIC model law changes.  Section 305 removes reference to a statute that is sought to be repealed in this bill.

Sections 306 through 311 rearrange Nevada's laws on domestic captive insurers and risk retention groups to clarify that domestic risk retention groups are licensed as domestic captives and held to the same standards.

Sections 312 and 313 ask for authority to inspect and copy certain sealed records of insurance applicants and licensees for the purpose of determining the suitability for a license or liability to discipline for misconduct, and for events or convictions related to insurance.  The access being requested is the same access granted to professional licensing boards, such as the State Board of Cosmetology and the State Gaming Control Board.  Section 314 provides exceptions for certain provisions of this bill from disclosure under the public records statutes. [Read from written testimony (Exhibit D).]

Section 318 authorizes the Commissioner to alter the 120-day annual fiscal reporting requirement for self-insured employers for the purposes of workers' compensation coverage.  It also permits the Division to accept financial statements audited by independent CPAs or the foreign equivalent.

[The Division of Insurance submitted its 2015 Insurance Market Report (Exhibit E).]

Assembly Committee on Commerce and Labor
May 4, 2015
Page 13

**Chairman Kirner:**
It is a long bill and could be complicated. It seems to me that you are working off a model certainly with NAIC types of things, but there are other things in here as well, based on our experiences in the last several years with our economy and so forth. With that, do members of the Committee have any questions?

**Assemblywoman Carlton:**
If we could go to section 239, subsection 2, you are adding "and small employers" and in subsection 4, "Except in cases of violations...." If you could explain those violations. It seems to me as though we are considering more things proprietary and constituting a trade secret than we had in the past. I want to understand the idea behind that.

**Scott Kipper:**
There is a great deal of information that comes in with these rate filings, including algorithms that carriers use to develop those rates, as well as other information specific to the company that may be considered proprietary or trade secrets. This provision would allow the Division to make a ruling on that as to whether or not it would be proprietary or would have to be disclosed. I will say that the Division has been very transparent with a lot of the rate filings. All that rate information is available on our website, as well as much of the supporting documentation. There is some information, and justifiably so, that should be considered a trade secret. I believe this also provides that if we are ordered by a court of competent jurisdiction, that information would have to be disclosed.

**Assemblywoman Carlton:**
In adding "small employers," what is the reason behind that? This used to be just for individuals, and now we are protecting employers. To me, there is a different level of protection for an individual versus giving the actual business protection.

**Scott Kipper:**
I believe this does apply for both those plans that are purchased by individuals and those plans that are purchased by small employers. They are very similar in structure. The information is very similar in what is submitted to the Division, so we extended those provisions and protections to those small employer plans.

**Assemblyman Ohrenschall:**
Section 179 talks about "foreign investments." I assume the model act and the drafters felt this was an acceptable amount that would not potentially cause the insurer to take too much of a chance. What are your comments on that?

Assembly Committee on Commerce and Labor
May 4, 2015
Page 14

**Scott Kipper:**
Section 179, subsection 2, which talks about the aggregate amount that might be held in foreign investments, makes sure that it does not exceed 10 percent of its admitted assets or 3 percent of its admitted assets as to any other foreign jurisdiction.  This is consistent with our approach to make sure that all of the investments are as diverse as possible but also as secure as possible.  I would be very surprised if any of these companies even approached the 10 percent threshold; it would likely be 1 or 2 percent in any single, particular investment.

**Assemblyman Ohrenschall:**
Currently, they are invested abroad?

**Scott Kipper:**
Some are, some are not.  This just provides some structure as to if they do, what they might do, and how much they might be able to invest.

**Assemblyman Ohrenschall:**
In section 238, subsection 6, the Division's ability has been expanded to not just consider a felony but any "crime which involves theft, fraud, dishonesty or moral turpitude."  I thought we were moving away from looking at moral turpitude and theft.  Let us say that someone had a misdemeanor shoplifting charge 20 years ago.  Do you think that would disqualify the person?

**Scott Kipper:**
We have a committee that reviews all applications.  When an applicant indicates that he or she has had a felony, the committee requests the specifics of that felony, and the committee makes a recommendation to the commissioners as to whether or not they believe this person has the wherewithal to go into people's homes, talk about their finances, and gather their most personal information, such as social security numbers, birthdates, and so forth.  I think it is vitally important that these folks are screened as much as possible.  If expansion of this to a crime involving theft, fraud, dishonesty, or moral turpitude, just to red flag something that we should look into a little deeper, I think it is very important for our Nevada consumers.

**Assemblyman Ohrenschall:**
There is no time limit?  Seven years or ten years?  This could go back to when someone was in college or a young person making some small indiscretion.

**Scott Kipper:**
Yes, all those indiscretions are required to be disclosed.  There are times where we have looked at that and said, "That happened 20 years ago.  You have lived

Assembly Committee on Commerce and Labor
May 4, 2015
Page 15

a model life since then." We certainly have no trouble licensing an individual in that case.

**Assemblywoman Neal:**
I was reading sections 33.7 through 37.5 on valuation, but I want a real-life example. It seems that these sections relate to what Assemblyman Ohrenschall was referring to in terms of some potential credit risks. When the reserves are developed and they want to quantify their benefits, the conversation in the bill started with whatever assumptions that you make that you do not have significant control or influence over. Basically, you have to set aside reserves in order to deal with the issues that could come about. In section 8 of your bill, when read all together it said, if a reinsurer chooses to do reduced security in relationship to the multibeneficiary trust, they are bound to you, the Commissioner, if there is a loss.

When you look at the investments at the back, some could lose. What is the amount of the reserve? How much do they need to set aside? Let us say it is a money market fund or a certificate of deposit. How much needs to be set aside in their reserve account if they lose? They come to you and say, "I know this is unsecured. I know that there is a risk, but I am investing in it anyway. Give me the go-ahead." How much above that investment do they need to have in place?

**Scott Kipper:**
The securities of all carriers are run through a valuation regimen. The NAIC has a securities valuation office in New York, and they look at every insurance company's holdings and are able to say "risky," or "not so risky." You look at the amount of insurance the company has written. You look at the amount of risk they have undertaken, and there is a process of matching the value of those securities, the amount of reserves that are required for the size of the company, and what those investments should look like.

I think I understand your question. There is a great deal of mental workout to determine what those values are, what those securities might be, and then what eventually the level of reserves the company must hold.

**Assemblywoman Neal:**
That is what I thought, because it said the assumptions must be prescribed for the risk over which the company does not have significant control or influence. When you talk about their behavior, how they have engaged, and the size of the company, the risk versus non-risk, they have to cover the assumptions even if the assumptions are good or bad.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 16

**Scott Kipper:**
I think you are right.  If they buy in a particular piece of a bond that is close to junk or close to that status, they would be given less value for holding that bond, and they would have to hold more, or conversely, they would probably have to hold other, better financial instruments to balance the higher risk of that investment.

**Assemblywoman Bustamante Adams:**
I know this is a very technical bill, but can you give me some level of comfort when you are drafting these revisions?  I am assuming that you started last year?  Do you meet on a national level, bring it down to the state level, and then you have a team within the state that looks at what would work for Nevada?

**Scott Kipper:**
I mentioned the principle-based reserving, and the revisions to the Standard Valuation Law model have been ten years in the making.  This is a process that has been undertaken by the National Association of Insurance Commissioners. There is a great deal of input from insurance industry individuals with even more input from regulators.  There is also a field of funded consumer representatives who have input and expertise in the development of these models. It is highly unusual for a model to be developed in less than 18 to 24 months.  It is highly unusual for an amendment to a model to take place in less time than that.  This is a very thorough process.

