Richard G. McCracken SBN 2748
Andrew J. Kahn, SBN 3751
Paul L. More, SBN 9628
McCRACKEN STEMERMAN & HOLSBERRY
1630 S. Commerce St.
Las Vegas, NV 89101
Telephone:   (702) 386-5132
Fax:             (415) 597-7201
Email:         rmccracken@dcbsf.com
                   ajk@dcbsf.com
                   pmore@dcbsf.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS POLICE PROTECTIVE ASSOCIATION METRO INC.; LAS VEGAS METRO POLICE MANAGERS & SUPERVISORS ASSOCIATION,<br><br>Plaintiffs,<br><br>vs.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT;<br><br>Defendant. | CASE NO. 2:15-cv-01928-LDG-CWH<br><br>**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

### I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Metro does a fine job of destroying a straw horse, a claim not made by Plaintiffs that the First Amendment provides some sort of abstract right to continued subsidy of speech. Plaintiffs instead are arguing they are victims of viewpoint discrimination in that they and their fellow local union advocates have alone been targeted for defunding: state and local government continues to subsidize ethnic employee groups and State employee groups and lobbying, and could subsidize anti-union speech as well. The First Amendment compels the Legislature to be consistent and even-handed: if it does not want public money to be used for advocacy, then pass

1

a law saying that, instead of saying public money cannot be used for union speech but letting anti-union speech be paid for with tax dollars. Because discrimination is the issue here, Metro's reliance on *Ysursa v Pocatello Ed Assn* and similar cases is entirely-misplaced, because the unions there either abandoned any discrimination claim or had no such claim.

## II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Metro relies on cases holding in the abstract there is no *per se* right to have speech subsidized such as *Regan v Taxation with Representation*, 461 US 540 (1983), but those cases were distinguished and found inapposite to the situation where government through de-funding engages in viewpoint discrimination against particular speakers in the two key Supreme Court cases cited by Plaintiffs in their opening brief but completely ignored by Metro's opposition, Legal *Services Corp. v. Velasquez,* 531 US 533 (2001) and *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 835 (1995). Like here, in the latter cases particular private advocacy was selected for defunding, which the Court found impermissible.

Here, the statutory definition of "employee organization" applicable to SB 241's funding ban is viewpoint-based: "'Employee organization' means an organization of any kind having as one of its purposes improvement of the terms and conditions of employment of local government employees." NRS 288.040. An employee organization is required by law to speak, and to do so in a certain manner: that is, to advocate on behalf of all unit employees on a non-discriminatory basis with an eye to improving employment terms and arriving at a collective bargaining agreement and enforcing the same, while renouncing strikes. NRS 288.160(1)(c); 288.270(2); NRS 288.240-.250.[1] Ethnic groups and government managers by their very nature have other

---

[1] Union speech mandated by law includes, for example, providing information to employers upon request (see, e.g., *Hotel & Restaurant Employees Local 226 (Caesars Palace)*, 281 NLRB 284 (1986))   and designating a particular spokesperson. (See, e.g., *City of Reno v. Int'l Assn of Firefighters*, Nev. EMRB Case No. A1-045472, EMRB Dec. No.253A, 2/3/91). Union leaders who thought their members' pay and benefits should be cut or their members contracted-out because that would be better for the public could not tell the employer or public as much without breaching their legal duty of fair representation to the bargaining unit. Unions are also often compelled to engage in the speech of filing grievances and pursuing arbitrations,  even for individuals who take a political stance contrary to that of the union (and ultimately harmful to the union and its unit). See NRS 288.270(2)(c); *Nevada Service Employees Union/SEIU Local 1107 v. Orr,* 121 Nev. 675, 119 P.3d 1259 (2005); Deborah *Boland MD v. SEIU Local 1107*, Nev.

