**Marquis Aurbach Coffing**
Nick D. Crosby, Esq.
Nevada Bar No. 8996
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
ncrosby@maclaw.com
Attorneys for LVMPD

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

LAS VEGAS POLICE PROTECTIVE
ASSOCIATION METRO INC.; LAS VEGAS
METRO POLICE MANAGERS &
SUPERVISORS ASSOCIATION,

                    Plaintiffs,

vs.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT,

                    Defendant.

Case No.:    2:15-cv-01928-LDG-CWH

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

The Las Vegas Metropolitan Police Department ("Department") by and through its counsel of record, Nick D. Crosby, Esq. of the law firm of Marquis Aurbach Coffing, hereby files its Response to Motion for Summary Judgment.

///
///
///
///
///
///
///
///
///
///

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

*MARQUIS AURBACH COFFING*
*10001 Park Run Drive*
*Las Vegas, Nevada 89145*
*(702) 382-0711 FAX: (702) 382-5816*

This Response is made and based upon the attached Memorandum of Points and Authorities, all pleadings and papers on file herein, and any oral argument allowed by the Court at the time of a hearing on the Motion.

Dated this 26th day of May, 2016.

MARQUIS AURBACH COFFING

By _____
Nick D. Crosby, Esq.
Nevada Bar No. 8996
Jimmy T. Lee, Esq.
Nevada Bar No. 12806
10001 Park Run Drive
Las Vegas, Nevada 89145
Attorney(s) for LVMPD

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

The Motion for Summary Judgment should be denied. SB 241 is content neutral, is not directed in any manner at the right to exercise free speech and is supported by an important governmental interest. In 2015, the State of Nevada passed SB 241 in an effort to strike a balance between tax payer interests, accountability in collective bargaining and the upcoming expenditure of educational funds throughout the state. A portion of this statute specifically addressed government entities paying for leave for employees while performing services for their unions or associations. That provision, however, is not directed at speech, conduct, ideas or other First Amendment rights held by any association or member of an association. Because the new law has nothing to do with free expression, it is not infringing on any of the Plaintiffs' rights and summary judgment should not be granted.

Plaintiffs rely on case law that is inapplicable to the facts at issue or their position with regard to SB 241. Instead of identifying or providing the Court with cases related to union activity, state laws addressing union activity and similar payment statutes, the Plaintiffs rely on "limited public forum" Supreme Court precedent and the funding of parties for speech in those

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

limited forums. This case, however, does not involve a limited forum and the Plaintiffs do not allege that a limited forum exists. As such, the overwhelming authority relied on by the Plaintiffs does not support their position or is a legal basis for summary judgment.

Even assuming some impact on speech exists, Supreme Court and Ninth Circuit precedent is clear – where a content neutral statute may have an incidental impact on speech, it remains valid so long as it addresses an important governmental interest. Here, the statute is content neutral, addresses an important governmental interest (tax payer concerns and accountability in collective bargaining) and does so in a way that, at best, has only a limited impact on speech. Further, the statute does not limit the right to speak openly about their ideas concerning workers' rights and benefits, to lobby the State Legislature or to in any way exercise their freedom of speech or association. Without any impact on speech, the statute is constitutional, validly applied as proposed by the LVMPD and summary judgment must be denied.

Plaintiffs also consistently overlook the critical distinction in their argument. Nothing in the statute limits any speech rights of the Plaintiffs; instead, the State of Nevada simply determined that it will no longer fund that speech and there is no constitutional requirement that it to subsidize or fund the free speech of private actors. Prior to the passage of SB 241, the law was entirely silent in Nevada on whether or not leave must be paid for union work. SB 241 clarified Nevada's position and allows that if the public employee works for an association, the local government employer must be reimbursed or the parties must agree on other concessions. In the end, Nevada is simply saying it will not subsidize this union work as an issue of tax payer concern.

Finally, Plaintiffs Equal Protection claim fails as a matter of law for the simple reason that members of a union are not a protected class. Plaintiffs' Motion for Summary Judgment is entirely silent on this point, overlooking the initial categorization that must be present to proceed with the claim. In these circumstances, the Court need look no farther and should deny, as a matter of law, the Plaintiffs' Equal Protection claim.

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

## II.   STATEMENT OF FACTS

In 2015, the Nevada Legislature took up issues related to collective bargaining, education and tax payer concerns. Among the legislation addressed was SB 241, the bill at issue in the Plaintiffs' Motion for Summary Judgment.[1]   SB 241 was designed to bring increased accountability to the public employee collective bargaining process while retaining key protections in the workplace for public employees. See Ex. A, p. 3. A marked change from the status quo was the tax payer relief identified in Section 1 and included a requirement that local government employers be reimbursed or receive a negotiated benefit if they pay for leave time for union work. See Ex. A, p. 4.

SB 241 also addressed issues related to the expiring of collective bargaining agreements, the rights of certain education employees making more than $120,000.00 and the accountability of the way tax dollars are spent. See Ex. A, p. 5. SB 241 was supported by associations of fire fighters, education employees, peace officers and other similarly situated associations. See Exs. A and C, generally. Indeed, it was recognized that parties on both sides of the table came together to develop the legislation to bring increased accountability to the public employee collective bargaining process and obtaining protections in the workplace for public employees. See Ex. C, pp. 17 and 18.

With regard to Section 1 and the payment of leave time, the Executive Director of the Clark County Education Association specifically stated:

> Finally, we think there is reasonable compromise reached on release time for an organization's officers to serve their organization but in a capacity away from the job. We do not have that luxury in the sense that our release time officers are paid by our organization, but we think that with the intent behind this language through collective bargaining, the parties would reach an agreement that essentially allows that release time, and not at the expense of the tax payer, but with the intent of doing meaningful work for both management and labor. For that reason we support this bill.

---

[1] True and accurate copies of the legislative history and Senate Committee meeting minutes on SB 241 are attached as follows: Ex. A – April 8, 2015 Senate Committee Minutes; Ex. B – April 10, 2015 Senate Committee Minutes; Ex. C – May 4, 2015 Assembly Committee Minutes and Ex. D – May 15, 2015 Assembly Committee Minutes.

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

See **Ex. C**, p. 25.   Specifically, the bill was supported by the Las Vegas Police Protective Association Metro, Inc. and Southern Nevada Conference of Police and Sheriffs.   See **Ex. C**, p. 26.   Ultimately, no association of any local government employees opposed SB 241 on First Amendment grounds.   See **Exs. A – D**.

In May 2015 SB 241 was passed by the full Legislature and delivered to the Governor. As approved, Section 1of SB 241 states:

> A local government employer may agree to provide leave to any of its employees for time spent by the employee in performing duties or providing services for an employee organization if the full cost of such leave is paid or reimbursed by the employee organization or is offset by the value of the concessions made by the employee organization in the negotiation of an agreement with the local government employer pursuant to this chapter.[2]

In June, 2015 SB 241 was approved by the Governor and became law in Nevada. See **Ex. E**.

## III.   LAW AND ARGUMENT

Under Rule 56 of the Rules of Federal Procedure, "[a] party may move for summary judgment, identifying each claim or defense - - or the part of each claim or defense - - on which summary judgment is sought [and] [t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). It is well established that the purpose of summary judgment "is to isolate and dispose of factually unsupported claims." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).   The rule, however, is not a "procedural short cut," but a "principal tool [] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources. Id. at 327.

The moving party has the initial burden of showing the absence of a genuine issue of material fact.  See Zoslaw v. MCA Distrib. Corp., 693 F.2d 870, 883 (9th Cir. 1982).   The district court's application of the law to the facts on free speech questions is reviewed de novo. Jews for Jesus, Inc. v. Bd. of Airport Comm'rs of City of Los Angeles, 785 F.2d 791, 792 (9th Cir. 1986), aff'd, 482 U.S. 569, 107 S. Ct. 2568, 96 L. Ed. 2d 500 (1987). The court must decide

---

[2] See SB 241 As Enrolled attached as **Ex. E**.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

whether the challenged activity or speech is protected by the First Amendment, for, if it is not, the court need go no further. <u>Jews for Jesus, Inc. v. Bd. of Airport Comm'rs of City of Los Angeles</u>, 785 F.2d 791, 792-93 (9th Cir. 1986), <u>aff'd</u>, 482 U.S. 569, 107 S. Ct. 2568, 96 L. Ed. 2d 500 (1987) citing <u>Cornelius v. NAACP Legal Defense & Educational Fund, Inc.</u>, 473 U.S. 788, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985).

## A.    SB 241 IS NOT A RESTRICTION ON SPEECH AND A RATIONAL BASIS TEST SHOULD BE APPLIED.

Content based restrictions on speech are presumptively invalid. <u>See Davenport v. Washington Ed. Assn.</u>, 551 U.S. 177, 188 (2007). However, in order to violate the First Amendment rights of any individuals or parties, the statute must be one directed at speech or expression. Where, as here, the statute or regulation does not touch upon speech or expression it is not presumptively invalid and is not subject to strict scrutiny. SB 241 is not directed at the Plaintiffs' speech or right to express their positions in any forum. Further, the LVMPD is not required to fund the Plaintiffs' expression or speech. Given these circumstances, a rational basis test should be applied and the Motion for Summary Judgment should be denied.

### 1.    SB 241 Does Not Address Speech.

SB 241 does not target speech, viewpoints or expression. The principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech because of an agreement or disagreement with the message it conveys. <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989). The purpose, or justification, of a regulation will often be evident on its face. <u>Frisby v. Schultz</u>, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500–2501, 101 L.Ed.2d 420 (1988). Laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral. <u>Turner Broad. Sys., Inc. v. F.C.C.</u>, 512 U.S. 622, 643, 114 S. Ct. 2445, 2459, 129 L. Ed. 2d 497 (1994) citing <u>Members of City Council of Los Angeles v. Taxpayers for Vincent</u>, 466 U.S. 789, 804, (1984).

By its plain language, SB 241 has nothing to do with speech. <u>See</u> **Ex. E**. In particular, the revised section addresses only the State's requirement that a local government employer receive reimbursement for an employee's time spent performing duties or providing services to

MARQUIS AURBACH COFFING

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

an employee organization. See **Ex. E**. Moreover, the organization and the employer can agree to concessions that would satisfy the reimbursement requirement. Id. SB 241 is entirely silent on requirements related to the conduct, advocacy or other forms of speech the Plaintiffs may desire to use or employ. Id. Plaintiff's Motion, in fact, does not specifically state how the statute relates to speech instead relying on the impact a lack of funds on an employee organization's lobbying efforts. See Mot., *generally*. Reliance on the definition of "employee organization" does not create a content based limitation or restriction in SB 241.

An "employee organization is "[A] an organization of any kind having as one of its purposes improvement of the terms and conditions of employment of local government employees." See NRS 288.040. Plaintiffs argue that changes included in SB 241 are "content based" because the definition of employee organization includes advocating for improvements in the workplace. See Mot., 6:14-16. This definition, unchanged by SB 241, does not create a content restriction in the new statute where none exists. Nothing in the definition of employee organization addresses speech or expression. See NRS 288.040. Nothing in the definition of "employee organization" limits the organization's right to say and do what it wants to advocate a positions to the Legislature or anywhere in public. Id. SB 241 is not a content based restriction simply because the definition of employee organization includes the word "advocacy". Because SB 241 is content neutral and does not impact any of Plaintiffs' rights, the Motion for Summary Judgment should be denied.

### 2. Nevada is Not Required to Fund the Plaintiffs' Exercise of its Free Speech Rights.

Summary judgment should also be denied because there is a clear and distinct difference between limiting speech and subsidizing speech. The First Amendment does not impose an obligation on the government to subsidize speech. Ysursa v. Pocatello Ed. Assn., 555 U.S. 353, 353 (2009). "A legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." See Regan v. Taxation with Representation of Wash., 461 U.S. 540, 549 (1983). In Ysursa, the Supreme Court overturned a finding that a state law banning political payroll deductions for union political activities was

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

1   unconstitutional. <u>See</u> <u>Ysursa</u>, 555 U.S. at 364. The statute in question barred automatic payroll

2   deductions for "political activities" defined as "electoral activities, independent expenditures, or

3   expenditures made to any candidate, political party, political action committee or political issue

4   committee or in support of or against any valid measure." <u>Id.</u> at 357. Nonetheless, the Supreme

5   Court found the statute **did not** violate the union's First Amendment rights because: "Idaho is

6   under no obligation to aid the unions in their political activities." <u>Id.</u> at 360. The Court further

7   found the state only needed to demonstrate a rational basis to justify the ban on political payroll

8   deductions. <u>Id.</u> at 359.

9       The <u>Ysursa</u> decision, therefore, is key to this case. First, the statute at issue in <u>Ysursa</u>

10  specifically addressed political speech – a more onerous burden than SB 241 – but was still

11  found to be constitutional. Secondly, the facts of the <u>Ysursa</u> case and this one are similar. Both

12  cases deal with funding issues related to employee activities, unlike the cases relied upon by the

13  Plaintiffs in their Motion. ·<u>See</u> Mot., *generally.* In these circumstances, the appropriate

14  precedent is those identified and dealt with through the <u>Ysursa</u> holding. Finally, because there

15  was no infringement on the free speech of the unions in <u>Ysursa</u>, the Court applied a rational basis

16  test exactly as it should in this case. Applying the appropriate precedent, the Motion for

17  Summary Judgment should be denied.

18      **3.    <u>SB 241 is Valid Under a Rational Basis Test.</u>**

19      When applied, rational basis justifies SB 241 and requires denial of the Motion for

20  Summary Judgment. Where a regulatory scheme neither implicates a fundamental right nor

21  creates a suspect classification, rational basis review applies. <u>Liberty Coins, LLC v. Goodman</u>,

22  748 F.3d 682, 693 (6th Cir. 2014). When a state merely declines to assist or subsidize speech, it

23  does not infringe upon an individual's First Amendment rights and strict scrutiny will not be

24  applied. <u>Utah Educ. Assn v. Shurtleff</u>, 565 F.3d 1226, 1230 (10th Cir. 2009) *citing* <u>Ysura</u> 555

25  U.S. at 358. Instead, the statute or regulation will be judged under a rational basis test. <u>Shurtleff</u>,

26  565 F.3d at 1230.

27      In <u>Shurtleff,</u> five labor organizations brought an action against the State of Utah for

28  enactment of the Voluntary Contributions Act prohibiting state and local employers from

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Page 8 of 16

withholding voluntary political contributions from employees' paychecks. <u>Shurtleff</u>, 565 F. 3d at 1226.  The Tenth Circuit Court of Appeals upheld the statute, found that the State was under no obligation to aid the union's exercise of First Amendment rights and found there was rational basis for enforcing the Voluntary Contributions Act. <u>Id.</u> at 1228. The <u>Shurtleff</u> court also found the union bore the burden under a rational basis review to eliminate every conceivable rational basis which might support the law. <u>Id.</u> at 1231.

Similarly, SB 241 requires only review under a rational basis.  The State of Nevada had an interest in ensuring accountability in collective bargaining while also protecting employee rights and addressing tax payer concerns.  <u>See</u> **Exs. A-E.**  The statute was passed after an agreement among numerous parties including membership of various public employee associations.  <u>See</u> **Exs. A-E.**  The statute, therefore, is supported by a rational governmental interest that was within the State of Nevada's power. The Motion for Summary judgment, furthermore, does not eliminate constitutional applications of SB 241. <u>See</u> Mot., *generally*. Unable to eliminate every possible constitutional application of the law, Plaintiffs have failed to reach their burden and the Motion for Summary Judgment should be denied.

**B.      ANY IMPACT ON SPEECH IS MERELY INCIDENTAL TO THE VALID EXERCISE OF GOVERNMENTAL AUTHORITY.**

Even if this court finds SB 241 impacts speech, the statute is still constitutionally applied. Subject only to narrow exceptions, the First Amendment does not countenance government control over the content of messages expressed by private individuals. <u>See</u> <u>Turner Broadcasting System, Inc. v. F.C.C.</u>, 512 U.S. 622, 641 (1994).  However, the test for determining whether the particular statute or regulation is content based or content neutral requires an inquiry to whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys.  <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989). Intermediate scrutiny is applied to content neutral statutes or regulations if: (1) it is within the constitutional power of the government; (2) it furthers an important or substantial government interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

1   restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of

2   that interest. See A.N.S.W.E.R. v. Jewell, 2016 WL 362361 (D. D.C. 2016).

