# Exhibit C
# May 4, 2015 Assembly
# Committee Minutes

# MINUTES OF THE MEETING
## OF THE
## ASSEMBLY COMMITTEE ON COMMERCE AND LABOR

### Seventy-Eighth Session
### May 4, 2015

The Committee on Commerce and Labor was called to order by Chairman Randy Kirner at 1:34 p.m. on Monday, May 4, 2015, in Room 4100 of the Legislative Building, 401 South Carson Street, Carson City, Nevada. The meeting was videoconferenced to Room 4406 of the Grant Sawyer State Office Building, 555 East Washington Avenue, Las Vegas, Nevada. Copies of the minutes, including the Agenda (Exhibit A), the Attendance Roster (Exhibit B), and other substantive exhibits, are available and on file in the Research Library of the Legislative Counsel Bureau and on the Nevada Legislature's website at www.leg.state.nv.us/App/NELIS/REL/78th2015.   In addition, copies of the audio or video of the meeting may be purchased, for personal use only, through the Legislative Counsel Bureau's Publications Office (email: publications@lcb.state.nv.us; telephone: 775-684-6835).

## COMMITTEE MEMBERS PRESENT:

Assemblyman Randy Kirner, Chairman
Assemblywoman Victoria Seaman, Vice Chair
Assemblyman Paul Anderson
Assemblywoman Irene Bustamante Adams
Assemblywoman Maggie Carlton
Assemblywoman Olivia Diaz
Assemblyman John Ellison
Assemblywoman Michele Fiore
Assemblyman Ira Hansen
Assemblywoman Marilyn K. Kirkpatrick
Assemblywoman Dina Neal
Assemblyman James Ohrenschall
Assemblyman P.K. O'Neill
Assemblyman Stephen H. Silberkraus

## COMMITTEE MEMBERS ABSENT:

Assemblyman Erven T. Nelson (excused)

Assembly Committee on Commerce and Labor
May 4, 2015
Page 2

## GUEST LEGISLATORS PRESENT:

Senator Michael Roberson, Senate District No. 20

## STAFF MEMBERS PRESENT:

Kelly Richard, Committee Policy Analyst
Matt Mundy, Committee Counsel
Leslie Danihel, Committee Manager
Connie Jo Smith, Committee Secretary
Olivia Lloyd, Committee Assistant

## OTHERS PRESENT:

Bruce H. Breslow, Director, Department of Business and Industry
Terry J. Reynolds, Deputy Director of Administration, Department of Business and Industry
Ernest Figueroa, Chief Deputy Attorney General, Bureau of Consumer Protection, Office of the Attorney General
Scott J. Kipper, Commissioner of Insurance, Division of Insurance, Department of Business and Industry
Jeanette K. Belz, representing Property Casualty Insurers Association of America; and U.S. Travel Insurance Association
Ruben Murillo, Jr., President, Nevada State Education Association
John Vellardita, Executive Director, Clark County Education Association
Rusty McAllister, President, Professional Fire Fighters of Nevada
Ronald P. Dreher, Government Affairs Director, Peace Officers Research Association of Nevada; and representing the Washoe County Public Attorney's Association; and Washoe School Principals' Association
Tray Abney, Director of Government Relations, The Chamber, Reno-Sparks-Northern Nevada
Paul J. Moradkhan, Vice President, Government Affairs, Las Vegas Metro Chamber of Commerce
Michael Ramirez, Director of Governmental Affairs, Las Vegas Police Protective Association Metro, Inc.; and representing Southern Nevada Conference of Police and Sheriffs
Lonnie Shields, Assistant Executive Director, Nevada Association of School Administrators; and representing Clark County Association of School Administrators and Professional-Technical Employees
Melissa Johanning, President, Las Vegas Police Protective Association Civilian Employees, Inc.
Richard P. McCann, Executive Director and Labor Representative, Nevada Association of Public Safety Officers

Assembly Committee on Commerce and Labor
May 4, 2015
Page 3

> Venicia Considine, Attorney, Consumer Rights Project, Legal Aid Center
> of Southern Nevada
> Alfredo Alonso, representing Community Financial Services Association of
> America; and Money Tree
> Sara Cholhagian, representing EZCORP, INC.
> Marlene Lockard, representing Nevada Women's Lobby
> John Fielding, Attorney, U.S. Travel Insurance Association,
> Washington, D.C.

**Chairman Kirner:**
[Roll was called, a quorum was present, and protocol was explained.] We will begin today's hearing with <u>Assembly Bill 481</u>.

<u>**Assembly Bill 481**</u>: **Provides additional authority for the enforcement of the laws prohibiting deceptive trade practices. (BDR 52-1168)**

**Bruce H. Breslow, Director, Department of Business and Industry:**
Four sessions ago, the Legislature put the Division of Consumer Affairs on ice because of a fiscal crisis.  Each session since, there has been a bill, usually toward the end of the session, to continue it on ice.  Last session, we created a small hybrid consumer affairs unit within the Director's Office of the Department of Business and Industry.  It was something that the Office of the Attorney General asked us to do; in essence, it was almost a small claims court for consumer affairs issues.

The Legislature last session asked us to come back with a plan to continue and improve that if we could, but we were conscious of the cost, so we tried to keep it very lean.  The Consumer Affairs Unit would consist of two investigators in Las Vegas, two administrative staff in Las Vegas, and an administrative law judge in Las Vegas.  In the north, the unit would have a compliance investigator and a part-time administrative person, giving the unit approximately seven positions in all.

Last session we hired an administrative law judge and were ready to go. At that point, we realized that the law being on ice did not allow us to bring any cases to the administrative law judge, and we moved him to another position in the Department of Business and Industry.  That position has been vacant awaiting the law so that we could bring cases to an administrative law judge. That is what this bill does.  It takes the bill that was put on ice, reduces it, adds the language allowing for our Consumer Affairs Unit, allows the Office of the Attorney General to continue doing what that office does, and allows us to bring cases for deceptive trade, and to do administrative fines.  We used the

Assembly Committee on Commerce and Labor
May 4, 2015
Page 4

power of persuasion for the last couple of years. This would allow administrative fines, restitution, and things like that.

This bill was worked on initially by us and then by the Legislative Counsel Bureau (LCB). It was a freestanding bill, and LCB preferred it to fix the bill so it did not have to get put on ice every session. They combined the two, and then the Attorney General made the changes to what they thought affected them in a negative way.

Deputy Director Reynolds has one other thing to point out in an amendment that was submitted (Exhibit C).

**Terry J. Reynolds, Deputy Director of Administration, Department of Business and Industry:**
There was some question about one of the amendments we have. We gave initial testimony before the Assembly Committee on Ways and Means as to where the administrative fines go. We have proposed an amendment (Exhibit C) to have the administrative fines go into the State General Fund and not go back to the support of this unit. The unit will be able to accept grants but not administrative fines. I think that was the point of contention.

**Chairman Kirner:**
That is in section 4, subsections 2 and 3?

**Terry Reynolds:**
That is correct.

**Chairman Kirner:**
The new language would have the administrative fines related to the Division go into the General Fund, correct?

**Bruce Breslow:**
The administrative fines, yes.

**Assemblyman Ohrenschall:**
Section 2, subsection 3, says, "The Attorney General may institute criminal, civil or administrative proceedings to enforce the provisions ... in any district court." I wonder about the language "in any district court." We have some statutes that require certain actions to be brought in the First Judicial District Court, and folks from my part of the state always think that is tough. I know it is convenient when you are up here, but why not have it be in the judicial district that the deceptive trade practice is allegedly occurring in?

Assembly Committee on Commerce and Labor
May 4, 2015
Page 5

**Bruce Breslow:**
That was not language that we put in the bill. I would assume it was for convenience and ease, but that may make it consistent to other language. The Attorney General's Office might properly answer that question, and they are here today.

**Assemblywoman Kirkpatrick:**
In section 5, subsection 2, currently notice "must" be given by certified mail. This will say "may" but also that someone can "personally serve" a subpoena, correct?

**Bruce Breslow:**
Yes.

**Assemblywoman Kirkpatrick:**
When it says "may," what is the alternative if that does not happen? We have seen problems in the past. What other form of notification will they get? Is this to read that service has to either be done by mail or done in person?

**Bruce Breslow:**
Again, I think that would be a question for the Attorney General's Office.

**Assemblywoman Carlton:**
I have the original bill and two different proposed amendments that we had in Ways and Means. I know the original bill is on the Nevada Electronic Legislative Information System (NELIS), but what am I actually working from?

**Bruce Breslow:**
Our original bill was very simple. At that point, LCB thought it would be a better idea to incorporate our bill into the bill the Legislature keeps putting on ice, so that is the second amendment. The newest amendment changes the administrative fine to go to the General Fund instead of to the agency.

**Assemblywoman Carlton:**
I have one that is dated April 12, 2015, and one that is not dated, but I do not have one that has the proposed amendment that you have. I want to make sure I have the right document.

**Bruce Breslow:**
The new amendment that incorporated all the changes is dated April 22, 2015, and that is the printed version that was handed out today.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 6

**Terry Reynolds:**
Regarding the small copy you received that is in NELIS, the only amendment we submitted to that is dated April 22, 2015; we provided it to you. The only change in there is having the administrative fines go into the State General Fund, and it retains grant funds into the operation of the Department.  That is the only change between those two.  With the exception of that, this bill has only one minor change dealing with the administrative fines.

**Chairman Kirner:**
I believe the April 22 change is on NELIS.  Are there other questions from the Committee?  [There were none.]  Are there those who are in support?

**Ernest Figueroa, Chief Deputy Attorney General, Bureau of Consumer Protection, Office of the Attorney General:**
I have worked closely with the Department of Business and Industry on the amendments to ensure that any of the language that was contained in the small pamphlet did not impact the current operations of the Nevada Attorney General's Office.  That was the intent of the April 12 amendment.  We are in support of the bill as amended.

**Assemblywoman Kirkpatrick:**
In regard to section 5, subsection 2, I would like to know what the process will be, considering we are going from "must" to "may" and adding an alternative piece.

**Ernest Figueroa:**
To answer that question, the purpose of this language was to ensure that the way to serve investigatory subpoenas under the deceptive trade practice statute would be in sync with the way the Attorney General's Office does it now. The language is consistent with the way the Attorney General's Office does it. Basically, in order for the Department of Business and Industry to issue a subpoena, it would have to be done by certified mail or by serving the individual personally.

**Assemblywoman Kirkpatrick:**
To follow up and make sure there is paperwork or a paper trail that follows—and I will sell myself out here—I do not pick up certified mail because the green card is not left until the day of expiration.   Is there some documentation that follows?  Is there a letter that goes out to say, "You will be getting a certified letter" or do they try to find you?  What happens if it is only a certified letter and you do not pick it up?  Are you in default?

Assembly Committee on Commerce and Labor
May 4, 2015
Page 7

**Ernest Figueroa:**
To the extent that such a situation happens now, in order to be legally consistent and served properly on the person if somebody fails to pick up their certified mail, then the Attorney General's Office, or in this case, the Department of Business and Industry, would have no choice but to serve that individual personally.

**Assemblywoman Kirkpatrick:**
That makes me feel comfortable that there is a second parameter for folks to be notified.

**Assemblywoman Neal:**
In section 13, subsection 4, the orange language reads, "Any offense which occurred within 10 years immediately preceding the date of the principal offense or after the principal offense constitutes a prior offense ... when evidenced by a conviction, without regard to the sequence of the offenses and convictions." Are these offenses where the cause of action is the same, and then you have this long chain-link fence and it is capped at 10 years?  What does that language mean?

**Ernest Figueroa:**
I believe that language you are referencing is set to be deleted.  It was in the amendment (Exhibit C).  It was present in the original printout.  To be consistent and to be within the spirit that we did not want to add additional language and duties in the way the deceptive trade practices actions are enforced by the Attorney General's Office, this language is to be removed completely by the amendments.

**Assemblywoman Neal:**
So the orange is now going to be purple one day, but not today?

**Ernest Figueroa:**
For clarity, the phrase that says, "Any offense which occurred within 10 years" and ends with "offenses and convictions" is to be removed by the amendment. It will not exist.

**Assemblywoman Neal:**
We are going to get a second amendment?

**Chairman Kirner:**
I will have our legal counsel explain.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 8

**Matt Mundy, Committee Counsel:**
I would like to make a point of clarification based on the previous testimony that the only substantive changes for the purposes of amendment were in section 4, regarding the fines going to the General Fund and grant funds received by the Consumer Affairs Division to be deposited in their account. Regarding the other blocks of orange text that appear as if they are being brought back in from the original bill, those are not part of the amendment.

**Ernest Figueroa:**
It is my understanding that is the version that the Attorney General's Office supports. Those sections in orange in the April 12 amendment should be contained in the April 22 amendment and are necessary to make sure that the current operations of the Attorney General's Office are not impacted by A.B. 481.

**Chairman Kirner:**
Are there any other questions? Seeing no other questions from the Committee, are there those who are in support of A.B. 481? Seeing no one, are there any opposed to this bill? Seeing no opposition, are there any who are neutral? Seeing no one, would the bill sponsor like to make closing comments? [He indicated no.] I will close the hearing on A.B. 481 and we will move to Senate Bill 67 (1st Reprint).

**Senate Bill 67 (1st Reprint):   Revises provisions governing the regulation of insurance. (BDR 57-371)**

**Scott J. Kipper, Commissioner of Insurance, Division of Insurance, Department of Business and Industry:**
The Division of Insurance has one policy bill this year. We apologize for the length and depth of the bill, but a variety of topics needed to be addressed relating to insurance regulation. [Referred to written testimony (Exhibit D).] Before I speak about the specific provisions of the bill, I will introduce you generally to Nevada's insurance industry and the Division of Insurance. Insurance is an $11.9 billion industry in Nevada, which breaks down to roughly $4,500 in insurance premiums per Nevadan per year. We oversee almost 135,000 licensees, 20,000 of whom are residents of the state; over 2,200 traditional insurers; and 159 captives. For the state of Nevada, the industry has generated over $254 million in premium tax revenues for the last reporting period and over $28 million in additional revenue for that period. The Division is a self-funded, fee-supported agency that takes no State General Fund money.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 9

As part of our charge to protect consumers and having an interest in insurance, the Division participates in the National Association of Insurance Commissioners (NAIC). The NAIC is the U.S. standard-setting and regulatory support organization created and governed by state insurance regulators across the country, including the District of Columbia and the five U.S. territories. Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory oversight. The NAIC is an integral part of state-based insurance regulation in the United States. The Division also uses NAIC systems to share information with and obtain information from other states for the purposes of licensure, enforcement, and uniform ethical standards. [Continued to read from written testimony (Exhibit D).]

Due to insurance company insolvencies in the 1980s and 1990s, insurance commissioners created an accreditation program and set accreditation standards to establish minimum requirements across the states. This program confirms that accredited states have adequate solvency laws to protect consumers, effective and efficient financial analysis and examinations, and appropriate organizational and personnel practices. Accreditation ensures that one state can give full faith and credit to the regulatory oversight of another accredited state because the states follow the same minimum standards, and regulatory staff has proper education and training.

I am very proud to say that the Division of Insurance in the state of Nevada is fully accredited. As a result, the Division can give full faith and credit to financial review and examinations of insurers domesticated in other states selling products to our citizens in Nevada. Additionally, other states can confidently accept the Division's exams of Nevada's domestic insurers. In short, accreditation gives Nevada consumers more options in insurance because they can trust carriers in other states, and accreditation makes operations easier and more efficient for Nevada insurance businesses.

I appreciate your indulgence in letting me share that with you because it provides a great deal of background for Senate Bill 67 (1st Reprint). As you will note, this is a first reprint, and the amendments reflect some technical corrections and include some input from the insurance industry. [Read from written testimony (Exhibit D).]

I will walk you through the sections. Sections 1 and 42 through 231 adopt the current version of the NAIC model law on investments. This model law helps protect insureds by promoting greater insurer solvency and financial strength through objective investment standards. The importance of this law is evident from the most recent financial crisis of 2008-2009. You will recall that most

Assembly Committee on Commerce and Labor
May 4, 2015
Page 10

insurance carriers fared far better than investment banks because of the conservative solvency requirements. The investment model law also requires insurers to invest in ways that incorporate principles of prudent investment management so that obligations to insureds are met without jeopardizing solvency and financial strength. The changes to Nevada's investment chapter required numerous changes throughout, making it more appropriate and efficient to replace most of the existing language with language from the model law.

Section 2 clarifies that fees apply to all the insurers as provided by the law. Let me be very clear: there are no new fees that will be charged to reinsurers. These fees were already in existence, and we are not changing one thing to that.

Sections 3 through 21 adopt revisions to NAIC's Credit for Reinsurance Model Law and amend related existing statutes. When an insurance company reinsures part of its obligations, it transfers that risk to a reinsurer. The Credit for Reinsurance Model Law is an accreditation standard which insures that the reinsurance company is financially capable of assuming the risk. These sections also outline the circumstances under which an insurer would be allowed to reduce reserves to reflect the transfer of risk to the reinsurance company—in other words, to allow the company to free up much needed capital to use elsewhere. These provisions strengthen the carrier's liquidity without harming its solvency. [Read from written testimony (Exhibit D).]

Sections 22 through 39.5, 40.15 through 40.3, and 40.5 through 41.7 adopt the revisions to the NAIC's Standard Valuation Law model act. This model act applies to life insurance companies to ensure that a life insurer maintains reserves that reflect the risks associated with a company's product offerings and business strategies, as well as the current economic environment, while preserving the historical practice of conservative statutory reserves.

The revisions to the Standard Valuation Law changes from a one-size-fits-all formulaic approach to principle-based reserving (PBR), which is based on principles rather than a set formula. Currently, these life insurance reserves are calculated based on a formula that applies to all situations regardless of the level of risk. This has resulted in overreserving for some products and underreserving for others. The PBR approach leads to the "right-sizing" of reserves to reflect and adjust to different circumstances. This provision will not be effective until 42 states, constituting greater than 75 percent of all direct premiums written, adopt the provision. Currently, 26 states have passed or adopted this legislation, representing more than 40 percent of U.S. direct written premiums. Having this provision in place in Nevada will contribute to reaching the threshold and allow Nevada to move forward with it as soon as it

Assembly Committee on Commerce and Labor
May 4, 2015
Page 11

takes effect. Having this model act in place is also important for life insurers who wish to form or redomesticate to Nevada.

Section 40 and section 232 remove references to statutes that are sought to be repealed in this bill.

Section 233 changes annual report filing requirements for administrators to 90 days after the expiration of the administrator's fiscal year and clarifies what other financial reporting documents should be included with the filing.

Sections 234 through 237 allow the Division to conduct more of its licensing activities by electronic means. The Division seeks to modernize and streamline its ability to communicate officially and effectively through electronic mediums. Allowing official email communications also results in a cost savings to the Division, carriers, and consumers. [Read from written testimony (Exhibit D).]

Section 238 gives the Division more latitude to consider criminal backgrounds of license and certificate applicants. Although the law currently allows the Commissioner to consider a felony conviction, there are other acts, such as theft, fraud, dishonesty, and moral turpitude, that may not be felonies but cause concern, especially when it comes to protecting consumers from individuals whose past makes them unsuitable for the business of insurance.

Section 239 consolidates various statutes relating to the confidentiality of health rate filing information into one statute.

Sections 240 through 249 and 251 through 253 make changes to the Nevada Life and Health Insurance Guaranty Association Act. These changes have been requested by the Nevada Life and Health Insurance Guaranty Association to allow Life and Health assumed claims to be covered under the Guaranty Association. If an insurer becomes insolvent and must be liquidated, it is not uncommon for another insurer to wish to acquire or "assume" the business. Currently, these assumed claims are not covered by the Life and Health Insurance Guaranty Association, which can leave consumers without a safety net. Sections 254 through 256 do the same thing for our property and casualty guaranty association, Nevada Insurance Guaranty Association.

Section 257 is a change to the notice requirement relating to the cancellation or renewal of health insurance policies and contracts. This section broadens the notice requirement provision to avoid the need to change it in the future even if federal deadlines change. Sections 258 and 259.5 are updates to the NAIC Standard Nonforfeiture Law relating to cash values of life insurance.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 12

Sections 260 through 262 remove references to statutes that are sought to be repealed in this bill. [Read from written testimony (Exhibit D).]

Section 263 and sections 315 through 317 allow automobile insurers to issue electronic proof of insurance "cards" and permit the Department of Motor Vehicles (DMV) to accommodate such cards. The DMV has been consulted on this measure.

Sections 264 through 289 adopt the NAIC's Risk Management and Own Risk Solvency Assessment Model Act. In the wake of the last financial crisis, it became clear that state insurance regulators needed to be able to assess a holding company's financial condition as a whole, and its impact on an insurer within the holding company system. The provisions of this model act require insurance companies to issue their own assessment of their current and future risk through an internal risk self-assessment process, and it will give regulators an enhanced view of an insurer's ability to withstand financial stress.

Sections 290 through 304 update Nevada's laws on insurer mergers and acquisitions to adopt recent NAIC model law changes. Section 305 removes reference to a statute that is sought to be repealed in this bill.

Sections 306 through 311 rearrange Nevada's laws on domestic captive insurers and risk retention groups to clarify that domestic risk retention groups are licensed as domestic captives and held to the same standards.

Sections 312 and 313 ask for authority to inspect and copy certain sealed records of insurance applicants and licensees for the purpose of determining the suitability for a license or liability to discipline for misconduct, and for events or convictions related to insurance. The access being requested is the same access granted to professional licensing boards, such as the State Board of Cosmetology and the State Gaming Control Board. Section 314 provides exceptions for certain provisions of this bill from disclosure under the public records statutes. [Read from written testimony (Exhibit D).]

Section 318 authorizes the Commissioner to alter the 120-day annual fiscal reporting requirement for self-insured employers for the purposes of workers' compensation coverage. It also permits the Division to accept financial statements audited by independent CPAs or the foreign equivalent.

[The Division of Insurance submitted its 2015 Insurance Market Report (Exhibit E).]

Assembly Committee on Commerce and Labor
May 4, 2015
Page 13

**Chairman Kirner:**
It is a long bill and could be complicated.  It seems to me that you are working off a model certainly with NAIC types of things, but there are other things in here as well, based on our experiences in the last several years with our economy and so forth.  With that, do members of the Committee have any questions?