When it comes to accreditation standards, again, these are standards that are well debated and put into place because of some experience we have had in the past, such as, the meltdown in 2008.  Some of these other provisions we are suggesting in this bill are basically an absolute minimum for us to have on our books to maintain our accreditation.  We could have come back with a much thicker bill, but we did not want to do anything beyond what we absolutely had to have.  There are some "want to haves," some "be good to haves," but it certainly does not take into consideration all the "like to haves."

**Assemblywoman Bustamante Adams:**
Can you elaborate on the funded consumer representatives that you mentioned?

**Scott Kipper:**
The NAIC provides funding for 30 consumer representatives to attend our three national meetings as well as participate in any interim meetings that might take place.  These representatives include the University of Georgia consumer representative, who is focused on items about readability and understanding the insurance contract, to folks from the University of Connecticut School of Law,

Assembly Committee on Commerce and Labor
May 4, 2015
Page 17

and representatives from the Center for Economic Justice in Austin, Texas. There are many consumer representatives that keep not only the regulators balanced but also bring their point of view to the discussion when it comes to working with the industry.

**Chairman Kirner:**
Seeing no more questions, we will move to those who are in support of this bill.

**Jeanette K. Belz, representing Property Casualty Insurers Association of America:**
Mark Sektnan submitted a letter to the Committee (Exhibit F). Property Casualty Insurers Association of America (PCI) member companies write about $1.4 billion in premiums annually, composing 34 percent of Nevada's property casualty insurance market. The Commissioner has spent a great deal of time going through the provisions of the bill. We are in support, particularly the adoption of the model acts, including the model holding company act on own risk insolvency assessment. Other important provisions add coverage for assumed claims transactions in the Nevada insurance guaranty associations. Senate Bill 67 (R1) also allows insurers to provide electronic proof of insurance e-cards. They would like to express their support.

**Chairman Kirner:**
Are there any questions for Ms. Belz? Seeing none, are there others who might be in support of this bill? Seeing none, are there any speakers in opposition? Seeing no opposition, are there any who are neutral? Seeing none, did you wish to make closing comments, Mr. Kipper?

**Scott Kipper:**
I would like to thank the Committee for their indulgence today for this lengthy bill, and we appreciate your attention. If there are any questions, please feel free to reach out to the Division, and we will be happy to try to answer them.

**Chairman Kirner:**
We will now close the hearing on Senate Bill 67 (R1) and open the hearing on Senate Bill 241 (3rd Reprint).

**Senate Bill 241 (3rd Reprint):    Revises provisions relating to collective bargaining. (BDR 23-1030)**

**Senator Michael Roberson, Senate District No. 20:**
The measure before you represents a consensus of many of the parties interested in reforming collective bargaining for local governments and their employees. Stakeholders on both sides of the table came together to develop

Assembly Committee on Commerce and Labor
May 4, 2015
Page 18

reasonable legislation bringing increased accountability to the public employee collective bargaining process while retaining key protections in the workplace for public employees.  <u>Senate Bill 241 (3rd Reprint)</u> makes some critical changes related to collective bargaining.  I would like to walk the Committee through the bill's major provisions.

Section 1 requires that in the event a local government employer provides paid leave to an employee for time spent providing services to an employee organization, the full cost of such leave must be paid or reimbursed by the employee organization or offset by the value of concessions negotiated in its collective bargaining agreement.

Section 1.1 reduces from 180 days to 45 days the amount of time within which the Local Government Employee-Management Relations Board (EMRB) must conduct a hearing related to certain complaints.

The evergreen issue provides that a collective bargaining agreement between a local government employer and a recognized employee organization expires for certain purposes at the end of the term stated in the agreement, and is addressed in section 1.3.  This section also provides that upon the end of the term stated in a collective bargaining agreement, and until a successor agreement becomes effective, a local government employer shall not, with limited exceptions, increase any compensation or monetary benefits paid to or on behalf of employees in the affected bargaining unit.

Section 1.4 excludes a school administrator whose annual salary adjusted for inflation is greater than $120,000 for membership in any bargaining unit. Sections 1.5 and 1.6 revise various provisions related to negotiations between a school district and an employee organization representing teachers or educational support personnel in order to expedite and streamline the bargaining process.

Section 1.7 requires the Local Government Employee-Management Relations Board to conduct a hearing not later than 45 days after the board decides to hear a complaint concerning prohibited practices related to collective bargaining.  Section 1.9 provides that during the first three years of employment by a school district, a principal is employed at-will.  After completing the probationary period, subsection 2 of section 1.9 provides that a principal may again be employed at-will if, during two consecutive school years, the school rating is reduced by one or more levels and 50 percent or more of the teachers at the school request a transfer to another school.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 19

Under subsection 3 of section 1.9, a school district must conduct a survey to evaluate conditions at a school which experiences a drop in its rating and has more than 50 percent of the teachers asking for a transfer.  However, the survey will not affect the employment status of the principal.  Continuing in section 1.9, subsection 4, a principal whose employment status reverts to at-will due to a drop in the school's rating and the teachers' transfer requests is subject to immediate dismissal by the school board upon a recommendation from the school superintendent.

Section 1.95 provides that a postprobationary administrator, other than an administrator excluded from a bargaining unit or a school principal, must apply to the superintendent of the school district for reappointment to his or her position every five years.  Further, under subsection 2 of section 1.95, if the person is not reappointed to the position, then the administrator is entitled to be assigned to his or her former position at the rate of pay for that position.

Finally, sections 2 through 4.8 make changes to other sections to conform with the new provisions in this bill.  This bill would become effective upon passage and approval.  I urge the Committee's approval of this important and timely measure.

**Chairman Kirner:**
Are there questions from the Committee for Senator Roberson?

**Assemblywoman Neal:**
How does the reassignment work?   If a principal gets reassigned, do the three years run the whole time or do they have to start upon the reassignment?

**Senator Roberson:**
My understanding of this provision is if a person is a school district employee and he or she is promoted to the position of principal, for those first three years, that principal is at-will.  A reassignment would typically be reassigning back to a former position, which would not be a principal position.

**Assemblywoman Neal:**
I am assuming they stay at-will even if they are a principal or return to their former position?

**Senator Roberson:**
No, that is not the intent.  The intent is that principals, and only principals under this section 1.9, would be at-will for those first three years that they are in the position of a principal.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 20

**Assemblywoman Neal:**
Regarding section 1.95, are there certain things the administrator will have to prove for their reappointment for the administrative position every five years, for instance, proof they have turned their school around or they have a four-star school?

**Senator Roberson:**
Let me clarify.   The purpose of this is to provide more accountability. Obviously, we collectively are looking to invest a lot more money into education this session.   I believe there needs to be accountability tied to that money. What section 1.95 would do is provide accountability measures for school administrators.   There are three categories for school administrators that are being reflected in section 1.95.   There are administrators who make $120,000 a year or more in base pay, which is the top level administrators.   They would no longer be able to participate in collective bargaining or be part of a bargaining unit.   The new principals would be at-will for the first three years.   After the first three years, if their school rating went down and half or more of the teachers wanted to leave, at that point we know there is a problem with that principal.   If that happens for two years in a row, then essentially they are going to be dismissed.

The third category is all other administrators; that is, administrators who are not principals and who do not make $120,000 or more.   Those administrators, and frankly that is the largest number of administrators in the school district, would have to reapply for their position every five years.   There is no specific criteria. This is about making sure that you are doing your job.   Every five years, your supervisors have to believe that you are doing a good job and that you ought to stay in that position.