priorities. Judges and scholars have recognized that labor organizations have a viewpoint by their very nature. See e.g., *United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167, 1193-94 (D. Ariz. 2013) ("Both definitions of picketing in A.R.S. § 23–1322 single out picketing by 'labor organizations.' Because § 23–1322(B) singles out labor unions as the only speakers on which to impose its restrictions, it is viewpoint discriminatory on its face."); *NLRB v. Fruit & Vegetable Packers, Local 760 (Tree Fruits)*, 377 U.S. 58, 76-80 (1964) (Black, J., concurring, finding statutory restrictions on picketing only by labor organizations to be unconstitutional discrimination); *Retail Store Employees Union v. NLRB* (*Safeco),* 447 U.S. 607 (1980) at 617 (Blackmun, J., concurring).[2] Union representatives are the functional equivalent of the legal aid lawyers held protected from defunding in *Velasquez.*

Metro's reliance on *Ysursa v. Pocatello Educ'n Assn,* 555 U.S. 353 (2009) is mistaken because it was not a discrimination case, unlike this one. There Justice Souter's dissent from the grant of certiorari put the problem succinctly: "the potential issue of viewpoint discrimination that should be addressed in this case is not before us. * * * the unions have accepted the

---

LGEMRB Case Nos. A1-045847 et seq., Dec. No. 802, 2015 WL 1324423 (March 23, 2015)(union must go on filing grievances and arbitrations for employees even after it disclaims interest in representing them). Unions by their very nature are organs of speech, and in the U.S. quite particular speech, that which observes that management and labor have fundamental differences and that managers make errors which should be addressed via workers having collective representation. See, e.g., *Thomas v. Collins*, 323 US 516, 535 (1945)(noting "unionism's most central principle, namely, that workingmen should unite for collective bargaining"); *Railroad Telegraphers v. Railway Express Agency, Inc*., 321 US 342, 346 (1944)("Collective bargaining was not defined by the statute which provided for it, but it generally has been considered to absorb and give statutory approval to the philosophy of bargaining as worked out in the labor movement in the United States.").'

[2] Other justices found the statute discriminatory but justified by state interests. Among the many scholars noting NLRA restrictions on picketing by labor organizations (but only such organizations) to be impermissible viewpoint discrimination are Prof. Julius Getman, "Labor Law and Free Expression: The Curious Policy of Limited Expression," 43 Md. L. Rev. 4, 14-15 (1984); Note, "Peaceful Labor Picketing and the First Amendment," 82 COLUM. L. REV. 1469, 1469-70 (1982); Charlotte Garden, "Citizens, United and Citizens United: the Future of Labor Speech Rights?" 53 WM. & MARY L.R. 1, 17 (2011); Prof. Cynthia Estlund, "Are Unions a Constitutional Anomaly?" New York University Public Law and Legal Theory Working Papers, Paper 503 (2015), at 34 ("Under the Court's 'normal' First Amendment analysis, the speaker-specific and content-based nature of the NLRA's [secondary picketing] restrictions would seem to doom them."), available at: http://lsr.nellco.org/nyu_plltwp/503.

constitutionality of applying the law to the State, where an effort at viewpoint discrimination would be as unconstitutional as it would be at the level of a town." *Id.* at 377. The majority opinion never comes close to dealing with the viewpoint discrimination issue here because a discrimination claim was waived and because the state law there did not exempt various speakers (unlike SB 241's exemption of spending on anti-union speech, local government officials' lobbying, state employee unions, and ethnic employee associations). The *Ysursa* majority explains at p. 361 note 3:

> Justice BREYER suggests that the ban on political payroll deductions may not be applied evenhandedly to all politically related deductions. Post, at 1104 (opinion concurring in part and dissenting in part). Justice STEVENS goes further and would find the ban unconstitutional in all its applications as discriminatory. Post, at 1104-1105 (dissenting opinion). The District Court, however, noted that the ban "is not viewpoint-based," 2005 WL 3241745, *3; the unions acknowledged in their Court of Appeals brief that they "have not attempted to establish that Section 44-2004(2) is based on viewpoint discrimination," Brief for Plaintiffs-Appellees in No. 06-35004(CA9), p. 18, n. 13; and nothing in the Questions Presented before this Court raised any issue of viewpoint discrimination. The ban on political payroll deductions is by its terms not limited to any particular type of political contribution. Nothing in the record suggests that public employers permit deductions for some political activities but not for those of unions. Idaho's attorney general—charged with enforcing the ban— explicitly confirmed that it "applies to all organizations, to any deduction regarding political issues, applies regardless of viewpoint or message, applies to all employers, and it does not single out any candidates or issues." App. 110.

Thus *Ysursa* is of no help to Metro at all in this case. It was not a real discrimination case like this one is.

Metro also relies on *Bailey v. Callaghan*, 715 F.3d 956 (6th Cir. 2013)(upholding a ban on schools making union dues deductions), but that case is inapposite because it did not involve a situation where local government's ethnic and/or anti-union employees continued to be allowed public funding while cutting off only union representatives. The *Bailey* court's rationale was that the Legislature had merely been selective as to which <u>employers</u> were restricted from providing deductions and this selection did not implicate speech, but here the Nevada Legislature was selective as to the speakers:  only employee organizational representatives (advocates for improving public employee conditions via labor contracts) are banned from getting money, while

4

anti-union managers and ethnic employee groups are free to spend as much paid time advocating against unions (and against union principles such as seniority)[3] as they wish. The fact that Nevada's definition of "employee organization" and laws dictating their speech are viewpoint-based dooms SB 241 when there was nothing comparable in the *Bailey* case.

Moreover, the *Bailey* decision is no longer good law in light of *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2228, 192 L. Ed. 2d 236 (2015)*,* which as noted in Plaintiffs' opening brief, explained that past lower court decisions allowing discrimination on the basis of speaker identity were incorrect because this too is a form of impermissible content discrimination. Commentators and courts have repeatedly noted recently the sea change effectuated by *Reed*. The Seventh Circuit recently underscored the "significance of the Supreme Court's recent decision in *Reed v. Town of Gilbert*" by striking down an anti-panhandling statute which the same court had previously upheld only a few months prior, *Norton v. City of Springfield*, No. 13-3581, 2015 WL 4714073 (7th Cir. Aug. 7, 2015) (on rehearing). In the few months since *Reed* was decided, courts in reliance on *Reed* have struck down a number of statutes which previously would have been thought unassailable, such as a statute intended to protect residential privacy and tranquility from unwanted and intrusive robocalls, *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015); a statute prohibiting the taking and sharing of images of marked ballots that are intended to disclose how a voter has voted, *Rideout v. Gardner*, No. 14-CV-489-PB, 2015 WL 4743731, at *9 (D.N.H. Aug. 11, 2015); and a statute prohibiting threats by public officials being used against the former Governor of Texas, *Ex Parte Perry*, — S.W.3d—, 2015 WL 4514696, at *37 & n.279 (Ct. App. Tex. July 24, 2015).[4]

---

[3] Published cases are filled with examples of ethnic employee associations being at odds with the unions selected by a majority of employees, particularly when seniority imposes a relative disadvantage to ethnic group members. See, e.g., *Dallas Firefighters Assn v. City of Dallas*, 885 F.Supp. 915 (N.D. Tex. 1995); *NAACP & Guardians v. Detroit Police Ofrs Assn*, 525 F.Supp. 1215 (D.Mi. 1981).