3       In this case, there is no dispute that the State of Nevada had the authority to pass a law

4   related to the interactions between local government employers and employee organizations or to

5   pass a law to address tax payer concerns or the educational system. As such, the first element of

6   the intermediate scrutiny test is not in dispute. Further, SB 241 furthers important governmental

7   interests, those interests are unrelated to the suppression of speech and any incidental impact on

8   speech is justified. Indeed, if there is any impact on speech, SB 241 leaves the Plaintiffs with

9   numerous other avenues or options to express their beliefs, opinions or political views.

### 1.   SB 241 Furthers Important Governmental Interest.

11       SB 241 addresses important governmental concerns regarding tax payers and Nevada's

12   educational system. The government is responsible to show that alleged harms are real and that

13   the regulations will alleviate those harms in a direct and material way. Turner Broadcasting, 512

14   U.S. at 664. In this case, Senate Bill 241 was passed to address collective bargaining, the interest

15   of tax payers and the need for accountability for certain employees. See **Exs. A-D**. Senate Bill

16   241 was designed to "bring increased accountability to the public employees' collective

17   bargaining process while retaining key protections in the workplace for public employees." See

18   **Ex. A**, p. 3. Further, as the Legislature planned on increasing the funds for education and sought

19   to ensure accountability for the way tax dollars were spent and to ensure a proper return on the

20   government's investment. See **Ex. A**, p. 5. SB 241, in fact, was the result of representatives of

21   the local government employers and local government employee organizations coming together

22   to create reasonable legislation to accomplish the accountability and protections during collective

23   bargaining. See **Ex. C**, p. 17. As such, the Legislature had a valid governmental interest and

24   concern to address and SB 241 was directed at those concerns.

### 2.   The Interests Are Unrelated to the Suppression of Speech.

26       None of the revisions in SB 241 in general, or the revision raised by the Plaintiffs in their

27   Motion in particular, addressed any speech concerns. The State of Nevada did not pass any laws

28   addressing or otherwise limiting the ability of a union or association to voice whatever beliefs it

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

has in whatever form it believes is appropriate. As such, an intermediate level of scrutiny is appropriate and the statute is constitutionally implied because the interests it seeks to address have nothing to do with speech.

### 3.  Any Incidental Restriction on Speech is Justified.

To the extent there is any impact on speech, the impact is only incidental and justified by the interests addressed in the statute. First, Plaintiffs have not identified any specific impact on speech. Vaguely, Plaintiffs argue that a reduction in funding from local government employers will impact their ability to lobby the Legislature. See Mot., 10:8-28. The Plaintiffs, however, don't provide any evidence to the Court about the budget for legislative efforts or the amount that will be lost from that budget based on SB 241. See Mot., *generally*. Moreover, as the statute allows for the parties to negotiate if they would like to include these payments, it is unclear whether speech will actually be limited in any way. See **Ex. E**. Indeed, LVMPD and the Plaintiffs could negotiate an agreement to address the payment for leave to perform union duties and the Plaintiffs could still have the same budget as they do today. It is unclear, therefore, whether the Plaintiffs can even show an impact on speech.

However, to the extent that it is possible speech is impacted, it is only incidental to the exercise of valid government authority. The changes in SB 241 do not require the Plaintiffs to stop lobbying for their interests or limit the subjects an association may raise in lobbying efforts or any other exercise of its free speech rights. If the Plaintiffs are required to change the way they lobby as a result of a decision to require it to pay for these efforts on its own, any impact on speech would be incidental only. Further, SB 241 does not address any other forums or other avenues of speech still available to the Plaintiffs. The Plaintiffs remain free to advocate on behalf of their members in any manner in exactly the way they were before SB 241 was passed. A restriction on an expressive activity may still be valid so long as there are other modes of communication available for the expression of speech and ideas. See e.g. City Counsel of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 812 (1984). Given that important governmental interests are being addressed by the statute, the limited impact and other available options for expression require the Motion for Summary Judgment be denied.

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**C.     PLAINTIFFS CANNOT JUSTIFY STRICT SCRUTINY.**

Plaintiffs' support for strict scrutiny and for an improper limitation on speech is not supported by the facts or law relied on in their Motion.  Plaintiffs' argument boils down to local government employer's refusal to continue paying for leave time impacts the lobbying efforts of the union and, by extension, their free speech rights.  See Mot., *generally*.  Plaintiffs, as addressed above, cannot escape the reality that SB 241 is content neutral and has no direct impact on speech.  Moreover, Plaintiffs rely almost exclusively on "limited public forum" cases that have no application to the facts in this case.

The Velasquez and Rosenberger decisions are specific only to situations where the government has created a limited forum for the exercise of free speech and then passed laws or regulations excluding expression in those forums.  No such situation occurs in this case and reliance on those cases is improper.  Moreover, to the extent that Plaintiffs are raising a facial challenge to the statute, the facts and circumstances they have presented do not justify this Court looking into the future to determine whether a hypothetical limitation on speech could occur that has not occurred to date.  Again, the Motion for Summary Judgment should be denied.

**1.     Reliance on "Limited Public Forum" Cases is Not Justified.**

Throughout their Motion, the Plaintiffs rely on the holdings in the Rosenberger and Velazquez Supreme Court cases to support their position that SB 241 must face strict scrutiny and violates their First Amendment free speech rights. See Mot., *generally*.  This reliance, however, is misplaced because their basic holdings are unrelated to the facts presented in this case.  Both Rosenberger and Velazquez are limited public forum cases with no relation to the claims in this matter or the alleged impact of SB 241.

"[A] government entity may create 'a designated public forum' if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 469, 129 S. Ct. 1125, 1132, 172 L. Ed. 2d 853 (2009). "'[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects.'" Arizona Life Coal. Inc. v. Stanton,

Page 12 of 16

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   515 F.3d 956, 968 (9th Cir. 2008) *citing* <u>Cornelius v. NAACP Legal Def. & Educ. Fund</u>, 473

2   U.S. 788, 802 (1985). However, the First Amendment does not guarantee access to property

3   simply because it is owned or controlled by the government. <u>U.S. Postal Service v. Greenburgh</u>

4   <u>Civic Ass'n.</u>, 453 U.S. 114, 129 (1981). The Supreme Court has recognized the validity of

5   speech restrictions in limited public forums that are reasonable and viewpoint neutral. <u>Christian</u>

6   <u>Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez</u>, 561 U.S.

7   661, 679, 130 S. Ct. 2971, 2984, 177 L. Ed. 2d 838 (2010). Both <u>Rosenberger</u> and <u>Velazquez</u>

8   rely on the limited public forum foundation to determine the government could not discriminate

9   against the content of speech.

10       In the <u>Rosenberger</u> case, students in charge of a Christian editorial magazine challenged

11   the University of Virginia's policy to deny funds for printing costs for student publications with

12   religious view points. <u>See Rosenberger v. Rector and Visitors of University of Virginia</u>, 515

13   U.S. 819 (1995). In the <u>Rosenberger</u> case, the Supreme Court recognized that discrimination

14   against speech based on its message is presumed unconstitutional even where the government

15   has created a limited public forum for the expression of speech. <u>Rosenberger</u>, 515 U.S. at 828-

16   830. In a limited forum created by the government, discrimination against speech may be

17   content based if it preserves the purpose of the limited forum but viewpoint discrimination in the

18   limited forum is presumed impermissible. <u>Id.</u> at 830-831. The <u>Rosenberger</u> court found that the

19   funds set aside by the university to cover costs for student printing was a "metaphysical" limited

20   forum and that the viewpoint discrimination was impermissible. <u>Id.</u> The university, therefore,

21   was required to provide access to funds for printing to religious student publications because the

22   university created the limited public forum for expression. <u>Id.</u>

23       The <u>Velasquez</u> case was based on similar grounds. There, an indigent legal services

24   corporation challenged a federal law prohibiting attorneys representing indigent clients from

25   challenging welfare benefits claims. <u>See Legal Services Corp. v. Velazquez</u>, 531 U.S. 533

26   (2001). The Supreme Court compared the legal services corporation to the program in the

27   <u>Rosenberger</u> case and looked to that opinion and other limited forum cases for guidance.

28   <u>Velazquez</u>, 531 U.S. at 543-544. The court found that the content based restriction was improper

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  and would distort the normal functioning of the attorney-client relationship.  <u>Velazquez</u>, 531

2  U.S. at 544.  As such, the content restriction was overturned.

3        While both <u>Rosenberger</u> and <u>Velazquez</u> deal with funding and speech, neither case

4  addresses anything like the facts currently before the court. Plaintiffs are not claiming that a

5  limited forum exists or its speech takes place in that forum. <u>See</u> Mot., *generally*.   The

6  <u>Rosenberger</u> and <u>Velazquez</u> cases are both narrow opinions that only address funding, speech

7  and limited public forums. There is no basis to extend those holdings or the rational supporting

8  the holdings to the case at hand. As such, they cannot support Plaintiffs claims that failing to

9  fund union leave time is a violation of the First Amendment.  Without more, the Motion should

10  be denied.

11                   2.        <u>Facial Challenge to a Statute is Disfavored.</u>

12        To the extent Plaintiffs' case is seeking a facial challenge to the statute, it should be

13  rejected. A facial challenge to an official to a legislative enactment tests the impact not only as it

14  applies to the Plaintiffs but as applied to other identified persons. <u>See</u> <u>Preston v. Leake</u>, 660 F.

15  3d 726, 738 (4th Cir. 2011).  However, facial challenges are treated cautiously because a court's

16  ruling may exceed the limitations of Article III and impact legislative prerogatives in violation of

17  the separation of powers. <u>Id.</u>  In the First Amendment context, however, the court will entertain

18  facial challenges on hypothetical applications even though the approach is contrary to the

19  fundamental principal of judicial restraint.   <u>Id.</u>, *citing* <u>Wash. State Grange v. Wash. State</u>

20  <u>Republican Party</u>, 552 U.S. 442, 450 (2008).  In the First Amendment context, a statute is

21  evaluated under a standard that inquires whether a substantial number of the state's applications

22  are unconstitutional, judged in relation to the statute's legitimate sweep.  A facial challenge fails

23  where at least some constitutional applications exist. <u>See</u> <u>Schall v. Martin</u>, 461 U.S. 253, 264

24  (1984).

25        It is unclear whether the Plaintiffs are seeking a facial challenge of SB 241.  However, to

26  date Plaintiffs have not suffered any harm and cannot identify a specific event where they were

27  damaged or their speech was infringed. <u>See</u> Mot., *generally*.  As such, they are seeking relief

28  based on a hypothetical or future harm that has yet to occur – consistent with a facial challenge.

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

Nonetheless, as addressed in more detail above, there are numerous constitutional applications of SB 241. At a minimum, SB 241 allows the parties to negotiate an agreement for the payment of union leave time that would leave the Plaintiffs unharmed in any respect. See **Ex. E**. In those circumstances, Plaintiffs and LVMPD could reach an agreement, LVMPD would still be responsible for funding leave time and the Plaintiffs free speech rights would not be impacted in any way. There is no reasonable basis for arguing those circumstances were violating Plaintiffs' First Amendment rights and no reason to find SB 241 unconstitutional. As there are applications of the statute that are constitutional, a facial challenge must fail.

### D.   PLAINTIFFS HAVE NO STANDING TO RAISE AN EQUAL PROTECTION CLAIM.

The Motion for Summary judgment, related to the Plaintiffs' Equal Protection claim, should be denied. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (quoting U.S. Const. Amend. XIV; citing Plyer v. Doe, U.S. 202, 216 (1982)). "To state a claim under 42 U.S.C. §1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998), cert. denied, 525 U.S. 1154 (1999). Union members are not a protected class for equal protection purposes. See Lyng v. UAW, 485 U.S. 360 (1988); Charlotte v. Firefighters, 426 U.S. 283, 286 (1976); Image Carrier Corp. v. Beame, 567 F.2d 1197 (2d Cir. 1977); Sweeney v. Pence, 767 F.3d 654, 669 (7th Cir. 2014).

As a matter of law, the Plaintiffs do not have standing to raise an Equal Protection claim. As addressed previously in LVMPD's Motion to Dismiss, the Plaintiffs are not a protected or suspect class pursuant to equal protection analysis. As such, they are not entitled to seek equal protection and have no basis for standing to raise a claim. Therefore, the Motion for Summary judgment based on the Equal Protection claim should be denied.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

## IV.   CONCLUSION.

The Motion for Summary Judgment should be denied. SB 241 was passed after numerous interested parties, including the Plaintiffs, agreed on the law to address accountability in collective bargaining, workplace protections for employees and taxpayer concerns. SB 241 and the requirement for reimbursement of union time do not impact any free speech rights and Plaintiffs have not provided any basis to find that SB 241 should be reviewed under a strict scrutiny test. Instead, valid state actions that are unrelated to speech and have no impact on speech should be analyzed for a rational basis and SB 241 satisfies that test. At most, the impact on speech is incidental and SB 241 stands because there is a valid governmental interest and the limited impact is justified because the Plaintiffs remain free to exercise their rights of free speech in numerous ways without limitation. The Motion for Summary judgment, on the First Amendment issue, should be denied.

The same result is appropriate for the claims related to the alleged Equal Protection violation. As a matter of law, an association like the Plaintiffs is not a protected class. Failing to meet this threshold issue, the Plaintiffs cannot satisfy any legal element of an Equal Protection claim. Summary judgment, therefore, should be denied.

Dated this 26th day of May, 2016.

MARQUIS AURBACH COFFING

By _____
Nick D. Crosby, Esq.
Nevada Bar No. 8996
Jimmy T. Lee, Esq.
Nevada Bar No. 12806
10001 Park Run Drive
Las Vegas, Nevada 89145
Attorney(s) for LVMPD

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:05166-893 2779197_1 5/26/2016 1:55 PM

# Exhibit A
# April 8, 2015 Senate Committee Minutes

**MINUTES OF THE**
**SENATE COMMITTEE ON GOVERNMENT AFFAIRS**

**Seventy-Eighth Session**
**April 8, 2015**

The Senate Committee on Government Affairs was called to order by Chair Pete Goicoechea at 1:17 p.m. on Wednesday, April 8, 2015, in Room 2135 of the Legislative Building, Carson City, Nevada. The meeting was videoconferenced to Room 4404B of the Grant Sawyer State Office Building, 555 East Washington Avenue, Las Vegas, Nevada. Exhibit A is the Agenda. Exhibit B is the Attendance Roster. All exhibits are available and on file in the Research Library of the Legislative Counsel Bureau.

<u>COMMITTEE MEMBERS PRESENT:</u>

Senator Pete Goicoechea, Chair
Senator Joe P. Hardy, Vice Chair
Senator Mark A. Lipparelli
Senator David R. Parks
Senator Kelvin Atkinson

<u>GUEST LEGISLATORS PRESENT:</u>

Senator Patricia Farley, Senatorial District No. 8
Senator Ben Kieckhefer, Senatorial District No. 16
Senator Michael Roberson, Senatorial District No. 20

<u>STAFF MEMBERS PRESENT:</u>

Jennifer Ruedy, Policy Analyst
Heidi Chlarson, Counsel
Nate Hauger, Committee Secretary

<u>OTHERS PRESENT:</u>

Tray Abney, The Chamber
Paul Moradkhan, Las Vegas Metro Chamber of Commerce
Pedro Martinez, Department of Education
Rusty McAllister, Professional Firefighters of Nevada
Ruben Murillo, President, Nevada State Education Association

Senate Committee on Government Affairs
April 8, 2015
Page 2

Ron Dreher, Washoe School Principals' Association; Peace Officers Research Association of Nevada; Washoe County Public Attorneys' Association

Josh Hicks, Southern Nevada Home Builders Association

Stephen Augspurger, Clark County Association of School Administrators and Professional-Technical Employees

Lonnie Shields, Nevada Association of School Administrators; Clark County Association of School Administrators and Professional-Technical Employees

Bruce Snyder, Commissioner, Local Government Employee-Management Relations Board, Department of Business and Industry

Mandi Lindsay, Mechanical Contractors Association of Las Vegas; Sheet Metal and Air Conditioning Contractors' National Association of Southern Nevada

Brian Reeder, Nevada Chapter, Associated General Contractors

Fred Reeder, President, Reno-Tahoe Construction Inc.

Jan Leggett

Richard Daly, Laborers' International Union of North America, Local 169

Mike Cathcart, City of Henderson

Constance Brooks, Nevada System of Higher Education

Brian McAnallen, City of Las Vegas

Lee Thompson, Clark County

Kay Scherer, Deputy Director, State Department of Conservation and Natural Resources

Greg Ferraro, Nevada Resort Association

Michael Alonso, Peppermill Casinos, Inc.; Caesars Entertainment

Tim Tretton, General Manager, Harrah's Reno

Stephen Ascuaga, Peppermill Casinos, Inc.