**Assemblywoman Carlton:**
If we could go to section 239, subsection 2, you are adding "and small employers" and in subsection 4, "Except in cases of violations...."  If you could explain those violations.  It seems to me as though we are considering more things proprietary and constituting a trade secret than we had in the past. I want to understand the idea behind that.

**Scott Kipper:**
There is a great deal of information that comes in with these rate filings, including algorithms that carriers use to develop those rates, as well as other information specific to the company that may be considered proprietary or trade secrets.  This provision would allow the Division to make a ruling on that as to whether or not it would be proprietary or would have to be disclosed. I will say that the Division has been very transparent with a lot of the rate filings.  All that rate information is available on our website, as well as much of the supporting documentation.  There is some information, and justifiably so, that should be considered a trade secret.  I believe this also provides that if we are ordered by a court of competent jurisdiction, that information would have to be disclosed.

**Assemblywoman Carlton:**
In adding "small employers," what is the reason behind that?  This used to be just for individuals, and now we are protecting employers.  To me, there is a different level of protection for an individual versus giving the actual business protection.

**Scott Kipper:**
I believe this does apply for both those plans that are purchased by individuals and those plans that are purchased by small employers.  They are very similar in structure.  The information is very similar in what is submitted to the Division, so we extended those provisions and protections to those small employer plans.

**Assemblyman Ohrenschall:**
Section 179 talks about "foreign investments."  I assume the model act and the drafters felt this was an acceptable amount that would not potentially cause the insurer to take too much of a chance.  What are your comments on that?

Assembly Committee on Commerce and Labor
May 4, 2015
Page 14

**Scott Kipper:**
Section 179, subsection 2, which talks about the aggregate amount that might
be held in foreign investments, makes sure that it does not exceed 10 percent
of its admitted assets or 3 percent of its admitted assets as to any other foreign
jurisdiction.  This is consistent with our approach to make sure that all of the
investments are as diverse as possible but also as secure as possible.  I would
be very surprised if any of these companies even approached the 10 percent
threshold; it would likely be 1 or 2 percent in any single, particular investment.

**Assemblyman Ohrenschall:**
Currently, they are invested abroad?

**Scott Kipper:**
Some are, some are not.  This just provides some structure as to if they do,
what they might do, and how much they might be able to invest.

**Assemblyman Ohrenschall:**
In section 238, subsection 6, the Division's ability has been expanded to not
just consider a felony but any "crime which involves theft, fraud, dishonesty or
moral turpitude."   I thought we were moving away from looking at
moral turpitude and theft.   Let us say that someone had a misdemeanor
shoplifting charge 20 years ago.  Do you think that would disqualify the person?

**Scott Kipper:**
We have a committee that reviews all applications.  When an applicant indicates
that he or she has had a felony, the committee requests the specifics of that
felony, and the committee makes a recommendation to the commissioners as to
whether or not they believe this person has the wherewithal to go into people's
homes, talk about their finances, and gather their most personal information,
such as social security numbers, birthdates, and so forth.  I think it is vitally
important that these folks are screened as much as possible.  If expansion of
this to a crime involving theft, fraud, dishonesty, or moral turpitude, just to red
flag something that we should look into a little deeper, I think it is very
important for our Nevada consumers.

**Assemblyman Ohrenschall:**
There is no time limit?  Seven years or ten years?  This could go back to when
someone was in college or a young person making some small indiscretion.

**Scott Kipper:**
Yes, all those indiscretions are required to be disclosed.  There are times where
we have looked at that and said, "That happened 20 years ago.  You have lived

Assembly Committee on Commerce and Labor
May 4, 2015
Page 15

a model life since then." We certainly have no trouble licensing an individual in that case.

**Assemblywoman Neal:**
I was reading sections 33.7 through 37.5 on valuation, but I want a real-life example. It seems that these sections relate to what Assemblyman Ohrenschall was referring to in terms of some potential credit risks. When the reserves are developed and they want to quantify their benefits, the conversation in the bill started with whatever assumptions that you make that you do not have significant control or influence over. Basically, you have to set aside reserves in order to deal with the issues that could come about. In section 8 of your bill, when read all together it said, if a reinsurer chooses to do reduced security in relationship to the multibeneficiary trust, they are bound to you, the Commissioner, if there is a loss.

When you look at the investments at the back, some could lose. What is the amount of the reserve? How much do they need to set aside? Let us say it is a money market fund or a certificate of deposit. How much needs to be set aside in their reserve account if they lose? They come to you and say, "I know this is unsecured. I know that there is a risk, but I am investing in it anyway. Give me the go-ahead." How much above that investment do they need to have in place?

**Scott Kipper:**
The securities of all carriers are run through a valuation regimen. The NAIC has a securities valuation office in New York, and they look at every insurance company's holdings and are able to say "risky," or "not so risky." You look at the amount of insurance the company has written. You look at the amount of risk they have undertaken, and there is a process of matching the value of those securities, the amount of reserves that are required for the size of the company, and what those investments should look like.

I think I understand your question. There is a great deal of mental workout to determine what those values are, what those securities might be, and then what eventually the level of reserves the company must hold.

**Assemblywoman Neal:**
That is what I thought, because it said the assumptions must be prescribed for the risk over which the company does not have significant control or influence. When you talk about their behavior, how they have engaged, and the size of the company, the risk versus non-risk, they have to cover the assumptions even if the assumptions are good or bad.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 16

**Scott Kipper:**
I think you are right. If they buy in a particular piece of a bond that is close to junk or close to that status, they would be given less value for holding that bond, and they would have to hold more, or conversely, they would probably have to hold other, better financial instruments to balance the higher risk of that investment.

**Assemblywoman Bustamante Adams:**
I know this is a very technical bill, but can you give me some level of comfort when you are drafting these revisions? I am assuming that you started last year? Do you meet on a national level, bring it down to the state level, and then you have a team within the state that looks at what would work for Nevada?

**Scott Kipper:**
I mentioned the principle-based reserving, and the revisions to the Standard Valuation Law model have been ten years in the making. This is a process that has been undertaken by the National Association of Insurance Commissioners. There is a great deal of input from insurance industry individuals with even more input from regulators. There is also a field of funded consumer representatives who have input and expertise in the development of these models. It is highly unusual for a model to be developed in less than 18 to 24 months. It is highly unusual for an amendment to a model to take place in less time than that. This is a very thorough process.

When it comes to accreditation standards, again, these are standards that are well debated and put into place because of some experience we have had in the past, such as, the meltdown in 2008. Some of these other provisions we are suggesting in this bill are basically an absolute minimum for us to have on our books to maintain our accreditation. We could have come back with a much thicker bill, but we did not want to do anything beyond what we absolutely had to have. There are some "want to haves," some "be good to haves," but it certainly does not take into consideration all the "like to haves."

**Assemblywoman Bustamante Adams:**
Can you elaborate on the funded consumer representatives that you mentioned?

**Scott Kipper:**
The NAIC provides funding for 30 consumer representatives to attend our three national meetings as well as participate in any interim meetings that might take place. These representatives include the University of Georgia consumer representative, who is focused on items about readability and understanding the insurance contract, to folks from the University of Connecticut School of Law,

Assembly Committee on Commerce and Labor
May 4, 2015
Page 17

and representatives from the Center for Economic Justice in Austin, Texas. There are many consumer representatives that keep not only the regulators balanced but also bring their point of view to the discussion when it comes to working with the industry.

**Chairman Kirner:**
Seeing no more questions, we will move to those who are in support of this bill.

**Jeanette K. Belz, representing Property Casualty Insurers Association of America:**
Mark Sektnan submitted a letter to the Committee (Exhibit F). Property Casualty Insurers Association of America (PCI) member companies write about $1.4 billion in premiums annually, composing 34 percent of Nevada's property casualty insurance market. The Commissioner has spent a great deal of time going through the provisions of the bill. We are in support, particularly the adoption of the model acts, including the model holding company act on own risk insolvency assessment. Other important provisions add coverage for assumed claims transactions in the Nevada insurance guaranty associations. Senate Bill 67 (R1) also allows insurers to provide electronic proof of insurance e-cards. They would like to express their support.

**Chairman Kirner:**
Are there any questions for Ms. Belz? Seeing none, are there others who might be in support of this bill? Seeing none, are there any speakers in opposition? Seeing no opposition, are there any who are neutral? Seeing none, did you wish to make closing comments, Mr. Kipper?

**Scott Kipper:**
I would like to thank the Committee for their indulgence today for this lengthy bill, and we appreciate your attention. If there are any questions, please feel free to reach out to the Division, and we will be happy to try to answer them.

**Chairman Kirner:**
We will now close the hearing on Senate Bill 67 (R1) and open the hearing on Senate Bill 241 (3rd Reprint).

**Senate Bill 241 (3rd Reprint):      Revises provisions relating to collective bargaining. (BDR 23-1030)**

**Senator Michael Roberson, Senate District No. 20:**
The measure before you represents a consensus of many of the parties interested in reforming collective bargaining for local governments and their employees. Stakeholders on both sides of the table came together to develop

Assembly Committee on Commerce and Labor
May 4, 2015
Page 18

reasonable legislation bringing increased accountability to the public employee collective bargaining process while retaining key protections in the workplace for public employees.  Senate Bill 241 (3rd Reprint) makes some critical changes related to collective bargaining.  I would like to walk the Committee through the bill's major provisions.

Section 1 requires that in the event a local government employer provides paid leave to an employee for time spent providing services to an employee organization, the full cost of such leave must be paid or reimbursed by the employee organization or offset by the value of concessions negotiated in its collective bargaining agreement.

Section 1.1 reduces from 180 days to 45 days the amount of time within which the Local Government Employee-Management Relations Board (EMRB) must conduct a hearing related to certain complaints.

The evergreen issue provides that a collective bargaining agreement between a local government employer and a recognized employee organization expires for certain purposes at the end of the term stated in the agreement, and is addressed in section 1.3.  This section also provides that upon the end of the term stated in a collective bargaining agreement, and until a successor agreement becomes effective, a local government employer shall not, with limited exceptions, increase any compensation or monetary benefits paid to or on behalf of employees in the affected bargaining unit.

Section 1.4 excludes a school administrator whose annual salary adjusted for inflation is greater than $120,000 for membership in any bargaining unit. Sections 1.5 and 1.6 revise various provisions related to negotiations between a school district and an employee organization representing teachers or educational support personnel in order to expedite and streamline the bargaining process.

Section 1.7 requires the Local Government Employee-Management Relations Board to conduct a hearing not later than 45 days after the board decides to hear a complaint concerning prohibited practices related to collective bargaining.  Section 1.9 provides that during the first three years of employment by a school district, a principal is employed at-will.  After completing the probationary period, subsection 2 of section 1.9 provides that a principal may again be employed at-will if, during two consecutive school years, the school rating is reduced by one or more levels and 50 percent or more of the teachers at the school request a transfer to another school.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 19

Under subsection 3 of section 1.9, a school district must conduct a survey to evaluate conditions at a school which experiences a drop in its rating and has more than 50 percent of the teachers asking for a transfer.  However, the survey will not affect the employment status of the principal.  Continuing in section 1.9, subsection 4, a principal whose employment status reverts to at-will due to a drop in the school's rating and the teachers' transfer requests is subject to immediate dismissal by the school board upon a recommendation from the school superintendent.

Section 1.95 provides that a postprobationary administrator, other than an administrator excluded from a bargaining unit or a school principal, must apply to the superintendent of the school district for reappointment to his or her position every five years.  Further, under subsection 2 of section 1.95, if the person is not reappointed to the position, then the administrator is entitled to be assigned to his or her former position at the rate of pay for that position.

Finally, sections 2 through 4.8 make changes to other sections to conform with the new provisions in this bill.  This bill would become effective upon passage and approval.  I urge the Committee's approval of this important and timely measure.

**Chairman Kirner:**
Are there questions from the Committee for Senator Roberson?

**Assemblywoman Neal:**
How does the reassignment work?   If a principal gets reassigned, do the three years run the whole time or do they have to start upon the reassignment?

**Senator Roberson:**
My understanding of this provision is if a person is a school district employee and he or she is promoted to the position of principal, for those first three years, that principal is at-will.  A reassignment would typically be reassigning back to a former position, which would not be a principal position.

**Assemblywoman Neal:**
I am assuming they stay at-will even if they are a principal or return to their former position?

**Senator Roberson:**
No, that is not the intent.  The intent is that principals, and only principals under this section 1.9, would be at-will for those first three years that they are in the position of a principal.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 20

**Assemblywoman Neal:**
Regarding section 1.95, are there certain things the administrator will have to prove for their reappointment for the administrative position every five years, for instance, proof they have turned their school around or they have a four-star school?

**Senator Roberson:**
Let me clarify.   The purpose of this is to provide more accountability. Obviously, we collectively are looking to invest a lot more money into education this session.   I believe there needs to be accountability tied to that money. What section 1.95 would do is provide accountability measures for school administrators.   There are three categories for school administrators that are being reflected in section 1.95.   There are administrators who make $120,000 a year or more in base pay, which is the top level administrators.   They would no longer be able to participate in collective bargaining or be part of a bargaining unit.   The new principals would be at-will for the first three years.   After the first three years, if their school rating went down and half or more of the teachers wanted to leave, at that point we know there is a problem with that principal.   If that happens for two years in a row, then essentially they are going to be dismissed.

The third category is all other administrators; that is, administrators who are not principals and who do not make $120,000 or more.   Those administrators, and frankly that is the largest number of administrators in the school district, would have to reapply for their position every five years.   There is no specific criteria. This is about making sure that you are doing your job.   Every five years, your supervisors have to believe that you are doing a good job and that you ought to stay in that position.

**Assemblyman O'Neill:**
Thank you for this bill.  I know the bill is in its third edition, but I have a small question.     Under section 1.9, subsection 2, paragraphs (a) and (b) are connected by the word "and."   In paragraph (b), you have 50 percent or more of the teachers assigned to the school requesting a transfer to another school. Should the word "and" possibly be an "or"?   The teachers may want to stay there.   They may like the school, the area, and the students.   They want to stay there even though the principal is not fulfilling his or her obligation.   Could you help work me through that?

**Senator Roberson:**
It is "and" for a reason.   Initially we are saying in the first three years, as an individual principal, you are at-will—you can be terminated at any time.   Once you have gotten past that threshold, presumably you are a good principal and

are in postprobationary status at that point.   There is a higher bar after that three-year probationary period to terminate a principal.  The reason we have the "and" between paragraphs (a) and (b) is that there could be a lot of reasons the school's star rating, or whatever rating exists at the time, goes down. Certainly, you need to look at the principal.  The principal has to be accountable if the rating of the school goes down.   Then you look at the teacher issue. I have heard in many conversations with teachers and administrators that it is apparent when you have a principal who is not doing a good job.  The teachers do not want to be there.   They are willing to drive across town to teach somewhere else because of the unhealthy environment that is created by the leader of the school—the principal.

The idea was, in the first three years, you can be easily terminated if you are at-will.   After that, we want to look at a couple of things: is the school not performing, and are teachers not wanting to be there.   If you have both of those, then I think the superintendent should have the discretion to say, "Mr. or Mrs. Principal, you need to do something else."

**Assemblyman Ellison:**
Say you had someone who went into that principal position, and they are there for a short time, and they say, "This just is not for me."  Can they go back to being a teacher?  Would they go back to the same salary?  This is before the first or second year, and it does not break that down.

**Senator Roberson:**
The last sentence in section 1.9, subsection 1 states, "If the principal was previously employed by the school district in another position and is reassigned pursuant to this section, the principal is entitled to be assigned to his or her former position at the rate of compensation provided for that position." The idea would be that if the person was an assistant principal or a dean or a teacher prior to being elevated to principal, and it is determined that it is not the right fit for them to be a principal at that time at that school, then the person would be able to go back to their previous position level.

**Assemblywoman Bustamante Adams:**
Regarding section 1.6, subsection 2, in your testimony you mentioned 45 days, but I could not find that in the bill.   Subsection 2 talks about the negotiations portion.

**Senator Roberson:**
I was referencing section 1.1, which reduces from 180 days to 45 days the amount of time within which the Local Government Employee Management-Relations Board must conduct a hearing.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 22

**Chairman Kirner:**
Section 1.1 and section 1.7 also.

**Senator Roberson:**
Yes, you are correct.

**Assemblyman Silberkraus:**
Regarding section 1.9, let us say somebody came in to take on the principal role at one of the district's more challenging schools, which could be on a downward trajectory at the time. I know that in subsection 4, the principal's dismissal would be upon the recommendation of the superintendent. You are foreseeing that in those three years, if those people could see that the downward trajectory was the reason why teachers were leaving and the ratings had gone down, the principal would not be terminated for going to a more difficult or challenging environment?

**Senator Roberson:**
We changed the language to account for what you are talking about. We do give discretion to the superintendent. Presumably, you would hope the superintendent understands and can look at a specific example where you may have a school that is perpetually not doing well. It takes awhile, obviously, for that school to be turned around. So, yes, that can be taken into account. They are at-will, but ultimately it is going to be up to the superintendent or someone above the principal to make that decision. The person is not automatically terminated. I think you are referencing section 1.9, subsection 2, when you talk about the factors for someone who is postprobationary, correct?

**Assemblyman Silberkraus:**
Yes.

**Senator Roberson:**
You might have a lot of teachers leaving, and you might have the star rating go down. I think when you have both of those things, you probably have a problem. It is understandable that the rating may go down for various factors, but when you also have half of the teachers or more leaving, you know you have a problem. Still, we are giving the superintendent the discretion to make that recommendation to the board of trustees.

**Chairman Kirner:**
Are there other questions for the Senator? Seeing none, will those who are in support of S.B. 241 (R3) please come to the table.

**Ruben Murillo, Jr., President, Nevada State Education Association:**
I am speaking in support of S.B. 241 (R3).  Collective bargaining allows both labor and management to look at issues through the lens of what is educationally best for our students.  Unions and districts have learned that collective bargaining need not be an obstacle to change for effectiveness. Where there is trust, mutual respect, and good communication, unions provide valuable partners in negotiating provisions for more accountability, improved quality, and greater effectiveness, and the collective bargaining process is a vehicle to deliver these goals.

Collective bargaining provides an opportunity to collectively improve public education while empowering teachers who are best equipped to make school and classroom decisions to ensure student success.  Given the unpalatable direction of many of the collective bargaining bills introduced, we believe S.B. 241 (R3) as passed by the Senate relating to school district collective bargaining is reasonable for support.  Senate Bill 241 (R3) will preserve the ability of professional educators to further develop innovative programs and accountability measures through the collective bargaining process.  On behalf of the more than 24,000 educators in the Nevada State Education Association, we respectfully ask for your support of S.B. 241 (R3). [Mr. Murillo submitted a letter of support (Exhibit G).]

**John Vellardita, Executive Director, Clark County Education Association:**
I am representing 18,000 licensed professionals in Clark County, and I am here today to speak in support of S.B. 241 (R3) for a few reasons.  I would like to frame the discussion this way: I think that this bill is a product of parties coming together in this current political climate to try to find some reasonable compromise around some issues that have gotten a lot of attention in this session.  We have been part of these discussions in the sense that we have been trying to find some moderation around some of these issues.

The first thing I want to speak to is the whole collective bargaining process. I bargained the contract between the Clark County School District and our members, and I have been party to a couple of sessions that were dictated by the recession, when the economy went flat, revenues dried up, and decisions made in Carson City essentially predetermined bargaining at the table between the school district and the teachers.  In other words, there was no money and, therefore, bargaining was done in that context.  That led to some contentious, complicated, and challenging negotiations that resulted in a couple of arbitrations.  One arbitration settled matters one way, and the following year the arbitrator settled the matter in another way, but in neither case were the settlements to the satisfaction of both parties.

One of the things that this whole process showed was that clearly the system of collective bargaining, as spelled out in statute, needs reforms, needs changes. We think S.B. 241 (R3) addresses it. For example, it expedites the bargaining process so that whether there is an agreement that is mutually agreed to by both parties, or whether an arbitrator has to come in and settle the matter, the decision of an arbitrator or the settlement of agreement by the parties is done before the date of expiration. Hence, the need for the evergreen provision is not that important if we are bargaining the process earlier and we have a system in place to find resolution. For example, in section 1.6, one month after we bargain a contract, the parties select an arbitrator who has to agree to schedule a hearing of not less than three days to begin no later than June 10, and to render a decision before an expiration of the contract if we do not reach an agreement. That provision does not exist today in statute. Also, in section 1.5, bargaining starts before January 1. Currently under statute, it starts no later than February 1.

Section 1.6 mandates eight bargaining sessions, whereas statute currently says only four. If a dispute in bargaining may hold up the process, statute currently allows the Local Government Employee Management-Relations Board to have 180 days to find resolution to that dispute. Section 1.1 in this bill shortens it to 45 days. So we think the process of bargaining has been reformed in this statute to the benefit of both the school districts, in this case, as well as teacher organizations, if the intent is to conduct good-faith bargaining in an expedited way whether it is reached mutually or by a third-party arbitrator before the expiration of the contract.

The second part is where we see language in this bill regarding principal accountability. In the 2011 Session, laws were passed that essentially said, "Some teachers are not meant to be teachers," and the type of statutes that were passed essentially raised the level of accountability. We have seen two successive legislative sessions where we now see postprobationary teachers put back on probation and, in some cases, not renewed for employment. The idea behind those laws was, again, that maybe some folks should not be teachers. We think it is high time that the same level of accountability be applied to principals. We think, by and large, Clark County has a tremendous number of good practicing principals, but administrators are supposed to be the instructional leader in the building, and most teachers go to those buildings to follow that leadership. We have a very small percentage who are not meant to be principals.

What we do not have by statute, or any other means, is a way to address that problem. Recently there was an incident in Clark County where scores of parents at John A. Dooley Elementary School protested the way a principal was

Assembly Committee on Commerce and Labor
May 4, 2015
Page 25

running that building, and ultimately that principal was removed and reassigned. We think this law addresses the fact that perhaps reassignment is applicable in some cases but again, maybe the principal is not meant to be a principal and thus it gives authority to remove that principal from being a principal. For that reason, we support S.B. 241 (R3). We do not think it erodes principals' collective bargaining rights in any way whatsoever. We believe it is a degree of accountability. We have heard more than once from folks saying let us stop the "dance of the lemons" regarding the teachers. We think it is time to stop the dance of the lemons with administrators.