**Assemblyman O'Neill:**
Thank you for this bill.  I know the bill is in its third edition, but I have a small question.    Under section 1.9, subsection 2, paragraphs (a) and (b) are connected by the word "and."  In paragraph (b), you have 50 percent or more of the teachers assigned to the school requesting a transfer to another school. Should the word "and" possibly be an "or"?   The teachers may want to stay there.   They may like the school, the area, and the students.   They want to stay there even though the principal is not fulfilling his or her obligation.   Could you help work me through that?

**Senator Roberson:**
It is "and" for a reason.   Initially we are saying in the first three years, as an individual principal, you are at-will—you can be terminated at any time.   Once you have gotten past that threshold, presumably you are a good principal and

Assembly Committee on Commerce and Labor
May 4, 2015
Page 21

are in postprobationary status at that point. There is a higher bar after that three-year probationary period to terminate a principal. The reason we have the "and" between paragraphs (a) and (b) is that there could be a lot of reasons the school's star rating, or whatever rating exists at the time, goes down. Certainly, you need to look at the principal. The principal has to be accountable if the rating of the school goes down. Then you look at the teacher issue. I have heard in many conversations with teachers and administrators that it is apparent when you have a principal who is not doing a good job. The teachers do not want to be there. They are willing to drive across town to teach somewhere else because of the unhealthy environment that is created by the leader of the school—the principal.

The idea was, in the first three years, you can be easily terminated if you are at-will. After that, we want to look at a couple of things: is the school not performing, and are teachers not wanting to be there. If you have both of those, then I think the superintendent should have the discretion to say, "Mr. or Mrs. Principal, you need to do something else."

**Assemblyman Ellison:**
Say you had someone who went into that principal position, and they are there for a short time, and they say, "This just is not for me." Can they go back to being a teacher? Would they go back to the same salary? This is before the first or second year, and it does not break that down.

**Senator Roberson:**
The last sentence in section 1.9, subsection 1 states, "If the principal was previously employed by the school district in another position and is reassigned pursuant to this section, the principal is entitled to be assigned to his or her former position at the rate of compensation provided for that position." The idea would be that if the person was an assistant principal or a dean or a teacher prior to being elevated to principal, and it is determined that it is not the right fit for them to be a principal at that time at that school, then the person would be able to go back to their previous position level.

**Assemblywoman Bustamante Adams:**
Regarding section 1.6, subsection 2, in your testimony you mentioned 45 days, but I could not find that in the bill. Subsection 2 talks about the negotiations portion.

**Senator Roberson:**
I was referencing section 1.1, which reduces from 180 days to 45 days the amount of time within which the Local Government Employee Management-Relations Board must conduct a hearing.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 22

**Chairman Kirner:**
Section 1.1 and section 1.7 also.

**Senator Roberson:**
Yes, you are correct.

**Assemblyman Silberkraus:**
Regarding section 1.9, let us say somebody came in to take on the principal role at one of the district's more challenging schools, which could be on a downward trajectory at the time. I know that in subsection 4, the principal's dismissal would be upon the recommendation of the superintendent. You are foreseeing that in those three years, if those people could see that the downward trajectory was the reason why teachers were leaving and the ratings had gone down, the principal would not be terminated for going to a more difficult or challenging environment?

**Senator Roberson:**
We changed the language to account for what you are talking about. We do give discretion to the superintendent. Presumably, you would hope the superintendent understands and can look at a specific example where you may have a school that is perpetually not doing well. It takes awhile, obviously, for that school to be turned around. So, yes, that can be taken into account. They are at-will, but ultimately it is going to be up to the superintendent or someone above the principal to make that decision. The person is not automatically terminated. I think you are referencing section 1.9, subsection 2, when you talk about the factors for someone who is postprobationary, correct?

**Assemblyman Silberkraus:**
Yes.

**Senator Roberson:**
You might have a lot of teachers leaving, and you might have the star rating go down. I think when you have both of those things, you probably have a problem. It is understandable that the rating may go down for various factors, but when you also have half of the teachers or more leaving, you know you have a problem. Still, we are giving the superintendent the discretion to make that recommendation to the board of trustees.

**Chairman Kirner:**
Are there other questions for the Senator? Seeing none, will those who are in support of <u>S.B. 241 (R3)</u> please come to the table.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 23

**Ruben Murillo, Jr., President, Nevada State Education Association:**
I am speaking in support of S.B. 241 (R3).  Collective bargaining allows both labor and management to look at issues through the lens of what is educationally best for our students.  Unions and districts have learned that collective bargaining need not be an obstacle to change for effectiveness. Where there is trust, mutual respect, and good communication, unions provide valuable partners in negotiating provisions for more accountability, improved quality, and greater effectiveness, and the collective bargaining process is a vehicle to deliver these goals.

Collective bargaining provides an opportunity to collectively improve public education while empowering teachers who are best equipped to make school and classroom decisions to ensure student success.  Given the unpalatable direction of many of the collective bargaining bills introduced, we believe S.B. 241 (R3) as passed by the Senate relating to school district collective bargaining is reasonable for support.  Senate Bill 241 (R3) will preserve the ability of professional educators to further develop innovative programs and accountability measures through the collective bargaining process.  On behalf of the more than 24,000 educators in the Nevada State Education Association, we respectfully ask for your support of S.B. 241 (R3). [Mr. Murillo submitted a letter of support (Exhibit G).]

**John Vellardita, Executive Director, Clark County Education Association:**
I am representing 18,000 licensed professionals in Clark County, and I am here today to speak in support of S.B. 241 (R3) for a few reasons.  I would like to frame the discussion this way: I think that this bill is a product of parties coming together in this current political climate to try to find some reasonable compromise around some issues that have gotten a lot of attention in this session.  We have been part of these discussions in the sense that we have been trying to find some moderation around some of these issues.

The first thing I want to speak to is the whole collective bargaining process. I bargained the contract between the Clark County School District and our members, and I have been party to a couple of sessions that were dictated by the recession, when the economy went flat, revenues dried up, and decisions made in Carson City essentially predetermined bargaining at the table between the school district and the teachers.  In other words, there was no money and, therefore, bargaining was done in that context.  That led to some contentious, complicated, and challenging negotiations that resulted in a couple of arbitrations.  One arbitration settled matters one way, and the following year the arbitrator settled the matter in another way, but in neither case were the settlements to the satisfaction of both parties.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 24

One of the things that this whole process showed was that clearly the system of collective bargaining, as spelled out in statute, needs reforms, needs changes. We think S.B. 241 (R3) addresses it. For example, it expedites the bargaining process so that whether there is an agreement that is mutually agreed to by both parties, or whether an arbitrator has to come in and settle the matter, the decision of an arbitrator or the settlement of agreement by the parties is done before the date of expiration. Hence, the need for the evergreen provision is not that important if we are bargaining the process earlier and we have a system in place to find resolution. For example, in section 1.6, one month after we bargain a contract, the parties select an arbitrator who has to agree to schedule a hearing of not less than three days to begin no later than June 10, and to render a decision before an expiration of the contract if we do not reach an agreement. That provision does not exist today in statute. Also, in section 1.5, bargaining starts before January 1. Currently under statute, it starts no later than February 1.

Section 1.6 mandates eight bargaining sessions, whereas statute currently says only four. If a dispute in bargaining may hold up the process, statute currently allows the Local Government Employee Management-Relations Board to have 180 days to find resolution to that dispute. Section 1.1 in this bill shortens it to 45 days. So we think the process of bargaining has been reformed in this statute to the benefit of both the school districts, in this case, as well as teacher organizations, if the intent is to conduct good-faith bargaining in an expedited way whether it is reached mutually or by a third-party arbitrator before the expiration of the contract.