[4] *See also* Adam Liptak, "Court's Free-Speech Expansion Has Far-Reaching Consequences," NEW YORK TIMES (Aug. 17, 2015) (citing Yale Law School Dean Robert Post on *Reed*'s far-reaching implications and quoting First Amendment lawyer Floyd Abrams that *Reed* "provides significantly enhanced protection for free speech while requiring a second look at the constitutionality of aspects of federal and state securities laws, the federal Communications Act

However, even before *Reed*, lower courts have made clear that the import of *Velasquez* and *Rosenberger* go beyond the particular facts in those cases, as in a decision invalidating a federal law which caused a transit agency to reject ads promoting legalization of marijuana. *Am. Civil Liberties Union v. Mineta*, 319 F. Supp. 2d 69, 78 (D.D.C. 2004) appeal dismissed, No. 04-5285, 2005 WL 263924 (D.C. Cir. Feb. 2, 2005):

> While Congress may be under no obligation to fund mass transit or other entities that rely also on advertising revenues for their survival, once it chooses to do so, it must act in a way that does not engage in viewpoint discrimination in violation of the First Amendment. See *Legal Services Corp. v. Velazquez*, 531 U.S. at 548, 121 S.Ct. 1043. Just as Congress could not permit advertisements calling for the recall of a sitting Mayor or Governor while prohibiting advertisements supporting retention, it cannot prohibit advertisements supporting legalization of a controlled substance while permitting those that support tougher drug sentences. The Court concludes that because Section 177 is viewpoint-discriminatory, it is an unconstitutional exercise of Congress' broad spending power under the test established in *South Dakota v. Dole*.

Metro cannot dispute that if the instant case is a viewpoint discrimination case, a compelling interest test applies and the Legislature's action neither involved a compelling interest nor a close fit with such interest. As in *Reed*, the legislative body's action here was "hopeless underinclusive". Plaintiffs have a reasonable likelihood of success.

### III.  PLAINTIFFS FACE SERIOUS IRREPARABLE HARMS

Plaintiffs' injuries are not self-inflicted, as Metro claims. Plaintiffs did not draft SB 241 nor vote for it, nor have the political power in the current Legislature to stop it. Plaintiff PMSA said nothing to support it.[5] It is Metro not Plaintiffs that is now deciding to ignore all past

---

and many others"), available at: http://www.nytimes.com/2015/08/18/us/politics/courts-free-speech-expansion-has-far-reaching-consequences.html.

[5] PPA member Ramirez when he uttered his one-line comment of support for SB 241 was acting on the assumption that PPA's past concessions to obtain paid leave meant the bill would have no impact on PPA's current number of employees on leave. Ramirez Decl. para. 11. Defendant Metro is pursuing a very different reading of the bill and demands new concessions or other payment.

sacrifices by the bargaining unit to obtain paid leave for their union representatives, as Metro has done with the Civilian Employees and has said it will do with Plaintiffs as well. It is the Legislature that has decided that if Plaintiffs want to go on being staffed by Metro employees on leave, then Plaintiffs must take dues away from other speech and spend it on these employees' salaries instead (until and unless they spend enough time and money to persuade employees to pay much more in dues). Metro presents no counter-declarations showing the Association representatives were wrong in their declarations in stating that many unit employees would oppose a dues increase and many would drop membership. Nor does Metro present any evidence rebutting the declarations noting that even if there were sufficient employee support to effectuate a net increase in dues, Metro employees would demand higher pay and thereby make negotiations much more difficult for Plaintiffs and Metro. It is the Legislature not Plaintiffs which mandates that Plaintiffs provide fair representation to everyone in their bargaining unit. The Legislature has also declared that every accused police officer and witness during internal investigations is entitled to two representatives. NRS 289.080. The Associations' belt-tightening can only go so far without impairing the Associations: Metro presents no declaration showing there is a pool of unemployed police union representatives just waiting to replace the incumbent representatives who are less-expensive but equally-competent. There is no such pool. See Ramirez Declaration and Supplemental Faulis Declaration filed herewith. Moreover, the elected association officers have the right to serve out their terms and cannot just be thrown out of office now because the association might find it financially expedient. There is no approach to the SB 241 problem by Plaintiffs which does not hurt them by cutting into the representational advocacy they would otherwise be engaging in. That is not self-inflicted harm, but instead what the caselaw recognizes as irreparable harm under the First Amendment resulting from government actions.