Kimberlee Tolkien, Atlantis Casino Resort Spa

Tony Mavrides, Circus Circus Casinos, Inc.

Glenn Carano, General Manager, Silver Legacy Resort Casino; Eldorado Resort Casino

Lisa Gianoli, Washoe County

Samuel P. McMullen, Reno-Sparks Convention and Visitors Authority; Nevada Bankers Association

Christopher Baum, President and CEO, Reno-Sparks Convention and Visitors Authority

Mike Draper, Grand Sierra Resort and Casino

Steven Wolstenholme, President and COO, Grand Sierra Resort and Casino

Senate Committee on Government Affairs
April 8, 2015
Page 3

Andy Chapman, President and CEO, Incline Village-Crystal Bay Visitor and
        Convention Bureau, Inc.
John Fudenberg, Clark County
Jordan Ross, Constable, Laughlin Township; Southern Nevada Rural Constable's
        Alliance
Reg Truman, Promontory Interfinancial Network, LLC
Al Kramer, Interim Chief Deputy Treasurer-Investments, Office of the State
        Treasurer
Mike Hix
Daniel Dykes, Nevada Bankers Association; Nevada State Bank
Randy Robison, CenturyLink
Frank Gonzales, NV Energy
Debra Gallo, Southwest Gas Corporation
Michael Hillerby, Charter Communications, Inc.
Kami Dempsey, Cox Communications
Randy Brown, AT&T
Scott Leedom, Las Vegas Valley Water District; Southern Nevada Water
        Authority
Steve Walker, Truckee Meadows Water Authority; Douglas County; Carson City
Jeff Fontaine, Nevada Association of Counties
Chris Figgins, Clark County
Denis Cederburg, Director, Department of Public Works, Clark County
Danny Rotter, Public Works, Carson City
Kristina Swallow, Public Works Department, City of Las Vegas
Robert Herr, City of Henderson

**Chair Pete Goicoechea:**
I will open the hearing with Senate Bill (S.B.) 241.

**SENATE BILL 241:**   Revises provisions relating to collective bargaining.
        (BDR 23-1030)

**Senator Michael Roberson (Senatorial District No. 20):**
My Proposed Amendment 6290 (Exhibit C) to S.B. 241 significantly changes
the original bill. I worked with many stakeholders who would be affected by this
legislation. This would bring increased accountability to the public employee
collective bargaining process while retaining key protections in the workplace
for public employees.

Senate Committee on Government Affairs
April 8, 2015
Page 4

This amendment does four things. First, in section 1 it provides for taxpayer relief with the requirement to pay for employee time spent on employee organization activities. Section 1 of the amendment reads:

> A local government employer may agree to provide leave to any of its employees for time spent by the employee in performing duties or providing services for an employee organization if the full cost of such leave is paid or reimbursed by the employee organization or is offset by the value of concessions made by the employee organization in the negotiation of an agreement with the local government employer pursuant to this chapter.

This is a marked change from the status quo when it comes to paid union activities by the taxpayer, i.e., the local government.

Section 4, subsection 1, and section 7 of Exhibit C provide a streamlined employee bargaining process and the elimination of the automatic rollover or evergreening of an expired collective bargaining contract in the event a new contract is not consummated in a timely manner. Section 5, subsection 2 eliminates collective bargaining for certain school administrators. This applies to top-level management. We have been working on a definition that would be inclusive of those administrators in lieu of a specific definition; we tied it to salary which targets the appropriate group of individuals. That salary is $120,000 a year. I am open to debate on that definition, but I am confident it hits the mark.

Sections 10 and 11 provide for new accountability measures for other school administrators who do not meet that $120,000 annual base salary threshold. Section 10 discusses principals. Principals will still have the ability to collectively bargain under this amendment, but the evaluation process will be different. Newly hired principals have a 3-year probationary period. This would maintain that 3-year probationary period but would provide that for the first 2 years, the principal is truly at will. After the probationary period, in the event that in 2 consecutive years the principal's school star rating goes down and at least 50 percent of the teachers leave the school, then the principal would be at will and potentially be dismissed.

In Exhibit C, section 11 provides for nonprincipal administrators who are under that $120,000 threshold to maintain their collective bargaining rights, but they

Senate Committee on Government Affairs
April 8, 2015
Page 5

would be required to reapply and be reappointed every 5 years for their positions. These changes would bring more accountability to the school system. We are proposing to inject a large amount of new money into education. We need to ensure accountability for the way those tax dollars are spent and that we see the return on that investment. This goes hand in hand with education funding. There is a consensus in favor of this bill.

**Chair Goicoechea:**
Can you point out where the $120,000 benchmark is?

**Senator Roberson:**
It is in section 5, subsection 2 of the amendment.

**Senator Hardy:**
Section 7 of the amendment discusses the arbitrator. Does the arbitrator mediate the hearing or does he or she side with one party?

**Senator Roberson:**
This requires that an arbitrator be picked earlier in the process.

**Senator Hardy:**
Does the arbitrator have mediation ability?

**Senator Roberson:**
The arbitrator would pick one final offer. The process would not change. This will force the parties to the table. It requires them to meet more often and to come to an agreement because the existing agreement will not automatically evergreen for more than 3 months after it expires. It is good for both sides. It will prevent long-running negotiations that go nowhere.

**Chair Goicoechea:**
The terms of that are not later than 330 days before the end of the term. That will force the parties to start early.

**Senator Roberson:**
The parties do not have to start at that point, but they have to pick an arbitrator.

Senate Committee on Government Affairs
April 8, 2015
Page 6

**Tray Abney (The Chamber):**
We support this concept. This is a first step; we need to consider applying this to all supervisors in different government entities. We must fix the rest of *Nevada Revised Statutes* (NRS) 288 as well.

**Paul Moradkhan (Las Vegas Metro Chamber of Commerce):**
We support the concepts of this amendment. The Metro Chamber has been a strong advocate for accountability measures that pertain to collective bargaining for years. This is a balanced approach between the taxpayer interests and protecting public employees. We support a streamlined approach. The Las Vegas Chamber has had many concerns throughout the years regarding how statute pertains to evergreen clauses. We support the changes regarding the arbitrator and forcing both sides to come to the table.

**Pedro Martinez (Department of Education):**
I support this bill. There is no great school in this State without a great principal. Principal is the most important position in the school district.

Section 10, subsection 2 of Exhibit C discusses what happens after a principal has finished probation. It could cause unintended consequences. According to subsection 4, if the school shows a downward trend in ratings for 2 consecutive years and 50 percent of the teachers in that school leave, the principal will be dismissed almost immediately. We are beginning a new assessment system this year, and the accountability system will be changed. High turnover rates for teachers are common in low-performing schools, so it is likely that in the first 2 years, a school would lose 50 percent of its teachers.

**Senator Hardy:**
If 50 percent of teachers leave during one year and 50 percent leave the next year, there will be no teachers left.

**Mr. Martinez:**
Suppose 20 teachers are in a school. Ten could leave and be replaced by ten others. And the next year that could happen again. For instance, a math teaching position could turn over 2 years in a row. It is common in low-performing schools, especially when there is a new principal.

**Senator Hardy:**
What do you mean by common?

Senate Committee on Government Affairs
April 8, 2015
Page 7

**Mr. Martinez:**
In Washoe County, we turned around 11 schools. Of those 11, only 1 showed up on our list of 78 that the State published. Those 11 schools had a lot of teacher turnover in the first 3 years. We investigated to make sure it was not for the wrong reasons; we want to support our teachers. There are unintended consequences, and if a principal takes over a low-performing school, I do not want that principal to misread this language. I like the intentions of the amendment, but I want to ensure the language is clear.

**Senator Parks:**
I do not like when statements are set in stone. Mr. Martinez indicated the 50 percent turnover rate in section 10, subsection 2, paragraph (b). In another committee on another bill, a teacher commented that some principals would give a teacher a poor rating in order to make it difficult for that teacher to transfer. Have you heard of that, Mr. Martinez?

**Mr. Martinez:**
I could see that as an unintended consequence. The opposite is actually more common. Principals often give inaccurate evaluations of teachers because they want them to leave. A principal who is worried about this law could evaluate teachers in certain ways so they cannot transfer out.

**Rusty McAllister (Professional Firefighters of Nevada):**
We support the sections of this amendment, Exhibit C, that apply to us. Most of the bill applies to school administrators. We support the parts regarding leave time, the evergreen section and section 8, which talks about being able to expedite hearings of the Local Government Employee-Management Relations Board regarding dealing in bad faith. Those sections help streamline the process.

**Ruben Murillo (President, Nevada State Education Association):**
The existing collective bargaining process is good for our organization in working with the school districts. Some people believe the existing collective bargaining process unfairly tips the balance of power to employee organizations. This amendment strikes a good balance to ensure improvements to the collective bargaining process without unfairly tipping the balance of power toward any single bargaining party. It offers a fair compromise on a number of important issues.

Senate Committee on Government Affairs
April 8, 2015
Page 8

**Ron Dreher (Washoe School Principals' Association; Peace Officers Research Association of Nevada; Washoe County Public Attorneys' Association):**
We are neutral on the amended version of this bill.

**Josh Hicks (Southern Nevada Home Builders Association):**
The Southern Nevada Home Builders Association is neutral on this amendment. We opposed the original bill but are neutral on the amendment.

**Stephen Augspurger (Clark County Association of School Administrators and Professional-Technical Employees):**
On behalf of the School Administrators Association, we are neutral on this amendment. The original bill excluded all administrators from the collective bargaining process. The amended version makes significant revisions to accountability measures for administrators, specifically principals. The School Administrators Association will assume a leadership role in helping principals embrace these new measures. We believe no student should be taught by a poorly performing teacher, and no teacher should work for a poorly performing administrator. Our reform initiatives, which we have voluntarily brought forward and included in our contract, reflect those beliefs. We are neutral and support the changes in this amendment in Exhibit C, sections 1 through 8.

We are concerned with the changes in sections 9 and 10 and echo the comments made by Mr. Martinez regarding those sections. We support the change in section 10, subsection 1 regarding the probationary period for principals. Senator Roberson discussed a 3-year period. I understand that under statute, any time a principal is appointed for the first time, there is a 1-year probation period even if he or she has already served 3 years as principal. This bill does not go far enough. If there is a 3-year period, we recommend that. We need to hire the best principal on the first try.

The new evaluation system for licensed administrators will be implemented. It will require that 50 percent of the principal's evaluation be determined by student achievement. Since test results are not received by the districts until fall after the conclusion of the probationary year, a 2-year probationary period will allow for only 1 year of student test data. Adding a third year of probation will provide 2 years of test data. The third year of probation and 2 years of student test data will provide a stronger measure of principal effectiveness and ensure that we have the right person in that position.

Senate Committee on Government Affairs
April 8, 2015
Page 9

Section 10, subsection 2 establishes the triggers for a postprobationary employee to return to at-will status. I agree with Mr. Martinez that these triggers will create an unintended consequence by serving as a disincentive for the best principals to transfer to the most at-risk schools. Most likely, it will be assistant principals newly appointed to principal positions who will go to the most at-risk schools. Best education practices suggest that meaningful incentives be established to recruit and retain the best and most experienced principals to schools that have the greatest need. Only time will tell the impact that this provision may have on that recruiting process.

Section 10, subsection 4, discusses principals who meet both of those triggers. Those principals will be removed from their positions and terminated. We would like that language changed to be consistent with other parts of the bill. Employees become principals by being successful in another position first. Instead of terminating unsuccessful principals, they should be moved back to the position where they were successful.

We support sections 11 through 14. Principal accountability must be done in a fair manner. By fair, I mean principals must have the essential tools and resources to achieve the high expectations established by the Legislature. It is important to have highly qualified teachers in every classroom; we cannot continue to open schools with too few teachers. Every time a teacher is absent, a substitute teacher pool of sufficient size needs to provide a substitute teacher for that day. Now, when principals hire assistant principals and deans, they come with no preservice training; they should be provided with training. We need to establish mutual consent and placement provisions where a principal knows that nobody can be assigned to your school unless you and your staff agree.

We need to make sure our reduction in force procedures are based on performance and not seniority. Nevada's principals have embraced the idea that their success shall be determined by the success of their students. They ask in return that the working relationship be reciprocal. In return for their commitment to improving student achievement and being held accountable for that improvement, they ask that they receive the tools I have laid out.

**Chair Goicoechea:**
You and Mr. Martinez both have suggestions for minor changes to the amendment. I suggest you speak with Senator Roberson.

Senate Committee on Government Affairs
April 8, 2015
Page 10

**Lonnie Shields (Nevada Association of School Administrators; Clark County Association of School Administrators and Professional-Technical Employees):**
Nevada Association of School Administrators is a statewide organization whose membership ranges from superintendents down to deans in Clark County. We represent about 900 administrators. We do not engage in collective bargaining. Our mission is to enhance education by providing leadership, professional development and collaboration among school administrators. School administrators should have the same rights and opportunities that other school employees enjoy. We opposed the original bill but are neutral on the amended version.

**Bruce Snyder (Commissioner, Local Government Employee-Management Relations Board, Department of Business and Industry):**
The Local Government Employee-Management Relations Board will be tasked with administering this bill if it passes. I am seeking clarification on section 2, page 2, lines 2 through 6 of the amendment, <u>Exhibit C</u>. It seems the intent of having a 45-day period to hear unfair labor practice cases is to have it apply to new contracts being negotiated or amendments to existing contracts or successor agreements. Those only amount to about 5 percent to 10 percent of the unfair labor practice cases that come before our Board. If that is the intent, we will do our best to ensure those cases are heard within the 45-day period. The refusal to bargain collectively in good faith extends throughout the life of an agreement. At least 50 percent, if not 66 percent, of the cases that come before our board relate to collective bargaining or bargaining in bad faith but are not necessarily related to the negotiating of a new contract.

For example, a contract may say this is how we bid for shifts for a given work unit, then a supervisor decides to do his or her own thing despite what the contract says. Technically, that is considered refusal to bargain collectively; it is known as a unilateral change case. Most of our cases allege something similar to that. If that is to be included, then it will be almost impossible for us to move all of those cases and have them heard within 45 days. I would be happy to meet with the sponsor to help clarify the language.

**Senator Hardy:**
Section 2, page 2, lines 4 and 5 of the amendment read, "the Board shall conduct a hearing within 45 days after it decides to hear the complaint ... ." That gives you some leeway.

Senate Committee on Government Affairs
April 8, 2015
Page 11

**Mr. Snyder:**
It gives us some leeway. Now, we have the complaint; 20 days later they answer; 20 days after that the prehearing statements are filed; then the case goes into a queue where the Board can decide whether to hear it. I agree that it is a good thing to hear these failure-to-bargain cases as fast as possible. I want to make sure that we are not talking about the broader scope of unilateral change cases if the traditional sense of bargaining is meant where two parties negotiate the contract.

**Chair Goicoechea:**
It sounds like significant time frames are involved in this if a 20-day deadline is followed by another 20-day deadline. It seems there would be adequate time to resolve this before getting to 45 days.

I will close the hearing on S.B. 241 and open the hearing on S.B. 254.

**SENATE BILL 254**:  Revises provisions relating to public works. (BDR 28-791)

**Senator Patricia Farley (Senatorial District No. 8):**
I have been in the construction industry for over 14 years. The Legislature last dealt with this issue during the 2011 Legislative Session and unanimously passed A.B. No. 413 of the 76th Session. This began the pilot program where retention was lowered on public works projects from 10 percent to 5 percent. The world did not come to an end, quality construction projects continue to be built and companies that work small margins get their money faster. Senate Bill 254 makes the pilot program permanent and carries forth the same provisions over to private works.

**Chair Goicoechea:**
Do you accept the amendment to this bill?

**Senator Farley:**
Yes. The amendment (Exhibit D) deletes section 1 of the bill. That section caused concern about changing the definition of public works relating to the Nevada System of Higher Education.

**Chair Goicoechea:**
This bill changes the percent for retention from 10 percent to 5 percent.

Senate Committee on Government Affairs
April 8, 2015
Page 12

**Mandi Lindsay (Mechanical Contractors Association of Las Vegas; Sheet Metal and Air Conditioning Contractors' National Association of Southern Nevada):**

Senate Bill 254 pertains to retention, an age-old practice in the construction industry. Specifically, retention is a portion of the agreed-upon contract price deliberately withheld by project owners until the work is substantially complete to assure that the prime contractors or subcontractors satisfy their obligations and complete the construction project. Until the passage of A.B. No. 413 of the 76th Session, traditionally, no more than 10 percent retention was held back from progress payments made to contractors on a project whether it was a public or private works project.