Finally, we think there is reasonable compromise reached on release time for an organization's officers to serve their organization but in a capacity away from the job. We do not have that luxury in the sense that our release time officers are paid by our organization, but we think that with the intent behind this language through collective bargaining, the parties would reach an agreement that essentially allows that release time, and not at the expense of the taxpayer, but with the intent of doing meaningful work for both management and labor. For that reason, we support this bill.

**Rusty McAllister, President, Professional Fire Fighters of Nevada:**
We support S.B. 241 (R3). We realize that over the course of this session there will be some changes that are made to the collective bargaining process. We believe that the changes within this bill that would apply to us are reasonable and, therefore, we are okay with them and are supportive of the provisions that apply to us.

**Ronald P. Dreher, Government Affairs Director, Peace Officers Research Association of Nevada; and representing the Washoe County Public Attorney's Association; and Washoe School Principals' Association:**
We had our conversations and concerns with Senator Roberson over this, and as Assemblyman O'Neill pointed out, this is the third reprint. I believe at this point we support S.B. 241 (R3). I have talked with the principals in Washoe County, obviously. We believe that they have a high level of accountability at this point with the duties and responsibilities that they have. This provides much more accountability to them. I have represented the school principals in Washoe County for the past several years, and I will tell you there is not a whole lot that goes by that they are not held accountable to the district and to the children and what they go through.

There were some concerns with a lot in this bill, but they can live with that because, as Mr. McAllister said, we realize there is going to be some changes made this session. This is what we believe are appropriate changes, and they can live with that. We are supporting S.B. 241 (R3).

Assembly Committee on Commerce and Labor
May 4, 2015
Page 26

**Tray Abney, Director of Government Relations, The Chamber, Reno-Sparks-Northern Nevada:**
We think this is a good first step.  I will echo Mr. McAllister's comments on this bill.  We want to thank Senator Roberson for bringing it forward.  We know it is a wide-ranging bill that starts to rebalance the equation in favor of our local elected officials and taxpayers.  It is important that our city councils, county commissions, and others have the flexibility to ensure that our taxpayers are protected.  We believe that union business should be done on union time with union pay, so we appreciate that provision.  The evergreen provision is critical so that these contracts are not on autopilot and that we have some control over that.

You have heard the word accountability a lot, and obviously this provides accountability for the most important thing that we discuss in this building and the biggest part of our budget, and that is education.  We support this bill.

**Paul J. Moradkhan, Vice President, Government Affairs, Las Vegas Metro Chamber of Commerce:**
The Las Vegas Metro Chamber of Commerce would like to offer its support of this bill today.  We would like to thank Senator Roberson and interested parties for coming to a good compromise.  We believe this bill reflects a lot of work to find a common ground that benefits the entire state.

Regarding this bill, the Metro Chamber is, of course, in support of accountability standards.  We have supported accountability measures for the teachers in the last several legislative sessions.  We want the best teachers in the classroom. We want teachers who are the best principals in their buildings.  We believe this follows that path.  We think that that is the same accountability standards that are appropriate.

We support the changes to the evergreen clauses.  What I think is also important here is the negotiation process by giving additional time, and the process to ensure that good intent is followed through by giving additional mechanisms to come to a resolution that will work for all interested parties.

**Michael Ramirez, Director of Governmental Affairs, Las Vegas Police Protective Association Metro, Inc.; and representing Southern Nevada Conference of Police and Sheriffs:**
With our colleagues, we support this bill.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 27

**Lonnie Shields, Assistant Executive Director, Nevada Association of School Administrators; and representing Clark County Association of School Administrators and Professional-Technical Employees:**
We appreciate Senator Roberson's willingness to meet with us and to put the part about collective bargaining for the majority of our members into the bill with the amendment.  We appreciate that right.  We do not want bad principals in our schools any more than anybody else, and we will work together to make sure that does not happen with the implementation of this bill.

**Melissa Johanning, President, Las Vegas Police Protective Association Civilian Employees, Inc.:**
I am here to mirror what my colleagues said in support of this bill.  I want to mention a couple of things that I think are very important to my organization.  First is the expeditious nature of having the negotiation process.  Our goal is to always have a contract in place before the next one expires.  With this bill, hopefully that will be accomplished, and we really would not have to worry about the evergreen clause that we currently have in our agreements.

Second, we believe it is an appropriate compromise for the collective bargaining reforms that we know are going to happen during this session.

**Chairman Kirner:**
Are there others who are in support of this bill?  [There were none.]  Is anyone opposed to the bill?

**Richard P. McCann, Executive Director and Labor Representative, Nevada Association of Public Safety Officers:**
My colleagues from fire, law enforcement, teachers, and other great people are in support of this bill.  I would like to offer one comment.  I represent 1,400 public safety officers and other professionals, including police officers, corrections officers, parole and probation officers, highway patrol dispatchers, and school police officers, among others.  I represent a lot of the smaller agencies and the employee organizations around the state.  We have about 20 different associations, many of which are in the rural areas.  I represent some people from the larger groups, such as Henderson and Las Vegas Metropolitan Police Department (Metro), and I have to offer this comment.  There may be a misconception, at least on section 1, and that is what I am primarily focused on.  All the other stuff that the teachers took care of, they are subject matter experts on that.

Section 1, on what I will call the union leave issue, I fear there is a misconception about what representatives for employee organizations may do.  At least for the 20 groups that I represent, they are not there to argue every

Assembly Committee on Commerce and Labor
May 4, 2015
Page 28

issue. They are not there to raise grievances that are necessarily inappropriate. They are not there to be the enemy of the employer organizations. They are not there to bleed the government employers. We understand that. Rather, they are there to use the buffer, and that is what we use them for. These people get some time from their day to be able to deal with the union, the labor-management issues. They are there to act as a buffer, to separate the wheat from the chaff, vis-à-vis the issues affecting membership as a whole, which are important, and to separate them from the gripe sessions that are often the case for some members. We try to act as a buffer, and those people are on a day-to-day basis, a week-to-week basis, a month-to-month basis. They are, in fact, doing that job.

Members need to be educated on their rights and their responsibilities under their particular contracts. These labor representatives do that, and they are there to provide a liaison to work with the local government employers to resolve issues, not to exacerbate problems. They work in concert with the employers to create labor-management partnerships. I have sat in several committee meetings of this nature, and I have heard a lot of people who have come from Henderson and Mesquite, and all over the state, who have said, "We have great relationships with our unions." We need those great relationships, and these men and women are in positions to be able to spend a few hours without having to worry about the compensatory nature of it, as long as it is not breaking the bank. I do not know that these small groups are breaking the bank; it is always a manpower issue. These people do not come to negotiate contracts. They do not come to file grievances. They do not come into the labor-management world unless their manpower issues are covered.

The need for this leave has long been recognized by both the employers and employees. It is in many, if not all, the contracts we negotiate. The employers have consistently seen the need for union leave time. Now this bill seeks to potentially strip the employers from that contractual right that for years they have seen the need for.

In each of our many contracts that we negotiate, there is a "bargain for benefit" to the employer. Union leave is tracked by the employers. The amounts cannot be exceeded by the employee associations. Union leave can only be used when those manpower issues are taken care of. Local government employers routinely line the halls of that building in Carson City and in Las Vegas in order to lobby for their interests. That is taxpayer money too. I am not saying it is a quid pro quo—that you take from us, we take from you. I am just reminding this esteemed Committee that we have a lot of local groups, and the way this bill is written can certainly be interpreted that you can no longer have a few hours here and there to do the things that make that partnership and give us the

Assembly Committee on Commerce and Labor
May 4, 2015
Page 29

opportunity of working with the employers. We need that in many of these smaller groups. Not everybody is a large group. Metro has done a fine job in being able to disperse that. A lot of people have dispersed that responsibility, but in smaller groups, they cannot always do that. I am asking that you consider that and, therefore, on that premise alone, with section 1, and for those foregoing reasons, we respectfully oppose S.B. 241 (R3).

**Assemblywoman Fiore:**
I am looking at a collective bargaining bill that unions are actually liking. So my first suspicious thought is there is something wrong with the bill. However, your concerns with section 1, and correct me if I am wrong, is basically you want taxpayers to pay your salary to lobby us. Is that your concern? I just want to be clear.

**Richard McCann:**
I think putting it in that respect is not accurate. In regard to having taxpayers pay us to lobby, the employers do that too, but I am not trying to get into that discussion. I am not a police officer. I have never been nor ever will be a law enforcement professional. Our organization is an umbrella over them, so many of the negotiations we do admittedly are us. I know it sounds like you want taxpayers to pay you to not do your job, but there is a point to be made, that these people provide a service. They provide a service to get that relationship going, to act as liaison. If we put this in a vacuum by saying, "You just want taxpayers to pay you to not do your job," that sounds pretty bad and I would agree with you, but look at what they do. That is what I try to educate you on. Look at these groups, at what they do, and they do, in fact, provide a service, paid for or not. Again, they negotiate these hours with the employers, they cannot exceed those hours, and manpower is covered—those are things to consider.

**Assemblywoman Fiore:**
The bottom line is, that is your concern?

**Richard McCann:**
Yes, that is my concern. These people have got to have an opportunity of doing the job that provides the relationship, the concert, the liaison that we have. I think that is important; otherwise, there will be a lot of fighting that absolutely is avoidable. These people provide a remedy to keep that relationship of labor and management alive, keep it focused, and get things done. For that, I think the employer is getting a bargain for benefit when they pay these people to do that very thing.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 30

**Chairman Kirner:**
Are there those who are neutral on the bill?  Seeing no one come forward, I will
go to the bill's sponsor for a summary.

**Senator Roberson:**
I appreciate Mr. McCann's testimony if only to assure my esteemed colleague,
Assemblywoman Fiore, that not everyone in labor supports this bill.  There is
some value there, I suppose.

To address Mr. McCann's interpretation, his interpretation is correct.  Let us
make no mistake about it.  Under section 1, it reads: "A local government
employer may agree to provide leave to any of its employees...."  Mr. McCann
is not a police officer; he is not an employee of local government.  To the extent
that there is interpretation that it would include someone like him, no, I do not
think it would.  He is simply a lobbyist for an organization.

Getting back to the language in section 1: "A local government employer may
agree to provide leave to any of its employees for time spent by the employee in
performing duties or providing services for an employee organization"—that is,
a labor group—only "if the full cost of such leave is paid or reimbursed by
the employee organization or is offset by the value of concessions made by the
employee organization in the negotiation of an agreement with the
local government employer pursuant to this chapter."  I think that is common
sense.  I think if you talk to the voters, 9 or 9.5 out of every 10 voters are
going to say, "Yes, that makes sense."  That is what section 1 would do.

I am sorry that Mr. McCann is opposed to it, but I would hope that all of you
would support this bill.

**Chairman Kirner:**
With those closing comments, we will close the hearing on <u>S.B. 241 (R3)</u> and
open the hearing on <u>Senate Bill 242 (1st Reprint)</u>.

<u>**Senate Bill 242 (1st Reprint):**</u>  **Requires payday lenders to use best practices.
    (BDR 52-953)**

**Senator Michael Roberson, Senate District No. 20:**
This bill would enact the Payday Lender Best Practices Act.  The payday lending
industry has had a meteoric growth in the past couple of decades since its
modern incarnation started from the check-cashing business during the early
1990s.  The Community Financial Services Association of America (CFSA), the
national payday lending trade group that represents more than half of all payday
advance stores, reports that there are approximately 20,600 payday advance

Assembly Committee on Commerce and Labor
May 4, 2015
Page 31

stores across the country. Nevada has regulated this growing industry for over a decade to protect consumers. Moreover, the CFSA believes that payday advance transactions should be conducted in a safe and responsible manner with appropriate consumer protections. Therefore, the CFSA has developed best practices that are used to maintain quality in the payday advance industry and could be used as a benchmark for payday lenders. The best practices ensure responsible conduct among lenders, protect borrowers rights, and encourages self-governance of the payday advance industry.

Senate Bill 242 (1st Reprint) requires a licensed person providing deferred deposit loan services, high-interest loan services, and title loan services to comply with revisions set forth in this bill. Section 4 requires a licensee to comply with the disclosure requirements of Nevada and the disclosure requirements in the Federal Truth in Lending Act. A licensee must disclose the cost of the service fee as both a dollar amount and as an annual percentage rate. In addition, to further ensure full disclosure, rates will be prominently disclosed in a customer's loan agreement before he or she enters into the transaction process.

Section 5 prohibits a licensee from charging a fee or a rate for a payday advance that is not authorized by state or federal law. Truthful advertising by the licensee is addressed in section 6 of the bill. Section 7 encourages consumer responsibility. A licensee must place certain notices on marketing and advertising materials to inform consumers that payday advance services should be used for short-term financial needs only, and those persons with credit difficulties should seek credit counseling before entering into any loan transaction.

Section 8 of the bill prohibits a licensee from allowing customers to roll over a payday advance. A rollover is an extension of an outstanding advance by payment of only a fee. This section would not apply to title loans. Section 9 makes it clear that under the existing law, Chapter 604A.460 of *Nevada Revised Statutes* (NRS), a licensee must provide each customer with the right to rescind, at no cost, a payday advance transaction on or before the close of business on the following business day.

Section 10 requires a licensee to collect past-due accounts in a professional, fair, and lawful manner. A licensee is prohibited from using unlawful threats, intimidation, or harassment to collect accounts. In addition, the Federal Fair Debt Collection Practices Act should guide a licensee's practice in this area. Section 11 requires the industry to self-police and report violations to the Commissioner of the Division of Financial Institutions, Department of Business and Industry. In accordance with existing NRS 604A.475, section 12 requires

Assembly Committee on Commerce and Labor
May 4, 2015
Page 32

a licensee to provide customers who are unable to repay a payday advance, according to the original contract, the option of repaying the advance over a longer period of time.  Section 13 of the bill requires a licensee that offers payday advances through the Internet to be licensed in each state where its customers reside and to comply with the state licensing requirements and other applicable laws preempted by federal law.

I urge your support of this important legislation.

**Assemblywoman Bustamante Adams:**
I noticed that you struck out the check-cashing services.  Can you explain why those are deleted from the bill?

**Senator Roberson:**
I struck out?

**Assemblywoman Bustamante Adams:**
I am not sure who struck it out.  I am looking at the first reprint.  It was in the work session from the Senate.  It said that you removed all references regarding the check-cashing services.

**Senator Roberson:**
Could you point out where?

**Assemblywoman Bustamante Adams:**
Section 5, in your original bill.

**Senator Roberson:**
I think that was in the original bill.  I do not think I made that change.

**Assemblywoman Bustamante Adams:**
All check-cashing services were deleted.  I was wondering why you had taken that out.  In the work session document, it was amended to remove all the references.

**Senator Roberson:**
Again, I do not recall that change being made in the work session, but I was not at the work session.  The Senate Committee on Commerce, Labor and Energy may have done that.  There may be others here who testified in support or opposition to the bill who may have more information on that.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 33

**Assemblywoman Bustamante Adams:**
My other question has to do with that portion as well, so I will hold my question.

**Chairman Kirner:**
I think the first reprint is the most current and up to date. Is that what you are asking?

**Assemblywoman Bustamante Adams:**
Yes. You will not see it in the first reprint unless you go back and look at the original bill to see what was struck out. I wanted to see what had changed from the original version. I had noticed that "check-cashing services" was deleted throughout the entire bill. I was wondering what the conversation was to delete them and take them out of this bill.

**Chairman Kirner:**
I see that as well and, as the Senator says, he was not there, and I was not there, so I do not know why that was. Maybe somebody else will have testimony that will help us.

Not seeing any other questions, we will go to those who are in support of the bill.

**Venicia Considine, Attorney, Consumer Rights Project, Legal Aid Center of Southern Nevada:**
Thank you for considering a bill on consumer protections in the payday lending industry. We are in support of this bill as it is without any amendments.

**Alfredo Alonso, representing Community Financial Services Association of America; and Money Tree:**
We also support the bill. All of our member companies already do most of these practices. We think it is a smart way to go forward and, obviously, we will get some of the bad actors to start playing by what seem to be fairly common, normal rules that a business should abide by. I think it will make the industry much better as a result.

The question that Assemblywoman Bustamante Adams referred to with respect to the check-cashing language, that was removed because it was inadvertently included in the original version of the bill. They are not loans. It would not have made any sense to include best practices with a basic check-cashing component that frankly no one understood why it would have been there in the first place, so it was simply removed.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 34

**Sara Cholhagian, representing EZCORP, INC.:**
We offer our full support of S.B. 242 (R1).   We echo the comments of Mr. Alonso and believe that this bill is seeking to codify many of those same practices already in place.   We think it is good for the industry and thank the sponsor for bringing this measure forward.

**Marlene Lockard, representing Nevada Women's Lobby:**
We are in support of this measure.

**Assemblywoman Neal:**
This question is for Mr. Alonso.   You were saying that most of your clients do some of these practices already.   In section 7, subsection 2, it says, "Customers with credit difficulties should seek credit counseling...."   Should seek is the not the same as direct.   How many of your clients are making their customers do credit counseling before they get the loan?

**Alfredo Alonso:**
I would have to poll them to find out.   I can tell you from my experience with Money Tree, that when you walk in, there are documents throughout the office indicating where you can go for credit counseling.   The customer will be directed to it.   Obviously, each business is different, so I will try to find out and get an answer for you.

**Assemblywoman Bustamante Adams:**
This is for Venicia Considine.   In this industry, for your consumers that you see on a regular basis, do they have more difficulty with the high-interest loans, the title loans?   If you had to rank them in order, which would be the most problematic ones?

**Venicia Considine:**
I would only be able to answer that anecdotally at this point.   I think the title loans would be the biggest issue because it is to the point where somebody is essentially turning their vehicle title over to someone.   Then there are the payday loans.  There are a couple of different types of payday loans.  What we appreciate is that this bill at least lists the best practices and offers some consumer protections.

**Chairman Kirner:**
Are there any other questions from the Committee?   Seeing none, we will go to those who are opposed.   Seeing none, is anyone neutral who wishes to testify?   Seeing none, I will close the hearing on Senate Bill 242 (R1) and move to Senate Bill 373 (1st Reprint).

Assembly Committee on Commerce and Labor
May 4, 2015
Page 35

**Senate Bill 373 (1st Reprint):**   **Makes various changes relating to insurance.**
   **(BDR 57-689)**

**John Fielding, Attorney, U.S. Travel Insurance Association, Washington, D.C.:**
I appreciate the opportunity to talk with you this afternoon in support of
Senate Bill 373 (1st Reprint). The legislation would update Nevada's producer
licensing requirements for travel insurance and does so in the way that provides
legislators and regulators with the information that you need for good
governance. [Submitted map showing status of legislation in the states
(Exhibit H) and an overview of the bill (Exhibit I).] The bill updates the licensing
process to reflect the way the marketplace operates today and, most
importantly, it protects consumers. Similar reforms are in place in 34 states
with legislation awaiting governor's signatures in two additional states, and
legislation and regulations are pending or under consideration in the remaining
states.

The bill is based on a model act adopted by the National Conference of
Insurance Legislators in November 2012 and on uniform licensing standards that
were adopted by the National Association of Insurance Commissioners in 2010.
Travel insurance producer licensing is in great need of modernization. Current
licensing difficulties and regulatory inconsistencies among the states are driven
by a number of underlying factors reflecting both the realities of the market and
the regulatory approaches of the states. Senate Bill 373 (R1) provides a fix for
those problems that addresses the needs of consumers, regulators, and the
industry players who need to comply with state licensing requirements here in
Nevada and across the country.

Although it may seem straightforward, the current process for licensing travel
insurance limited line producers does not work for the simple reason that the
travel business is different now from what it was decades ago. It is a much
more national business with travel agencies serving customers across the
country. This complicates the distribution of travel insurance because each
state has its own licensing requirements for insurance producers.

Nonresident licenses are very difficult to obtain for travel insurance producers
because, unlike major lines of authority like life or health or property and
casualty, there is very little licensing reciprocity among the states with respect
to travel insurance. In fact, before states started enacting the model act
a couple of years ago, there were 41 different licensing qualifications across the
country to get licensed for travel insurance. In addition, states had different
licensing processes and procedures and different applications. As a result,
it could take up to six months for a travel agent to get licensed to sell
travel insurance across the United States, making full compliance nearly

Assembly Committee on Commerce and Labor
May 4, 2015
Page 36

impossible in an industry that can suffer from high turnover rates. This is a significant burden and regulatory risk to the 133 travel agencies in Nevada. Moreover, compliance burdens can be more keenly felt because these are predominantly small businesses, with 94 of the 133 agencies employing fewer than 5 people, and 124 of those 133 employing fewer than 20 people.

The situations improved as more and more states have enacted the model act's reforms, but compliance difficulties will remain until all states have adopted the model language. Senate Bill 373 (R1) would permit licensed insurance providers—managing general agents (MGA), third party administrators (TPA), insurers, and administrators—to be the licensees for products that are distributed through noninsurance travel retailers—that is, through travel agents—but only if certain consumer protections are met, such as training and consumer disclosures that are not currently required under law. The essential feature of the proposal is that going forward, individual travel agents would not have to hold their own licenses, although they could if they wanted to, but instead they would be able to operate under the producer license of a licensed entity like the administrator, the TPA, or the MGA. The names and contact information of these travel agents would be registered and would be provided to the insurance department upon request so if there are any problems, the department knows who is responsible and can take action both against the licensed entity and against the travel retailer. Also, the definition of travel insurance would be updated to reflect the current marketplace and how it operates.

In addition to the U.S. Travel Insurance Association, the bill is supported by the American Society of Travel Agents, which represents travel agents in Nevada and across the country. I urge you to support the bill.

**Jeanette K. Belz, representing U.S. Travel Insurance Association:**
There is a letter (Exhibit J) on the Nevada Electronic Legislative Information System from the American Society of Travel Agents in support.

**Assemblyman Ellison:**
In section 19, subsection 1, paragraph (j) says, "Rental car agency as a limited line." What do you mean by that?

**John Fielding:**
The rental car agency, as a limited line, is a current line of authority in Nevada law, and that is not going to change. It is a limited line of authority, so when you go to Hertz or Avis and rent the car, you can get a limited line of rental coverage from them.

Assembly Committee on Commerce and Labor
May 4, 2015
Page 37

**Assemblywoman Bustamante Adams:**
Just so I understand the industry, there is a producer and there is a retailer. The producer does not have to be located in Nevada. The producer is the one who actually sells the insurance. How does the money connect between the retailer and the producer? Do they get a percentage?