The second part is where we see language in this bill regarding principal accountability. In the 2011 Session, laws were passed that essentially said, "Some teachers are not meant to be teachers," and the type of statutes that were passed essentially raised the level of accountability. We have seen two successive legislative sessions where we now see postprobationary teachers put back on probation and, in some cases, not renewed for employment. The idea behind those laws was, again, that maybe some folks should not be teachers. We think it is high time that the same level of accountability be applied to principals. We think, by and large, Clark County has a tremendous number of good practicing principals, but administrators are supposed to be the instructional leader in the building, and most teachers go to those buildings to follow that leadership. We have a very small percentage who are not meant to be principals.

What we do not have by statute, or any other means, is a way to address that problem. Recently there was an incident in Clark County where scores of parents at John A. Dooley Elementary School protested the way a principal was

Assembly Committee on Commerce and Labor
May 4, 2015
Page 25

running that building, and ultimately that principal was removed and reassigned. We think this law addresses the fact that perhaps reassignment is applicable in some cases but again, maybe the principal is not meant to be a principal and thus it gives authority to remove that principal from being a principal.  For that reason, we support S.B. 241 (R3).   We do not think it erodes principals' collective bargaining rights in any way whatsoever.  We believe it is a degree of accountability.  We have heard more than once from folks saying let us stop the "dance of the lemons" regarding the teachers.  We think it is time to stop the dance of the lemons with administrators.

Finally, we think there is reasonable compromise reached on release time for an organization's officers to serve their organization but in a capacity away from the job.  We do not have that luxury in the sense that our release time officers are paid by our organization, but we think that with the intent behind this language through collective bargaining, the parties would reach an agreement that essentially allows that release time, and not at the expense of the taxpayer, but with the intent of doing meaningful work for both management and labor. For that reason, we support this bill.

**Rusty McAllister, President, Professional Fire Fighters of Nevada:**
We support S.B. 241 (R3).  We realize that over the course of this session there will be some changes that are made to the collective bargaining process. We believe that the changes within this bill that would apply to us are reasonable and, therefore, we are okay with them and are supportive of the provisions that apply to us.

**Ronald P. Dreher, Government Affairs Director, Peace Officers Research Association of Nevada; and representing the Washoe County Public Attorney's Association; and Washoe School Principals' Association:**
We had our conversations and concerns with Senator Roberson over this, and as Assemblyman O'Neill pointed out, this is the third reprint.  I believe at this point we support S.B. 241 (R3).   I have talked with the principals in Washoe County, obviously.   We believe that they have a high level of accountability at this point with the duties and responsibilities that they have. This provides much more accountability to them.   I have represented the school principals in Washoe County for the past several years, and I will tell you there is not a whole lot that goes by that they are not held accountable to the district and to the children and what they go through.

There were some concerns with a lot in this bill, but they can live with that because, as Mr. McAllister said, we realize there is going to be some changes made this session.  This is what we believe are appropriate changes, and they can live with that.  We are supporting S.B. 241 (R3).

Assembly Committee on Commerce and Labor
May 4, 2015
Page 26

**Tray Abney, Director of Government Relations, The Chamber, Reno-Sparks-Northern Nevada:**
We think this is a good first step. I will echo Mr. McAllister's comments on this bill. We want to thank Senator Roberson for bringing it forward. We know it is a wide-ranging bill that starts to rebalance the equation in favor of our local elected officials and taxpayers. It is important that our city councils, county commissions, and others have the flexibility to ensure that our taxpayers are protected. We believe that union business should be done on union time with union pay, so we appreciate that provision. The evergreen provision is critical so that these contracts are not on autopilot and that we have some control over that.

You have heard the word accountability a lot, and obviously this provides accountability for the most important thing that we discuss in this building and the biggest part of our budget, and that is education. We support this bill.

**Paul J. Moradkhan, Vice President, Government Affairs, Las Vegas Metro Chamber of Commerce:**
The Las Vegas Metro Chamber of Commerce would like to offer its support of this bill today. We would like to thank Senator Roberson and interested parties for coming to a good compromise. We believe this bill reflects a lot of work to find a common ground that benefits the entire state.

Regarding this bill, the Metro Chamber is, of course, in support of accountability standards. We have supported accountability measures for the teachers in the last several legislative sessions. We want the best teachers in the classroom. We want teachers who are the best principals in their buildings. We believe this follows that path. We think that that is the same accountability standards that are appropriate.

We support the changes to the evergreen clauses. What I think is also important here is the negotiation process by giving additional time, and the process to ensure that good intent is followed through by giving additional mechanisms to come to a resolution that will work for all interested parties.

**Michael Ramirez, Director of Governmental Affairs, Las Vegas Police Protective Association Metro, Inc.; and representing Southern Nevada Conference of Police and Sheriffs:**
With our colleagues, we support this bill.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 27

**Lonnie Shields, Assistant Executive Director, Nevada Association of School
    Administrators; and representing Clark County Association of School
    Administrators and Professional-Technical Employees:**
We appreciate Senator Roberson's willingness to meet with us and to put the
part about collective bargaining for the majority of our members into the bill
with the amendment.  We appreciate that right.  We do not want bad principals
in our schools any more than anybody else, and we will work together to make
sure that does not happen with the implementation of this bill.

**Melissa Johanning, President, Las Vegas Police Protective Association Civilian
    Employees, Inc.:**
I am here to mirror what my colleagues said in support of this bill.  I want to
mention a couple of things that I think are very important to my organization.
First is the expeditious nature of having the negotiation process.  Our goal is to
always have a contract in place before the next one expires.  With this bill,
hopefully that will be accomplished, and we really would not have to worry
about the evergreen clause that we currently have in our agreements.

Second, we believe it is an appropriate compromise for the collective bargaining
reforms that we know are going to happen during this session.

**Chairman Kirner:**
Are there others who are in support of this bill?  [There were none.]  Is anyone
opposed to the bill?

**Richard P. McCann, Executive Director and Labor Representative, Nevada
    Association of Public Safety Officers:**
My colleagues from fire, law enforcement, teachers, and other great people are
in support of this bill.  I would like to offer one comment.  I represent
1,400 public safety officers and other professionals, including police officers,
corrections officers, parole and probation officers, highway patrol dispatchers,
and school police officers, among others.  I represent a lot of the smaller
agencies and the employee organizations around the state.  We have about
20 different associations, many of which are in the rural areas.  I represent
some people from the larger groups, such as Henderson and Las Vegas
Metropolitan Police Department (Metro), and I have to offer this comment.
There may be a misconception, at least on section 1, and that is what I am
primarily focused on.  All the other stuff that the teachers took care of, they are
subject matter experts on that.

Section 1, on what I will call the union leave issue, I fear there is
a misconception about what representatives for employee organizations may do.
At least for the 20 groups that I represent, they are not there to argue every

Assembly Committee on Commerce and Labor
May 4, 2015
Page 28

issue. They are not there to raise grievances that are necessarily inappropriate. They are not there to be the enemy of the employer organizations. They are not there to bleed the government employers. We understand that. Rather, they are there to use the buffer, and that is what we use them for. These people get some time from their day to be able to deal with the union, the labor-management issues. They are there to act as a buffer, to separate the wheat from the chaff, vis-à-vis the issues affecting membership as a whole, which are important, and to separate them from the gripe sessions that are often the case for some members. We try to act as a buffer, and those people are on a day-to-day basis, a week-to-week basis, a month-to-month basis. They are, in fact, doing that job.