Finally, it simply cannot be disputed that bargaining which starts soon will be severely impacted by SB 241 if not enjoined by this Court, as if the associations must hike their dues significantly (as SB 241 in effect requires if Plaintiffs wish to continue serving their members as before), then Plaintiffs must demand considerably more in wage increases than they otherwise

would have sought. Plaintiffs will have to make alternative proposals, one assuming SB 241 to be valid and the other assuming it is invalid. The parties would have to engage in protracted and difficult bargaining over both sides' historic functions, such as Metro taking over health benefit functions heretofore carried out by Plaintiffs, and over Metro paying for competent individual representation in internal affairs investigations to the extent not necessary to come from an employee organization. Impasse is thus a near-certainty if SB 241 is in the mix, but then what is an arbitrator to do with these alternative packages if the arbitrator does not know whether the statute is constitutional? Thus SB 241 not only impairs the plaintiff associations, it also impairs the public's interest in prompt and inexpensive resolution of labor negotiations at Metro this spring.

### IV. METRO'S CONTENTIONS AS TO STANDING AND RIPENESS ARE ADDRESSED VIA SEPARATE MEMORANDUM

Metro's arguments as to standing and ripeness are addressed by Plaintiffs' opposition to Metro's motion to dismiss, incorporated herein by this reference.

### V. A NOMINAL BOND IS ALL THAT IS APPROPRIATE

Plaintiffs would waive any claim that the bond amount set by this Court serves as an upward limit on their liability to Metro if an injunction were later found erroneously granted. Accordingly, this Court should set the bond amount at zero or a nominal sum. See *Continuum Co., Inc. v. Incepts, Inc.*, 873 F. 2d 801 (5th Cir. 1989)(if moving party waives claim that bond amount limits its liability, and it has assets, proper to set bond at zero). Plaintiffs are not about to leave the State and currently have enough in assets to repay Metro for their representatives' pay for the brief time period it should take to get a final judgment here if this case were expedited (as it should be). See Ramirez Decl. para. 12: Supp. Faulis Decl. para. 5. See also *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782-83 (10th Cir.1964) (no abuse of discretion to grant preliminary injunction without requiring bond where plaintiff had assets such that it was "able to respond in damages if [defendant] does suffer damages by reason of the injunction");

*Asa v. Pictometry Int'l Corp.*, 757 F.Supp.2d 238, 247 (W.D.N.Y. 2010) (no bond required where, among other things, "both parties appear to be fully solvent, and there is no indication ... that either of them would be unable to satisfy an award of damages if it is later determined that the other party was wrongfully enjoined"); *Radio One, Inc. v. Wooten*, 452 F.Supp.2d 754, 760 (E.D.Mich.2006) (declining to require bond where defendant did "not pose a collection risk.").

## VI.   CONCLUSION

Given recent U.S. Supreme Court First Amendment caselaw, Plaintiffs have shown they have a reasonable likelihood of success in their constitutional challenge to SB 241. The balance of irreparable injuries and the public interest all favor granting a preliminary injunction against Metro's use of SB 241.

Dated: November 19, 2015            Respectfully submitted,

**McCRACKEN STEMERMAN & HOLSBERRY**

By: */s/ Andrew J. Kahn*
    Richard G. McCracken
    Andrew J. Kahn
    Paul L. More

*Attorneys for Plaintiffs*

Case 2:15-cv-01928-LDG-CWH   Document 16   Filed 11/19/15   Page 10 of 10

## CERTIFICATE OF SERVICE

1
2
3   I hereby certify that on November 19, 2015, I electronically transmitted the attached
4   document to the Clerk's Office using the CM/ECF System for filing and transmittal and a Notice
5   of Electronic Filing was electronically transmitted from the court to the e-mail addresses on file.
6
7                                       /s/ Joyce Archain
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10