Senate Bill 254 lists the July 1 expiration established in A.B. No. 413 of the 76th Session, and our industry asks that you maintain the status quo established in 2011 and continue to allow the public works agencies of Nevada to not withhold more than 5 percent on construction projects. Our association submitted the friendly amendment, Exhibit D, that deletes the entirety of section 1 of the bill because we do not want this legislation to amend the definition of a public work. We want to replace the word "shall" with "may" in section 2, subsection 3 of the bill.

Since the transition from 10 percent to 5 percent retention on public works has been implemented during the last 4 years with little fanfare, section 3 of this bill aims to extend the same privilege of a maximum 5 percent retention from 10 percent retention to private works.

Section 4, subsection 1, paragraph (b), subparagraph (2) of S.B. 254 adds language to include unpaid monies to be remitted in the instance of the issuance of a temporary certificate of occupancy. Oftentimes, especially in southern Nevada, large projects open and operate with the permission of a temporary certificate of occupancy which may be extended in Clark County for upwards of 2 years before a final certificate of occupancy is issued.

**Chair Goicoechea:**
We also have a proposed amendment from the business operations manager from the City of Henderson (Exhibit E). Have you seen that, Senator Farley?

**Senator Farley:**
I have.

Senate Committee on Government Affairs
April 8, 2015
Page 13

**Brian Reeder (Nevada Chapter, Associated General Contractors):**
We support S.B. 254. It establishes an appropriate retention rate which will help ensure that cash flow is adequate at a time when contractors operate on extremely slim margins and financing is increasingly more difficult to obtain from banks, especially for the State's small contractors. The construction industry was hit hard during the recession, and it is finally starting to recover. This bill will help ensure that recovery is sustainable.

The A.B. No. 413 of the 76th Session that Senator Farley talked about gave the public agency the ability to only withhold 5 percent. However, we have seen that at times, they withhold closer to 10 percent, which is a burden on contractors and forces them to fund the project out of pocket. Senate Bill 254 sets the retention rate at 5 percent which addresses that challenge for the contractors. Assembly Bill No. 413 of the 76th Session required general contractors to pay subcontractors and only withhold 5 percent. Senate Bill 254 makes those amounts equal because the 5 percent rate withheld by the public agency is not the same as the rate withheld by the general contractor. The bill removes that burden from the general contractor. This bill also removes the sunset on the legislation from 2011, and we support that. This bill will reduce the burden on contractors and still protect public agencies.

**Fred Reeder (President, Reno-Tahoe Construction Inc.):**
I support this bill. Since the crash our industry faced during the Great Recession of 2008, it has been difficult for me. Our industry has large volumes of work with low margins, so we are dependent on cash flow. The definition of public works is being removed from this, and that dismays me. Bringing the issue to the table on these projects is an important part of this bill. I have two projects at the University, one is the University of Nevada, Reno, residence dorm that will be called Peavine Hall. Contractors are the first in and the last out. I started that project in April 2014; by the end of May 2014, I was about 85 percent or 90 percent done with my work, and I now have over $100,000 held on that job for work I completed.

I am in the same situation across the street from that project at the Pennington Student Achievement Center. I had a contract of more than $2 million there; I am 92 percent done and have $200,000 of retention held. These two projects put me in a difficult position because there is only so much juggling I can do with my vendors and subcontractors. It is difficult to manage these jobs.

Senate Committee on Government Affairs
April 8, 2015
Page 14

Historically, I have always used credit lines with my banks to manage this retention. Since 2008, I can no longer do that because banks are heavily regulated. We are not the most favored customer with banks anymore, and they no longer give that line of credit to people in the construction industry. In 2010, I fell out of my covenants with my bank. The bank closed my credit line, swept all my available cash and almost put me out of business overnight. We do not have the means to finance the retention on these projects anymore. Anything you do comes out of pocket. I was recently able to establish my line of credit. It is only a fraction of what I used to receive from the banks, but it is enough to take me through a couple payrolls in the event somebody does not pay me on time. I support this bill.

**Chair Goicoechea:**
When I talk to public works projects, the rates are still in place as far as retention goes.

**Mr. F. Reeder:**
They do not have to play by NRS 338 anymore; this bill would modify NRS 338.

**Chair Goicoechea:**
I need clarification on that. We are talking about public and private. No matter whom your contract is with, the retention goes from 10 percent to 5 percent?

**Mr. F. Reeder:**
That is a good point. Not being a lawyer, I cannot answer that. Are they now private or public ... ?

**Chair Goicoechea:**
It would not make a difference because public or private, the retention goes from 10 percent to 5 percent.

**Jan Leggett:**
I echo Fred Reeder's comments.

**Richard Daly (Laborers' International Union of North America Local 169):**
I was involved in A.B. No. 413 of the 76th Session, and I support S.B. 254. The change from "may" to "shall" in section 2 is good. Regarding the language excluding the University, it may leave it a little bit vague; I would prefer to leave the University in. Language in another bill takes that same language out. An

Senate Committee on Government Affairs
April 8, 2015
Page 15

agreement made with Nevada System of Higher Education on an amendment to that bill covers the University's concern.

Section 2, subsection 1, of the bill states, "except as otherwise provided in NRS 338.525, a public body and its officers or agents awarding a contract for a public work shall pay … ." If by definition the University is not creating a contract for a public work based on how it is funded, that section could be undercut. The expiration date added in 2011 was a concern of the contract-awarding bodies at the time. They did not know how this would affect them, so we put in a sunset at 4 years to evaluate whether it worked. If there were significant issues, they could keep it at 10 percent. I have not heard of any problems, and I am glad the sunset is being taken out.

**Chair Goicoechea:**
We wanted a bill that deals with retention, and that is all this bill does.

**Mike Cathcart (City of Henderson):**
We are withdrawing our proposed amendment. The change from the wording "shall" back to "may" resolves our issue with section 2, subsection 3.

**Constance Brooks (Nevada System of Higher Education):**
We would like to thank Senator Farley for amending us out of the bill. We are a unique State entity. We have our own set of fund-raising because of student fees and a substantial amount of donors who support our construction projects.

**Brian McAnallen (City of Las Vegas):**
We shared the City of Henderson's concern regarding the words "shall" and "may" in section 2. Senator Farley's change satisfies our concern.

**Lee Thompson (Clark County):**
I echo Mr. McAnallen's statements.

**Senator Farley:**
This is an important issue for the industry. Fred Reeder explained what has happened over the last 10 years and how hard it is to stay in business. When you have that much money tied up on a project and you have no credit line, every day is a test to see if you survive. One problem could put you under. Putting this into effect will allow money to move more freely through the

Senate Committee on Government Affairs
April 8, 2015
Page 16

general contractors and subcontractors, which means more people will stay employed and projects will continue moving forward.

**Chair Goicoechea:**
I will now begin work session with S.B. 265.

**SENATE BILL 265**:  Makes various changes concerning health care. (BDR 18-94)

    SENATOR HARDY MOVED TO REREFER  S.B. 265  TO THE SENATE COMMITTEE ON FINANCE.

    SENATOR PARKS SECONDED THE MOTION.

    THE MOTION CARRIED UNANIMOUSLY.

* * * * *

**Chair Giocoechea:**
We will now hear S.B. 157.

**SENATE BILL 157**:  Enacts the State and Local Government Cooperation Act. (BDR 22-706)

**Jennifer Ruedy (Policy Analyst):**
I submitted my work session document (Exhibit F).

**Kay Scherer (Deputy Director, State Department of Conservation and Natural Resources):**
The amendment addresses our concerns and eliminates any fiscal note.

    SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED S.B. 157.

    SENATOR PARKS SECONDED THE MOTION.

    THE MOTION CARRIED UNANIMOUSLY.

* * * * *

Senate Committee on Government Affairs
April 8, 2015
Page 17

**Chair Goicoechea:**
We will now hear S.B. 268.

**SENATE BILL 268**:  Provides certain services for veterans. (BDR 37-1042)

**Ms. Ruedy:**
Senate Bill 268 requires the director and deputy director of the Department of Veterans Services to develop plans and programs to assist veterans who have suffered sexual trauma while on active duty or during military training. I have submitted my work session document (Exhibit G).

> SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED S.B. 268.
>
> SENATOR PARKS SECONDED THE MOTION.
>
> THE MOTION CARRIED UNANIMOUSLY.

* * * * *

**Chair Goicoechea:**
We will now hear S.B. 311.

**SENATE BILL 311**:  Revises provisions relating to irrigation districts. (BDR 48-831)

**Ms. Ruedy:**
This bill authorizes the board of directors of an irrigation district that has entered into a contract with the United States for the purpose of complying with the Reclamation Safety of Dams Act to incur an indebtedness not exceeding in the aggregate the sum of $6 million. More details can be found in the work session document (Exhibit H).

**Chair Goicoechea:**
This bill simply increases the cap and does not change the cap on the assessment.

Senate Committee on Government Affairs
April 8, 2015
Page 18

> SENATOR HARDY MOVED TO DO PASS S.B. 311.
>
> SENATOR LIPPARELLI SECONDED THE MOTION.
>
> THE MOTION CARRIED UNANIMOUSLY.

<center>* * * * *</center>

**Chair Goicoechea:**
We will now hear S.B. 318.

**SENATE BILL 318:**  Provides for the consolidation of certain fire protection
districts in certain counties. (BDR 42-833)

**Ms. Ruedy:**
This bill authorizes a board of county commissioners whose population is less
than 700,000 to consolidate two or more fire protection districts. More details
can be found in the work session document on this bill (Exhibit I).

> SENATOR PARKS MOVED TO DO PASS S.B. 318.
>
> SENATOR LIPPARELLI SECONDED THE MOTION.
>
> THE MOTION CARRIED UNANIMOUSLY.

<center>* * * * *</center>

**Chair Goicoechea:**
We will now hear S.B. 325.

**SENATE BILL 325:**  Revises provisions relating to state purchasing. (BDR 27-
1024)

**Ms. Ruedy:**
Details about this bill can be found in the work session document (Exhibit J).

> SENATOR LIPPARELLI MOVED TO AMEND AND DO PASS AS AMENDED
> S.B. 325.

Senate Committee on Government Affairs
April 8, 2015
Page 19

SENATOR HARDY SECONDED THE MOTION.

THE MOTION CARRIED UNANIMOUSLY.

\* \* \* \* \*

**Chair Goicoechea:**
We will now hear S.B. 471.

**SENATE BILL 471**:   Revises provisions governing payments from the State
Retirees' Health and Welfare Benefits Fund made on behalf of certain
retired persons. (BDR 23-1178)

**Ms. Ruedy:**
Details on this bill can be found in the work session document (Exhibit K).

SENATOR HARDY MOVED TO DO PASS S.B. 471.

SENATOR PARKS SECONDED THE MOTION.

THE MOTION CARRIED UNANIMOUSLY.

\* \* \* \* \*

**Chair Goicoechea:**
We will now hear S.B. 472.

**SENATE BILL 472**:   Revises provisions governing the eligibility of state officers
and employees for health benefits. (BDR 23-1193)

**Ms. Ruedy:**
Details for this bill can be found in the work session document (Exhibit L).

SENATOR PARKS MOVED TO AMEND AND DO PASS AS AMENDED
S.B. 472.

SENATOR HARDY SECONDED THE MOTION.

Senate Committee on Government Affairs
April 8, 2015
Page 20

THE MOTION CARRIED UNANIMOUSLY.

\* \* \* \* \*

**Chair Goicoechea:**
We will now hear S.B. 473.

**SENATE BILL 473**:    Revises provisions relating to the Office of Grant
Procurement, Coordination and Management of the Department of
Administration. (BDR 18-839)

**Ms. Ruedy:**
Details for this bill can be found in the work session document (Exhibit M).

**Senator Parks:**
If a department or agency does not spend all of the grant funds and has to
revert the funds back to the federal government, that information will be
captured on the Website maintained by the department.

**Chair Goicoechea:**
It is a way of finding out which agency is using all its money.

SENATOR PARKS MOVED TO DO PASS S.B. 473.

SENATOR HARDY SECONDED THE MOTION.

THE MOTION CARRIED UNANIMOUSLY.

\* \* \* \* \*

**Chair Goicoechea:**
We will now hear S.B. 477 in a work session document (Exhibit N).

**SENATE BILL 477**:  Revises provisions governing the installation of automatic
fire sprinkler systems in certain single-family residences. (BDR 22-1110)

The City of Henderson requested I read a statement into the record:

Senate Committee on Government Affairs
April 8, 2015
Page 21

> Section 6 of this bill effectively exempts any building code ordinance regulation or rule adopted by the governing body of a county or incorporated city in this State with an effective date before January 1, 2015. We want to ensure that that same exemption is maintained in place, for the City of Henderson wants to make sure that exemption is maintained in place or rule as necessary for the purpose of updating the most recent version of the International Residential Code.

**Senator Hardy:**
I want to make sure I get this on the record: "So if they do a remodel or put a room on or reconvert their garage, they are not going to have to put sprinklers in and retrofit their whole house?

**Chair Goicoechea:**
Yes. On the record:

> What we're really talking about on this is, if you're under 5,000 square feet and you do do something, you know, either build a new or expand it, again you don't have to sprinkle that home unless the entity comes forward and says hey, we've looked at this, you're clearly out here a long ways from a fire station, a long steep hill getting to you, we're not going to be able to respond to you. Bottom line is, then at that point if they could in fact come forward and justify that, then you could be required to sprink[sic] ... but if you're in downtown next to the fire hydrant, you've got a manufactured home and they say come in and sprinkle, I think you're going to have a hard time justifying it.

**Mr. Hicks:**
That is correct. To Senator Hardy's question, this is a limiting bill, not an enabling bill. If you had to sprinkle some of your property because you remodeled it, the local government would have to undertake a cost-benefit analysis before it could require that. However, if you were grandfathered in, then you would not have to sprinkle.

Senate Committee on Government Affairs
April 8, 2015
Page 22

**Senator Hardy:**
If the house is sitting there before January and you remodeled it, you would not have to sprinkle, but if it was after January and you remodeled it, you might have to if the local government determined it was necessary based on a cost-benefit analysis?

**Mr. Hicks:**
It would depend what was in the grandfather clause. If there was a requirement to do that on remodels already in place, that would stay in place; if that was not in place, that would be covered by the cost-benefit piece.

**Senator Hardy:**
When you say if it is already in place, does that mean we are making a law now that would prevent that from being in place so I would not have to hear from people who put on an addition and then have to sprinkle the whole house?

**Mr. Hicks:**
That is correct. There would now be a requirement if you wanted to put something like that in place, it would have to come with a cost-benefit study.

> SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED S.B. 477.
>
> SENATOR PARKS SECONDED THE MOTION.
>
> THE MOTION CARRIED UNANIMOUSLY.

* * * * *

**Chair Goicoechea:**
I will now close the work session and we will hear S.B. 312.

**SENATE BILL 312**: Revises provisions relating to certain taxes. (BDR 21-834)

**Senator Ben Kieckhefer (Senatorial District No. 16):**
This bill is designed to improve marketing, air service and tourism in Washoe County. My engagement in this issue began in 2011 when the resort properties in downtown Reno came to the Legislature to request a tax be imposed upon the area's room rates, adding a $1 surcharge per night to improve

Senate Committee on Government Affairs
April 8, 2015
Page 23

physical infrastructure of publicly owned assets in the tourism market for downtown Reno. We created that district, and it has been a useful tool in generating the revenue needed to improve and maintain the facilities that are critical to tourism for downtown Reno.

This bill is an offshoot of that success and recognition that additional investment needs to be made into the broader marketing efforts of the region as well as a newly emerging strategic plan for the Reno-Sparks Convention and Visitors Authority that will direct how that additional revenue will be invested.

I support Proposed Amendment 6311 (Exhibit O). There may need to be additional changes.