**John Fielding:**
The producer, who may or may not be a Nevada resident, is in a contractual relationship with the travel retailer, the travel agent. The travel agent would be able to earn a commission or a fee for the distribution of the policy.

**Assemblywoman Bustamante Adams:**
Would they get a different commission depending on who the producer is? Could a higher amount be earned if they pushed a certain product versus another? Is that how it works?

**John Fielding:**
Yes. It depends on what the contract would be with the individual producers, from the agent to the producer. Generally, the travel retailer will only work with one insurance producer, so that retailer would only be offering one set of policies.

**Assemblywoman Bustamante Adams:**
Section 10, subsection 1 says, if I understand this correctly, that both the producer and the retailer are not required to pass any written examination or meet any prelicensing education. Can you elaborate on that?

**John Fielding:**
Under current law, there is no examination or education requirements, and that is the way it is in almost all states. Going forward, what this says is that travel retailers and travel producers would not be subject to the standard prelicensing examination requirements that are required of most insurance producers for life, health, property, and casualty.

Having said that, in another provision of the bill, there is a specific training requirement that these travel retailers will have to undergo in order to make sure they understand what they can and cannot do. There are disclosures they are required to provide, and they understand the basics about the policies.

**Assemblywoman Bustamante Adams:**
Section 12 says it prohibits a travel retailer from evaluating or providing advice. Is that the section you are talking about? The retailer cannot give advice on the insurance portion of it?

Assembly Committee on Commerce and Labor
May 4, 2015
Page 38

**John Fielding:**
Yes, that is correct.  The retailer can only engage in limited activities because they are not licensed; they are only registered.  The bill is very specific to say they cannot do certain things like a fully licensed insurance agent would be able to do.

**Assemblywoman Bustamante Adams:**
I think I understand what travel insurance means, but what does it cover? Would it cover your luggage being damaged?

**John Fielding:**
The definition in section 5 goes through exactly what travel insurance is in an updated and current market understanding.  Insurance coverage for personal risk, meaning when you are on a personal trip or business trip, would cover cancellation or interruption of the trip.  It fills the gap if something happens and you cannot take the trip or you have to leave the trip early, for lost baggage, for damages if you have a rental vehicle that is damaged, if you rent a cottage and it gets damaged in some way, or if you get sick and you need emergency coverage.  It fills the gap if you are abroad, particularly, and your health insurance may not cover certain things [referred to information from Allianz Global Assistance (Exhibit K) and Expedia (Exhibit L)].

**Chairman Kirner:**
I am focusing on section 7 and trying to ascertain why this bill requires a two-thirds majority vote?  In section 7, it reads, "A license issued pursuant to this section authorizes the licensee to sell...."   So this is a two-thirds bill because a license would be required to be issued.   Am I interpreting this correctly?

**Jeanette Belz:**
Yes, that is correct.

**Chairman Kirner:**
This would not be a new license?

**Jeanette Belz:**
That is correct.

**Chairman Kirner:**
So it is an existing license because of anybody who might be added to that. It is nothing new, not a new fee; it is just for additional licensees?

Assembly Committee on Commerce and Labor
May 4, 2015
Page 39

**Jeanette Belz:**
That is correct.

**Chairman Kirner:**
If I understand this correctly, the travel insurance provision in section 5, subsection 1, paragraph (a), would take care of any of us legislators who have a trip planned and who might have to be here for a special session.

Are there any other questions from the Committee? [There were none.] With that, I will ask those who are in support of S.B. 373 (R1) to add their testimony. Seeing no one, are there any who are opposed to S.B. 373 (R1)? Seeing no opposition, I will take testimony from those who are neutral. Seeing no one who is neutral, did you want to have a closing comment? [There was none.] With that we will close the hearing on S.B. 373 (R1).

That completes our agenda for today. I will open the Committee meeting to public comment. Seeing none, the meeting is adjourned [at 3:36 p.m.].

RESPECTFULLY SUBMITTED:

_____
Connie Jo Smith
Committee Secretary

APPROVED BY:

_____
Assemblyman Randy Kirner, Chairman

DATE: _____

Assembly Committee on Commerce and Labor
May 4, 2015
Page 40

**EXHIBITS**

**Committee Name:**  Assembly Committee on Commerce and Labor

**Date:** May 4, 2015                          **Time of Meeting:  1:34 p.m.**

| Bill | Exhibit | Witness / Agency | Description |
|------|---------|------------------|-------------|
|  | A |  | Agenda |
|  | B |  | Attendance Roster |
| A.B. 481 | C | Bruce H. Breslow, Department of Business and Industry | Proposed amendment |
| S.B. 67 (R1) | D | Scott J. Kipper, Division of Insurance | Testimony in support |
| S.B. 67 (R1) | E | Scott J. Kipper, Division of Insurance | 2015 Insurance Market Report |
| S.B. 67 (R1) | F | Jeanette K. Belz, Property Casualty Insurers Association of America | Letter of support from Mark Sektnan |
| S.B. 241 (R3) | G | Ruben Murillo, Jr., Nevada State Education Association | Letter of support |
| S.B. 373 (R1) | H | John Fielding, U.S. Travel Insurance Association | Map:  State Implementation of Travel Insurance Producer Licensing Reform |
| S.B. 373 (R1) | I | John Fielding, U.S. Travel Insurance Association | Travel Insurance Producer Licensing Reform |
| S.B. 373 (R1) | J | Jeanette Belz, U.S. Travel Insurance Association | Letter of support, American Society of Travel Agents |
| S.B. 373 (R1) | K | John Fielding, U.S. Travel Insurance Association | Travel Insurance Essential Plan, Allianz Global Assistance |
| S.B. 373 (R1) | L | John Fielding, U.S. Travel Insurance Association | Expedia Travel Protection Plans |

# Exhibit D
# May 15, 2015 Assembly
# Committee Minutes

**MINUTES OF THE MEETING
OF THE
ASSEMBLY COMMITTEE ON COMMERCE AND LABOR**

**Seventy-Eighth Session
May 15, 2015**

The Committee on Commerce and Labor was called to order by Chairman Randy Kirner at 1:38 p.m. on Friday, May 15, 2015, in Room 4100 of the Legislative Building, 401 South Carson Street, Carson City, Nevada. The meeting was videoconferenced to Room 4401 of the Grant Sawyer State Office Building, 555 East Washington Avenue, Las Vegas, Nevada. Copies of the minutes, including the Agenda (Exhibit A), the Attendance Roster (Exhibit B), and other substantive exhibits, are available and on file in the Research Library of the Legislative Counsel Bureau and on the Nevada Legislature's website at www.leg.state.nv.us/App/NELIS/REL/78th2015.   In addition, copies of the audio or video of the meeting may be purchased, for personal use only, through the Legislative Counsel Bureau's Publications Office (email: publications@lcb.state.nv.us; telephone: 775-684-6835).

<u>**COMMITTEE MEMBERS PRESENT:**</u>

     Assemblyman Randy Kirner, Chairman
     Assemblywoman Victoria Seaman, Vice Chair
     Assemblyman Paul Anderson
     Assemblywoman Irene Bustamante Adams
     Assemblywoman Maggie Carlton
     Assemblywoman Olivia Diaz
     Assemblyman John Ellison
     Assemblywoman Michele Fiore
     Assemblyman Ira Hansen
     Assemblywoman Marilyn K. Kirkpatrick
     Assemblywoman Dina Neal
     Assemblyman Erven T. Nelson
     Assemblyman James Ohrenschall
     Assemblyman P.K. O'Neill
     Assemblyman Stephen H. Silberkraus

<u>**COMMITTEE MEMBERS ABSENT:**</u>

     None

Minutes ID: 1228



Assembly Committee on Commerce and Labor
May 15, 2015
Page 2

## GUEST LEGISLATORS PRESENT:

Senator Kelvin Atkinson, Senate District No. 4

## STAFF MEMBERS PRESENT:

Kelly Richard, Committee Policy Analyst
Matt Mundy, Committee Counsel
Leslie Danihel, Committee Manager
Janel Davis, Committee Secretary
Olivia Lloyd, Committee Assistant

## OTHERS PRESENT:

Jennifer Kandt, Executive Director, Nevada State Funeral and Cemetery
    Services Board
Garrett Gordon, representing Hawkins Holdings, LLC, Sacramento,
    California
Steven T. Polikalas, representing Hawkins Holdings, LLC, Sacramento,
    California
Chris Ferrari, representing Nevada Dental Association
Keith Lee, representing Nevada Association of Health Plans

**Chairman Kirner:**
[Roll was called. Rules and protocol were stated.]  We received a waiver on
Senate Bill 440 (1st Reprint) so we will not be processing it today.  However,
we added to the agenda Senate Bill 370 (1st Reprint).  We will now open the
work session on Senate Bill 12.

**Senate Bill 12:** **Revises provisions governing certain personnel of the Public**
    **Employees' Retirement System. (BDR 23-385)**

**Kelly Richard, Committee Policy Analyst:**
Senate Bill 12 was put forward on behalf of the Public Employees' Retirement
System (PERS).  [Referred to work session document (Exhibit C).]  It was heard
in Committee on May 13, 2015.  It replaces the position of Assistant
Investment Officer within PERS with a position of Chief Financial Officer (CFO).
Chairman Kirner is proposing an amendment to the bill which adds two voting
members to the current membership of the PERS Board, thereby increasing the
size of the Board from seven to nine persons.  The amendment requires the
two new members of the Board to be persons who: (1) are not employees or
elected officers of the state or its political subdivisions; (2) have never been
active members of the system; and (3) have demonstrated experience in

Assembly Committee on Commerce and Labor
May 15, 2015
Page 4

public a voice, which is not represented at all today. I am not trying to make a federal case out of this or create something that is not worthwhile.

**Assemblywoman Carlton:**
I remember the days when PERS was having problems and we were actually in a special session for something else but ended up dealing with one of the PERS issues. I also remember the discussion Senator Amodei and I had at the time about the need to have some public members on this Board so the public is actually represented. We got a major defeat on that because people thought that we would be crossing the line. I would have concerns that this would run into those same issues. I understand what you are trying to do. I always advocate for public members on the different boards, but these are the employees, and the employees happen to be taxpayers of the state also. They have a dual responsibility when it comes to this Board.

**Assemblyman Ellison:**
We heard a similar bill in the Assembly Committee on Government Affairs and another one in this Committee. They did not pass. At this point, I am a no.

**Chairman Kirner:**
My sense is that overall there is great negativity on my amendment. I do not have any hard feelings against PERS. I think this is a reasonable bill and I am going to withdraw my amendment and seek any discussion on the original bill. I see no reason not to pass the original bill.

**Assemblyman O'Neill:**
I appreciate your understanding some of our positions and your retracting the amendment.

**Assemblywoman Kirkpatrick:**
I echo those sentiments because I think that is a pretty stand-up thing to do. I think the original bill for the CFO is important. I would like to make a motion to go forward.

**Chairman Kirner:**
What is the pleasure of the Committee?

> ASSEMBLYWOMAN KIRKPATRICK MOVED TO DO PASS SENATE BILL 12.
>
> ASSEMBLYMAN O'NEILL SECONDED THE MOTION.
>
> THE MOTION PASSED UNANIMOUSLY.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 5

We will move to Senate Bill 146 (1st Reprint).

**Senate Bill 146 (1st Reprint): Revises provisions relating to the payment of wages to certain employees. (BDR 53-629)**

**Kelly Richard, Committee Policy Analyst:**
Senate Bill 146 (1st Reprint) is sponsored by Senator David Parks and was heard in Committee on May 8, 2015. [Referred to work session document (Exhibit D).] The bill authorizes an employer of a residential facility for a group of similarly situated persons to enter into a written agreement with an employee who is required to be on duty for 24 hours or more to exclude from his or her wages a sleeping period not to exceed 8 hours if adequate sleeping facilities are provided. If the sleeping period is interrupted by any call for service by the employer, the interruption must be counted as hours worked or, to such an extent that the sleeping period is less than 5 hours, the employee must be paid for the entire sleeping period.

Attached is a copy of the mock-up amendment submitted by Senator Parks. Sections 1 and 2 were previously adopted and are reflected in the first reprint. Sections 3 through 5 of the mock-up amend the bill by exempting a domestic service employee who resides in the household in which he or she works from the minimum wage requirements of *Nevada Revised Statutes* 608.018. The mock-up also allows a domestic service employee to agree in writing to exclude from his or her wages any sleeping period, meal period, or free time and defines the terms "domestic service employee," "household," and "free time."

**Chairman Kirner:**
Are there any comments? [There were none.] I will call for a motion.

> ASSEMBLYWOMAN DIAZ MOVED TO AMEND AND DO PASS SENATE BILL 146 (1ST REPRINT).

> ASSEMBLYMAN OHRENSCHALL SECONDED THE MOTION.

Are there any questions?

**Assemblyman Ellison:**
Is the amendment going to stay in the bill?

**Chairman Kirner:**
Yes, the motion that was made includes the amendment that Kelly Richard just reviewed. Sections 3, 4, and 5 are a part of that.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 6

THE MOTION PASSED UNANIMOUSLY.

We will now review Senate Bill 162 (1st Reprint).

**Senate Bill 162 (1st Reprint): Revises provisions relating to insurance. (BDR 57-950)**

**Kelly Richard, Committee Policy Analyst:**
Senate Bill 162 (1st Reprint) was sponsored by Senator Michael Roberson and heard in this Committee on April 22, 2015 (Exhibit E). It repeals current Nevada law governing the provision of medical records by a claimant or a claimant's attorney upon the request of an insurer or other party who is the subject of a personal injury claim brought under a policy of motor vehicle insurance covering a passenger car.

**Chairman Kirner:**
There are no amendments to this bill. Is there any discussion?

**Assemblyman Nelson:**
I had some concerns about this at first. I have spoken with parties on both sides and have been assured that this was a negotiated deal. I am in favor of the bill.

**Assemblywoman Carlton:**
I am not sure what a negotiated deal means. I was not part of any deal. I have been opposed to this since I first heard it numerous sessions ago. I am still a no.

**Assemblywoman Neal:**
I will say ditto to that.

**Chairman Kirner:**
I will call for the motion.

> ASSEMBLYMAN NELSON MOVED TO DO PASS SENATE BILL 162 (1ST REPRINT).
>
> ASSEMBLYWOMAN SEAMAN SECONDED THE MOTION.
>
> THE MOTION PASSED. (ASSEMBLYMEN BUSTAMANTE ADAMS, CARLTON, DIAZ, NEAL, AND OHRENSCHALL VOTED NO.)

We will move to Senate Bill 168 (1st Reprint).

Assembly Committee on Commerce and Labor
May 15, 2015
Page 7

**Senate Bill 168 (1st Reprint): Revises provisions relating to collective bargaining by local government employers. (BDR 23-602)**

**Kelly Richard, Committee Policy Analyst:**
Senate Bill 168 (1st Reprint) was sponsored by Senator James Settelmeyer and Senator Pete Goicoechea and was heard in this Committee on April 24, 2015 (Exhibit F). It authorizes a local government to reopen a collective bargaining agreement during a fiscal emergency and sets forth the circumstances under which such an emergency shall be deemed to exist. Negotiations must begin no later than 21 days after the local government employer notifies the employee organization that a fiscal emergency exists. The bill provides, for certain governmental funds, that a budgeted ending fund balance of not more than 25 percent of the total budgeted expenditures, less capital outlay, for a general fund is not subject to negotiation and cannot be considered by a fact finder or arbitrator in determining ability to pay compensation or monetary benefits.

**Chairman Kirner:**
Is there any discussion?

**Assemblywoman Kirkpatrick:**
In the spirit of good policy moving forward, I was hoping to work with the Chair for the Senate Committee on Commerce, Labor and Energy to get an amendment to allow the Committee on Local Government Finance to actually determine what the correct ending fund balance is. The Committee on Local Government Finance is an independent committee that oversees local government to ensure they are staying on track with all of their budgets and labor issues. Many of the people who sit on that Committee, including Mary Walker, are testifying in support of this bill. Before I can support this, I would like to see a 16.6 percent ending fund balance of all the budgets.

As a chair of local government, I have seen people move dollars from one account to another account. I will throw my own city under the bus because that is exactly what they did. If the City of North Las Vegas had gone before the Committee on Local Government Finance sooner and had that 16.6 percent ending fund balance instead of 25 percent, we might have been able to catch it. I wish we could have made some amendments. The Governor and I worked on the City of North Las Vegas in heated negotiations to try and get them back on track to save the city as a whole. I agreed to work with the Department of Taxation on another bill. I have bold faith in the Committee on Local Government Finance because, if any of you have met the chair, Marvin Leavitt, he does not take anything lightly. He has no friends in it and he just wants them to do well. I can only hope between now and floor session

that the Chair in the Senate Committee on Commerce, Labor and Energy could agree to some type of reasonable amendment.

**Chairman Kirner:**
I will call for a motion.

> ASSEMBLYMAN   NELSON   MOVED   TO   DO   PASS
> SENATE BILL 168 (1ST REPRINT).
>
> ASSEMBLYMAN O'NEILL SECONDED THE MOTION.
>
> THE MOTION PASSED.  (ASSEMBLYMEN BUSTAMANTE ADAMS, CARLTON,   DIAZ,   ELLISON,   KIRKPATRICK,   NEAL,   AND OHRENSCHALL VOTED NO.)

We will now review Senate Bill 181 (1st Reprint).

**Senate Bill 181 (1st Reprint): Provides for the licensure of certified anesthesiology assistants. (BDR 54-240)**

**Kelly Richard, Committee Policy Analyst:**
Senate Bill 181 (1st Reprint) was sponsored by Senator Joseph Hardy.  It was heard in this Committee on April 29, 2015.  [Referred to work session document (Exhibit G).]  It provides for the licensure of anesthesiologist assistants by the Board of Medical Examiners and the State Board of Osteopathic Medicine.  An anesthesiologist assistant (AA) must work under the medically direct supervision of a supervisory anesthesiologist and may perform certain anesthesia services.  The measure provides that an anesthesiologist assistant may only administer controlled substances to a patient with the patient's written consent.  There were no amendments proposed to the bill.

**Chairman Kirner:**
What is the pleasure of the Committee?

**Assemblyman Ellison:**
I received a lot of calls from rural doctors who are totally opposed to this.  I will be voting no.

**Assemblyman Hansen:**
I am a strong yes on this.  My son is at the Mayo Clinic in his second year getting his degree in anesthesiology.  I checked with him and did some thorough background checks.  There are 17 states that allow AAs.  The Mayo Clinic encourages it.  They have a similar law enforcing it in Arizona.  In my opinion,

Assembly Committee on Commerce and Labor
May 15, 2015
Page 9

this is a bill that is attempting to limit competition.  When you look at what the AAs have to do as far as getting degrees, it is very similar to the nurses.  There is absolutely no evidence that there is any danger to patients.

I am a little surprised, especially for the free-market people, that they would oppose this.  Opposition is clearly based on limiting competition, not on patient safety, because there is a strong track record.  I believe the market should be allowed what it wants to do.  Additionally, there is a true free-market check.  If you are a doctor, you must have liability insurance.  As everybody knows, medical malpractice insurance is extremely expensive.  If there were any danger from using AAs then these people would not be allowed to get any insurance, or the insurance cost would be so prohibitive that it would prevent doctors from using this methodology.  I am a strong yes on this bill and I do so on the basis of dealing with people who are on the front lines, especially a place as reputable as the Mayo Clinic.

**Assemblywoman Carlton:**
I have gone back and forth on this.  When I first heard it, I was comfortable with it.  I looked deeper and had some concerns.  The thing that pushed me over the edge is when my oncologist called me personally and voiced his concerns.  It was a Sunday afternoon and we spent 45 minutes on the phone.  When your doctor calls you to tell you he has an issue, you listen.  I respect Assemblyman Hansen's opinion on this, and I know that last session we passed the advanced practice registered nurse (APRN) bill, but the level of education on this is one of the many unanswered questions for me.  I love expanding the health care workforce.  Everyone should practice at the top of their license.  My whole career I have fought for more health care providers.  The phone call on Sunday changed my mind and I will be voting no.

**Assemblyman Nelson:**
I am a cosponsor on this bill and I have really agonized over it.  I have the deepest respect for Assemblyman Hansen and Senator Hardy.  I communicated with ten anesthesiologists and surgeons whom I know and trust.  Two of them thought this was a great bill and the rest did not because they thought it could cause some problems due to the impossibility to supervise four surgeries at once; even two was dubious to them.  It is not like you are going to have four surgical suites right next to each other.  There might be one surgery going on in radiology, one going on in outpatient, and one going on in inpatient.  If something goes wrong during anesthesia, there is no time to run somewhere else.

The other concern is that this could create a second-class citizen in that Medicaid patients will get less good service than other patients who are wealthy

or have good insurance.  For those two reasons, regrettably, I am going to vote no.

**Assemblyman Ohrenschall:**
I have learned a lot and have been educated by a lot of people on this. Depending on who I talk to, this is either purely about greed and anesthesiologists making more money, or it is about providing access to patients on Medicaid who would not be able to get that anesthesia care that they need.  I am very torn.  I am going to vote to get it out of Committee and reserve my right to change my vote on the floor.  I believe the whole body should weigh in on this.

**Assemblyman O'Neill:**
I will be voting yes on this for multiple reasons.  I actually had doctors, anesthesiologists, and surgeons who are friends of mine call and have long discussions about this.  They were initially opposed.  The final anesthesiologist who is a close friend of mine said that he may promote his practice going out into the rural areas and opening his practice up to some of the rural hospitals with AAs also.

In 1971, when I became a paramedic, the nurses and doctors were adamantly opposed to those people who had not gone to medical school but were allowed to go out into the field, read an electrocardiogram (EKG) strip, use a defibrillator, or perform a variety of other duties that we all take as standard practice.  If it does not have at least one paramedic on the ambulance, it is not worth it—you would not even want to call the ambulance.  I see this as a new technology that opens up the field.  It makes medicine more available to our citizens.  I am hoping for a new medical school or that the medical school we already have at the University of Nevada, Reno takes this on as a possibility and starts instructing AAs.

**Assemblywoman Neal:**
I concur with all that has been said by my colleagues.  It was a very difficult situation.  I understand the team care model, but I was leaning more toward the certified registered nursing assistant (CRNA) versus the AA and using them in the team care model.  After all of this discussion, I will be voting no, but reserve the right to change my vote on the floor.

**Chairman Kirner:**
I will be voting yes on this bill.  I will entertain a motion.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 11

ASSEMBLYMAN   O'NEILL   MOVED   TO   DO   PASS
SENATE BILL 181 (1ST REPRINT).