Members need to be educated on their rights and their responsibilities under their particular contracts. These labor representatives do that, and they are there to provide a liaison to work with the local government employers to resolve issues, not to exacerbate problems. They work in concert with the employers to create labor-management partnerships. I have sat in several committee meetings of this nature, and I have heard a lot of people who have come from Henderson and Mesquite, and all over the state, who have said, "We have great relationships with our unions." We need those great relationships, and these men and women are in positions to be able to spend a few hours without having to worry about the compensatory nature of it, as long as it is not breaking the bank. I do not know that these small groups are breaking the bank; it is always a manpower issue. These people do not come to negotiate contracts. They do not come to file grievances. They do not come into the labor-management world unless their manpower issues are covered.

The need for this leave has long been recognized by both the employers and employees. It is in many, if not all, the contracts we negotiate. The employers have consistently seen the need for union leave time. Now this bill seeks to potentially strip the employers from that contractual right that for years they have seen the need for.

In each of our many contracts that we negotiate, there is a "bargain for benefit" to the employer. Union leave is tracked by the employers. The amounts cannot be exceeded by the employee associations. Union leave can only be used when those manpower issues are taken care of. Local government employers routinely line the halls of that building in Carson City and in Las Vegas in order to lobby for their interests. That is taxpayer money too. I am not saying it is a quid pro quo—that you take from us, we take from you. I am just reminding this esteemed Committee that we have a lot of local groups, and the way this bill is written can certainly be interpreted that you can no longer have a few hours here and there to do the things that make that partnership and give us the

Assembly Committee on Commerce and Labor
May 4, 2015
Page 29

opportunity of working with the employers.  We need that in many of these smaller groups.  Not everybody is a large group.  Metro has done a fine job in being able to disperse that.  A lot of people have dispersed that responsibility, but in smaller groups, they cannot always do that.  I am asking that you consider that and, therefore, on that premise alone, with section 1, and for those foregoing reasons, we respectfully oppose S.B. 241 (R3).

**Assemblywoman Fiore:**
I am looking at a collective bargaining bill that unions are actually liking.  So my first suspicious thought is there is something wrong with the bill.  However, your concerns with section 1, and correct me if I am wrong, is basically you want taxpayers to pay your salary to lobby us.  Is that your concern?  I just want to be clear.

**Richard McCann:**
I think putting it in that respect is not accurate.  In regard to having taxpayers pay us to lobby, the employers do that too, but I am not trying to get into that discussion.  I am not a police officer.  I have never been nor ever will be a law enforcement professional.  Our organization is an umbrella over them, so many of the negotiations we do admittedly are us.  I know it sounds like you want taxpayers to pay you to not do your job, but there is a point to be made, that these people provide a service.  They provide a service to get that relationship going, to act as liaison.  If we put this in a vacuum by saying, "You just want taxpayers to pay you to not do your job," that sounds pretty bad and I would agree with you, but look at what they do.  That is what I try to educate you on.  Look at these groups, at what they do, and they do, in fact, provide a service, paid for or not.  Again, they negotiate these hours with the employers, they cannot exceed those hours, and manpower is covered—those are things to consider.

**Assemblywoman Fiore:**
The bottom line is, that is your concern?

**Richard McCann:**
Yes, that is my concern.  These people have got to have an opportunity of doing the job that provides the relationship, the concert, the liaison that we have.  I think that is important; otherwise, there will be a lot of fighting that absolutely is avoidable.  These people provide a remedy to keep that relationship of labor and management alive, keep it focused, and get things done.  For that, I think the employer is getting a bargain for benefit when they pay these people to do that very thing.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 30

**Chairman Kirner:**
Are there those who are neutral on the bill?  Seeing no one come forward, I will go to the bill's sponsor for a summary.

**Senator Roberson:**
I appreciate Mr. McCann's testimony if only to assure my esteemed colleague, Assemblywoman Fiore, that not everyone in labor supports this bill.  There is some value there, I suppose.

To address Mr. McCann's interpretation, his interpretation is correct.  Let us make no mistake about it.  Under section 1, it reads: "A local government employer may agree to provide leave to any of its employees...."  Mr. McCann is not a police officer; he is not an employee of local government.  To the extent that there is interpretation that it would include someone like him, no, I do not think it would.  He is simply a lobbyist for an organization.

Getting back to the language in section 1: "A local government employer may agree to provide leave to any of its employees for time spent by the employee in performing duties or providing services for an employee organization"—that is, a labor group—only "if the full cost of such leave is paid or reimbursed by the employee organization or is offset by the value of concessions made by the employee organization in the negotiation of an agreement with the local government employer pursuant to this chapter."  I think that is common sense.  I think if you talk to the voters, 9 or 9.5 out of every 10 voters are going to say, "Yes, that makes sense."  That is what section 1 would do.

I am sorry that Mr. McCann is opposed to it, but I would hope that all of you would support this bill.

**Chairman Kirner:**
With those closing comments, we will close the hearing on <u>S.B. 241 (R3)</u> and open the hearing on <u>Senate Bill 242 (1st Reprint)</u>.

<u>**Senate Bill 242 (1st Reprint):**</u>  **Requires payday lenders to use best practices. (BDR 52-953)**

**Senator Michael Roberson, Senate District No. 20:**
This bill would enact the Payday Lender Best Practices Act.  The payday lending industry has had a meteoric growth in the past couple of decades since its modern incarnation started from the check-cashing business during the early 1990s.  The Community Financial Services Association of America (CFSA), the national payday lending trade group that represents more than half of all payday advance stores, reports that there are approximately 20,600 payday advance

Assembly Committee on Commerce and Labor
May 4, 2015
Page 31

stores across the country.  Nevada has regulated this growing industry for over a decade to protect consumers.  Moreover, the CFSA believes that payday advance transactions should be conducted in a safe and responsible manner with appropriate consumer protections.  Therefore, the CFSA has developed best practices that are used to maintain quality in the payday advance industry and could be used as a benchmark for payday lenders.  The best practices ensure responsible conduct among lenders, protect borrowers rights, and encourages self-governance of the payday advance industry.

Senate Bill 242 (1st Reprint) requires a licensed person providing deferred deposit loan services, high-interest loan services, and title loan services to comply with revisions set forth in this bill.  Section 4 requires a licensee to comply with the disclosure requirements of Nevada and the disclosure requirements in the Federal Truth in Lending Act.  A licensee must disclose the cost of the service fee as both a dollar amount and as an annual percentage rate.  In addition, to further ensure full disclosure, rates will be prominently disclosed in a customer's loan agreement before he or she enters into the transaction process.

Section 5 prohibits a licensee from charging a fee or a rate for a payday advance that is not authorized by state or federal law.  Truthful advertising by the licensee is addressed in section 6 of the bill.  Section 7 encourages consumer responsibility.  A licensee must place certain notices on marketing and advertising materials to inform consumers that payday advance services should be used for short-term financial needs only, and those persons with credit difficulties should seek credit counseling before entering into any loan transaction.

Section 8 of the bill prohibits a licensee from allowing customers to roll over a payday advance.  A rollover is an extension of an outstanding advance by payment of only a fee.  This section would not apply to title loans. Section 9 makes it clear that under the existing law, Chapter 604A.460 of *Nevada Revised Statutes* (NRS), a licensee must provide each customer with the right to rescind, at no cost, a payday advance transaction on or before the close of business on the following business day.