**Greg Ferraro (Nevada Resort Association):**
We support this bill with Proposed Amendment 6311, Exhibit O. The concept is to impose a room tax surcharge in Washoe County only for the purposes of implementation of the Reno-Sparks Convention and Visitors Authority's (RSCVA) 5-year strategic plan. That plan is to be decided at the RSCVA Board level, and once the Board makes the decision, it would also be given the authority to decide how to allocate the surcharge proceeds. As Senator Kieckhefer mentioned, in 2011 the Legislature agreed to impose a $2 surcharge in the downtown area. This bill adds $1 to the existing surcharge for implementation of the strategic plan. Everywhere else in Washoe County, hotels would have a $3 surcharge as well. The RSCVA Board would also decide how to spend that money. That surcharge would yield about $5.85 million on an annual basis.

We may need to expand the definition of the strategic plan because it could include more than marketing and promotion. Section 3.5 of Proposed Amendment 6311, Exhibit O, requires that a report be sent to the Legislative Counsel Bureau summarizing the activity of the collection.

There are limitations on how the money can be spent. For instance, it cannot be used for marketing or promotion of professional bowling. These monies would be spent exclusively on the strategic plan.

**Chair Goicoechea:**
Would we have $1 apply over the whole City?

Senate Committee on Government Affairs
April 8, 2015
Page 24

**Senator Kieckhefer:**
Section 2 was created during the 2011 Session. It creates the downtown district with the $2 surcharge. Section 1 imposes the $1 per night surcharge on all hotels in downtown Reno. Section 4 creates the $3 countywide surcharge outside of the downtown district. The combination of sections 1 and 2 creates the $3 in the downtown district.

**Chair Goicoechea:**
The $3 fee will apply across the City …

**Senator Kieckhefer:**
No, it will be across the County.

**Chair Goicoechea:**
The district is the whole county?

**Senator Kieckhefer:**
Yes.

**Chair Goicoechea:**
Even Gerlach has the $3 surcharge?

**Mr. Ferraro:**
If there is a hotel in Gerlach, yes.

**Chair Goicoechea:**
There is.

**Mr. Ferraro:**
Page 1, line 19, and line 1 on page 2 of Proposed Amendment 6311 would be more than just advertising, publicizing and promoting the recreation facilities. We will come up with language that better summarizes and captures what the strategic plan.

**Chair Goicoechea:**
That makes Bruno Selmi in Gerlach happy because he is going to spend $3 on advertising?

Senate Committee on Government Affairs
April 8, 2015
Page 25

**Mr. Ferraro:**
I will leave that for the RSCVA Board to decide. Assuming S.B. 480 passes, by that time, the RSCVA Board would have nine members.

**SENATE BILL 480:** Revises the membership of the county fair and recreation board in certain counties. (BDR 20-1113)

**Michael Alonso (Peppermill Casinos, Inc.; Caesars Entertainment):**
We agree with everything Mr. Ferraro said, including the broadening of the language to cover marketing, air service, capital, capital expenditures (CAPEX) and maintenance of facilities, or whatever the RSCVA comes up with for the 5-year plan. This is the first time in a long time that a downtown property owner and an outside-of-downtown property owner have agreed on this issue. We have to help the tourism economy in Reno and Sparks.

We do not want any of this money to be used to promote professional bowling. Opponents of this amendment proposed to keep the surcharge at $1. We oppose that because it does not raise enough money and continues the disparity between downtown and out-of-downtown properties. Another alternative raises $2 across the board; this would continue that disparity and is not realistic. The $2 surcharge passed in the 2011 Session is committed. The City of Reno would oppose that alternative because it has debt on the National Bowling Stadium and bond covenants to maintain and provide CAPEX on the Stadium. There is also an agreement between the RSCVA and the bowlers over that money. It is not realistic.

**Tim Tretton (General Manager, Harrah's Reno):**
We support the $3 surcharge. This is a critical time for Washoe County. We are on the brink of outstanding economic recovery. This is the first time the Peppermill and Caesars have agreed on something. There are not enough funds to do what we need to do from a marketing, air service, CAPEX or advertising standpoint. Passing this bill will prepare us for the imminent economic recovery. If the bill does not pass, we will be taking two steps backward.

**Stephen Ascuaga (Peppermill Casinos, Inc.):**
The Peppermill has seven properties in northern Nevada; but this bill would affect the Western Village Casino and Inn in Sparks and the Peppermill Casino in Reno. We support S.B. 312. We like the idea that it is a work in progress and will evolve with the strategic plan the RSCVA will adopt.

Senate Committee on Government Affairs
April 8, 2015
Page 26

The RSCVA owns many facilities, and a CAPEX program is not adequately funded. These facilities benefit everyone. My family's business was located farther from the Reno-Sparks Convention Center than anybody. While business is not evenly distributed, it was a benefit to the tourism community. Keeping tourism activity would benefit everybody. The general marketing dollars the RSCVA has now are not adequate and never have been. Some individual properties outspend the RSCVA. This bill will provide money for marketing and address air service. As a result of the Great Recession, we lost a lot of direct air service to Reno, but recently our air service has increased. We have direct air service from Guadalajara, Mexico, on Valera Airlines; in December, Thomas Cook Airlines will provide direct flights from London to Reno; and JetBlue recently began direct air service from New York City to Reno.

Northern Nevada has great economic momentum, and the money generated from this legislation would benefit everybody, not a specific property or industry. The tourism industry, including taxi companies, restaurants and other services, will benefit.

**Chair Goicoechea:**
Did you say that Western Village is a Peppermill property?

**Mr. Ascuaga:**
Yes.

**Kimberlee Tolkien (Atlantis Casino Resort Spa):**
We support this bill with the amendment. We need the funding this legislation would provide for the strategic plan.

**Tony Mavrides (Circus Circus Casinos, Inc.):**
We support this bill with the amendment. We are excited about the strategic plan, but without resources, it cannot be well executed. The issue for Reno is northern California and Native American gaming. We have worked with the RSCVA to market in that community, specifically the Bay Area, but we do not have the resources to compete now. Our market is stabilizing, and we are seeing some upticks.

Senate Committee on Government Affairs
April 8, 2015
Page 27

**Glenn Carano (General Manager, Silver Legacy Resort Casino; Eldorado Resort Casino):**
I represent the Silver Legacy and the Eldorado Resort Casino. We support this bill with the amendment for the reasons stated.

**Lisa Gianoli (Washoe County):**
We support this bill with the amendment.

**Samuel P. McMullen (Reno-Sparks Convention and Visitors Authority):**
We have a change we would like to make to the amendment. I have submitted an amendment (Exhibit P) which details the changes we would like to make.

**Christopher Baum (President and CEO, Reno-Sparks Convention and Visitors Authority):**
The RSCVA supports S.B. 312 in principle. We have long advocated for an expansion of the hotel room surcharges that worked well in downtown Reno for our extensive capital and marketing requirements in the Reno-Sparks area. However, we do not support including hotels in Incline Village and Crystal Bay in this effort since they already collect disproportionately in the room tax based on their countywide room rates which are the highest in the region. Many of the capital marketing needs that will be met by these increased funds will not directly support the properties at Lake Tahoe. In addition, RSCVA opposes any language that limits what the Board and executive staff may determine is the most appropriate way to spend a portion of the funds on behalf of the RSCVA.

**Mr. McMullen:**
The issue of any of the properties within the rim line of the Tahoe Basin is under discussion. We have an obligation to promote the bowling center in downtown Reno and the U.S. Bowling Congress. I would like to delete the word "not" on page 5, line 23, of Proposed Amendment 6311 so that the funds may be used for the promotion and marketing of professional bowling.

The room tax is collected through the former County Fair and Recreation Board of Washoe County in the form of the RSCVA. This legislation would make it so the tax on the area in the County outside of Reno would be imposed and collected by the County. We oppose this change to statute because it does not make sense to have two different collection mechanisms inside the County.

Senate Committee on Government Affairs
April 8, 2015
Page 28

**Chair Goicoechea:**
It would have to be a County ordinance because it will be applied countywide.

**Mr. McMullen:**
Correct.

**Chair Goicoechea:**
The County could by contract allow somebody to collect it.

**Mr. McMullen:**
All the taxes for the RSCVA are imposed by the local governments, but the ordinances transfer the obligation to the RSCVA. This one does not. The existing room tax mechanisms should not change. It would have to be done by County and City ordinance.

**Mike Draper (Grand Sierra Resort and Casino):**
We do not oppose the concept of this legislation. We agree that our industry needs to work together to help make Reno a destination for businesses and tourists. Resorts and hotels need to establish more funding to implement the strategic plan and marketing budget for the RSCVA. We oppose the mechanism in this legislation. Everybody will benefit equally from the strategic plan, and the destination marketing of RSCVA and everybody should be held equally accountable for the funding of the plan. This legislation would not require equal funding from all parties.

**Steven Wolstenholme (President and COO, Grand Sierra Resort and Casino):**
Grand Sierra Resort was purchased by the Morelli Group in 2011 as a distressed property. We created a 5-year plan that focused on CAPEX. The CAPEX at the Grand Sierra Resort will be about $150 million, and we are about halfway through it. We are committed to the growth of this community. As a 2,000-room hotel, we want to be active in that growth. We support the strategic plan for the RSCVA because any implementation requires a strategic plan. The funding is inadequate to implement a strategic plan. That plan will benefit this community, and we support efforts to increase funding.

The downtown has a $2 room charge that mainly goes to the bowling center. The bowling center was established to benefit the downtown area. That obligation was made in 2011. Grand Sierra opposes this bill because it is not consistent; the plan would be funded by $3 fees outside of downtown and

Senate Committee on Government Affairs
April 8, 2015
Page 29

$1 fees in downtown. We would like to work with the sponsor to create a better bill.

**Chair Goicoechea:**
I hope you recognize the RSCVA is underfunded. I hope you can work your issues out with the sponsor.

**Senator Lipparelli:**
I grew up in this community, and I have lived in Las Vegas for 20 years now. I have rarely seen this group of people work together, so it is impressive to see them working together now. I encourage you to find a way to work with them.

**Andy Chapman (President and CEO, Incline Village-Crystal Bay Visitor and Construction Bureau, Inc.):**
I echo Mr. Baum's and Mr. McMullen's points about the carving out of the Incline Village-Crystal Bay area in this bill. Mr. Baum mentioned that the hotel properties within the Incline Village-Crystal Bay area pay a disproportionate amount of taxes based on the higher room rate we charge. The Incline Village-Crystal Bay area does not receive equal benefit from all the programs and efforts by the receiving agency which is why the Incline Village-Crystal Bay Visitor and Convention Bureau was created by statute to promote that area with dedicated tax, a portion of the bed tax that comes out of our region. Our tourism and lodging industry requests that we be carved out from the district's boundaries. If that is not possible, we would like to discuss dedicating those funds out of those surcharges from our area back to our organization so we can promote the area as the official State agency for the Incline Village-Crystal Bay region.

We support air service. Air service support has been on the back of tourism for many years, and we are looking for ways to expand it. We are starting to expand it by getting businesses involved in air service. We oppose this bill but would like to work with the sponsor to find a solution. We agree that this area needs more revenue to support tourism. We are too far from the facilities to benefit from additional funding.

**Senator Kieckhefer:**
I am ready to work with any parties that have concerns about this bill. Those who oppose it do have the interest of the region at heart and recognize the need for the advanced marketing efforts of the region.

Senate Committee on Government Affairs
April 8, 2015
Page 30

**Chair Giocoechea:**
We will now hear S.B. 285.

**SENATE BILL 285:**   Revises provisions relating to local law enforcement
agencies. (BDR 20-208)

**Senator David R. Parks (Senatorial District No. 7):**
This bill was originally intended to address a potential consequence of a federal
class action lawsuit brought by a former Utah resident who sought not to
reregister her vehicle in Nevada. When she was cited for having an improperly
registered vehicle, she filed a class action lawsuit in federal court; but a U.S.
district judge has since denied class action status. Had a class action status
been allowed or approved, Clark County may have been on the hook for several
million dollars in reimbursement.

This bill picked up some additions and now addresses several problems and
outdated provisions. Several sections of the bill deal with fiscal impact and will
have to be addressed. For example, section 9 deals with credit and debit cards.
Section 13, subsection 6, line 34 on page 8 of the bill deals with the $100 fee
that a constable's office is eligible to collect for an improperly registered vehicle.
Section 15 deals with fees in general. The intent of this bill is to keep justice
court fees and fee structures that relate to a township uniform. Section 15
seeks to address that.

Several requests for amendments have mostly come about as a result of the
U.S. district judge's finding. Recommendations have been brought forward by
the Southern Nevada Rural Constable's Alliance and Clark County.

**Chair Goicoechea:**
Which of these amendments are friendly?

**Senator Parks:**
I do not oppose any of the recommendations. Clark County requested
three amendments. One has already been incorporated, and the other two are
minor revisions.

Senate Committee on Government Affairs
April 8, 2015
Page 31

**Chair Goicoechea:**
Of four different proposed amendments, two are from the Southern Nevada Rural Constable's Alliance, proposed by Jordan Ross (<u>Exhibit Q</u> and <u>Exhibit R</u>), and two from Clark County (<u>Exhibit S</u> and <u>Exhibit T</u>).

**John Fudenberg (Clark County):**
We support the bill and have proposed a minor amendment (<u>Exhibit T</u>) that adds section 12, amending NRS 258.065 to allow the county commission to appoint employees of the constable in addition to constables appointing their own staff. This is the practice in some townships; Clark County has dual processes.

**Chair Goicoechea:**
Who does the appointing, the Clark County Sheriff?

**Mr. Fudenberg:**
No, the Clark County Commission.

**Chair Goicoechea:**
The County Commissioners appoint employees who work under the constable?

**Mr. Fudenberg:**
Yes.

**Chair Goicoechea:**
The email to Senator Parks from Alex Ortiz, <u>Exhibit S</u>, references NRS 258 that allows a board of county commissioners to abolish a constable. The abolition does not become effective as to a particular township until ... That was old language. The office of the township cannot be abolished when an elected constable is in place. That has been the rule for a long time. That is underlined and deleted. Then the constable shall, upon conviction of a defendant who was issued such a citation, be entitled to the $100.

**Senator Parks:**
In the email from Alex Ortiz, <u>Exhibit S</u>, it appears the County only wanted lines 22 through 24 removed from page 6 of the bill, but wanted to leave lines 19 through 22.

**Chair Goicoechea:**
Are you reading from the original bill?

Senate Committee on Government Affairs
April 8, 2015
Page 32

**Senator Parks:**
Yes. The revised provisions suggested in Exhibit S by Mr. Ortiz affect S.B. 285, section 11, deleting the portion in lines 22 through 24. The second portion of Mr. Ortiz's email deals with section 13, lines 31 through 33 on page 8 regarding the entitlement of the $100.

**Chair Goicoechea:**
Mr. Fudenberg, you will appoint the people who work for the constable? You are talking about the support staff, not necessarily the constable and/or people who work for him or her, meaning people packing a gun and serving writs. Would you appoint those people as well under your amended language?

**Mr. Fudenberg:**
I do not think so. We are just referring to the clerks, not the deputy constable.

**Chair Goicoechea:**
Mr. Ross is a constable, but suppose Mr. Parks and Mr. Atkinson are hired by the County, they would be under the constable.

**Senator Parks:**
These are simply the clerical support staff who run the office.

**Heidi Chlarson (Counsel):**
Because there are multiple amendments on this bill, if the Committee would like to consider all of them in one proposed amendment, I can put that together. If I find that an amendment conflicts with another amendment, I will bring it to your attention. Now, nothing seems to conflict.

**Jordan Ross (Constable, Laughlin Township; Southern Nevada Rural Constable's Alliance):**
The document entitled the Constable Reform Act, Exhibit R, was an earlier bill draft request sent to Senator Parks; it is not an amendment. We included it because there is some explanatory language.

The Southern Nevada Rural Constable's Alliance supports both of Clark County's amendments, Exhibit S and Exhibit T. Our amendment is minor. The constable system is an integral part of the civil enforcement system in Nevada and has a unique financial model that allows it to provide a great deal of services at low cost to the taxpayer. This bill contains reforms we have been

Senate Committee on Government Affairs
April 8, 2015
Page 33

pushing for the last 4 years. Much of the discussion of the issues of constables was obfuscated by the prior incumbent of the Las Vegas Constable's Office in largely isolated problems. We need to regain the confidence of the public regarding constables and their work in Nevada. This bill calls for some significant restrictions on constable peace officer powers. California places restrictions on its equivalent of what we call category II peace officer agencies.

**Chair Goicoechea:**
When we authorize the possession or sale of liquor by a person who holds a license under this chapter, it does not apply to an officer or officer's deputy who sells or offers the liquor. The chapter about constables is confusing.