ASSEMBLYMAN HANSEN SECONDED THE MOTION.

THE MOTION FAILED.   (ASSEMBLYMEN BUSTAMANTE ADAMS,
CARLTON, DIAZ, ELLISON, FIORE, NEAL, NELSON, SEAMAN,
AND SILBERKRAUS VOTED NO.)

We will move to Senate Bill 193 (1st Reprint).

**Senate Bill 193 (1st Reprint): Revises provisions governing the payment of
minimum wage and compensation for overtime. (BDR 53-989)**

**Kelly Richard:**
Senate Bill 193 (1st Reprint) was heard in Committee on April 22, 2015, and
was sponsored by the Senate Committee on Commerce, Labor and Energy.
[Referred to work session document (Exhibit H).]   This measure requires the
Labor Commissioner to establish a $9 per hour minimum wage for an employee
in private employment if the employer does not provide health insurance for the
employee.

The measure also removes provisions requiring compensation for overtime for
hours worked in excess of 8 hours in any workday, while retaining provisions
requiring that compensation for overtime be paid to certain employees for hours
worked in excess of 40 hours in any week of work.

The attached amendment proposes to revert S.B. 193 (R1) to its original version
by removing the requirement that the Labor Commissioner establish the $9 per
hour minimum wage proposed in section 1.

**Chairman Kirner:**
Is there any discussion?

**Assemblywoman Kirkpatrick:**
I would like to say thank you for taking the minimum wage piece out of the bill
and solely focusing on the overtime portion.   I have some concerns, however.
How does this work in the construction industry?

When my husband was in construction, sometimes they worked 12 to 14 hours
per day, but then they did not work the whole week depending on the deadline
of the job.   Would he have been penalized for not working the full 40 hours
because in those two or three days he worked around the clock?   I think that

Assembly Committee on Commerce and Labor
May 15, 2015
Page 12

construction is different because there are so many variables within the workweek. Weather and all sorts of things can change what that means. I want to understand if this applies to them. The way I read it I think it does.

I also want to understand how this works and why we picked 40 hours. Everything I have seen this session we talk about the average workweek being 30 hours. Economic development was an average of 30 hours a week. We talk about the state average wage which is based on a 30-hour workweek. How is this going to apply to people in the service industry? I know that there are a lot of them who will not be a part of this, but Nevada is a service industry state. In that world, you cannot always guarantee that you are going to get 40 hours. For example, does it apply to people who set up conventions who work 18 hours, are not set up for collective bargaining, but are just regular people who do not have any contracts? It is a feast or famine kind of work. I would like us to discuss that.

**Chairman Kirner:**
In regard to your husband as an example, he was a union worker. Unions are excluded from this requirement. Nonunion workers would not be excluded from this requirement.

With regard to the 30-hour workweek, they would not reach 40, and are therefore not subject to overtime rules under this bill.

**Assemblywoman Kirkpatrick:**
I understand that my husband was a union employee and his package was a negotiated deal. I represent construction workers. I have 24 families on my street and they are all in construction. Not all of them are union workers. Are you saying that because my husband negotiated a contract within his union he is going to get paid overtime because he worked more than 12 hours? Yet my neighbor, who is nonunion and works in the same field, will not get overtime. Is that correct?

**Chairman Kirner:**
That is correct.

**Assemblyman Hansen:**
I am a nonunion construction worker. We often try to negotiate to where we get four 10-hour shifts. In some cases you get rained out on your fourth day. If this bill passes, can we still have four 10-hour days? Also, would the contractor get penalized if you end up with three 10-hour days and one 2-hour day, or would they have to pay overtime on the 10-hour days? I think there was some confusion about that. If in fact we have an agreement

Assembly Committee on Commerce and Labor
May 15, 2015
Page 13

where we are going to work four 10-hour days and for whatever reason one of those days you do not get the full 10 hours, if they are not going to go back and penalize the contractor and force them to pay overtime, then this is okay.

**Chairman Kirner:**
It is my understanding that is the case.

**Assemblyman Hansen:**
I would like our legal counsel to make sure this is correct.

**Matt Mundy, Committee Counsel:**
As to the second part, yes, that is correct.   As to negotiating the four 10-hour workweek question, I believe it was struck out.  I will look that over right now.  The intent of the bill is to go to a straight 40-hour workweek for the purposes of overtime consistent with federal law.

**Assemblyman Hansen:**
That is good, but I want the clarification before we vote.

**Assemblyman Ellison:**
Is this one and a half times what the minimum wage is?  And anything above that is excluded?

**Matt Mundy:**
Yes.  Originally, if you made less than one and a half times, and you worked more than eight hours per day, then you were entitled to overtime for the excess time over eight hours, and that is what is being struck out.  We have taken out all of the exceptions for working over eight hours so that everything is consistent with federal law.  If an employer has an employee who has worked the 40 hours, he is not required to pay overtime until the employee reaches that 40-hour threshold, unless there is an exemption met in subsection 2.

**Assemblyman Ohrenschall:**
The problem Assemblyman Hansen was talking about with having contractors work four 10-hour days and getting rained out on the fourth day will be solved for contractors.  Moreover, let us say there is a store rushing a deadline for a grand opening, so they hire part-time employees through temporary agencies, but not for four 10-hour days.  They need them to work 13 hours before the grand opening, and that is all they need to work.  That employee who works 13 hours the day before the grand opening will not be entitled to any overtime because he or she did not hit the 40-hour threshold in a one-week period. If this bill becomes law, is that scenario correct?

Assembly Committee on Commerce and Labor
May 15, 2015
Page 14

**Matt Mundy:**
That is correct.  To answer Assemblyman Hansen regarding his earlier question, section 2, subsection 1, paragraph (b) is the agreement with the employee working a scheduled 10-hour day for four calendar days; that language has been removed from the bill.  The effect of that is an employer is only entitled to pay overtime once you hit 40 hours in a week.   To answer your question, Assemblyman Ohrenschall, that employee would not be entitled to overtime for the five additional hours that he worked over the first eight hours.

**Assemblyman Ohrenschall:**
That really concerns me.   I meet constituents who work for the temporary employment agencies who go out every day hoping to get called out to a job and do not know whether they will get 20 hours one week or 30 hours the next week.  Sometimes when there is a grand opening or some similar job where they can actually get overtime, it makes all the difference in the world.  Most of these people are not making very high wages at all.  I am concerned about those individuals.  I will be voting no.

**Assemblywoman Kirkpatrick:**
I am still confused on the construction piece.  I do not know that everybody has a contract with the general contractor to ensure they get to work four 10-hour days.  Some of it is travel time or it just depends.  I do not know how that falls in when they do get rained out.  If Mr. Mundy can go over that again, I would appreciate it.

I have a different scenario.  I worked at minimum wage for a lot of years. I know it is different whether or not it is with health insurance.  I know that the Chair of the Senate Committee on Commerce, Labor and Energy had alluded to the fact they had verified that state employees make more than one and a half times the minimum wage so they would not be subject to this.  Going through it I found that we have a lot of employees who do make about $10 an hour. When they first start out, they have those temporary positions for six months to get the experience.  In their job, would they then not be subject to overtime if they only worked a 30-hour week?   We defined in statute that the average workweek is 30 hours.  Is that correct?

**Matt Mundy:**
Yes, that is my understanding.

**Assemblywoman Carlton:**
Being in the restaurant industry for years, I had to work either two jobs or two shifts.  There were a number of times where I would work breakfast, take an hour off, work the lunch shift, and then I would work dinner.  I was really

Assembly Committee on Commerce and Labor
May 15, 2015
Page 15

only scheduled for two shifts, but if they came up short and I worked that third shift, I got the time and a half for being over the eight hours.

In the restaurant industry you very rarely work 40 hours. There are not that many hours in a week until I moved to Las Vegas where I got an actual designated shift. I would be concerned that I would want to take those overtime hours. The time and a half I made helped pay for day care so that I could stay working and still come out ahead.

Honestly, when you walk in your district and talk to people, I do not think I have heard anybody ask me to lower their wages. I see this as a way to lower wages for people. There are other flexibilities out there. When you are really struggling, trying to make ends meet, that time and a half can make the difference between getting ahead or just breaking even for the week. I have some concerns that there is an economic impact to our constituents. They are living off overtime and it is a part of their budget. I would hate to take that away from them.

**Chairman Kirner:**
I will entertain a motion.

> ASSEMBLYWOMAN SEAMAN MOVED TO AMEND AND DO PASS SENATE BILL 193 (1ST REPRINT).

> ASSEMBLYWOMAN FIORE SECONDED THE MOTION.

Is there any more discussion?

**Assemblywoman Bustamante Adams:**
I want to be clear on the motion that was made. Was it amend and do pass? Does that mean we do not want the amendment?

**Chairman Kirner:**
No, the amendment is we accept the withdrawal of the $9 per hour. The bill becomes aligned with the Nevada Fair Labor Standards Act of the 40-hour week of overtime.

**Assemblywoman Diaz:**
I have severe concerns about this. As I talked to my constituents in my district, it is becoming increasingly more difficult to obtain a full-time job. A lot of my constituents have two part-time jobs. I think this is giving the upper hand to the employer to expand to a more part-time model without paying employees their benefits or a livable wage in order to stay off social state benefits.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 16

Now they are going to need to work a 14-hour day, but they are not going to get a 40-hour week. They are basically forced to work overtime for the same rate. I see this as a detriment to my constituents and I am opposed to it.

**Assemblyman Paul Anderson:**
I have heard the concerns. I am certainly supportive of the measure, but we have one week before the second house passage. I think there is still some room to work on this. I would be willing to get this out of Committee and then focus on some of the concerns already stated.

**Assemblyman Hansen:**
I apologize. I was confused on parts of this bill. In light of what Assemblyman Anderson just suggested, I would feel the same. I did not realize they were taking out the one and a half times portion. I thought it was still a part of the bill. I am really uncomfortable with people who are making minimum wage not getting a break. I would like to discuss the idea of a conceptual amendment possibly added during a floor session. These are hardworking individuals at the lowest end of the economic ladder and we are taking the little bit away that they get a break on. I am going to support this, but I would suggest we take serious consideration on putting that portion back into the bill.

**Chairman Kirner:**
In my own experience with the industry, my company always paid time and a half after eight hours. We did that, not because it was the law, but because we could. This bill makes the overtime rule consistent with what the other 47 states are doing. Certainly, in Assemblyman Hansen's practice, if he wanted he could pay overtime. Your company probably already makes more than time and a half anyway.

**Assemblyman Hansen:**
I agree with you, Chairman Kirner. I would say that Nevada is unique and we have such a huge portion of our population working in the service sectors for very low wages. I do not like seeing those people possibly being weakened economically by working 13 hours through temporary services, but not getting paid for overtime. I just wanted to throw that into the mix for a possible floor amendment.

**Chairman Kirner:**
I will call for the vote at this time.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 17

>THE MOTION PASSED.  (ASSEMBLYMEN BUSTAMANTE ADAMS, CARLTON, DIAZ, KIRKPATRICK, NEAL, AND OHRENSCHALL VOTED NO.)

**Assemblywoman Kirkpatrick:**
If we can make some amendments, I will reserve the right to change my vote on the floor.  If we think back to when we heard this bill and had discussion during the hearing, it was a tough day for all of us.  I think there could be further discussion to make it better for Nevadans.  I would be willing to change my vote if we can get to that.

**Chairman Kirner:**
I am certainly open to that.  You heard Assemblyman Anderson say he is also willing to work on this.  I have faith that he will keep his promise.

**Assemblyman Silberkraus:**
I wanted to echo the comments of Assemblymen Anderson and Hansen.

**Assemblyman Ellison:**
I would like to offer assistance to Assemblyman Anderson on getting a floor amendment.

**Chairman Kirner:**
I am going to leave it in his hands.  Knowing how he operates, he will engage any number of us.  Assemblywoman Seaman will carry the floor statement.

We will move on to Senate Bill 241 (3rd Reprint).

**Senate Bill 241 (3rd Reprint):  Revises provisions relating to collective bargaining. (BDR 23-1030)**

**Kelly Richard, Committee Policy Analyst:**
Senate Bill 241 (3rd Reprint) was sponsored by Senator Michael Roberson. It was heard in this Committee on May 4, 2015.  [Referred to work session document (Exhibit I).]  It makes various changes relating to collective bargaining.  Among other things, the bill excludes a school administrator whose annual salary, adjusted for inflation, is greater than $120,000, from membership in any bargaining unit; authorizes, under certain circumstances, a local government employer to provide paid leave to an employee for time spent in providing services to an employee organization; reduces from 180 days to 45 days the amount of time within which the Local Government Employee-Management Relations Board must conduct a hearing relating to certain complaints; provides that a collective bargaining agreement between

Assembly Committee on Commerce and Labor
May 15, 2015
Page 18

a local government employer and a recognized employee organization expires for certain purposes at the end of the term stated in the agreement; provides that upon the end of the term stated in a collective bargaining agreement, and until a successor agreement becomes effective, a local government employer shall not, with limited exceptions, increase any compensation or monetary benefits paid to or on behalf of employees in the affected bargaining unit; revises various provisions relating to negotiations between a school district and an employee organization representing teachers or educational support personnel; and provides that during the first three years of employment by a school district, a principal is employed at will.

**Chairman Kirner:**
We heard this in Committee.  As you may recall, this bill had the support of both union and management.  It is an agreement that has been worked out. I will entertain a motion.

> ASSEMBLYMAN   SILBERKRAUS   MOVED   TO   DO   PASS
> SENATE BILL 241 (3RD REPRINT).

> ASSEMBLYWOMAN FIORE SECONDED THE MOTION.

Is there any discussion?

**Assemblywoman Kirkpatrick:**
I will be supporting this.  I think there was a lot of work and discussion that went into some reasonable changes.  Hopefully, for those of you who will be here next session, you can come back and evaluate it and make sure they did what you wanted.  I would be supporting it because I think it is reasonable.

**Assemblywoman Carlton:**
I have the latest version and the first version of the bill.  Can I get some clarification on this?

**Chairman Kirner:**
The bill we are voting on is the third reprint of the bill without any amendments.

**Assemblywoman Carlton:**
I have the latest version of the work session document which eliminates the bottom amendment.  Is there no additional amendment from the original third reprint that was proposed to us?

**Chairman Kirner:**
The third reprint is the version we are working from.  I will call for a vote.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 19

THE MOTION PASSED UNANIMOUSLY.

We will move to Senate Bill 286 (1st Reprint).

**Senate Bill 286 (1st Reprint): Revises provisions relating to the Nevada Funeral and Cemetery Services Board. (BDR 54-905)**

**Kelly Richard, Committee Policy Analyst:**
Senate Bill 286 (1st Reprint), sponsored by Senator Greg Brower, was heard in this Committee on May 8, 2015. [Referred to work session document (Exhibit J).] It revises various provisions governing funeral and cemetery services. The measure authorizes the Nevada State Funeral and Cemetery Services Board to issue permits for the operation of direct cremation facilities and licenses to persons to engage in the business as a funeral arranger. The bill establishes a two-year duration for most licenses and permits issued by the Board and a continuing education requirement for licensed funeral directors and embalmers. In addition, a person who holds a license, permit, or certificate issued by the Board must comply with the requirements of the federal Occupational Safety and Health Administration. An applicant for a funeral director's license, who applies after January 1, 2016, must have at least one year of active practice as a funeral arranger.

The measure revises the priority of persons who are authorized to order the burial or cremation of a decedent. A person who is arrested for or charged with murder or voluntary manslaughter may not act as the person authorized to order the burial or cremation of the decedent whom the person is accused of killing. Further, an operator of a crematory is required to ensure that any person operating crematory equipment has completed a crematory certification program approved by the Board. The attached amendment (Exhibit J) was submitted by Garrett Gordon on behalf of Hawkins Holdings LLC. The amendment would clarify a cemetery authority's ability to sell, mortgage, or encumber property from which human remains have been lawfully removed. It is my understanding that this amendment is approved by the bill sponsor.

**Chairman Kirner:**
Is there any conversation?

**Assemblywoman Carlton:**
The bill sponsors came to visit with me yesterday, and I thank them for coming to talk to me before this work session. In another conversation with one of my colleagues, it was brought to my attention that this particular cemetery was a topic of discussion a couple years ago. A lot of the people who were buried there had died from anthrax. My concerns with this are on the health side.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 20

I realize what they are trying to do, but I need to understand the health concerns as far as when this cemetery is shut down, and if that land is reused, how do we make sure that it is safe for the public?

**Chairman Kirner:**
I appreciate that. I believe there is some sort of process they have to go through before the land would be used.

**Assemblywoman Carlton:**
I believe there is, but I do not know what it is. This came up in another bill during the legislative session of 2013. There were also issues then. I want to be sure that whatever we do here today is not the proverbial camel's nose under the tent and that we provide the level of public safety we need to provide.

**Chairman Kirner:**
Will the bill sponsor and the sponsor of the amendment please come forward? While you are settling in, there is another comment.

**Assemblywoman Kirkpatrick:**
This matter came up when Assemblyman Elliot Anderson had the bill in the legislative session of 2011 because they were trying to use a burial ground within his district to make it move forward. From that particular hearing, the Southern Nevada Health District testified that there is an entire process as a dormant piece that they go through. Outside of what these sponsors say today, I would be willing to track that down and get the legislative record because there was a long debated discussion about it. I believe that the District has a process.

**Jennifer Kandt, Executive Director, Nevada State Funeral and Cemetery Services Board:**
There is a disinterment process already in place. It requires permits from the county. This has nothing to do with the actual disinterment process. It is the process after the bodies have been disinterred as to who has authority over the land to do different things. I will turn it over to Garret Gordon to further explain what they are trying to do.

**Garrett Gordon, representing Hawkins Holdings, LLC, Sacramento, California:**
The cemetery in question already has a health permit in place from Washoe County. We made sure to go through that process. The permit has been issued and it is valid. Health concerns were reviewed at the time of issuance. The amendment does not create any new process. There is already a disinterment process that takes place and is already in statute, including

starting with providing proper notice, getting a health permit, and going through the proper steps. This amendment describes what happens at the very end of it. We believe there was a hole in the statute. We want to address what the Funeral and Cemetery Services Board can do after it has legally gone through the whole process, including obtaining a valid health permit. What happens at that point in time? This amendment says the Board can sell, mortgage, et cetera, the remaining property. We believe this is for purposes of economic development.

I would note that you cannot move forward with the disinterment process unless two prongs are met at the very beginning. The first prong is blight. It has to be a blighted piece of property. The second is there is no financial provision for that property moving forward. Those two findings have to be met and able to move through this process. We believe the cemetery in question is up by the University of Nevada, Reno, and would be a great piece of property to move forward with if and when you go through all the proper steps under the statute.

**Assemblywoman Kirkpatrick:**
Currently there is a process in statute with local government. In my mind it is no different than a gas station. After a gas station has had fuel in the groundwater, we have to let it be dormant. There is a clean-up process to go through, and we have to let it sit awhile. Then you have to go back before local jurisdictions in order to make sure all of those things are done for the environmental piece of it before any permits can be issued. I believe I see this the same way.

This is a stretch for me because I was the one trying to kill the Board last session, but I think Jennifer Kandt has done an amazing job with the second chance. I want to understand that we are not giving too much authority away from the local governments because it is truly an environmental issue. Regular people own the land that cemeteries are on. Would this be giving an additional approval as well as local governmental approval?

**Garrett Gordon:**
First, cemeteries in this state are owned both by government and by private party. This bill does nothing to take any jurisdiction away from any city or county for purposes of zoning, discretionary approvals, health permits, or federal review. Any contractor who performs this work must meet certain criteria for federal and state licenses they must have. It also does not add any review by the Board. The bill is germane to this issue. Jennifer Kandt and the Board did not and will not review this. We are simply confirming with respect

Assembly Committee on Commerce and Labor
May 15, 2015
Page 22

to what happens after the disinterment process that the property could move
forward for purposes of economic development.

**Assemblywoman Kirkpatrick:**
The language that states it is automatically transferred to the cemetery
authority and then can be sold, mortgaged, and securitized for a loan is
troublesome to me. I do not see the connection of trying to take a cemetery,
remove all of the remains, and put them somewhere else because it is now in
a spot that has encroached on other things. I am curious why the amendment
did not present itself in the Senate.

**Garrett Gordon:**
That language with respect to sold, mortgaged, and securitized for a loan is
pulled from other locations in the statute. We are simply reusing that language
and putting it here to make it clear that after you have gone through the whole
process, NRS 451.320 is at the very end. The very end talks about recording
a declaration with the county recorder saying that you have followed the
process and obtained all of the state and federal permits. The land is now free
and clear. The declaration is being recorded so if that land is actually sold, you
can get title insurance and other things.

I will argue that we are not changing the law, but we are clarifying the law by
putting in some language that has been in other provisions. We are clarifying
the law at the bottom of the process to confirm that no matter how those burial
processes are held—if by a license, by an easement, by fee simple title—that
you follow the whole process. The legislative intent is that if it is blighted and
there is no financial provision we want to make sure something good happens.

This amendment was not brought up in the Senate. It was brought up recently
and I know it is coming out of left field. There has been interest in it for a long
time given Reno is trying to become a university town and this is an infill
project. Steve Polikalas has a group which is looking at this property, and given
the uncertainty of how this statute reads, this will be helpful in moving the
project forward. There has just now been interest, and that is why we are here
today. We have a deadline date today and we are here today before you asking
for this amendment.

**Assemblywoman Bustamante Adams:**
We said during Committee that the Board has made great effort to bring
themselves back to being relevant for Nevadans, so congratulations, we
appreciate that. I know that some people were able to be briefed on the
amendment. I did not see it until probably an hour ago and it concerns me. I do
not want you to mess with the Board because they are on a great trajectory on

getting themselves back. I am surprised why you would accept the amendment and I am concerned things would get messed up. It is not the right time for it.

**Assemblyman Ohrenschall:**
Regarding the part in the bill about the spouse being accused, why not wait until a conviction? What if they are accused and there is no close family member nearby to make the funeral arrangements? It is possible that they are acquitted, or the case is dismissed, but maybe they were accused and maybe not. I just wonder why. I also have a question on the amendment.