Section 10 requires a licensee to collect past-due accounts in a professional, fair, and lawful manner.  A licensee is prohibited from using unlawful threats, intimidation, or harassment to collect accounts.  In addition, the Federal Fair Debt Collection Practices Act should guide a licensee's practice in this area. Section 11 requires the industry to self-police and report violations to the Commissioner of the Division of Financial Institutions, Department of Business and Industry.  In accordance with existing NRS 604A.475, section 12 requires

Assembly Committee on Commerce and Labor
May 4, 2015
Page 32

a licensee to provide customers who are unable to repay a payday advance, according to the original contract, the option of repaying the advance over a longer period of time.  Section 13 of the bill requires a licensee that offers payday advances through the Internet to be licensed in each state where its customers reside and to comply with the state licensing requirements and other applicable laws preempted by federal law.

I urge your support of this important legislation.

**Assemblywoman Bustamante Adams:**
I noticed that you struck out the check-cashing services.  Can you explain why those are deleted from the bill?

**Senator Roberson:**
I struck out?

**Assemblywoman Bustamante Adams:**
I am not sure who struck it out.  I am looking at the first reprint.  It was in the work session from the Senate.  It said that you removed all references regarding the check-cashing services.

**Senator Roberson:**
Could you point out where?

**Assemblywoman Bustamante Adams:**
Section 5, in your original bill.

**Senator Roberson:**
I think that was in the original bill.  I do not think I made that change.

**Assemblywoman Bustamante Adams:**
All check-cashing services were deleted.  I was wondering why you had taken that out.  In the work session document, it was amended to remove all the references.

**Senator Roberson:**
Again, I do not recall that change being made in the work session, but I was not at the work session.  The Senate Committee on Commerce, Labor and Energy may have done that.  There may be others here who testified in support or opposition to the bill who may have more information on that.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 33

**Assemblywoman Bustamante Adams:**
My other question has to do with that portion as well, so I will hold my question.

**Chairman Kirner:**
I think the first reprint is the most current and up to date. Is that what you are asking?

**Assemblywoman Bustamante Adams:**
Yes. You will not see it in the first reprint unless you go back and look at the original bill to see what was struck out. I wanted to see what had changed from the original version. I had noticed that "check-cashing services" was deleted throughout the entire bill. I was wondering what the conversation was to delete them and take them out of this bill.

**Chairman Kirner:**
I see that as well and, as the Senator says, he was not there, and I was not there, so I do not know why that was. Maybe somebody else will have testimony that will help us.

Not seeing any other questions, we will go to those who are in support of the bill.

**Venicia Considine, Attorney, Consumer Rights Project, Legal Aid Center of Southern Nevada:**
Thank you for considering a bill on consumer protections in the payday lending industry. We are in support of this bill as it is without any amendments.

**Alfredo Alonso, representing Community Financial Services Association of America; and Money Tree:**
We also support the bill. All of our member companies already do most of these practices. We think it is a smart way to go forward and, obviously, we will get some of the bad actors to start playing by what seem to be fairly common, normal rules that a business should abide by. I think it will make the industry much better as a result.

The question that Assemblywoman Bustamante Adams referred to with respect to the check-cashing language, that was removed because it was inadvertently included in the original version of the bill. They are not loans. It would not have made any sense to include best practices with a basic check-cashing component that frankly no one understood why it would have been there in the first place, so it was simply removed.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 34

**Sara Cholhagian, representing EZCORP, INC.:**
We offer our full support of <u>S.B. 242 (R1)</u>.   We echo the comments of
Mr. Alonso and believe that this bill is seeking to codify many of those same
practices already in place.   We think it is good for the industry and thank the
sponsor for bringing this measure forward.

**Marlene Lockard, representing Nevada Women's Lobby:**
We are in support of this measure.

**Assemblywoman Neal:**
This question is for Mr. Alonso.   You were saying that most of your clients do
some of these practices already.     In section 7, subsection 2, it says,
"Customers with credit difficulties should seek credit counseling...."   Should
seek is the not same as direct.   How many of your clients are making their
customers do credit counseling before they get the loan?

**Alfredo Alonso:**
I would have to poll them to find out.   I can tell you from my experience with
Money Tree, that when you walk in, there are documents throughout the office
indicating where you can go for credit counseling.    The customer will be
directed to it.   Obviously, each business is different, so I will try to find out and
get an answer for you.

**Assemblywoman Bustamante Adams:**
This is for Venicia Considine.   In this industry, for your consumers that you see
on a regular basis, do they have more difficulty with the high-interest loans, the
title loans?   If you had to rank them in order, which would be the most
problematic ones?

**Venicia Considine:**
I would only be able to answer that anecdotally at this point.   I think the
title loans would be the biggest issue because it is to the point where somebody
is essentially turning their vehicle title over to someone.    Then there are the
payday loans.   There are a couple of different types of payday loans.   What we
appreciate is that this bill at least lists the best practices and offers some
consumer protections.

**Chairman Kirner:**
Are there any other questions from the Committee?   Seeing none, we will go to
those who are opposed.   Seeing none, is anyone neutral who wishes to testify?
Seeing none, I will close the hearing on <u>Senate Bill 242 (R1)</u> and move to
<u>Senate Bill 373 (1st Reprint)</u>.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 35

<u>Senate Bill 373 (1st Reprint)</u>:   **Makes various changes relating to insurance.**
   (BDR 57-689)

**John Fielding, Attorney, U.S. Travel Insurance Association, Washington, D.C.:**
I appreciate the opportunity to talk with you this afternoon in support of <u>Senate Bill 373 (1st Reprint)</u>.  The legislation would update Nevada's producer licensing requirements for travel insurance and does so in the way that provides legislators and regulators with the information that you need for good governance. [Submitted map showing status of legislation in the states (<u>Exhibit H</u>) and an overview of the bill (<u>Exhibit I</u>).]  The bill updates the licensing process to reflect the way the marketplace operates today and, most importantly, it protects consumers.  Similar reforms are in place in 34 states with legislation awaiting governor's signatures in two additional states, and legislation and regulations are pending or under consideration in the remaining states.

The bill is based on a model act adopted by the National Conference of Insurance Legislators in November 2012 and on uniform licensing standards that were adopted by the National Association of Insurance Commissioners in 2010.  Travel insurance producer licensing is in great need of modernization.  Current licensing difficulties and regulatory inconsistencies among the states are driven by a number of underlying factors reflecting both the realities of the market and the regulatory approaches of the states.  <u>Senate Bill 373 (R1)</u> provides a fix for those problems that addresses the needs of consumers, regulators, and the industry players who need to comply with state licensing requirements here in Nevada and across the country.

Although it may seem straightforward, the current process for licensing travel insurance limited line producers does not work for the simple reason that the travel business is different now from what it was decades ago.  It is a much more national business with travel agencies serving customers across the country.  This complicates the distribution of travel insurance because each state has its own licensing requirements for insurance producers.

Nonresident licenses are very difficult to obtain for travel insurance producers because, unlike major lines of authority like life or health or property and casualty, there is very little licensing reciprocity among the states with respect to travel insurance.  In fact, before states started enacting the model act a couple of years ago, there were 41 different licensing qualifications across the country to get licensed for travel insurance.  In addition, states had different licensing processes and procedures and different applications.  As a result, it could take up to six months for a travel agent to get licensed to sell travel insurance across the United States, making full compliance nearly

Assembly Committee on Commerce and Labor
May 4, 2015
Page 36

impossible in an industry that can suffer from high turnover rates. This is a significant burden and regulatory risk to the 133 travel agencies in Nevada. Moreover, compliance burdens can be more keenly felt because these are predominantly small businesses, with 94 of the 133 agencies employing fewer than 5 people, and 124 of those 133 employing fewer than 20 people.