**Mr. Ross:**
This came about as a result of the execution of a complex civil enforcement action on the part of my agency. Under court order, we had seized the entire contents of two nightclubs in downtown Las Vegas. This included a significant amount of alcohol. The Civil Division of the Clark County District Attorney's Office advised us that we could auction the alcohol off, but we could not sell it to anybody who held a liquor license; meaning we could only sell it to individual members of the public, which would have been incredibly time-consuming considering we had to get rid of a couple thousand bottles of liquor.

The plaintiff who was entitled to the proceeds of this judgment would not receive any money because the expense of auctioning it off—because even the most dedicated drunks will only buy so much—would have chewed everything up. In fact, they could end up owing us money. In this case, the plaintiff had to give the goods back to the defendant at a deeply discounted price. The intent of the court order to auction off this product was not met. All this does is allow a sheriff or constable who has been ordered to auction off alcoholic beverages by a court in the satisfaction of a judgment to sell the alcohol to a liquor license-holding business. It seems like a small technicality, but we do everything we can to adhere to the decisions we get from the Civil Division. If they tell us we cannot sell it, we do not sell it.

**Chair Goicoechea:**
Given some constables' track record there, I was apprehensive about granting somebody the ability to have a rolling bar.

Senate Committee on Government Affairs
April 8, 2015
Page 34

**Senator Parks:**
Regarding the issue dealing with the fee structure in section 15 of the bill, we might be able to resolve a fiscal note if we were to match the fee structures in place in justice courts with those in place for constables.

**Chair Goicoechea:**
This bill does not have a fiscal note. The fees would be imposed by the county, so they are not an issue for this body. This bill does not need to go to the Senate Committee on Finance.

I will now close the hearing on S.B. 285 and open the hearing on S.B. 448.

**SENATE BILL 448**:   Revises provisions governing the deposit of certain public
          money in insured institutions. (BDR 31-1141)

**Samuel P. McMullen (Nevada Bankers Association):**
We proposed this bill to give small community banks tools similar to larger banks.

**Reg Truman (Promontory Interfinancial Network, LLC):**
I support S.B. 448. It would allow community banks to acquire public deposits. The Promontory Network is made up of about 3,000 financial institutions. More than 40 percent of all banks in this Country belong to the Network, including 9 of the 18 chartered banks in Nevada, including Wells Fargo Financial National Bank, Nevada State Bank, Farm Bureau Bank, Heritage Bank of Nevada, Meadows Bank, First Security Bank of Nevada, Town and Country Bank, Bank of George and Valley Bank of Nevada.

The Promontory Network provides two deposit allocation services: The certificate of deposit account registry service (CDARS) and the insured cash sweep (ICS). Certificate of deposit account registry service, which has been provided since 2003, places depository money certificates in banks that are members of the Network. The insured cash sweep, which was created after CDARS placed depositors' money in savings accounts or transaction accounts, uses banks that are members of the Network. Both services offer depositors access to millions of dollars in Federal Deposit Insurance Corporation (FDIC) insurance. With both services, a customer only deals with the originating bank. Certificate of deposit (CD) account registry service has been available for deposits by local governments in Nevada in accordance with

Senate Committee on Government Affairs
April 8, 2015
Page 35

NRS 355.170 which authorizes investment by counties, cities and school districts in certificates of deposits issued by insured commercial banks, credit unions, and savings and loans.

Senate Bill 448 would extend this existing authority for investment in certificates of deposit to investments in other forms of insured deposit accounts, such as money market deposit accounts and demand deposit accounts, through a deposit placement service such as ICS. The effect will be to give the State and local governments in Nevada the options of placing funds through CDARS or insured CDs for prescribed terms through ICS in insured money market demand accounts with the ability to withdraw funds up to six times per month through ICS in a demand account with no limits on the timing or amount of withdrawals. If enacted, this bill would bring Nevada law in line with statutes in more than 40 states which authorize the placement of public funds into multiple FDIC-insured money market deposit accounts and demand deposit accounts through a deposit service such as ICS. This authority would not be exclusive to the Promontory Network. It would apply to other entities that provide deposit allocation services that comply with the statutory conditions.

Nothing in this bill is mandatory. The existing deposit authority in the bill provides local governments with options. Because the banks do not have to hold collateral for CDARS and ICS deposits by local governments, funds that would have been used for collateral can be used for lending instead. Certificate of deposit account registry service and ICS also make the lives of local government finance officers easier because they save time and effort that they would have spent managing multiple bank relations or tracking collateral. Local governments in more than 40 states already benefit from participation in services like ICS. Local governments in Nevada should benefit as well.

**Al Kramer (Interim Chief Deputy Treasurer-Investments, Office of the State Treasurer):**
I worked on a similar bill to this a couple of years ago. This bill will not harm any local government. It is in a form that the State would not use, so the State is neutral.

**Chair Goicoechea:**
So it is only enabling.

Senate Committee on Government Affairs
April 8, 2015
Page 36

**Mr. Kramer:**
It is an option, yes.

**Chair Goicoechea:**
It could be beneficial to some county jurisdictions.

**Mr. Kramer:**
Yes.

**Chair Goicoechea:**
How is this better than what counties have now?

**Mr. Kramer:**
This allows for sweep accounts and other types of accounts rather than just CDs. The language states that it has to be in the name of the local government for the insurance and custody. It is more flexible and requires fewer man-hours to do now than it did before for the same benefit from investment.

**Chair Goicoechea:**
It would bring the same benefit with less time?

**Mr. Kramer:**
Yes, and less oversight from the county financial management people.

**Chair Goicoechea:**
They are just as insured?

**Mr. Kramer:**
I do not know.

**Mike Hix:**
I work for First Independent Bank in Reno. We have five branches in the Reno-Sparks area and one branch each in Fallon and Carson City. First Independent is a division of Western Alliance.

I have worked in the banking industry for 35 years serving deposit and lending customers. I have experienced the benefits of the CDARS program. Having weathered the recession, we would often encounter customers who were unsure about the safety of their deposits. The CDARS program allows us to

Senate Committee on Government Affairs
April 8, 2015
Page 37

place the deposits with other FDIC-insured financial institutions throughout the United States, ensuring that their larger deposits were covered under this insurance program beyond what a single institution could cover.

Typically, a single institution can only cover up to $250,000 on each customer. The CDARS program allows the municipalities and States to receive full FDIC coverage by working with one institution which can place those dollars with other FDIC-insured institutions outside the State. We support this bill.

**Daniel Dykes (Nevada Bankers Association; Nevada State Bank):**
I have worked in the Nevada banking industry for 39 years. Over the past decades, there has been much change in the banking industry and the government. With bankers working with their clients and partners in government, we have allowed these advances to make a positive set of changes to create a more efficient system.

Senate Bill 448 would allow state and local governments to access a network that has been available to the private sector for a number of years. If a governmental body deposits $1 million into a small local bank, it would seem on the surface as if this deposit would greatly benefit both the bank and the community by providing a large deposit, most of which the bank could use to make loans to local residents and businesses. In reality, the bank would only be able to lend $250,000 of that money and would have to buy collateral securities from the bond market for the other $750,000 and post the funds into an account of the name of their new government client. The net benefit to the community is marginalized by the requirement to post the collateral for uninsured deposits. This requirement for posting collateral is essential in protecting tax dollars; but we have not gained access to a redeposit option that would make a significant change in how much benefit is gained when a local government makes a $1 million deposit into a local bank.

In the scenario, the local bank would not need to purchase additional collateral securities and would instead redeposit what would have been uninsured funds into the network and receive a like sum of dollars back in a reciprocal deposit; $750,000 is taken out of the $1 million deposit to put into the network to gain deposit insurance. The reciprocal deposit plus $750,000 is made through the network back to the local bank that does not have collateral requirements. Banks generally lend about 70 percent of their deposits and loans.

Senate Committee on Government Affairs
April 8, 2015
Page 38

If this bill passes, the local bank would receive a total of $700,000 in loanable funds as compared to the $250,000 in the scenario I illustrated. We support this bill. It will benefit local governments and banks of all sizes by providing a safe and efficient window to achieve higher levels of deposit insurance to state and local governmental bodies. Our local government banks should be afforded this proven option for attaining high levels of insurance.

**Mr. McMullen:**
We submitted an additional amendment (Exhibit U). This would ensure that the collateralization requirement would fall away in favor of this plan so people would not be paying double protection.

**Ms. Gianoli:**
We dealt with a similar bill in 2013. Our treasurer, Tammi Davis, reviewed it then and has reviewed it again. Because it is enabling, we do not have any concerns.

**Chair Goicoechea:**
I agree because it is an enabling bill. However, some rural counties have large ending fund balances because of the Net Proceeds of Minerals Tax, and they assume because they keep their balances local, they are helping their economy—but apparently they are not.

I will now close the hearing on S.B. 448 and open on S.B. 481.

**SENATE BILL 481:**   Prescribes certain requirements relating to the receipt, maintenance and disclosure by a county or incorporated city of certain information of a public utility. (BDR 20-1114)

**Randy Robison (CenturyLink):**
This bill would prohibit local government entities from collecting, digitizing and aggregating our information regarding the location of our facilities and critical infrastructure for the purposes of building a digital model of our infrastructure. That can be referred to as 3D mapping, electronic mapping or digital mapping. We take the security of our data and the location of our facilities seriously. We have people who protect it around the clock every day. If that was out of our control and aggregated within a local government subject to records requests and other priorities besides protecting our data, it could pose a security risk. For people who are competitive in our industry, that information is proprietary.

Senate Committee on Government Affairs
April 8, 2015
Page 39

The intent of this bill is to address the idea of digitizing, aggregating and storing information on the location of our facilities somewhere outside our shop. The bill draft could be read to affect existing policy, the way we provide mapping information to local governments when they are doing public works. We want to make clear that we are not trying to change any existing policies, procedures or franchise agreements, we only address digital mapping and ask for the protections we need.

**Frank Gonzales (NV Energy):**
I serve on the Edison Electric Institute, National Response Executive Committee for the western United States. I serve as Commissioner on the Nevada Commission on Homeland Security. I am a retired brigadier general for the U.S. Army and I served as a State director for the Selective Service System.

NV Energy supports S.B. 481 because it would provide important protections against public disclosure of sensitive information about NV Energy's distribution transmission system. NV Energy has long cooperated with local governments by providing information of the locations of our facilities to comply with municipal plans and reviews and franchise agreements necessary toward planning public works projects for local governments. We will continue to do that.

However, we have received broad-ranging requests to get digitized information regarding our electrical system. A lot of that information is not public. Because of the sensitive nature of electric facilities throughout the U.S., the Federal Energy Regulatory Commission has adopted regulations for the critical infrastructure protection of key bulk electric systems within Nevada and the U.S. Our electrical system must be secured against cyberattacks and physical security threats. Allowing access to key information about our system would allow sensitive information to be used to disrupt our system reliability.

While the general location of our facilities is open and known to anyone who drives, public knowledge does not encompass which specific integrated facilities are critical and contain reliable operations of the grid and which, if compromised, could result in targeted disruption of service to large or sensitive customer loads or could trigger cascading outages that extend outside of Nevada. In the wrong hands, a large amount of information requested of NV Energy could be used by those intending to do maximum harm. Providing that information would allow dangerous individuals to determine which facilities provide the maximum vulnerability.

Senate Committee on Government Affairs
April 8, 2015
Page 40

This bill recognizes the sensitive nature of detailed information about our facilities and the customers we serve. The bill in no way changes NV Energy's obligation and ability to provide local governments with timely information they need to monitor what is placed in their rights-of-ways and to plan public works projects. It does not change any franchise agreements. Passing S.B. 481 will ensure our critical infrastructure information does not fall into the wrong hands.

**Chair Goicoechea:**
Mr. Robison, did you have an amendment for this bill that incorporated some water purveyors?

**Mr. Robison:**
The amendment (Exhibit V) on behalf of Cox Communications, Charter Communications and the Las Vegas Valley Water District would include public water systems. Because of the way Cox Communications is set up, it needs some specific language that covers all its businesses.

**Debra Gallo (Southwest Gas Corporation):**
We do not support the online collection of all the detailed locations of our facilities. A single repository of records containing operational and pipeline integrity specifications significantly increases our infrastructure physical security vulnerability. We are concerned with the security of the sensitive information handling that would be provided and the cybersecurity of any online database to which all the information would be submitted and stored. Mishandling of sensitive information could result in unintended consequences with the potential to threaten the security of the communities we serve.

Detailed locations of our utility facilities stored within a single repository of data creates a vulnerability that does not exist now. This information is in multiple formats and sources now, but it is under control by the utility. This variation in distribution of this information minimizes systemwide vulnerability from targeted strategic physical infrastructure attacks. The U.S. Departments of Homeland Security, Transportation and Energy support our position on this.

**Mr. Robison:**
A city section and county section in the bill mirror each other. Some people have expressed concerns that the bill is too broad. We are focused on the idea of digital mapping, not the practices we have now for sharing our locations with local governments.

Senate Committee on Government Affairs
April 8, 2015
Page 41

**Michael Hillerby (Charter Communications, Inc.):**
Exhibit V would add a public water system or video service provider to the list. In this case, the video service provider would be a company, such as Cox Communications or Charter Communications, Inc., that provides video service, telephone and Internet access. Our fiber optic locations, critical Internet infrastructure and telecommunications phone service for business and residential customers would be included in that information. That warrants similar protection to the other utilities.

**Kami Dempsey (Cox Communications):**
I echo the rest of the testimony. We need to be a part of this for the protection of our communications and security.

**Randy Brown (AT&T):**
I echo the comments made so far.

**Scott Leedom (Las Vegas Valley Water District; Southern Nevada Water Authority):**
We have the same security concerns that others have expressed. We support this bill with the amendment.

**Steve Walker (Truckee Meadows Water Authority):**
I support the bill with the amendment.

**Jeff Fontaine (Nevada Association of Counties):**
We oppose this bill because it is too broad in reference to the public utilities within a county. There is a need to have information about where the lines are. We are willing to work with the sponsors to address that issue.

**Chair Goicoechea:**
The way the bill is written, you would not be able to access that information?

**Mr. Fontaine:**
I do not think so.

**Chair Goicoechea:**
I do not think that is the intent of the bill. When you put the whole package together and all of a sudden you have the whole system and the water starts here and it goes down this pipe, so if you shut this valve off ... I do not know

Senate Committee on Government Affairs
April 8, 2015
Page 42

how you are going to ... whether you actually talk about putting them in
compartments or departments or how you do it so you can access ... but
access to that system would not give somebody the knowledge of how to turn
the whole system off or sideways.

**Mr. Fontaine:**
That probably is not the intent of the sponsors. Now, if you want to put a utility
within a public right-of-way, you need a permit, and that information needs to
be available.

**Senator Hardy:**
I do not want this information easily accessible to everybody on the Internet.
The intent of the bill is to give the county a call-before-you-dig policy where
somebody can receive a portion of the information instead of all the information.

**Mr. Fontaine:**
I would support that, but that is not what this language does.

**Senator Hardy:**
That is what I would like it to say.

**Chris Figgins (Clark County):**
We strongly oppose S.B. 481. It was stated that the purpose was to address
digital mapping. That is only in section 1, subsection 1, paragraph (b) and
paragraph (c) of the original bill. The rest of the bill would cause an extreme
conflict with our practices in Clark County. Section 1, subsection 1,
paragraph (a) says a county shall not "require a public utility to provide to the
county any information relating to the physical location of the facilities or critical
infrastructure ... ." We need to have that information before we construct our
projects. In order to create designs, we need that information and we need it
while doing construction. Clark County is not opposed to the paragraphs that
mention the digital mapping, but the bill needs to be rewritten just to address
those paragraphs. Section 1, subsection 1, paragraph (a) clearly states that
utilities do not need to provide that information that we have to have.

The bill goes on to say it is not a public record except as otherwise provided,
and the information may be disclosed only to an officer or employee of the
county, state agency or independent contractor under contract with the county
or state agency. That is also a problem for the county because under statute, in

Senate Committee on Government Affairs
April 8, 2015
Page 43

order for us to bid the projects, we have to provide the plans and specifications that must be on file for inspection. That would include where we put the utilities so the bidders can make their bids based on what type of equipment they will need. The statute says give information to a person desiring to do the bid or any other interested person, whereas this statute tells us that it can only be given to an employee of the county or an independent contractor under contract. The statute also tells the county to indemnify it, and it is ridiculous to have the county be responsible because we have to abide by public records laws. The county does not oppose the issue with respect to digitizing. If that is the intent of the bill, language needs to be narrowed a lot.