**Jennifer Kandt:**
Again, there is a timeliness factor here. When someone has died and everyone is waiting for arrangements to be made, oftentimes what happens is the accused individual has been incarcerated. The funeral home is then left with sending the family to get a court order so they can authorize cremation or burial. We are not saying that means any random person is going to take over and decide; it just goes down to the next family member in line. The spouse is always at the top of the list and it would then go to another family member such as a sibling or child.

**Assemblyman Ohrenschall:**
Are there many other cemeteries in the state you think this would be applicable to? Are there any family members or heirs still around who might care about whatever kind of property right is extinguished? And have you spoken to them?

**Steven T. Polikalas, representing Hawkins Holdings, LLC, Sacramento, California:**
The notice provisions of the statute give rise to all of the notices of the heirs or friends. All of that has to be accomplished prior to any disinterment. They are all put on notice, so at that point they bring forth any concerns they may have. I would also like to clarify that the cemetery authority referred to in Chapter 451 is not a funeral board. It is a separate entity and so it is not a governmental cemetery authority unless it is owned by a government. In NRS 451.280 it provides the authority to sell and encumber a cemetery once the statute has been complied with. This is simply to confirm what happens following the successful disinterment and reinterment of the remains.

**Assemblyman Ohrenschall:**
Let us say there is a great-grandson of one of the deceased persons. Will an effort be made to try and move the remains somewhere here in the Reno area rather than far away?

Assembly Committee on Commerce and Labor
May 15, 2015
Page 24

**Steve Polikalas:**
That is part of the notice statutes to notice the heirs as to where the remains are going. At that time, they have the choice to consent to where the reinterment is to take place and whether or not it is at the same cemetery. There would be a place where there was a financial provision for the further upkeep because in a blighted cemetery like this, all that happens there is people park and drink on it and do things that are not of any benefit to the decedents. This provides the ability for a new financial entity to come in to move the remains into a place that has appropriate financial upkeep.

**Assemblyman Ohrenschall:**
Does the fact that a cemetery is blighted mean a redevelopment agency or local authority can already take over?

**Steve Polikalas:**
To be clear, it is not a redevelopment agency; it is the cemetery authority or a governmental authority. The determination is if the further maintenance of the cemetery is not in accordance with the health, safety, comfort, and welfare of the public, or if there is no financial provision to be made for the future care of gravesites within the specified area. These are the findings that need to be made by the local governmental authority or the private or public cemetery ownership to remedy the blighted condition of the cemetery.

**Assemblyman Nelson:**
Mr. Gordon, are these plots given a fee simple title or are they just licenses?

**Garrett Gordon:**
That question nails the amendment on its head. The answer is yes to both. Certainly in some cemeteries it is a license, in some it is an easement, and in others it is a fee simple title. This amendment clarifies that the process applies to three of those scenarios. I think that was the intent of the original legislation and this amendment just clarifies that for purposes of going forward.

**Assemblyman Nelson:**
This is not a taking if it is fee simple? I would assume the heirs would own the property. If it is fee simple, it would pass on to the decedents of whoever owned it, correct?

**Matt Mundy, Committee Counsel:**
That is a great question and one the Legal Division also looked at. There is no case law on that point in Nevada, but there is quite an extensive case law on the interest in a burial plot in which no one has been interred. To cite the Supreme Court of California, the right of the lot holders to be buried in

Assembly Committee on Commerce and Labor
May 15, 2015
Page 25

a cemetery was terminated and destroyed under the police power of the state. In the case of the state of Washington's Supreme Court, the court held that consistent with nearly universal authority in this country, no fee interest, and no interest in the land itself, is carried with a transfer of interment rights. The courts have basically said that even if you say it is a fee simple transfer, it is really an easement or a license contingent upon the use of the property. Once the property is no longer dedicated for the purposes of a cemetery, that interest terminates or is extinguished.

**Assemblyman Nelson:**
Does this escheat to the state?

**Matt Mundy:**
In this context we are talking about cemetery authorities. We are talking about if you are referring to eminent domain or combination action. We are not talking about a situation where the state is compelling a private owner to transfer his interest in property to another private owner. That is prohibited by the *Nevada Constitution*, but this is a private property owner choosing to undedicate property as a cemetery for certain reasons under certain conditions.

**Assemblyman Nelson:**
Obviously we want to avoid any potential quiet title actions down the road. Mr. Gordon, do you feel strongly that this statute will take care of that?

**Garrett Gordon:**
Yes.

**Assemblywoman Neal:**
Mr. Polikalas, which statute did you cite in regard to the authority to dispose of the land? Was it NRS 451.280?

**Steve Polikalas:**
Yes.

**Assemblywoman Neal:**
At the end of NRS 451.280 it says that the "portions from which all human remains have been removed, may be sold, mortgaged or otherwise encumbered as security for any loan or loans made to the cemetery authority." Is this money going to the cemetery authority if these bodies are moved?

**Steve Polikalas:**
If there is a sale, yes.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 26

**Assemblywoman Neal:**
It does not say that you can sell it and then you develop a mall on the property and whatever happens to the land is supposed to recycle itself to the cemetery authority. Is that accurate?

**Steve Polikalas:**
I believe so. In essence, it is the cemetery authority that would be receiving the loan, the proceeds of the sale, or the encumbrance consideration.

**Assemblywoman Neal:**
How does this benefit you if you do an economic development part? Who owns it? Is it the cemetery authority board or the private developer?

**Garrett Gordon:**
The term cemetery authority is defined in NRS 451.069 as the property owner. The cemetery authority can either be a governmental entity if they own the cemetery, or it could be a private party who owns the cemetery. I understand your confusion. We were confused when we first read the statute. Cemetery authority can mean whoever owns that actual property.

**Assemblywoman Neal:**
I thought it was already privately owned as is.

**Steve Polikalas:**
It is.

**Chairman Kirner:**
Based on what you are saying, because it is privately owned, whoever that private owner is, is the authority. Is that correct?

**Steve Polikalas:**
Yes.

**Assemblywoman Neal:**
Is their authority being usurped somehow by this bill? Either way, it does not matter because we are going in circles about a last-minute amendment. You can take a motion because I am a no. I do not agree with the amendment. I do not like it or what it does.

**Chairman Kirner:**
I will entertain a motion.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 27

> ASSEMBLYMAN O'NEILL MOVED TO AMEND AND DO PASS
> SENATE BILL 286 (1ST REPRINT).
>
> ASSEMBLYWOMAN SEAMAN SECONDED THE MOTION.
>
> THE MOTION FAILED.  (ASSEMBLYMEN BUSTAMANTE ADAMS,
> CARLTON, DIAZ, ELLISON, FIORE, KIRKPATRICK, NEAL, NELSON,
> AND OHRENSCHALL VOTED NO.)

How would the Committee feel if we remove the amendment?  It looks as if
Assemblyman O'Neill would like a one-minute recess.

**Assemblywoman Kirkpatrick:**
I would remind Committee members that we have the opportunity to do floor
amendments once there is a little more discussion.  We have until next Friday
for second house passage from the Assembly floor session.  I do not want to kill
the bill for someone who has worked very hard because there are some unclear
pieces in the bill.  At some point, we just need to determine if we want to
penalize the person who is doing the job.

**Chairman Kirner:**
Assemblywoman Kirkpatrick is correct.  If after some consideration we want to
make an amendment on the Assembly floor, we have a week to do so.  I would
like to get the basic bill passed out of Committee.

**Assemblywoman Bustamante Adams:**
I would like to make a motion to do pass to continue the conversation so we
get our questions answered on the amendment that was proposed at the last
minute.

**Chairman Kirner:**
I will entertain your motion.

> ASSEMBLYWOMAN BUSTAMANTE ADAMS MOVED TO DO PASS
> SENATE BILL 286 (1ST REPRINT).
>
> ASSEMBLYMAN O'NEILL SECONDED THE MOTION.
>
> THE MOTION PASSED UNANIMOUSLY.

We will now review Senate Bill 341 (1st Reprint).

Assembly Committee on Commerce and Labor
May 15, 2015
Page 28

### Senate Bill 341 (1st Reprint): Revises provisions relating to dentists. (BDR 57-261)

**Kelly Richard, Committee Policy Analyst:**
Senate Bill 341 (1st Reprint), sponsored by Senator Debbie Smith, was heard in this Committee on May 8, 2015.  [Referred to work session document (Exhibit K).]  It provides that insurers who offer individual health insurance or group health insurance, nonprofit corporations for dental service, health maintenance organizations (HMO), and organizations for dental care who enter into agreements with third parties to provide access to dentists must comply with certain requirements.  The bill requires such insurers to provide a dentist with a notice containing certain information prior to entering into a contract and before executing an agreement with a third party.  The measure requires the third party to maintain a website or toll-free telephone number for dentists to obtain contact information for the person used by the third party to reimburse the dentist for covered services.  Finally, the bill prohibits the assignment or sale of a contract that includes a dentist that would hinder the ability of the dentist to manage his or her practice, including scheduling patients.

Chris Ferrari has submitted the attached amendment (Exhibit K) on behalf of the bill's proponents, the Nevada Dental Association.  The amendment proposes to strike the bill entirely and replace it with a provision requiring medical discount plans that contract directly with a dentist to provide certain notices and disclosures.  The amendment also requires a medical discount plan that is the assignee of a contract with a dentist to issue certain notices.

**Chairman Kirner:**
Is there any discussion?

**Assemblywoman Carlton:**
When I originally looked at my documents I thought we were amending something in.  This is an entirely new bill.  The provisions that were in the HMO sections and everything we discussed in the hearing are all gone.  I have had an issue with medical discount plans for the last few years with the advent of the way we do health insurance in this state now with everyone being required to actually have health insurance.  I have constituents who have been sold these medical discount plans thinking they were buying health insurance.  When they got to the doctor they found out they did not have it.  Thankfully, it was before we started fining people for not having health insurance.

I have concerns about doing more disclosure on a product that really is not necessary in this state any longer since everyone is now required to have health

Assembly Committee on Commerce and Labor
May 15, 2015
Page 29

insurance. Without understanding more, and I apologize to the proponents of this bill because I thought this was in addition to the original bill—I like the original bill and now it is gone—I have concerns with what we are actually going to be doing here. I have not had a chance to talk to the sponsor of the bill.

**Chairman Kirner:**
Chris Ferrari is in the audience. He will come up to answer questions.

**Assemblywoman Carlton:**
Senator Smith is the sponsor of the bill.

**Chairman Kirner:**
Yes. Mr. Ferrari actually worked with Senator Smith on the bill.

**Chris Ferrari, representing Nevada Dental Association:**
In working on this bill with Senator Smith and the insurers, we came to a point of identifying the biggest challenge in regard to the dental discount plans or medical discount plans, which is that some of our members would find people in their waiting rooms not being aware that they were contracted with the particular discount plan, and that creates an awkward scenario both for the patient and the provider. It also does not allow our members, as providers, to do them the greater service.

With this particular amendment, we are trying to address the problem head on and make sure there is a sufficient notification process to the provider so that they can be prepared to receive the patient and to provide them the services that they had purchased. We are very supportive and appreciative of the Committee's support of the measure.

**Keith Lee, representing Nevada Association of Health Plans:**
As Mr. Ferrari indicated, our members are not a part of the problem. The problem is the discount plans. What happens is the dental network all of a sudden rents itself somewhere else or to another entity. Then the members who are covered by the rented discount plan either call the dentist or show up and expect to be treated and covered, but the dentist has no idea the plan has been assigned. It is not an issue that affects the health insurance providers. That is why we worked on this bill and amended it to get it to point directly to the culprits in this area, and that is the discount plan that takes advantage of the providers, in this case, the dentists.

**Assemblywoman Carlton:**
It is not the providers I am worried about; it is the constituents buying these plans and being abused. I do not understand why we are giving more disclosure

Assembly Committee on Commerce and Labor
May 15, 2015
Page 30

on something that should not be sold in the state anymore because it does not comply with the health care law of the land. I dislike these plans and I have disliked them for a very long time. No matter how much disclosure you put on this pig, it is still going to be a pig. I understand that you represent the providers, but I represent the constituents who get abused by the people who sell these plans. I do not think any amount of disclosure is going to fix something that is this broken.

**Chris Ferrari:**
I am certainly not here to dispute the valor of the plans themselves. All we are asking for is that there is simply a notification process that can help us do the work we are being asked to do.

**Chairman Kirner:**
I will entertain a motion.

>          ASSEMBLYWOMAN SEAMAN MOVED TO AMEND AND DO PASS
>          SENATE BILL 341 (1ST REPRINT).

>          ASSEMBLYMAN NELSON SECONDED THE MOTION.

>          THE MOTION PASSED. (ASSEMBLYMEN BUSTAMANTE ADAMS,
>          CARLTON, DIAZ, NEAL, AND OHRENSCHALL VOTED NO.)

Are there any other comments?

**Assemblywoman Kirkpatrick:**
I am going to vote to get this bill out of Committee, but I reserve the right to change my vote. I talked to all sides that were involved and they seemed in agreement. They reverted back to the original intention of the bill which was to just address the one issue of oral maxillofacial surgery. I will dig a little deeper to make sure that we are all on the same page. I support it for those reasons of reverting back to the original bill as opposed to having something more broad.

**Chairman Kirner:**
We will move to hear Senate Bill 370 (1st Reprint).

**Senate Bill 370 (1st Reprint):** **Revises provisions relating to barbering.
    (BDR 54-673)**

**Kelly Richard, Committee Policy Analyst:**
Senate Bill 370 (1st Reprint), sponsored by Senator Kelvin Atkinson, was heard in this Committee on May 8, 2015. [Read work session document (Exhibit L).]

Assembly Committee on Commerce and Labor
May 15, 2015
Page 31

This bill requires the State Barbers' Health and Sanitation Board to oversee the examination for a license as a barbering instructor but prohibits the Board from administering any part of the examination. The bill provides that the examination for a license as an instructor must include a practical demonstration and written test. The Board must contract with a national organization to administer the examination for such a license and use only proctors who are licensed barbers in Nevada and approved by a national organization to administer the practical demonstration portion of the examination.

The measure provides that an applicant for license as an instructor may fail to pass the examination two times before he or she must complete 250 hours of further study. The bill revises the ratio of students enrolled in a barber school to instructors required to be on the premises of the barber school, and a barber school must have at least one barber's chair for each student present during instruction in the barber school. Finally, the bill requires an applicant for a license to operate a barber school to submit information to the Board demonstrating that the barber school will be owned and operated by at least two instructors.

Assemblywoman Seaman would like to introduce an amendment for your consideration on the bill. The amendment would revise section 2, subsection 4, to provide that an applicant for license as an instructor, who fails to pass the required examination, may retake the examination as many times as it is offered within the following 365 days. The applicant would be required to pay for each examination. If, after 365 days from the first failed examination, the applicant has not yet passed the examination, the applicant must complete 250 hours of further study in a barber school approved by the Board before he or she may retake the examination.

**Chairman Kirner:**
Is this a friendly amendment, Assemblywoman Seaman?

**Assemblywoman Seaman:**
Yes, this is a friendly amendment that the sponsor of the bill has agreed to and actually wanted.

**Chairman Kirner:**
When I read the language, the intent is much more clear to me as opposed to what is in the bill itself. I appreciate the fact that Senator Atkinson has accepted this amendment. Is there any discussion?

Assembly Committee on Commerce and Labor
May 15, 2015
Page 32

**Assemblywoman Bustamante Adams:**
I appreciate the amendment also.  I like the fact that we are giving Nevadans an opportunity to retake the examination more than two times.  I am grateful we are making some changes on this Board.

The bill says that the barber school will be owned and operated by at least two instructors.  Maybe we can look into this further next session, but I do not think a barber school has to be owned by an instructor.  It could be owned by a businessperson who hires the instructor to teach and oversee the students.  We are making steps forward and I am glad for Assemblywoman Seaman's amendment.

**Assemblywoman Seaman:**
I agree with Assemblywoman Bustamante Adams.  I wonder if we could possibly work together on another amendment because I do not understand why two instructors must own the barber shop.  It could have been a typo.

**Chairman Kirner:**
The bill does call for two instructors to be owners.

**Assemblywoman Seaman:**
Why?

**Chairman Kirner:**
I am not saying it is right or wrong.  I am just stating what the bill says.

**Assemblywoman Carlton:**
In one of my first sessions in this Legislature, this was a topic of discussion because the licensees would actually be under the jurisdiction of the Board and there would be a regulatory body that would make sure they would comply with all of the barber regulations and instructions.   Within the postsecondary education realm, we wanted to make sure that if people paid for the instruction that there was actually someone who had the hammer over them.  It is a very expensive process to go through.  Ultimately, if they do not get licensure then they paid for an education that they cannot make any money off of.  The discussion was to have the actual licensee be the instructor and the owner.  Whether that needs to evolve and change is fine; I just wanted to give you the history of where that came from.

**Chairman Kirner:**
Thank you.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 33

**Assemblywoman Seaman:**
I am thankful for the history. I am wondering if we can possibly change that to be at least one instructor instead of two. What I understood from the bill sponsor was that it is so hard to find instructors. I think to need to have two instructors to own the shop is very difficult. If the Committee and bill sponsor are okay with it, I would like to amend it to be one instructor-owner because I think this might be easier.

**Chairman Kirner:**
I will let the bill sponsor reply to that request.

**Senator Kelvin Atkinson, Senate District No. 4:**
We negotiated with the instructors and the barbers and we actually wanted just one instructor. They did not think that would work, so we changed it to two instructors. If you look at the language in the bill it is one instructor until 2017. If people need to get together before now and then, they can do so. Hopefully by 2017 we will have more instructors and people will have the ability to do that.

**Chairman Kirner:**
Based on what I am hearing you say and in your discussions with your constituents with regard to this, I am not hearing a need to make an amendment at this time. Is that correct?

**Senator Atkinson:**
No, it is not necessary because it has already been addressed. That is why the 2017 language is in the bill. It gives them the opportunity to get going now.

**Chairman Kirner:**
I will entertain a motion.

> ASSEMBLYWOMAN BUSTAMANTE ADAMS MOVED TO AMEND AND DO PASS SENATE BILL 370 (1ST REPRINT).
>
> ASSEMBLYWOMAN FIORE SECONDED THE MOTION.
>
> THE MOTION PASSED. (ASSEMBLYWOMAN CARLTON VOTED NO.)

We will move to Senate Bill 393 (1st Reprint).

Assembly Committee on Commerce and Labor
May 15, 2015
Page 34

**Senate Bill 393 (1st Reprint): Revises provisions related to Oriental medicine.
(BDR 54-864)**

**Kelly Richard, Committee Policy Analyst:**
Senate Bill 393 (1st Reprint) was presented by Senators David Parks and
Tick Segerblom and Assemblyman Pat Hickey.  It was heard in Committee on
March 25, 2015.  [Referred to work session document (Exhibit M).]  It revises
provisions related to Oriental medicine and exempts a practitioner of
acupuncture from the licensing requirements of *Nevada Revised Statutes*
Chapter 634A if the practitioner is: (1) employed by a school of Oriental
medicine that is located in Nevada, which has received at least candidacy status
for institutional accreditation from the Accreditation Commission for
Acupuncture and Oriental Medicine; (2) licensed in another state or jurisdiction;
and (3) limited in his or her practice to teaching, supervising, or demonstrating
the methods and practice of acupuncture in a clinical setting and does not
accept payments from any patients relating to his or her practice of
acupuncture.

**Chairman Kirner:**
There are no amendments on this bill.  Is there any discussion?

**Assemblywoman Neal:**
Is a person who does acupuncture no longer under the medical statutes?
Can you practice acupuncture without a license?

**Kelly Richard:**
This bill is intended to exempt someone who is employed by a school of Oriental
medicine located in the state of Nevada.  The idea would be if they could bring
over experts in the field to work at the school and teach.

**Chairman Kirner:**
They would not be allowed to practice, only teach.  I will entertain a motion at
this point.

> ASSEMBLYMAN SILBERKRAUS MOVED TO DO PASS
> SENATE BILL 393 (1ST REPRINT).

> ASSEMBLYWOMAN SEAMAN SECONDED THE MOTION.

> THE MOTION PASSED.    (ASSEMBLYWOMAN CARLTON
> VOTED NO.)

Assembly Committee on Commerce and Labor
May 15, 2015
Page 35

<u>Senate Bill 181 (1st Reprint)</u> failed earlier today.  I would like to bring it back up and have some discussion.

**<u>Senate Bill 181 (1st Reprint)</u>:  Provides for the licensure of certified anesthesiology assistants. (BDR 54-240)**

**Assemblyman Nelson:**
I would like to make a motion to reconsider <u>S.B. 181 (R1)</u>.  I will vote yes to get it out of Committee so the entire body on the Assembly floor can hear it.

**Assemblyman Silberkraus:**
I am still opposed to this and still have great discomfort with it.  I will give us the extra week to continue the discussion.

**Chairman Kirner:**
I will entertain a motion.

> ASSEMBLYMAN NELSON MOVED TO RECONSIDER <u>SENATE BILL 181 (1ST REPRINT)</u>.

> ASSEMBLYMAN SILBERKRAUS SECONDED THE MOTION.

> THE MOTION PASSED.  (ASSEMBLYMEN BUSTAMANTE ADAMS, CARLTON, DIAZ, ELLISON, FIORE, NEAL, AND SEAMAN VOTED NO.)

I will now entertain a motion to do pass.

> ASSEMBLYMAN HANSEN MOVED TO DO PASS <u>SENATE BILL 181 (1ST REPRINT)</u>.

> ASSEMBLYMAN PAUL ANDERSON SECONDED THE MOTION.

Is there any further discussion?

**Assemblyman Ohrenschall:**
I have concerns.  I have one group of people telling me this is all about greed and I have another group telling me this is about access for Medicaid patients.  I have tried to figure out what the truth is and I am still not there yet.

Assembly Committee on Commerce and Labor
May 15, 2015
Page 36

**Chairman Kirner:**
If this were not a deadline day, I would allow us more time to think about this and have more discussion. I would like to get it passed out of Committee and take a week to contact our people and see if that helps our decision-making.

**Assemblyman Nelson:**
Ditto to Assemblyman Ohrenschall's comments. I also reserve the right to change my vote on the floor.

**Assemblyman Silberkraus:**
Ditto as well for me.

**Assemblywoman Carlton:**
For clarification, this is not just about Medicaid; this is about every patient in the state of Nevada. I do not want it to be perceived that this is just for Medicaid patients, but it is for anyone who will be walking through that door.

**Chairman Kirner:**
I will call for the vote.

> THE MOTION PASSED. (ASSEMBLYMEN BUSTAMANTE ADAMS, CARLTON, DIAZ, ELLISON, FIORE, NEAL, AND SEAMAN VOTED NO.)