The situations improved as more and more states have enacted the model act's reforms, but compliance difficulties will remain until all states have adopted the model language. <u>Senate Bill 373 (R1)</u> would permit licensed insurance providers—managing general agents (MGA), third party administrators (TPA), insurers, and administrators—to be the licensees for products that are distributed through noninsurance travel retailers—that is, through travel agents—but only if certain consumer protections are met, such as training and consumer disclosures that are not currently required under law. The essential feature of the proposal is that going forward, individual travel agents would not have to hold their own licenses, although they could if they wanted to, but instead they would be able to operate under the producer license of a licensed entity like the administrator, the TPA, or the MGA. The names and contact information of these travel agents would be registered and would be provided to the insurance department upon request so if there are any problems, the department knows who is responsible and can take action both against the licensed entity and against the travel retailer. Also, the definition of travel insurance would be updated to reflect the current marketplace and how it operates.

In addition to the U.S. Travel Insurance Association, the bill is supported by the American Society of Travel Agents, which represents travel agents in Nevada and across the country. I urge you to support the bill.

**Jeanette K. Belz, representing U.S. Travel Insurance Association:**
There is a letter (<u>Exhibit J</u>) on the Nevada Electronic Legislative Information System from the American Society of Travel Agents in support.

**Assemblyman Ellison:**
In section 19, subsection 1, paragraph (j) says, "Rental car agency as a limited line." What do you mean by that?

**John Fielding:**
The rental car agency, as a limited line, is a current line of authority in Nevada law, and that is not going to change. It is a limited line of authority, so when you go to Hertz or Avis and rent the car, you can get a limited line of rental coverage from them.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 37

**Assemblywoman Bustamante Adams:**
Just so I understand the industry, there is a producer and there is a retailer. The producer does not have to be located in Nevada. The producer is the one who actually sells the insurance. How does the money connect between the retailer and the producer? Do they get a percentage?

**John Fielding:**
The producer, who may or may not be a Nevada resident, is in a contractual relationship with the travel retailer, the travel agent. The travel agent would be able to earn a commission or a fee for the distribution of the policy.

**Assemblywoman Bustamante Adams:**
Would they get a different commission depending on who the producer is? Could a higher amount be earned if they pushed a certain product versus another? Is that how it works?

**John Fielding:**
Yes. It depends on what the contract would be with the individual producers, from the agent to the producer. Generally, the travel retailer will only work with one insurance producer, so that retailer would only be offering one set of policies.

**Assemblywoman Bustamante Adams:**
Section 10, subsection 1 says, if I understand this correctly, that both the producer and the retailer are not required to pass any written examination or meet any prelicensing education. Can you elaborate on that?

**John Fielding:**
Under current law, there is no examination or education requirements, and that is the way it is in almost all states. Going forward, what this says is that travel retailers and travel producers would not be subject to the standard prelicensing examination requirements that are required of most insurance producers for life, health, property, and casualty.

Having said that, in another provision of the bill, there is a specific training requirement that these travel retailers will have to undergo in order to make sure they understand what they can and cannot do. There are disclosures they are required to provide, and they understand the basics about the policies.

**Assemblywoman Bustamante Adams:**
Section 12 says it prohibits a travel retailer from evaluating or providing advice. Is that the section you are talking about? The retailer cannot give advice on the insurance portion of it?

Assembly Committee on Commerce and Labor
May 4, 2015
Page 38

**John Fielding:**
Yes, that is correct.  The retailer can only engage in limited activities because they are not licensed; they are only registered.  The bill is very specific to say they cannot do certain things like a fully licensed insurance agent would be able to do.

**Assemblywoman Bustamante Adams:**
I think I understand what travel insurance means, but what does it cover? Would it cover your luggage being damaged?

**John Fielding:**
The definition in section 5 goes through exactly what travel insurance is in an updated and current market understanding.  Insurance coverage for personal risk, meaning when you are on a personal trip or business trip, would cover cancellation or interruption of the trip.  It fills the gap if something happens and you cannot take the trip or you have to leave the trip early, for lost baggage, for damages if you have a rental vehicle that is damaged, if you rent a cottage and it gets damaged in some way, or if you get sick and you need emergency coverage.  It fills the gap if you are abroad, particularly, and your health insurance may not cover certain things [referred to information from Allianz Global Assistance (Exhibit K) and Expedia (Exhibit L)].

**Chairman Kirner:**
I am focusing on section 7 and trying to ascertain why this bill requires a two-thirds majority vote?  In section 7, it reads, "A license issued pursuant to this section authorizes the licensee to sell...."  So this is a two-thirds bill because a license would be required to be issued.  Am I interpreting this correctly?

**Jeanette Belz:**
Yes, that is correct.

**Chairman Kirner:**
This would not be a new license?

**Jeanette Belz:**
That is correct.

**Chairman Kirner:**
So it is an existing license because of anybody who might be added to that. It is nothing new, not a new fee; it is just for additional licensees?

Assembly Committee on Commerce and Labor
May 4, 2015
Page 39

**Jeanette Belz:**
That is correct.

**Chairman Kirner:**
If I understand this correctly, the travel insurance provision in section 5, subsection 1, paragraph (a), would take care of any of us legislators who have a trip planned and who might have to be here for a special session.

Are there any other questions from the Committee?  [There were none.]  With that, I will ask those who are in support of S.B. 373 (R1) to add their testimony. Seeing no one, are there any who are opposed to S.B. 373 (R1)?  Seeing no opposition, I will take testimony from those who are neutral.  Seeing no one who is neutral, did you want to have a closing comment?  [There was none.] With that we will close the hearing on S.B. 373 (R1).

That completes our agenda for today.  I will open the Committee meeting to public comment.  Seeing none, the meeting is adjourned [at 3:36 p.m.].

RESPECTFULLY SUBMITTED:


_____
Connie Jo Smith
Committee Secretary


APPROVED BY:



_____
Assemblyman Randy Kirner, Chairman

DATE: _____

Assembly Committee on Commerce and Labor
May 4, 2015
Page 40

## EXHIBITS

**Committee Name:** **Assembly Committee on Commerce and Labor**

**Date:** **May 4, 2015**                    **Time of Meeting:** **1:34 p.m.**

| Bill | Exhibit | Witness / Agency | Description |
|---|---|---|---|
|  | A |  | Agenda |
|  | B |  | Attendance Roster |
| A.B. 481 | C | Bruce H. Breslow, Department of Business and Industry | Proposed amendment |
| S.B. 67 (R1) | D | Scott J. Kipper, Division of Insurance | Testimony in support |
| S.B. 67 (R1) | E | Scott J. Kipper, Division of Insurance | 2015 Insurance Market Report |
| S.B. 67 (R1) | F | Jeanette K. Belz, Property Casualty Insurers Association of America | Letter of support from Mark Sektnan |
| S.B. 241 (R3) | G | Ruben Murillo, Jr., Nevada State Education Association | Letter of support |
| S.B. 373 (R1) | H | John Fielding, U.S. Travel Insurance Association | Map:  State Implementation of Travel Insurance Producer Licensing Reform |
| S.B. 373 (R1) | I | John Fielding, U.S. Travel Insurance Association | Travel Insurance Producer Licensing Reform |
| S.B. 373 (R1) | J | Jeanette Belz, U.S. Travel Insurance Association | Letter of support, American Society of Travel Agents |
| S.B. 373 (R1) | K | John Fielding, U.S. Travel Insurance Association | Travel Insurance Essential Plan, Allianz Global Assistance |
| S.B. 373 (R1) | L | John Fielding, U.S. Travel Insurance Association | Expedia Travel Protection Plans |