If we cannot acquire this information, our projects will be delayed. If we have to design projects while we are out there because we run into utilities—which often happens but this bill would make that more frequent—more roadways will have to close down while we redesign. There will also be issues with construction and delay claims. We have delay claims now that are millions of dollars because of issues related to not knowing where utilities are located. I have been through hearings with the Pedernales Electric Cooperative. We have had issues with respect to where utilities are cut or damaged and pose harm to the public. We need this information to protect the public. This bill needs to be amended to address only digital mapping.

**Senator Lipparelli:**
The law has not caught up with technology. These corporatewide plans that have become digitized are the intellectual property of these firms, and the required disclosure of full maps is the concern. Is there a way to bridge the gap between compelling these organizations to disclose their confidential, proprietary information and your goal of expediency in working on projects?

**Mr. Figgins:**
If everything is removed from the bill except section 1, subsection 1, paragraphs (b) and (c), then we would not oppose it. We do not want to require utilities to provide government entities with these digitized documents. It sounds like that is not the intent of the bill, but that is what it does.

**Denis Cederburg (Director, Department of Public Works, Clark County):**
I agree with Mr. Figgins. As written, this bill would significantly impact the way we design, build and manage our public rights-of-way with utilities. We do not want their networkwide information; we simply want the project-specific

Senate Committee on Government Affairs
April 8, 2015
Page 44

information. As written, the bill does not require utilities to give us project-specific information. The utilities do not want to change the way we have conducted business for over 30 years. I do not oppose their intent, but the bill is too broad and would impact our ability to provide cost-effective projects.

**Mr. Figgins:**
We have 580 miles of channels and underground storm structures, and we still have 226 miles of conveyance systems that need to be built. These are our rights-of-way. We not only have road services, many of our facilities are underground. We have to know where the utilities are so we can create the appropriate designs. The Clark County Water Reclamation District would like me to read this in opposition to the bill:

> The Clark County Water Reclamation District opposes the bill as being too restrictive and imposing. More new conditions as potential State laws beyond the federal Homeland Security guidelines are restrictive as protocols safeguarding critical infrastructure. This bill is too onerous and will prevent the transfer of the required existing infrastructure information for the good of the installation of new infrastructure. This bill is not necessary and we should continue to follow the Homeland Security critical infrastructure protocols associated with disseminating information as already recognized as confidential information. The Clark County Water Reclamation District already encounters challenges when designing, maintaining and repairing our collection system in order to serve the public. The measures will make the situation worse, not better. Utilities and government entities need to work better together.

**Chair Goicoechea:**
What happens in the scenario that you have information and a breach occurs? For instance, somebody from the County leaks something that is confidential or something that could give a company an advantage.

**Mr. Figgins:**
I do not know what you mean by "leak." We have to comply with the public records law.

Senate Committee on Government Affairs
April 8, 2015
Page 45

**Chair Goicoechea:**
You do not view any of the utilities' records as being confidential?

**Mr. Figgins:**
That is not entirely true. We recently made a franchise relocation agreement with NV Energy, and in that agreement, NV Energy did not give us all its documents. We can see them, but NV Energy does not give them to us. This is not just for critical infrastructure—your definition of critical infrastructure is loose—it is for all facilities. We have worked with NV Energy staff members, and when they do not want us to know information, we can still work with them and not keep that information as a public record. The bill should be amended to consider critical infrastructure but not for all utilities. You can call before you dig and get this information. We need this information up front when we create the design. We cannot wait to call before we dig to find out where the utilities are.

**Chair Goicoechea:**
The utilities' focus is on the areas they consider confidential. It sounds like they are supplying them, but not supplying them to you in a digital format. The question this bill addresses is if you have everything submitted to you and some of it is confidential, how will you secure it?

**Mr. Figgins:**
I disagree. The drafters of the bill could add an exception to the public records law that would allow us to keep sensitive information and not have to disclose it. There are times when we issue encroachment permits. There are developers who like to look at the plans we put out. I do not think those are confidential records.

**Chair Goicoechea:**
I suggest you work with the sponsor to take care of your issues with the bill.

**Steve Walker (Douglas County; Carson City):**
We oppose this bill as written.

**Danny Rotter (Public Works, Carson City):**
I want to echo the comments from NV Energy and Clark County.

Senate Committee on Government Affairs
April 8, 2015
Page 46

**Kristina Swallow (Public Works Department, City of Las Vegas):**
We oppose this bill and filed a fiscal note. Our fiscal note reflects costs incurred under today's system where we lack complete information on the location of utilities. If we had better information about the location of the utilities, we could save those funds and use them on other projects that would better benefit the members of our communities. The fiscal note today is reflective of the lack of better information and our current costs.

We need some clarification. Section 1, subsection 1, paragraph (c) references creating a digital model of the location of the facilities. When we prepare documents to build new infrastructure, whether it is a wastewater line or a flood control facility, we need to enter that data into our AutoCAD drawings, and we would need clarification to ensure that the definition of "digital model of the location of the facilities" could not apply to our CAD drawings, since that would slow us down in our development of plans and projects.

We want to work with the utilities to address these issues. The utilities put projects in our roadways; they need to know where other facilities are so they will not be in conflict; they need to ensure there is not an outage by one of their customers or a sister utility customer; they must protect the safety of the contractors working on the projects and the residents in the communities who are adjacent to those projects.

**Robert Herr (City of Henderson):**
We are neutral on S.B. 481. We understand the interest of the public utilities to keep the information relating to their critical infrastructure privileged and confidential. We understand the intent of this bill is not to change the way we do business with the public utility companies through our franchise agreements under our charter authority and responsibility to regulate the use of the public rights-of-way. The bill does not intend to supersede any conditions or provisions of the franchise rights-of-way or other similar occupancy agreements between the city and public utility companies.

We are in the final stages of updating our franchise agreement with NV Energy, and we deem this pending agreement as an existing agreement and thus unaffected by the bill. The public utility companies are willing to coordinate continued discussions with us regarding the standard of a compelling need for information as determined by the utility as compared to more of a reasonable need as mutually determined by the government entity and public utility. The

Senate Committee on Government Affairs
April 8, 2015
Page 47

public utility companies will continue to work with us to revise the language regarding indemnification of the utility.

Our franchise agreements require the public utilities to provide copies of their as-built drawings in paper and electronic format, and we include requirements that the city shall hold information regarding their critical infrastructure confidential for public safety and security concerns in our agreements. An amendment could rectify our concerns.

**Mr. Hicks:**
The Southern Nevada Home Builders Association is neutral on this bill. We would like to be included in the bill as well. Many times, builders and developers have digitized infrastructure information. We are concerned that if this bill passes, local governments will require the digitized infrastructure from the builders and developers.

**Chair Goicoechea:**
I would recommend simplifying this bill down to the sections that everybody agrees on in section 1, subsection 1, paragraph (b) and paragraph (c).

**Mr. Robison:**
We will do that.

Senate Committee on Government Affairs
April 8, 2015
Page 48

**Chair Goicoechea:**
The meeting is adjourned at 4:36 p.m.

RESPECTFULLY SUBMITTED:


_____
Nate Hauger,
Committee Secretary


APPROVED BY:


_____
Senator Pete Goicoechea, Chair


DATE:_____

Senate Committee on Government Affairs
April 8, 2015
Page 49

| EXHIBIT SUMMARY | | | | |
|---|---|---|---|---|
| **Bill** | **Exhibit** | | **Witness or Agency** | **Description** |
|  | A | 2 |  | Agenda |
|  | B | 9 |  | Attendance Roster |
| S.B. 241 | C | 18 | Senator Michael Roberson | Proposed Amendment |
| S.B. 254 | D | 1 | Mechanical Contractors Association of Las Vegas | Proposed Amendment |
| S.B. 254 | E | 1 | City of Henderson | Proposed Amendment |
| S.B. 157 | F | 2 | Jennifer Ruedy | Work Session Document |
| S.B. 268 | G | 5 | Jennifer Ruedy | Work Session Document |
| S.B. 311 | H | 1 | Jennifer Ruedy | Work Session Document |
| S.B. 318 | I | 1 | Jennifer Ruedy | Work Session Document |
| S.B. 325 | J | 5 | Jennifer Ruedy | Work Session Document |
| S.B. 471 | K | 1 | Jennifer Ruedy | Work Session Document |
| S.B. 472 | L | 4 | Jennifer Ruedy | Work Session Document |
| S.B. 473 | M | 1 | Jennifer Ruedy | Work Session Document |
| S.B. 477 | N | 3 | Jennifer Ruedy | Work Session Document |
| S.B. 312 | O | 6 | Senator Ben Kieckhefer | Proposed Amendment 6311 |
| S.B. 312 | P | 1 | Reno-Sparks Convention and Visitors Authority | Proposed Amendment |
| S.B. 285 | Q | 1 | Southern Nevada Rural Constable's Alliance | Proposed Amendment |
| S.B. 285 | R | 7 | Southern Nevada Rural Constable's Alliance | Proposed Amendment |
| S.B. 285 | S | 1 | Clark County | Proposed Amendment |
| S.B. 285 | T | 2 | Clark County | Proposed Amendment |
| S.B. 448 | U | 1 | Nevada Bankers Association | Proposed Amendment |
| S.B. 481 | V | 3 | Cox Communications | Proposed Amendment |

# Exhibit B
# April 10, 2015 Senate
# Committee Minutes

**MINUTES OF THE**
**SENATE COMMITTEE ON GOVERNMENT AFFAIRS**

**Seventy-Eighth Session**
**April 10, 2015**

The Senate Committee on Government Affairs was called to order by Chair Pete Goicoechea at 1:02 p.m. on Friday, April 10, 2015, in Room 2135 of the Legislative Building, Carson City, Nevada. The meeting was videoconferenced to Room 4412 of the Grant Sawyer State Office Building, 555 East Washington Avenue, Las Vegas, Nevada. Exhibit A is the Agenda. Exhibit B is the Attendance Roster. All exhibits are available and on file in the Research Library of the Legislative Counsel Bureau.

**COMMITTEE MEMBERS PRESENT:**

Senator Pete Goicoechea, Chair
Senator Joe P. Hardy, Vice Chair
Senator Mark Lipparelli
Senator David R. Parks
Senator Kelvin Atkinson

**GUEST LEGISLATORS PRESENT:**

Senator Ben Kieckhefer, Senatorial District No. 16
Senator Michael Roberson, Senatorial District No. 20

**STAFF MEMBERS PRESENT:**

Jennifer Ruedy, Policy Analyst
Heidi Chlarson, Counsel
Suzanne Efford, Committee Secretary

**OTHERS PRESENT:**

Zev Kaplan, MV Transportation, Inc.; Keolis Transit America, Inc.
Jeff Fontaine, Nevada Association of Counties
Misty Grimmer, Cox Communications

**Chair Goicoechea:**
I will open the work session with Senate Bill (S.B.) 65.

Senate Committee on Government Affairs
April 10, 2015
Page 2

**SENATE BILL 65**: Revises provisions relating to the use of water. (BDR 48-366)

**Jennifer Ruedy (Policy Analyst):**
Senate Bill 65 is a lengthy bill with the lengthy Proposed Amendment 6372. It is not eligible for exemption and has a zero fiscal note from the Division of Water Resources. The Division of Water Resources held three informal working groups to iron out differences among the interested parties. Chair Goicoechea held an additional informal working group. Proposed Amendment 6372 in the work session document is the result of those four informal working group meetings (Exhibit C).

Senate Bill 65 increases certain fees, defines perennial yield and revises provisions relating to the adjudication of vested water rights; applications, permits and certificates for the appropriation of public waters; underground water and wells; and the planning and development of water resources.

Some of the items that were the topic of much discussion have been eliminated. The definition of "perennial yield" was deleted because the informal working groups could not come to an agreement.

There was much concern about the change in language at the beginning of section 51 in Proposed Amendment 6372. The wording " ... 250 acre-feet of groundwater ... " was changed to " ... 25 percent of the perennial yield or 1000 acre feet of groundwater, whichever is less ... ."

There was much opposition to "1,000 feet" on page 48, line 3 of the proposed amendment. If the property line of a parcel is not more than 1,000 feet from the municipal waterline, the parcel would be required to be connected to the municipal waterline. That has gone back to 180 feet.

**Chair Goicoechea:**
Most of the revisions to the bill involve adjudication.

Everyone is aware of the drought situation and where we are headed. Nevada has the best water laws in the Nation, but sometimes they have to be cleaned up. The more we tried to change them, the more opposition we garnered. Senate Bill 65 and Senate Bill 81 have at least 30 hours of working time each.

Senate Committee on Government Affairs
April 10, 2015
Page 3

**SENATE BILL 81**:   Revises provisions relating to the management and appropriation of water. (BDR 48-367)

It is not as if we did not vet them. I feel comfortable where we are today. We probably missed some things. However, this bill has to go through the same process in the Assembly. I hope that by the time we get these two bills out, they will be good water bills.

**Senator Atkinson:**
Will this bill require a two-thirds majority vote on the floor because of the fee changes?

**Chair Goicoechea:**
No, this bill does not have a fiscal note; however, S.B. 81 has a fiscal note and will require a two-thirds majority vote.

**Ms. Ruedy:**
It does require a two-thirds vote.

> SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED S.B. 65.

> SENATOR LIPPARELLI SECONDED THE MOTION.

> THE MOTION CARRIED. (SENATOR ATKINSON VOTED NO.)

<div align="center">* * * * *</div>

**Senator Atkinson:**
I am going to reserve my right to change my vote. I want to review the amendment more.

**Chair Goicoechea:**
We have three ayes and one nay. We will check on Senator Parks' vote when he gets here.

We will move on to S.B. 81.

Senate Committee on Government Affairs
April 10, 2015
Page 4

**Ms. Ruedy:**
Senate Bill 81 was similar to S.B. 65 because the informal working groups spent much time on it. This bill is eligible for exemption. Senate Bill 81 does not have the two-thirds majority vote requirement.

I will summarize S.B. 81 from the work session document (Exhibit D).

Much is deleted in Proposed Amendment 6310. The language "without limitation" in section 4 of Proposed Amendment 6310 was deleted in response to much concern.

**Chair Goicoechea:**
Senate Bill 81 went through the same process as S.B. 65 with much public involvement. It may not be a perfect bill; however, it is at least palatable to go through the Assembly. There will probably be more changes.

This bill is critical to the overappropriated groundwater basins across the State. We have two poster children, Diamond Valley and Pahrump Valley. Twenty-six other basins are right on the edge. We must have tools like this if we are to address the water shortage.

> SENATOR LIPPARELLI MOVED TO AMEND AND DO PASS AS AMENDED S.B. 81 WITH PROPOSED AMENDMENT 6310.
>
> SENATOR HARDY SECONDED THE MOTION.
>
> THE MOTION CARRIED. (SENATOR ATKINSON VOTED NO.)

\* \* \* \* \*

**Chair Goicoechea:**
The next bill is S.B. 185.

**SENATE BILL 185**:   Makes changes relating to fire and related emergency services in certain counties. (BDR 42-121)

**Ms. Ruedy:**
Senate Bill 185 is summarized in the work session document (Exhibit E).

Senate Committee on Government Affairs
April 10, 2015
Page 5

This bill is not eligible for an exemption. An amendment proposed by the Truckee Meadows Fire Protection District added three words, "structure or brush."

**Chair Goicoechea:**
What is the effective date of the bill?

**Ms. Ruedy:**
The effective date of the bill is October 1.

**Senator Hardy:**
Does this preclude giving aid before October 1?

**Chair Goicoechea:**
The law would not be in effect until October 1 unless we change the date.

**Heidi Chlarson, Legal Counsel:**
It does not prohibit a fire agency from giving aid before October 1. The provisions of this bill that require giving aid do not go into effect until October 1.

> SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED S.B. 185.
>
> SENATOR LIPPARELLI SECONDED THE MOTION.
>
> THE MOTION CARRIED UNANIMOUSLY.

* * * * *

**Chair Goicoechea:**
The next bill in the work session is S.B. 241.

**SENATE BILL 241:**   Revises provisions relating to collective bargaining. (BDR 23-1030)

**Ms. Ruedy:**
The summary of S.B. 241 is in the work session document (Exhibit F).

Senate Committee on Government Affairs
April 10, 2015
Page 6

This bill has Proposed Amendment 6390, and section 5, subsection 2 should read:

> A school administrator whose annual salary, adjusted for inflation as provided in this subsection, is greater than $120,000 must be excluded from any bargaining unit. The annual salary provided in this subsection must be adjusted on July 1 of each year for the period beginning that day and ending on June 30 of the following year ... .