We have completed the work session for today. Is there any public comment? [There was none.] This meeting is adjourned [at 3:25 p.m.].

RESPECTFULLY SUBMITTED:

_____
Janel Davis
Committee Secretary

APPROVED BY:

_____
Assemblyman Randy Kirner, Chair

DATE: _____

Assembly Committee on Commerce and Labor
May 15, 2015
Page 37

**EXHIBITS**

**Committee Name:** **Assembly Committee on Commerce and Labor**

**Date:** **May 15, 2015**                    **Time of Meeting:** **1:38 p.m.**

| Bill | Exhibit | Witness / Agency | Description |
|------|---------|------------------|-------------|
|  | A |  | Agenda |
|  | B |  | Attendance Roster |
| S.B. 12 | C | Kelly Richard, Committee Policy Analyst | Work Session Document |
| S.B. 146 (R1) | D | Kelly Richard, Committee Policy Analyst | Work Session Document |
| S.B. 162 (R1) | E | Kelly Richard, Committee Policy Analyst | Work Session Document |
| S.B. 168 (R1) | F | Kelly Richard, Committee Policy Analyst | Work Session Document |
| S.B. 181 (R1) | G | Kelly Richard, Committee Policy Analyst | Work Session Document |
| S.B. 193 (R1) | H | Kelly Richard, Committee Policy Analyst | Work Session Document |
| S.B. 241 (R3) | I | Kelly Richard, Committee Policy Analyst | Work Session Document |
| S.B. 286 (R1) | J | Kelly Richard, Committee Policy Analyst | Work Session Document |
| S.B. 341 (R1) | K | Kelly Richard, Committee Policy Analyst | Work Session Document |
| S.B. 370 (R1) | L | Kelly Richard, Committee Policy Analyst | Work Session Document |
| S.B. 393 (R1) | M | Kelly Richard, Committee Policy Analyst | Work Session Document |

# Exhibit E
# SB 241 as Enrolled

Senate Bill No. 241–Senator Roberson

CHAPTER..........

AN ACT relating to collective bargaining; authorizing, under certain circumstances, a local government employer to provide paid leave to an employee for time spent in providing services to an employee organization; reducing the amount of time within which the Local Government Employee-Management Relations Board must conduct a hearing relating to certain complaints; providing that a collective bargaining agreement between a local government employer and a recognized employee organization expires for certain purposes at the end of the term stated in the agreement; excluding certain school administrators from membership in a bargaining unit for the purposes of collective bargaining; revising various provisions relating to negotiations between a school district and an employee organization representing teachers or educational support personnel; providing that certain principals are employed at will; requiring certain postprobationary school administrators to apply for reappointment to their administrative positions; and providing other matters properly relating thereto.

**Legislative Counsel's Digest:**
    This bill makes various changes relating to collective bargaining. **Section 1** of this bill authorizes, under certain circumstances, a local government employer to provide leave to an employee for time spent by the employee in performing duties or providing services for an employee organization. **Section 1.2** of this bill makes a conforming change.
    Existing law requires the Local Government Employee-Management Relations Board to conduct a hearing within 180 days after deciding to hear a complaint arising out of the interpretation of, or performance under, the provisions of law relating to collective bargaining. (NRS 288.110) **Section 1.1** of this bill reduces that time to not later than 45 days if a complaint alleges that a local government employer or an employee organization has refused to bargain collectively in good faith unless the parties agree to waive the requirement.
    **Section 1.3** of this bill is directed to "evergreen" language in a collective bargaining agreement, pursuant to which the agreement remains in effect beyond the end of its stated term until a successor agreement becomes effective. Notwithstanding any such provision, **section 1.3** provides that upon the end of the term stated in a collective bargaining agreement, and until a successor agreement becomes effective, a local government employer shall not, with limited exceptions, increase any compensation or monetary benefits paid to or on behalf of employees in the affected bargaining unit.
    Existing law generally requires a local government employer to engage in collective bargaining with the recognized employee organization, if any, for each bargaining unit among its employees. (NRS 288.150) Existing law also requires employees in certain supervisory and administrative positions, including certain school administrators, to be members of a different bargaining unit from the



– 2 –

employees they supervise and entirely excludes certain other employees from membership in a bargaining unit. (NRS 288.140, 288.170) **Section 1.4** of this bill excludes school administrators whose annual salary, adjusted for inflation, is greater than $120,000 from membership in a bargaining unit, with the result that such administrators may not engage in collective bargaining with their employer. **Sections 2, 3 and 4** of this bill make conforming changes.

Existing law requires an employee organization that desires to negotiate to give written notice of that desire to the local government employer. If the subject of negotiation requires the budgeting of money by the local government employer, the notice must be given by the employee organization on or before February 1. (NRS 288.180) **Section 1.5** of this bill provides that if an employee organization represents teachers or educational support personnel and desires to negotiate, it must give written notice on or before January 1.

If, after four sessions of negotiation between a school district and an employee organization representing teachers and educational support personnel, the parties fail to reach an agreement, existing law provides that either party may submit the issues to an arbitrator. (NRS 288.217) **Section 1.6** of this bill requires that the parties have eight sessions of negotiation before the issues are submitted to an arbitrator. **Section 1.6** also requires the parties to: (1) select an arbitrator not later than 330 days before the end of the term stated in the existing collective bargaining agreement; and (2) schedule a hearing of not less than 3 consecutive business days.

Existing law authorizes any controversy concerning a prohibited practice relating to collective bargaining to be submitted to the Local Government Employee-Management Relations Board. (NRS 288.110, 288.280) **Section 1.7** of this bill requires the Board to conduct a hearing not later than 45 days after the Board decides to hear the complaint unless the parties agree to waive the requirement.

**Section 1.9** of this bill provides that during the first 3 years of employment by a school district, a principal is employed at-will. **Section 1.9** also provides that if a principal completes the 3-year probationary period, the principal again becomes an at-will employee if, in 2 consecutive school years: (1) the rating of the school to which the principal is assigned pursuant to the statewide system of accountability for public schools is reduced by one or more levels; and (2) fifty percent or more of the teachers assigned to the school request a transfer to another school. **Section 1.9** further provides that such a principal is subject to immediate dismissal by the board of trustees of the school district on recommendation of the superintendent of the school district.

**Section 1.95** of this bill provides that a postprobationary administrator, other than an administrator who is excluded from a bargaining unit or a principal, must apply to the superintendent of the school district for reappointment to his or her administrative position every 5 years.

**Sections 3.5-4.8** of this bill make changes to conform with **sections 1.9 and 1.95.**



— 3 —

EXPLANATION – Matter in *bolded italics* is new; matter between brackets [omitted material] is material to be omitted.

THE PEOPLE OF THE STATE OF NEVADA, REPRESENTED IN
SENATE AND ASSEMBLY, DO ENACT AS FOLLOWS:

**Section 1.**   Chapter 288 of NRS is hereby amended by adding
thereto a new section to read as follows:

*A local government employer may agree to provide leave to any
of its employees for time spent by the employee in performing
duties or providing services for an employee organization if the
full cost of such leave is paid or reimbursed by the employee
organization or is offset by the value of concessions made by the
employee organization in the negotiation of an agreement with the
local government employer pursuant to this chapter.*

**Sec. 1.1.**   NRS 288.110 is hereby amended to read as follows:

288.110   1.   The Board may make rules governing:

(a) Proceedings before it;

(b) Procedures for fact-finding;

(c) The recognition of employee organizations; and

(d) The determination of bargaining units.

2.   The Board may hear and determine any complaint arising
out of the interpretation of, or performance under, the provisions of
this chapter by any local government employer, local government
employee or employee organization. [The] *Except as otherwise
provided in this subsection and NRS 288.280, the* Board shall
conduct a hearing within 180 days after it decides to hear a
complaint. *If a complaint alleges a violation of paragraph (e) of
subsection 1 of NRS 288.270 or paragraph (b) of subsection 2 of
that section, the Board shall conduct a hearing not later than 45
days after it decides to hear the complaint, unless the parties agree
to waive this requirement.* The Board, after a hearing, if it finds that
the complaint is well taken, may order any person to refrain from
the action complained of or to restore to the party aggrieved any
benefit of which the party has been deprived by that action. The
Board shall issue its decision within 120 days after the hearing on
the complaint is completed.

3.   Any party aggrieved by the failure of any person to obey an
order of the Board issued pursuant to subsection 2, or the Board at
the request of such a party, may apply to a court of competent
jurisdiction for a prohibitory or mandatory injunction to enforce the
order.



– 4 –

4.   The Board may not consider any complaint or appeal filed more than 6 months after the occurrence which is the subject of the complaint or appeal.

5.   The Board may decide without a hearing a contested matter:

(a) In which all of the legal issues have been previously decided by the Board, if it adopts its previous decision or decisions as precedent; or

(b) Upon agreement of all the parties.

6.   The Board may award reasonable costs, which may include attorneys' fees, to the prevailing party.

**Sec. 1.2.**   NRS 288.150 is hereby amended to read as follows:

288.150   1.   Except as provided in subsection 4, every local government employer shall negotiate in good faith through one or more representatives of its own choosing concerning the mandatory subjects of bargaining set forth in subsection 2 with the designated representatives of the recognized employee organization, if any, for each appropriate bargaining unit among its employees. If either party so requests, agreements reached must be reduced to writing.

2.   The scope of mandatory bargaining is limited to:

(a) Salary or wage rates or other forms of direct monetary compensation.

(b) Sick leave.

(c) Vacation leave.

(d) Holidays.

(e) Other paid or nonpaid leaves of absence [.] *consistent with the provisions of this chapter.*

(f) Insurance benefits.

(g) Total hours of work required of an employee on each workday or workweek.

(h) Total number of days' work required of an employee in a work year.

(i) Discharge and disciplinary procedures.

(j) Recognition clause.

(k) The method used to classify employees in the bargaining unit.

(l) Deduction of dues for the recognized employee organization.

(m) Protection of employees in the bargaining unit from discrimination because of participation in recognized employee organizations consistent with the provisions of this chapter.

(n) No-strike provisions consistent with the provisions of this chapter.



(o) Grievance and arbitration procedures for resolution of disputes relating to interpretation or application of collective bargaining agreements.

(p) General savings clauses.

(q) Duration of collective bargaining agreements.

(r) Safety of the employee.

(s) Teacher preparation time.

(t) Materials and supplies for classrooms.

(u) The policies for the transfer and reassignment of teachers.

(v) Procedures for reduction in workforce consistent with the provisions of this chapter.

(w) Procedures and requirements for the reopening of collective bargaining agreements that exceed 1 year in duration for additional, further, new or supplementary negotiations during periods of fiscal emergency. The requirements for the reopening of a collective bargaining agreement must include, without limitation, measures of revenue shortfalls or reductions relative to economic indicators such as the Consumer Price Index, as agreed upon by both parties.

3.   Those subject matters which are not within the scope of mandatory bargaining and which are reserved to the local government employer without negotiation include:

(a) Except as otherwise provided in paragraph (u) of subsection 2, the right to hire, direct, assign or transfer an employee, but excluding the right to assign or transfer an employee as a form of discipline.

(b) The right to reduce in force or lay off any employee because of lack of work or lack of money, subject to paragraph (v) of subsection 2.

(c) The right to determine:

(1) Appropriate staffing levels and work performance standards, except for safety considerations;

(2) The content of the workday, including without limitation workload factors, except for safety considerations;

(3) The quality and quantity of services to be offered to the public; and

(4) The means and methods of offering those services.

(d) Safety of the public.

4.   Notwithstanding the provisions of any collective bargaining agreement negotiated pursuant to this chapter, a local government employer is entitled to take whatever actions may be necessary to carry out its responsibilities in situations of emergency such as a riot, military action, natural disaster or civil disorder. Those actions may include the suspension of any collective bargaining agreement



for the duration of the emergency. Any action taken under the provisions of this subsection must not be construed as a failure to negotiate in good faith.

    5.   The provisions of this chapter, including without limitation the provisions of this section, recognize and declare the ultimate right and responsibility of the local government employer to manage its operation in the most efficient manner consistent with the best interests of all its citizens, its taxpayers and its employees.

    6.   This section does not preclude, but this chapter does not require, the local government employer to negotiate subject matters enumerated in subsection 3 which are outside the scope of mandatory bargaining. The local government employer shall discuss subject matters outside the scope of mandatory bargaining but it is not required to negotiate those matters.

    7.   Contract provisions presently existing in signed and ratified agreements as of May 15, 1975, at 12 p.m. remain negotiable.

    **Sec. 1.3.**   NRS 288.155 is hereby amended to read as follows:

    288.155   ~~[Agreements entered into between local government employers and employee organizations pursuant to this chapter may]~~

    *1.   A collective bargaining agreement:*

    *(a) May* extend beyond the term of office of any member or officer of the local government employer.

    *(b) Expires for the purposes of this section at the end of the term stated in the agreement, notwithstanding any provision of the agreement that it remain in effect, in whole or in part, after the end of that term until a successor agreement becomes effective.*

    *2.   Except as otherwise provided in subsection 3 and notwithstanding any provision of the collective bargaining agreement to the contrary, upon the expiration of a collective bargaining agreement, if no successor agreement is effective and until a successor agreement becomes effective, a local government employer shall not pay to or on behalf of any employee in the affected bargaining unit any compensation or monetary benefits in any amount greater than the amount in effect as of the expiration of the collective bargaining agreement.*

    *3.   The provisions of subsection 2 do not prohibit a local government employer from paying:*

    *(a) An increase in compensation or monetary benefits during the first quarter of the next ensuing fiscal year of the local government employer after the expiration of a collective bargaining agreement; or*



*(b) An increase in the employer's portion of the matching contribution rate for employees and employers in accordance with an adjustment in the rate of contributions pursuant to NRS 286.450.*

**Sec. 1.4.** NRS 288.170 is hereby amended to read as follows:

288.170 1. Each local government employer which has recognized one or more employee organizations shall determine, after consultation with the recognized organization or organizations, which group or groups of its employees constitute an appropriate unit or units for negotiating. The primary criterion for that determination must be the community of interest among the employees concerned.

2. A ~~[principal, assistant principal or other school administrator below the rank of superintendent, associate superintendent or assistant superintendent shall not be a member of the same bargaining unit with public school teachers unless the school district employs fewer than five principals but may join with other officials of the same specified ranks to negotiate as a separate]~~ *school administrator whose annual salary, adjusted for inflation as provided in this subsection, is greater than $120,000 must be excluded from any* bargaining unit. *The annual salary provided in this subsection must be adjusted on July 1 of each year for the period beginning that day and ending on June 30 of the following year in a rounded dollar amount corresponding to the percentage of increase or decrease in the Consumer Price Index (All Items) published by the United States Department of Labor for the preceding calendar year. On April 1 of each year, the Commissioner shall determine the amount of the increase or decrease required by this subsection, establish the adjusted amount to take effect on July 1 of that year and notify each school district of the adjusted amount.*

3. A head of a department of a local government, an administrative employee or a supervisory employee must not be a member of the same bargaining unit as the employees under the direction of that department head, administrative employee or supervisory employee. Any dispute between the parties as to whether an employee is a supervisor must be submitted to the Board. An employee organization which is negotiating on behalf of two or more bargaining units consisting of firefighters or police officers, as defined in NRS 288.215, may select members of the units to negotiate jointly on behalf of each other, even if one of the units consists of supervisory employees and the other unit does not.



4.    Confidential employees of the local government employer must be excluded from any bargaining unit but are entitled to participate in any plan to provide benefits for a group that is administered by the bargaining unit of which they would otherwise be a member.

5.    If any employee organization is aggrieved by the determination of a bargaining unit, it may appeal to the Board. Subject to judicial review, the decision of the Board is binding upon the local government employer and employee organizations involved. The Board shall apply the same criterion as specified in subsection 1.

6.    As used in this section:

(a) "Confidential employee" means an employee who is involved in the decisions of management affecting collective bargaining.

(b) "Supervisory employee" means a supervisory employee described in paragraph (a) of subsection 1 of NRS 288.075.

**Sec. 1.5.**    NRS 288.180 is hereby amended to read as follows:

288.180    1.    Whenever an employee organization desires to negotiate concerning any matter which is subject to negotiation pursuant to this chapter, it shall give written notice of that desire to the local government employer. [If] *Except as otherwise provided in this subsection, if* the subject of negotiation requires the budgeting of money by the local government employer, the employee organization shall give notice on or before February 1. *If an employee organization representing teachers or educational support personnel desires to negotiate concerning any matter which is subject to negotiation pursuant to this chapter, it shall give the notice required by this subsection on or before January 1.*

2.    Following the notification provided for in subsection 1, the employee organization or the local government employer may request reasonable information concerning any subject matter included in the scope of mandatory bargaining which it deems necessary for and relevant to the negotiations. The information requested must be furnished without unnecessary delay. The information must be accurate, and must be presented in a form responsive to the request and in the format in which the records containing it are ordinarily kept. If the employee organization requests financial information concerning a metropolitan police department, the local government employers which form that department shall furnish the information to the employee organization.



– 9 –

3.   The parties shall promptly commence negotiations. As the first step, the parties shall discuss the procedures to be followed if they are unable to agree on one or more issues.

4.   This section does not preclude, but this chapter does not require, informal discussion between an employee organization and a local government employer of any matter which is not subject to negotiation or contract under this chapter. Any such informal discussion is exempt from all requirements of notice or time schedule.

**Sec. 1.6.**   NRS 288.217 is hereby amended to read as follows:

288.217   1.   The provisions of this section govern negotiations between school districts and employee organizations representing teachers and educational support personnel.

*2.   Not later than 330 days before the end of the term stated in their collective bargaining agreement, the parties shall select an arbitrator in the manner provided in subsection 2 of NRS 288.200 to conduct a hearing in the event that an impasse is declared pursuant to subsection 3. The parties and the arbitrator shall schedule a hearing of not less than 3 consecutive business days, to begin not later than June 10 immediately preceding the end of the term stated in the collective bargaining agreement or 60 days before the end of that term, whichever is earlier. As a condition of his or her selection, the arbitrator must agree to render a decision, if the hearing is held, within the time required by subsection 9. If the arbitrator fails or refuses to agree to any of the conditions stated in this subsection, the parties shall immediately proceed to select another arbitrator in the manner provided in subsection 2 of NRS 288.200 until an arbitrator is selected who agrees to those conditions.*

*3.*   If the parties to a negotiation pursuant to this section have failed to reach an agreement after at least [four] *eight* sessions of negotiation, either party may declare the negotiations to be at an impasse and, after 5 days' written notice is given to the other party, submit the issues remaining in dispute to [an] *the* arbitrator [.] *selected pursuant to subsection 2.* The arbitrator [must be selected in the manner provided in subsection 2 of NRS 288.200 and] has the powers provided for fact finders in NRS 288.210.

[3.] *4.*   The arbitrator shall, [within 30 days after the arbitrator is selected, and after 7 days' written notice is given to the parties,] *pursuant to subsection 2,* hold a hearing to receive information concerning the dispute. The hearing must be held in the county in which the school district is located and the arbitrator shall arrange for a full and complete record of the hearing.



– 10 –

[4.] *5.* The parties to the dispute shall each pay one-half of the costs of the arbitration.

[5.] *6.* A determination of the financial ability of a school district must be based on:

(a) All existing available revenues as established by the school district and within the limitations set forth in NRS 354.6241, with due regard for the obligation of the school district to provide an education to the children residing within the district.

(b) Consideration of funding for the current year being negotiated. If the parties mutually agree to arbitrate a multi-year contract the arbitrator must consider the ability to pay over the life of the contract being negotiated or arbitrated.

↪ Once the arbitrator has determined in accordance with this subsection that there is a current financial ability to grant monetary benefits, the arbitrator shall consider, to the extent appropriate, compensation of other governmental employees, both in and out of this State.

[6.] *7.* At the recommendation of the arbitrator, the parties may, before the submission of a final offer, enter into negotiations. If the negotiations are begun, the arbitrator may adjourn the hearing for a period of 3 weeks. If an agreement is reached, it must be submitted to the arbitrator, who shall certify it as final and binding.

[7.] *8.* If the parties do not enter into negotiations or do not agree within [30] *7* days after the hearing held pursuant to subsection [3,] *4,* each of the parties shall submit a single written statement containing its final offer for each of the unresolved issues.

[8.] *9.* The arbitrator shall, within 10 days after the final offers are submitted, render a decision on the basis of the criteria set forth in NRS 288.200. The arbitrator shall accept one of the written statements and shall report the decision to the parties. The decision of the arbitrator is final and binding on the parties. Any award of the arbitrator is retroactive to the expiration date of the last contract between the parties.

[9.] *10.* The decision of the arbitrator must include a statement:

(a) Giving the arbitrator's reason for accepting the final offer that is the basis of the arbitrator's award; and

(b) Specifying the arbitrator's estimate of the total cost of the award.

[10.] *11.* Within 45 days after the receipt of the decision from the arbitrator, the board of trustees of the school district shall hold a public meeting in accordance with the provisions of chapter 241 of NRS. The meeting must include a discussion of:



(a)  The issues submitted pursuant to subsection [2;] *3;*

(b)  The statement of the arbitrator pursuant to subsection [9;] *10;* and

(c)  The overall fiscal impact of the decision which must not include a discussion of the details of the decision.

↪ The arbitrator must not be asked to discuss the decision during the meeting.

[11.] *12.*   The superintendent of the school district shall report to the board of trustees the fiscal impact of the decision. The report must include, without limitation, an analysis of the impact of the decision on compensation and reimbursement, funding, benefits, hours, working conditions or other terms and conditions of employment.

[12.] *13.*   As used in this section:

(a)  "Educational support personnel" means all classified employees of a school district, other than teachers, who are represented by an employee organization.

(b)  "Teacher" means an employee of a school district who is licensed to teach in this State and who is represented by an employee organization.

**Sec. 1.7.**   NRS 288.280 is hereby amended to read as follows:

288.280   Any controversy concerning prohibited practices may be submitted to the Board in the same manner and with the same effect as provided in NRS 288.110, except that an alleged failure to provide information as provided by NRS 288.180 [shall] *must* be heard and determined by the Board as soon as possible after the complaint is filed with the Board [.] *and, in any case, not later than 45 days after the Board decides to hear the complaint, unless the parties agree to waive this requirement.*

**Sec. 1.8.**   Chapter 391 of NRS is hereby amended by adding thereto the provisions set forth as sections 1.9 and 1.95 of this act.