# Exhibit D



# LAS VEGAS POLICE PROTECTIVE ASSOCIATION

DONATE TO LEAF

*We Protect Those Who Protect Others*

FOLLOW US 

ABOUT    NEWS    BUSINESS DIRECTORY    SHOP

LEAF CHARITIES    CONTACT    MEMBERS    JOIN    

# MEDICAL INFORMATION

## Employee Health and Welfare Trust

### Director of Trust

Kelly Taylor ✉
702.641.2160

### Board of Trustees – Management

Todd Fasulo ✉
702.828.8230

Jamie Frost ✉
702.828.3993

Gary Schofield ✉
702.828.3520

Jackson Wong ✉
702.828.3928

## Board of Trustees – Labor

Mark Chaparian ✉
702.384.8692

## REMINDER

# Membership Meeting

## December 3 at 5:00 pm

**VIEW ALL EVENTS »**





John Faulis ✉
702.384.2924

Christine Payson ✉
702.828.3243

Thomas Reid ✉
702.384.8692 ext 219

## Health & Welfare Trust Administrator

UMR ✉
2716 N. Tenaya Way
Las Vegas, NV 89128
866.868.1395
702.413.1701
https://member-fhs.umr.com

## Useful Websites

UMR
General – Beechstreet Provider Network
Eye – Davis Vision
Dental – Dental Guard Preferred Network
Pharmacy – CVS / Caremark

## Medical Rates

Retiree Rates
Dependent Rate Structure

Las Vegas Police Protective Association © 2015 | Website Designed and Maintained by

# Exhibit E



  Home  Contact us

Enter username   Enter password
New user? Register here.   Forgot username or password?   Log in



*Member*

**How can we help you?**

- View site tour
- Find a form
- Tools and resources
- Report fraud



WELCOME
Make a pledge to be a "Fit Family" and learn more about childhood obesity in our special report

Read Healthy You

I use UMR.com to track claims for my knee surgery.


UMR member | TRISHA
Basketball coach


**Find a provider**


**Plan cost estimator**


**Healthy You Magazine**


**Healthy 'U' Presentations**

**About Us**

UMR is a third-party administrator (TPA), hired by your employer, to help ensure that your claims are paid correctly so that your health care costs can be kept to a minimum and you can focus on well-being.

UMR is not an insurance company. Your employer pays the portion of your health care costs not paid by you.

UMR is a UnitedHealthcare company.

©2015 United HealthCare Services, Inc.

Careers

**Your privacy is important to us!**
At UMR, we are very sensitive to privacy issues. To better understand the procedures and protocols we follow to help to ensure your privacy, please review the following information:

- Terms of use
- Privacy statement
- Statement regarding conflict of interest
- Editorial policy
- Important information on payment of out-of-network benefits

Explore our library of informative videos on the UMR YouTube channel

Exhibit F

# John J Faulis Salary for 2014

| | |
|---|---|
| **Name** | John J Faulis |
| **Position** | POLICE LIEUTENANT<br>Las Vegas Metro Police Department |
| **Year** | 2014<br>Other years<br>2013   2012   2011   2010   2009 |
| **Base Pay** | $120,913.90 |
| **Overtime and Callback Pay** | $0.00 |
| **Other Pay** | $25,528.93 |
| **Total Pay** | $146,442.83 |
| **Benefits Accumulated** | $67,870.13 |
| **Total Pay & Benefits** | $214,312.96 |

# Exhibit G

# John D Hayes Salary for 2014

| | |
|---|---|
| **Name** | John D Hayes |
| **Position** | POLICE SERGEANT<br>Las Vegas Metro Police Department |
| **Year** | 2014<br>Other years<br>2013    2012    2011    2010    2009 |
| **Base Pay** | $100,760.00 |
| **Overtime and Callback Pay** | $0.00 |
| **Other Pay** | $21,447.75 |
| **Total Pay** | $122,207.75 |
| **Benefits Accumulated** | $59,026.91 |
| **Total Pay & Benefits** | $181,234.66 |

Exhibit H



# Mark A Chaparian Salary for 2014

| Name | Mark A Chaparian |
|---|---|
| Position | POLICE OFFICER (/salaries/search?p=1&q=POLICE%20OFFICER&t=job&j=any&y=any) Las Vegas Metro Police Department (/salaries/2014/las-vegas-metro-police-department/) |
| Year | 2014 (/salaries/2014) Other years 2013 (/salaries/2013/las-vegas-metro-police-department/mark-chaparian/)   2012 (/salaries/2012/las-vegas-metro-police-department/mark-chaparian/)   2011 (/salaries/2011/las-vegas-metro-police-department/mark-chaparian/)   2010 (/salaries/2010/las-vegas-metro-police-department/mark-chaparian/)   2009 (/salaries/2009/las-vegas-metro-police-department/mark-chaparian/) |
| Base Pay | $80,616.00 |
| Overtime and Callback Pay | $0.00 |
| Other Pay | $26,488.10 |
| Total Pay | $107,104.10 |
| Benefits Accumulated | $50,818.12 |
| Total Pay & Benefits | $157,922.22 |

TransparentNevada.com, provided by the Nevada Policy Research Institute, is dedicated to making Nevada's public sector truly public. Since its launch in September 2008, it has served as a unique source of public pay information for hundreds of thousands of citizens, journalists and elected officials. Please see our disclaimer. (/disclaimer/)



← Previous page    Home (/)    To top of page ↑



TransparentNevada (/) is provided by the Nevada Policy Research Institute (http://npri.org/) as a public service. Copyright © 2015. Connect with us on Facebook (https://www.facebook.com/NevadaPolicyResearchInstitute) or Twitter (https://twitter.com/TransparentNV)

Exhibit I

# Thomas J Reid Salary for 2014

| | |
|---|---|
| **Name** | Thomas J Reid |
| **Position** | CORRECTIONS OFFICER<br>Las Vegas Metro Police Department |
| **Year** | 2014<br>Other years<br>2013    2012    2011    2010    2009 |
| **Base Pay** | $80,624.70 |
| **Overtime and Callback Pay** | $0.00 |
| **Other Pay** | $19,136.61 |
| **Total Pay** | $99,761.31 |
| **Benefits Accumulated** | $49,652.52 |
| **Total Pay & Benefits** | $149,413.83 |

TransparentNevada.com, provided by the Nevada Policy Research Institute, is dedicated to making Nevada's public sector truly public. Since its launch in September 2008, it has served as a unique source of public pay information for hundreds of thousands of citizens, journalists and elected officials. Please see our disclaimer.

# Exhibit J

## DECLARATION OF RICHARD HOGGAN

Richard Hoggan, declares as follows:

1.     I am over the age of 18 years and have personal knowledge of the facts stated herein, except for those stated upon information and belief, and as to those, I believe them to be true.  I am competent to testify as to the facts stated herein in a court of law and will so testify if called upon.

2.     I am the Chief Financial Officer for the Las Vegas Metropolitan Police Department ("Department").

3.     Currently, the dues rates for Las Vegas Police Metro Protective Association, Inc. ("PPA") are $40.95 per pay period for 24 pay periods.

4.     The dues rates for Las Vegas Police Managers' & Supervisors' Association, Inc. ("PMSA") are $39.66 per pay period for 24 pay periods.

Pursuant to NRS § 53.045, I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Dated this 2nd day of November, 2015.

RICHARD HOGGAN

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816