This limits the scope of the bill. Most of the changes were discussed at the hearing. Section 10 was not discussed in the hearing. It was added because of concerns about the automatic dismissal and encouraging principals to take assignments in challenging schools where 50 percent of the teachers request reassignment because of reforms.

The language added in section 10, subsection 4 is, "A principal described in subsection 2 is subject to immediate dismissal by the board of trustees of the school district on recommendation of the superintendent ... ." Also in section 10, subsection 1, 2 years was changed to 3 years.

Those changes are different from what was discussed in the meeting.

**Senator Atkinson:**
What is the reasoning in section 5, subsection 2? If salary defines a school administrator, can an administrator receive less than $120,000? I am confused about that.

**Ms. Ruedy:**
This was discussed in Committee. The intent is to narrow the scope so school administrators receiving salaries less than $120,000 are not affected by this.

**Chair Goicoechea:**
The $120,000 is the threshold; therefore, no one under that is affected. Salary is the benchmark. We wanted a threshold rather than include everyone.

> SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED S.B. 241.

Senate Committee on Government Affairs
April 10, 2015
Page 7

SENATOR LIPPARELLI SECONDED THE MOTION.

THE MOTION CARRIED. (SENATORS ATKINSON AND PARKS VOTED NO.)

* * * * *

**Chair Goicoechea:**
We will take up S.B. 254 in the work session.

**SENATE BILL 254**: Revises provisions relating to public works. (BDR 28-791)

**Ms. Ruedy:**
I will summarize S.B. 254 as contained in the work session document (Exhibit G).

We have Proposed Amendment 6374 that in addition to deleting section 1, which was related to changing the definition of public work, a small change in section 2, subsection 3 reinstates the word "may" instead of having "shall." This was in statute prior to the bill and was in response to concerns.

SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED S.B. 254.

SENATOR PARKS SECONDED THE MOTION.

THE MOTION CARRIED UNANIMOUSLY.

* * * * *

**Chair Goicoechea:**
The next bill in the work session is S.B. 285.

**SENATE BILL 285**: Revises provisions relating to local law enforcement agencies. (BDR 20-208)

**Ms. Ruedy:**
Senate Bill 285 relates to constables. I will summarize from the work session document (Exhibit H).

Senate Committee on Government Affairs
April 10, 2015
Page 8

This bill requires a two-thirds majority vote.

The example was offered of closing down two nightclubs in Las Vegas and what happens with that vast quantity of liquor.

Amendments brought by Clark County and the Southern Nevada Rural Constables Alliance are incorporated into Proposed Amendment 6375 as prepared by the Legal Division.

In section 11, subsection 3, paragraphs (a) and (b) of Proposed Amendment 6375 retain language that the bill had proposed to delete.

Clark County testified that the authority in section 12.5, subsection 3 was deleted in 2013 along with many good changes to the law. The counties need this authority when their volume of work requires additional clerks.

The reference to township was deleted in section 13, subsection 2, paragraphs (c) and (d).

>    SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED
>    S.B. 285.
>
>    SENATOR LIPPARELLI SECONDED THE MOTION.
>
>    THE MOTION CARRIED UNANIMOUSLY.

* * * * *

**Chair Goicoechea:**
We will move on to S.B. 289.

**SENATE BILL 289**:  Revises provisions relating to the protection of technology.
    (BDR 19-892)

**Ms. Ruedy:**
Senate Bill 289 is summarized in the work session document (Exhibit I). This bill is about peering. All fiscal notes were zero, indicating they could not be determined at the time.

Senate Committee on Government Affairs
April 10, 2015
Page 9

Proposed Amendment 6376, recommended by the bill's sponsors subsequent to the Committee hearing, deletes the entirety of the bill and instead requires the Information Technology Advisory Board to conduct a study of peering.

SENATOR LIPPARELLI MOVED TO AMEND AND DO PASS AS AMENDED S.B. 289.

SENATOR HARDY SECONDED THE MOTION.

**Chair Goicoechea:**
There was only one question, and I want to make that comment on the record because this is going to the Assembly. That question was whether the Information Technology Advisory Board has the expertise to look into the peering issue. Maybe the bill's sponsor could raise that in the Assembly because we are not going to discuss it here.

THE MOTION CARRIED UNANIMOUSLY.

* * * * *

**Chair Goicoechea:**
Let us take up S.B. 312 in the work session. We have an additional change to this bill.

**SENATE BILL 312**: Revises provisions relating to certain taxes. (BDR 21-834)

**Senator Ben Kieckhefer (Senatorial District No. 16):**
I will present Proposed Amendment 6388 to S.B. 312 (Exhibit J) in the work session document.

We have tried to work out some of the details on this bill, and while we have not reached a unanimous position, we have addressed some of the concerns and agreed to disagree on others.

This Proposed Amendment 6388 refines the nondowntown district to include properties within 20 miles of that district. That will exempt the hotels in Incline Village, Crystal Bay and the one in Gerlach.

Senate Committee on Government Affairs
April 10, 2015
Page 10

Section 4.5, on page 7 of Proposed Amendment 6388, defines how the revenue can be used. It indicates that any revenue collected by the surcharges must be used to implement the strategic plan, which includes but is not exclusive to marketing, air service development, capital expenditures and other identified projects within the strategic plan adopted by the local board. It would be the Reno-Sparks Convention and Visitors Authority (RSCVA) for Washoe County.

Proposed Amendment 6388 also prohibits the use of these funds for marketing professional bowling, which supports the agreement of the properties and prohibits the RSCVA from using the funds for operational expenditures. This is an add-on for tourism development and marketing.

Finally, to address concerns about the collection and disbursement of the revenue, under Proposed Amendment 6388, the county commission would establish that by ordinance when it creates the district pursuant to the bill.

**Chair Goicoechea:**
Are there any conceptual changes to Proposed Amendment 6388?

**Senator Kieckhefer:**
Proposed Amendment 6388 should stand on its own. I should also point out that it does incorporate the language, as originally intended, for all properties and is not restricted to gaming properties.

**Senator Parks:**
When someone makes a reservation at a hotel, will this be included in the price he or she is quoted? I ask that only because a major resort in Las Vegas just was hit with a class action lawsuit for failure to detail all the charges it proposes to levy.

**Senator Kieckhefer:**
I am unable to answer that question.

> SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED S.B. 312.

> SENATOR PARKS SECONDED THE MOTION.

Senate Committee on Government Affairs
April 10, 2015
Page 11

THE MOTION CARRIED UNANIMOUSLY.

\* \* \* \* \*

**Chair Goicoechea:**
We will move on to S.B. 401 in the work session.

**SENATE BILL 401**:  Revises provisions relating to notaries public and document
preparation services. (BDR 19-895)

**Ms. Ruedy:**
Senate Bill 401 and Proposed Amendment 6397 are summarized in the work
session document (Exhibit K).

SENATOR ATKINSON MOVED TO AMEND AND DO PASS AS AMENDED
S.B. 401.

SENATOR PARKS SECONDED THE MOTION.

THE MOTION CARRIED UNANIMOUSLY.

\* \* \* \* \*

**Chair Goicoechea:**
Senate Bill 406 is the next bill in the work session.

**SENATE BILL 406**:  Revises provisions relating to public retirement systems.
(BDR 23-1049)

**Ms. Ruedy:**
Senate Bill 406 relates to the Public Employees' Retirement System (PERS), the
Judicial Retirement System and the Legislators' Retirement and is summarized in
the work session document and Proposed Amendment 6422 (Exhibit L).

Changes made in the proposed amendment address concerns raised about the
provision wherein anyone who commits a felony forfeits his or her retirement.
That has been narrowed in scope. Section 2, subsection 1 states:

Senate Committee on Government Affairs
April 10, 2015
Page 12

> ... any felony involving accepting or giving, or offering to give, any
> bribe, the embezzlement of public money, extortion or theft of
> public money, perjury, or conspiracy to commit any of those crimes
> arising directly out of his or her duties as an employee forfeits all
> rights and benefits under the System.

In addition, the language in section 5, subsection 1, paragraph (c) was added to
all three of the retirement systems as follows:

> ... unless the member has a family medical emergency. For the
> purposes of this paragraph, the Board shall define by regulation
> "family medical emergency" and set forth by regulation the
> circumstances pursuant to which purchased service credit may be
> considered in determining the number of years of service of the
> member who has a family medical emergency.

The Clark County School District requested that section 29.5 in Proposed
Amendment 6422 include language to remove the prohibition on the critical
labor shortage in NRS 286.523, which is scheduled to sunset on June 30.

Section 16.5 provides clarification on "killed in the course of judicial service" for
the Judicial Retirement Plan, pages 12 and 13 of Proposed Amendment 6422,
Exhibit L.

**Senator Michael Roberson (Senatorial District No. 20):**
The idea was to provide an expanded definition of "beneficiary"; however, it
should not be limited to judiciary. It should be included in each retirement
system.

**Ms. Chlarson:**
Section 4.5 was added to Proposed Amendment 6422. This section relates to
regular police and firefighter members of PERS. Sections 16 and 27.5 make the
same change to the Judicial Retirement Plan and the Legislators' Retirement
Plan. Each retirement plan has its own chapter in NRS; therefore, the same
change was made three times to make sure the changes relate to the
three different plans. That is already in Proposed Amendment 6422.

> SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED
> S.B. 406.

Senate Committee on Government Affairs
April 10, 2015
Page 13

    SENATOR LIPPARELLI SECONDED THE MOTION.

    THE MOTION CARRIED. (SENATORS ATKINSON AND PARKS VOTED NO.)

<p align="center">* * * * *</p>

**Chair Goicoechea:**
We will take up S.B. 448 in the work session.

**SENATE BILL 448**:  Revises provisions governing the deposit of certain public money in insured institutions. (BDR 31-1141)

**Ms. Ruedy:**
Senate Bill 448 is summarized in the work session document (Exhibit M).

**Chair Goicoechea:**
Testimony was that this bill would help some of the smaller rural institutions in making more cash available.

    SENATOR LIPPARELLI MOVED TO DO PASS S.B. 448.

    SENATOR HARDY SECONDED THE MOTION.

    THE MOTION CARRIED UNANIMOUSLY.

<p align="center">* * * * *</p>

**Chair Goicoechea:**
Let us take up S.B. 478.

**SENATE BILL 478**:  Revises provisions relating to regional transportation commissions. (BDR 22-1111)

**Ms. Ruedy:**
Senate Bill 478 is summarized in the work session document (Exhibit N).

**Zev Kaplan (MV Transportation, Inc.; Keolis Transit America, Inc.):**
I had a discussion with Larry Brown, the Chair of the Regional Transportation Commission of Southern Nevada (RTCSNV). He indicated that as long as the

Senate Committee on Government Affairs
April 10, 2015
Page 14

RTCSNV is excluded from the bill, which is the intent of the population qualifier, he has no opposition to the bill. He recognizes that the Regional Transportation Commission of Washoe County (RTC) is in favor of the bill.

**Senator Parks:**
I expressed concerns when we heard the bill, and I would like to suggest either an amendment today or that it be taken up in the Assembly. I ask that within 6 months of the enactment of this statute, the RTC contractors must report all savings derived from the limited liability cap. They also must report how these savings are being used—under the contract between the contractor and the RTC—to lower prices for the provision of services and any refunds.

I do not want the savings to go to the bottom line of a contractor. I want something that shows this reduces transit costs and costs for the transit rider and the taxpayer.

**Chair Goicoechea:**
The population cap gets down into the rural counties. I do not know if we will see any rural provider outside of Clark County.

**Senator Parks:**
Yes. It is under the 700,000 limit, and sometimes governmental regulations tend to be so onerous that smaller businesses find it prohibitive to submit a proposal.

**Chair Goicoechea:**
Senator Parks, I am trying to deal with your amendment. Would you feel comfortable putting that on the record and asking that it be dealt with in the Assembly because this is deadline day? I will make a commitment to help you in the Assembly as much as I can to make sure that language is incorporated.

> SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED S.B. 478.
>
> SENATOR PARKS SECONDED THE MOTION.

Senate Committee on Government Affairs
April 10, 2015
Page 15

THE MOTION CARRIED. (SENATORS ATKINSON AND LIPPARELLI VOTED NO.)

\* \* \* \* \*

**Chair Goicoechea:**
The final bill with Proposed Amendment 6412 in the work session document (Exhibit O) is S.B. 481. Another amendment brought forward at the last minute has eight word deletions and nothing added (Exhibit P). Has everyone agreed to the conceptual amendment? We are not going to rehear the bill, but I want to ensure everyone is comfortable enough to send it to the Assembly.

**SENATE BILL 481:**   Prescribes certain requirements relating to the receipt, maintenance and disclosure by a county or incorporated city of certain information of a public utility. (BDR 20-1114)

**Jeff Fontaine (Nevada Association of Counties):**
We have been working with the proponents of the bill to come to an agreement on language. We do not disagree with the intent of the bill, but the language needs some additional work.

First, we need to address the issue at the end of section 1, subsection 2, paragraph (b) that talks about "entered into before the effective date of this act." That needs to be deleted to reflect new franchise agreements and needs for utility permits within the rights-of-way. We want to make sure that whatever we do in this bill that affects existing encroachment permits and franchise agreements carries on into the future.

Second, Cox Communications proposed an amendment to include public water systems in this bill. Public water systems are defined in NRS 445A, and there are probably 650 or 700 public water systems in this State. The federal definition says a water system that serves more than 25 people is considered a public water system. Many, if not most of those public water systems, are owned and operated by local governments; therefore, we do not want to be in a position of prohibiting local governments from modeling their own water systems. We need to address that also. For this work session to move this bill forward, as long as we can address those issues, we will be okay.

Senate Committee on Government Affairs
April 10, 2015
Page 16

**Misty Grimmer (Cox Communications):**
To clarify, the additional amendment, <u>Exhibit P</u>, is an amendment to the amendment so the two go together. The local governments have met with us to continue this conversation, and we look forward to working with them in the Assembly to answer some of those questions.

> SENATOR HARDY MOVED TO AMEND AND DO PASS AS AMENDED <u>S.B. 481</u> WITH BOTH AMENDMENTS.
>
> SENATOR PARKS SECONDED THE MOTION.
>
> THE MOTION CARRIED UNANIMOUSLY.

<div align="center">* * * * *</div>

**Senator Parks:**
Regarding <u>S.B. 406</u>, I would like to reserve my right to change my vote to a yes on the floor.

Remainder of page intentionally left blank; signature page to follow.

Senate Committee on Government Affairs
April 10, 2015
Page 17

**Chair Goicoechea:**
The meeting of the Senate Committee on Government Affairs is adjourned at 2 p.m.

RESPECTFULLY SUBMITTED:

_____

Suzanne Efford,
**Committee Secretary**

APPROVED BY:

_____

Senator Pete Goicoechea, Chair

DATE:_____

Senate Committee on Government Affairs
April 10, 2015
Page 18

| EXHIBIT SUMMARY | | | |
|---|---|---|---|
| **Bill** | **Exhibit** | | **Witness or Agency** |
| | A | 1 | | Agenda |


| EXHIBIT SUMMARY | | | |
|---|---|---|---|
| **Bill** | **Exhibit** | **Witness or Agency** | **Description** |
| | A | 1 | | Agenda |
| | B | 3 | | Attendance Roster |
| S.B. 65 | C | 56 | Jennifer Ruedy | Work Session Document |
| S.B. 81 | D | 12 | Jennifer Ruedy | Work Session Document |
| S.B. 185 | E | 2 | Jennifer Ruedy | Work Session Document |
| S.B. 241 | F | 19 | Jennifer Ruedy | Work Session Document |
| S.B. 254 | G | 14 | Jennifer Ruedy | Work Session Document |
| S.B. 285 | H | 15 | Jennifer Ruedy | Work Session Document |
| S.B. 289 | I | 4 | Jennifer Ruedy | Work Session Document |
| S.B. 312 | J | 9 | Jennifer Ruedy | Work Session Document |
| S.B. 401 | K | 8 | Jennifer Ruedy | Work Session Document |
| S.B. 406 | L | 22 | Jennifer Ruedy | Work Session Document |
| S.B. 448 | M | 1 | Jennifer Ruedy | Work Session Document |
| S.B. 478 | N | 4 | Jennifer Ruedy | Work Session Document |
| S.B. 481 | O | 7 | Jennifer Ruedy | Work Session Document |
| S.B. 481 | P | 1 | Cox Communications | Proposed Amendment |