**Sec. 1.9.**   *1.  During the first 3 years of his or her employment by a school district in the position of principal, a principal is employed at-will in that position. A principal who is reassigned pursuant to this subsection is entitled to a written statement of the reason for the reassignment. If the principal was previously employed by the school district in another position and is reassigned pursuant to this section, the principal is entitled to be assigned to his or her former position at the rate of compensation provided for that position.*

*2.  A principal who completes the probationary period provided by NRS 391.3197 in the position of principal is again employed at-will if, in each of 2 consecutive school years:*



*(a)  The rating of the school to which the principal is assigned, as determined by the Department pursuant to the statewide system of accountability for public schools, is reduced by one or more levels; and*

*(b)  Fifty percent or more of the teachers assigned to the school request a transfer to another school.*

*3.  If the events described in paragraphs (a) and (b) of subsection 2 occur with respect to a school for any school year, the school district shall conduct a survey of the teachers assigned to the school to evaluate conditions at the school and the reasons given by teachers who requested a transfer to another school. The results of the survey do not affect the employment status of the principal of the school.*

*4.  A principal described in subsection 2 is subject to immediate dismissal by the board of trustees of the school district on recommendation of the superintendent and is entitled, on dismissal, to a written statement of the reasons for dismissal.*

**Sec. 1.95.  1.**  *Each    postprobationary    administrator employed by a school district, except an administrator excluded from any bargaining unit pursuant to NRS 288.170 or a principal, must apply to the superintendent for reappointment to his or her administrative position every 5 years.*

*2.  If an administrator is not reappointed to his or her administrative position pursuant to this section and was previously employed by the school district in another position, the administrator is entitled to be assigned to his or her former position at the rate of compensation provided for that position.*

**Sec. 2.**  NRS 391.166 is hereby amended to read as follows:

391.166  1.  There is hereby created the Grant Fund for Incentives for Licensed Educational Personnel to be administered by the Department. The Department may accept gifts and grants from any source for deposit in the Grant Fund.

2.  The board of trustees of each school district shall establish a program of incentive pay for licensed teachers, school psychologists, school librarians, school counselors and administrators employed at the school level which must be designed to attract and retain those employees. The program must be negotiated pursuant to chapter 288 of NRS *, insofar as the provisions of that chapter apply to those employees,* and must include, without limitation, the attraction and retention of:

(a) Licensed teachers, school psychologists, school librarians, school counselors and administrators employed at the school level who have been employed in that category of position for at least



5 years in this State or another state and who are employed in schools which are at-risk, as determined by the Department pursuant to subsection 8; and

(b) Teachers who hold a license or endorsement in the field of mathematics, science, special education, English as a second language or other area of need within the school district, as determined by the Superintendent of Public Instruction.

3.  A program of incentive pay established by a school district must specify the type of financial incentives offered to the licensed educational personnel. Money available for the program must not be used to negotiate the salaries of individual employees who participate in the program.

4.  If the board of trustees of a school district wishes to receive a grant of money from the Grant Fund, the board of trustees shall submit to the Department an application on a form prescribed by the Department. The application must include a description of the program of incentive pay established by the school district.

5.  The Superintendent of Public Instruction shall compile a list of the financial incentives recommended by each school district that submitted an application. On or before December 1 of each year, the Superintendent shall submit the list to the Interim Finance Committee for its approval of the recommended incentives.

6.  After approval of the list of incentives by the Interim Finance Committee pursuant to subsection 5 and within the limits of money available in the Grant Fund, the Department shall provide grants of money to each school district that submits an application pursuant to subsection 4 based upon the amount of money that is necessary to carry out each program. If an insufficient amount of money is available to pay for each program submitted to the Department, the amount of money available must be distributed pro rata based upon the number of licensed employees who are estimated to be eligible to participate in the program in each school district that submitted an application.

7.  An individual employee may not receive as a financial incentive pursuant to a program an amount of money that is more than $3,500 per year.

8.  The Department shall, in consultation with representatives appointed by the Nevada Association of School Superintendents and the Nevada Association of School Boards, develop a formula for identifying at-risk schools for purposes of this section. The formula must be developed on or before July 1 of each year and include, without limitation, the following factors:



– 14 –

(a) The percentage of pupils who are eligible for free or reduced-price lunches pursuant to 42 U.S.C. §§ 1751 et seq.;

(b) The transiency rate of pupils;

(c) The percentage of pupils who are limited English proficient;

(d) The percentage of pupils who have individualized education programs; and

(e) The percentage of pupils who drop out of high school before graduation.

9.   The board of trustees of each school district that receives a grant of money pursuant to this section shall evaluate the effectiveness of the program for which the grant was awarded. The evaluation must include, without limitation, an evaluation of whether the program is effective in recruiting and retaining the personnel as set forth in subsection 2. On or before December 1 of each year, the board of trustees shall submit a report of its evaluation to the:

(a) Governor;

(b) State Board;

(c) Interim Finance Committee;

(d) If the report is submitted in an even-numbered year, Director of the Legislative Counsel Bureau for transmittal to the next regular session of the Legislature; and

(e) Legislative Committee on Education.

**Sec. 3.**   NRS 391.168 is hereby amended to read as follows:

391.168   1.   The board of trustees of each school district shall:

(a) Establish a program of performance pay and enhanced compensation for the recruitment and retention of licensed teachers and administrators which must be negotiated pursuant to chapter 288 of NRS [-] , *insofar as the provisions of that chapter apply to those employees;* and

(b) Commencing with the 2015-2016 school year, implement the program established pursuant to paragraph (a).

2.   The   program   of   performance   pay   and   enhanced compensation established by a school district pursuant to subsection 1 must have as its primary focus the improvement in the academic achievement of pupils and must give appropriate consideration to implementation in at-risk schools. In addition, the program may include, without limitation, the following components:

(a) Career leadership advancement options to maximize the retention of teachers in the classroom and the retention of administrators;

(b) Professional development;

(c) Group incentives; and



– 15 –

(d) Multiple assessments of individual teachers and administrators, with primary emphasis on individual pupil improvement and growth in academic achievement, including, without limitation, portfolios of instruction, leadership and professional growth, and other appropriate measures of teacher and administrator performance which must be considered.

**Sec. 3.3.**   NRS 391.311 is hereby amended to read as follows:

391.311   As used in NRS 391.311 to 391.3197, inclusive, ***and sections 1.9 and 1.95 of this act*** unless the context otherwise requires:

1.   "Administrator" means any employee who holds a license as an administrator and who is employed in that capacity by a school district.

2.   "Board" means the board of trustees of the school district in which a licensed employee affected by NRS 391.311 to 391.3197, inclusive, ***and sections 1.9 and 1.95 of this act*** is employed.

3.   "Demotion" means demotion of an administrator to a position of lesser rank, responsibility or pay and does not include transfer or reassignment for purposes of an administrative reorganization.

4.   "Immorality" means:

(a) An act forbidden by NRS 200.366, 200.368, 200.400, 200.508, 201.180, 201.190, 201.210, 201.220, 201.230, 201.265, 201.540, 201.560, 207.260, 453.316 to 453.336, inclusive, except an act forbidden by NRS 453.337, 453.338, 453.3385 to 453.3405, inclusive, 453.560 or 453.562; or

(b) An act forbidden by NRS 201.540 or any other sexual conduct or attempted sexual conduct with a pupil enrolled in an elementary or secondary school. As used in this paragraph, "sexual conduct" has the meaning ascribed to it in NRS 201.520.

5.   "Postprobationary employee" means an administrator or a teacher who has completed the probationary period as provided in NRS 391.3197 and has been given notice of reemployment. The term does not include a person who is deemed to be a probationary employee pursuant to NRS 391.3129.

6.   "Probationary employee" means:

(a) An administrator or a teacher who is employed for the period set forth in NRS 391.3197; and

(b) A person who is deemed to be a probationary employee pursuant to NRS 391.3129.

7.   "Superintendent" means the superintendent of a school district or a person designated by the board or superintendent to act as superintendent during the absence of the superintendent.



– 16 –

8.   "Teacher" means a licensed employee the majority of whose working time is devoted to the rendering of direct educational service to pupils of a school district.

**Sec. 3.5.**   NRS 391.3115 is hereby amended to read as follows:

391.3115   1.   The demotion, suspension, dismissal and nonreemployment provisions of NRS 391.311 to 391.3197, inclusive, do not apply to:

(a)  Substitute teachers; or

(b)  Adult education teachers.

2.   The admonition, demotion, suspension, dismissal and nonreemployment provisions of NRS 391.311 to 391.3194, inclusive, do not apply to:

(a)  A probationary teacher. The policy for evaluations prescribed in NRS 391.3125 and 391.3128 applies to a probationary teacher.

(b)  *A principal described in subsection 1 of section 1.9 of this act with respect to his or her employment as a principal.*

(c)  *A principal who is employed at-will pursuant to subsection 2 of section 1.9 of this act.*

(d)  *An administrator described in subsection 2 of section 1.95 of this act.*

(e)  *A* new employee who is employed as a probationary administrator primarily to provide administrative services at the school level and not primarily to provide direct instructional services to pupils, regardless of whether licensed as a teacher or administrator, including, without limitation, a principal and vice principal. [The]

➨ *Insofar as it is consistent with the provisions of sections 1.9 and 1.95 of this act, the* policy for evaluations prescribed in NRS 391.3127 and 391.3128 applies to [such a probationary] *any* administrator [.] *described in this subsection.*

3.   The admonition, demotion and suspension provisions of NRS 391.311 to 391.3194, inclusive, do not apply to a postprobationary teacher who is employed as a probationary administrator primarily to provide administrative services at the school level and not primarily to provide direct instructional services to pupils, regardless of whether licensed as a teacher or administrator, including, without limitation, a principal and vice principal, with respect to his or her employment in the administrative position. The policy for evaluations prescribed in NRS 391.3127 and 391.3128 applies to such a probationary administrator.



4.   The provisions of NRS 391.311 to 391.3194, inclusive, do not apply to a teacher whose employment is suspended or terminated pursuant to subsection 3 of NRS 391.120 or NRS 391.3015 for failure to maintain a license in force.

5.   A licensed employee who is employed in a position fully funded by a federal or private categorical grant or to replace another licensed employee during that employee's leave of absence is employed only for the duration of the grant or leave. Such a licensed employee and licensed employees who are employed on temporary contracts for 90 school days or less, or its equivalent in a school district operating under an alternative schedule authorized pursuant to NRS 388.090, to replace licensed employees whose employment has terminated after the beginning of the school year are entitled to credit for that time in fulfilling any period of probation and during that time the provisions of NRS 391.311 to 391.3197, inclusive, for demotion, suspension or dismissal apply to them.

Sec. 4.   NRS 391.3116 is hereby amended to read as follows:

391.3116   Excluding the provisions of NRS 391.3129, *and sections 1.9 and 1.95 of this act,* the provisions of NRS 391.311 to 391.3197, inclusive, do not apply to a teacher [, administrator,] or other licensed employee who has entered into a contract with the board negotiated pursuant to chapter 288 of NRS if the contract contains separate provisions relating to the board's right to dismiss or refuse to reemploy the employee . [or demote an administrator.]

Sec. 4.2.   NRS 391.3127 is hereby amended to read as follows:

391.3127   *Except as otherwise provided in sections 1.9 and 1.95 of this act:*

1.   Each board, following consultation with and involvement of elected representatives of administrative personnel or their designated representatives, shall develop an objective policy for the objective evaluation of administrators in narrative form. The policy must provide for the evaluation of those administrators who provide primarily administrative services at the school level and who do not provide primarily direct instructional services to pupils, regardless of whether such an administrator is licensed as a teacher or administrator, including, without limitation, a principal and a vice principal. The policy must comply with the statewide performance evaluation system established by the State Board pursuant to NRS 391.465. The policy must set forth a means according to which an administrator's overall performance is determined to be highly effective, effective, minimally effective or ineffective. Except as otherwise provided in subsection 8, the policy must require that pupil achievement data, as prescribed by the State Board pursuant to



– 18 –

NRS 391.465, account for at least 50 percent of the evaluation. The policy may include an evaluation by the administrator, superintendent, pupils or other administrators or any combination thereof. A copy of the policy adopted by the board must be filed with the Department and made available to the Commission.

    2.  The person charged with the evaluation of an administrator pursuant to this section shall hold a conference with the administrator before and after each scheduled observation of the administrator during the school year.

    3.  A probationary administrator must be evaluated three times during each school year of his or her probationary employment. Each evaluation must include at least one scheduled observation of the probationary administrator during the school year as follows:

    (a) The first scheduled observation must occur within 40 days after the first day of instruction of the school year;

    (b) The second scheduled observation must occur after 40 days but within 80 days after the first day of instruction of the school year; and

    (c) The third scheduled observation must occur after 80 days but within 120 days after the first day of instruction of the school year.

    4.  If a postprobationary administrator receives an evaluation designating his or her overall performance as minimally effective or ineffective, the postprobationary administrator must be evaluated three times in the immediately succeeding school year in accordance with the observation schedule set forth in subsection 3. If a postprobationary administrator is evaluated three times in a school year and he or she receives an evaluation designating his or her overall performance as minimally effective or ineffective on the first or second evaluation, or both evaluations, the postprobationary administrator may request that the third evaluation be conducted by another administrator. If a postprobationary administrator requests that his or her third evaluation be conducted by another administrator, that administrator must be:

    (a) Employed by the school district or, if the school district has five or fewer administrators, employed by another school district in this State; and

    (b) Selected by the postprobationary administrator from a list of three candidates submitted by the superintendent.

    5.  If a postprobationary administrator receives an evaluation designating his or her overall performance as effective, the postprobationary administrator must be evaluated one time in the immediately succeeding school year. The evaluation must include at least two scheduled observations as follows:



(a) The first scheduled observation must occur within 80 days after the first day of instruction of the school year; and

(b) The second scheduled observation must occur after 80 days but within 120 days after the first day of instruction of the school year.

6.  If a postprobationary administrator receives an evaluation designating his or her overall performance as highly effective, the postprobationary administrator must be evaluated one time in the immediately succeeding school year. The evaluation must include at least one scheduled observation which must occur within 120 days after the first day of instruction of the school year.

7.  The evaluation of an administrator pursuant to this section must comply with the regulations of the State Board adopted pursuant to NRS 391.465, which must include, without limitation:

(a) An evaluation of the instructional leadership practices of the administrator at the school;

(b) An evaluation of the professional responsibilities of the administrator to support learning and promote the effectiveness of the school community;

(c) Except as otherwise provided in subsection 8, an evaluation of the performance of pupils enrolled in the school;

(d) An evaluation of whether the administrator employs practices and strategies to involve and engage the parents and families of pupils enrolled in the school;

(e) Recommendations for improvements in the performance of the administrator; and

(f) A description of the action that will be taken to assist the administrator in the areas of instructional leadership practice, professional responsibilities and the performance of pupils.

8.  The evaluation of a probationary administrator in his or her initial year of probationary employment must not include an evaluation of the performance of pupils enrolled in the school. This subsection does not apply to a postprobationary employee who is deemed to be a probationary employee pursuant to NRS 391.3129.

9.  Each probationary administrator is subject to the provisions of NRS 391.3128 and 391.3197.

10.  Before a superintendent transfers or assigns an administrator to another administrative position as part of an administrative reorganization, if the transfer or reassignment is to a position of lower rank, responsibility or pay, the superintendent shall give written notice of the proposed transfer or assignment to the administrator at least 30 days before the date on which it is to be effective. The administrator may appeal the decision of the



– 20 –

superintendent to the board by requesting a hearing in writing to the president of the board within 5 days after receiving the notice from the superintendent. The board shall hear the matter within 10 days after the president receives the request, and shall render its decision within 5 days after the hearing. The decision of the board is final.

   **Sec. 4.4.**   NRS 391.3129 is hereby amended to read as follows:

   391.3129   ~~[A]~~ ***Except as otherwise provided in section 1.9 of this act, a*** postprobationary employee who receives an evaluation designating his or her overall performance as:

   1.   If evaluated pursuant to NRS 391.3125 or 391.3127, as applicable:

   (a)  Minimally effective;

   (b)  Ineffective; or

   (c)  Minimally effective during 1 year of the 2-year consecutive period and ineffective during the other year of the period; or

   2.   If evaluated pursuant to any other system of evaluation, any designation which indicates that the overall performance of the employee is below average,

   ↪  for 2 consecutive school years shall be deemed to be a probationary employee for the purposes of NRS 391.311 to 391.3197, inclusive, and must serve an additional probationary period in accordance with the provisions of NRS 391.3197.

   **Sec. 4.6.**   NRS 391.317 is hereby amended to read as follows:

   391.317   ***Except as otherwise provided in sections 1.9 and 1.95 of this act:***

   1.   At least 15 days before recommending to a board that it demote, dismiss or not reemploy a postprobationary employee, the superintendent shall give written notice to the employee, by registered or certified mail, of the superintendent's intention to make the recommendation.

   2.   The notice must:

   (a)  Inform the licensed employee of the grounds for the recommendation.

   (b)  Inform the employee that, if a written request therefor is directed to the superintendent within 10 days after receipt of the notice, the employee is entitled to a hearing before a hearing officer pursuant to NRS 391.315 to 391.3194, inclusive, or if a dismissal of the employee will occur before the completion of the current school year or if the employee is deemed to be a probationary employee pursuant to NRS 391.3129 and dismissal of the employee will occur before the completion of the current school year, the employee may request an expedited hearing pursuant to subsection 3.

   (c)  Refer to chapter 391 of NRS.



– 21 –

3.   If a postprobationary employee or an employee who is deemed to be a probationary employee pursuant to NRS 391.3129 receives notice that he or she will be dismissed before the completion of the current school year, the employee may request an expedited hearing pursuant to the Expedited Labor Arbitration Procedures established by the American Arbitration Association or its successor organization. If the employee elects to proceed under the expedited procedures, the provisions of NRS 391.3161, 391.3192 and 391.3193 do not apply.

   **Sec. 4.8.**   NRS 391.3197 is hereby amended to read as follows:

   391.3197   *Except as otherwise provided in section 1.9 of this act:*

   1.   A probationary employee is employed on a contract basis for three 1-year periods and has no right to employment after any of the three probationary contract years.

   2.   The board shall notify each probationary employee in writing on or before May 1 of the first, second and third school years of the employee's probationary period, as appropriate, whether the employee is to be reemployed for the second or third year of the probationary period or for the fourth school year as a postprobationary employee. Failure of the board to notify the probationary employee in writing on or before May 1 in the first or second year of the probationary period does not entitle the employee to postprobationary status. The employee must advise the board in writing on or before May 10 of the first, second or third year of the employee's probationary period, as appropriate, of the employee's acceptance of reemployment. If a probationary employee is assigned to a school that operates all year, the board shall notify the employee in writing, in the first, second and third years of the employee's probationary period, no later than 45 days before his or her last day of work for the year under his or her contract whether the employee is to be reemployed for the second or third year of the probationary period or for the fourth school year as a postprobationary employee. Failure of the board to notify a probationary employee in writing within the prescribed period in the first or second year of the probationary period does not entitle the employee to postprobationary status. The employee must advise the board in writing within 10 days after the date of notification of his or her acceptance or rejection of reemployment for another year. Failure to advise the board of the employee's acceptance of reemployment pursuant to this subsection constitutes rejection of the contract.

   3.   A probationary employee who:

   (a) Completes a 3-year probationary period;



– 22 –

(b) Receives a designation of "highly effective" or "effective" on each of his or her performance evaluations for 2 consecutive school years; and

(c) Receives a notice of reemployment from the school district in the third year of the employee's probationary period,
➥ is entitled to be a postprobationary employee in the ensuing year of employment.

4.   If a probationary employee is notified that the employee will not be reemployed for the school year following the 3-year probationary period, his or her employment ends on the last day of the current school year. The notice that the employee will not be reemployed must include a statement of the reasons for that decision.

5.   A new employee who is employed as an administrator to provide primarily administrative services at the school level and who does not provide primarily direct instructional services to pupils, regardless of whether the administrator is licensed as a teacher or administrator, including, without limitation, a principal and vice principal, or a postprobationary teacher who is employed as an administrator to provide those administrative services shall be deemed to be a probationary employee for the purposes of this section and must serve a 3-year probationary period as an administrator in accordance with the provisions of this section. If:

(a) A postprobationary teacher who is an administrator is not reemployed as an administrator after any year of his or her probationary period; and

(b) There is a position as a teacher available for the ensuing school year in the school district in which the person is employed,
➥ the board of trustees of the school district shall, on or before May 1, offer the person a contract as a teacher for the ensuing school year. The person may accept the contract in writing on or before May 10. If the person fails to accept the contract as a teacher, the person shall be deemed to have rejected the offer of a contract as a teacher.

6.   An administrator who has completed his or her probationary period pursuant to subsection 5 and is thereafter promoted to the position of principal must serve an additional probationary period of [1 year] *2 years* in the position of principal. If an administrator is promoted to the position of principal before completion of his or her probationary period pursuant to subsection 5, the administrator must serve the remainder of his or her probationary period pursuant to subsection 5 or an additional probationary period of [1 year] *2 years* in the position of principal, whichever is longer. If the administrator



– 23 –

serving the additional probationary period is not reemployed as a principal after the expiration of the probationary period or additional probationary period, as applicable, the board of trustees of the school district in which the person is employed shall, on or before May 1, offer the person a contract for the ensuing school year for the administrative position in which the person attained postprobationary status. The person may accept the contract in writing on or before May 10. If the person fails to accept such a contract, the person shall be deemed to have rejected the offer of employment.

7.   If a probationary employee receives notice that he or she will be dismissed before the completion of the current school year, the probationary employee may request an expedited hearing pursuant to the Expedited Labor Arbitration Procedures established by the American Arbitration Association or its successor organization.

**Sec. 5.**   Insofar as they conflict with the provisions of such an agreement, the amendatory provisions of this act do not apply during the current term of any contract of employment or collective bargaining agreement entered into before the effective date of this act, but do apply to any extension or renewal of such an agreement and to any agreement entered into on or after the effective date of this act. For the purposes of this section, the term of an agreement ends on the date provided in the agreement, notwithstanding any provision of the agreement that it remains in effect, in whole or in part, after that date until a successor agreement becomes effective.

**Sec. 6.**   This act becomes effective upon passage and approval.



20   ~~~~~   15

